[NOT YET SCHEDULED FOR ORAL ARGUMENT]

**No. 25-5326**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

LISA D. COOK,
in her official capacity as a member of the Board of Governors of the
Federal Reserve System and her personal capacity,

*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Columbia

---

## EMERGENCY MOTION FOR A STAY PENDING APPEAL AND
## ADMINISTRATIVE STAY

---

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
LAURA E. MYRON
DANIEL AGUILAR
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiff is Lisa D. Cook, in her official capacity as a member of the Board of Governors of the Federal Reserve System and her personal capacity.  Defendants are Donald J. Trump, in his official capacity as President of the United States of America; the Board of Governors of the Federal Reserve System both collectively and in their individual official capacities; and Jerome H. Powell, in his official capacity as Chair of the Board of Governors of the Federal Reserve System.

Azoria Capital, Inc. and James T. Fishback appeared as amici curiae in the district court.  K.L. Smith, Jason Goodman, Martin Akerman, and William Michael Cunningham filed pro se motions to appear as amici curiae.  There have been no intervenors.

### B.    Ruling Under Review

The ruling under review is an order granting a preliminary injunction (Dkt. 28) and opinion (Dkt. 27) that the district court (Judge Jia M. Cobb) issued on September 9, 2025. The opinion and order are attached to this motion.

**C.    Related Cases**

This case has not previously been before this Court.

*Wilcox v. Trump*, No. 25-5057 (D.C. Cir.); *Harris v. Bessent*, No. 25-5055 (D.C. Cir.); *Grundmann v. Trump*, No. 25-5165 (D.C. Cir.); *Slaughter v. Trump*, No. 25-5261 (D.C. Cir.), and *Boyle v. Trump*, No. 25-1687 (4th Cir.), involve challenges to the President's removal of principal officers from multimember agencies with statutory removal restrictions.

/s/    *Daniel Aguilar*
Daniel Aguilar
  *Attorney, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

STATEMENT ............................................................................................ 4

ARGUMENT ............................................................................................. 8

I.  The Government Is Likely To Prevail On The Merits ......................... 8

    A.  The President's Determination Is Unreviewable Or At Most Reviewable Under The *Ultra Vires* Standard ................... 8

    B.  The President Had Cause To Remove Cook From Office Based On Her Apparent Contradictory Attestations Made To Benefit Herself ................................................................. 10

    C.  Cook Does Not Have A Due Process Interest In A Hearing ..... 16

II.  The Remaining Factors Favor A Stay .................................................. 20

CONCLUSION .......................................................................................... 24

CERTIFICATE OF COMPLIANCE

ATTACHMENT A: District Court Opinion

ATTACHMENT B: District Court Order

ATTACHMENT C: Hearing Transcript

## INTRODUCTION

This appeal arises from an order enjoining the President's removal for cause of plaintiff Lisa Cook as a member of the Board of Governors of the Federal Reserve System. The President removed Cook for cause under 12 U.S.C. § 242 after detailing misrepresentations Cook had made in mortgage applications—misrepresentations that would constitute mortgage fraud if made knowingly, and that at a minimum reflect a lack of care in financial matters that the President determined was inconsistent with Cook's holding a position of public financial trust on the Federal Reserve Board. The district court nonetheless preliminarily enjoined Cook's removal, holding that the President lacked cause to remove Cook because she made the misrepresentations before she assumed office and that Cook had not been afforded sufficient notice or an opportunity to be heard before the President removed her. That extraordinary order countermanding the President's exercise of his Article II authority rests on a series of legal errors and should be stayed pending appeal.

*First*, under longstanding Supreme Court precedent, when a statute gives a power of removal "for cause," without any specification of the causes, the removal decision "is a matter of discretion and not reviewable." *Reagan v. United States*, 182 U.S. 419, 425 (1901). And even if the decision

were reviewable, Cook would have to show that the President acted *ultra vires—i.e.*, contrary to a specific statutory prohibition that is clear and mandatory—a standard that Cook does not come close to satisfying.

*Second*, under any standard, the President had clear cause to remove Cook from office.  As a Governor, Cook serves on the Federal Open Market Committee which "has exclusive control over the open market operations of the entire Federal Reserve System," which "affects the ability of banks to make loans and investments" and "has a substantial impact on interest rates and investment activity in the economy as a whole." *Federal Open Market Committee of Federal Reserve System v. Merrill*, 443 U.S. 340, 343-44 (1979).  Here, the evidence—which Cook has yet to offer contrary explanation for—was that she applied for two loans for her personal benefit, and was able to obtain favorable interest rates by misrepresenting where she lived.  Op. 5.  Regardless of whether that misconduct occurred before or during office, it indisputably calls into question Cook's trustworthiness and whether she can be a responsible steward of the interest rates and economy for the whole Nation.  Indeed, the district court had no problem confirming that the President would have cause to remove Cook if she was convicted of mortgage fraud based on her conduct before taking office.  Op. 21-22.  Criminal conviction is not a prerequisite for removal under 12 U.S.C. § 242,

and the President acted lawfully in removing Cook from office.

*Third*, there is no basis under the Due Process Clause for enjoining the President's removal of a principal officer. Cook does not hold a personal property interest in her position, as a "public office is not property" and her role as a principal officer "to the public is inconsistent with either a property or a contract right." *Taylor v. Beckham*, 178 U.S. 548, 576-77 (1900). And here, the President clearly made public both the factual basis for his concern and his judgment that Cook's conduct constituted grounds for removal. Cook does not allege that she sought to offer any evidence to the President or anyone else that would explain her actions, either after the President first called on her to resign, *see* Dkt. 1 at 14, ¶¶ 44-46, or even through this litigation. For a "hearing mandated by the Due Process Clause [] to serve any useful purpose, there must be some factual dispute," and "the absence of" materially disputed facts "is fatal to [plaintiff's] claim under the Due Process Clause that [she] should have been given a hearing." *Codd v. Velger*, 429 U.S. 624, 627 (1977).

*Finally*, the Supreme Court has established that the balance of equities favors the government when a district court reinstates a removed principal officer. *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025); *Trump v. Boyle*, 145 S. Ct. 2653 (2025). The equitable calculus is identical here. *See*

*Grundmann v. Trump*, 2025 WL 1840641, at *1 (D.C. Cir. July 3, 2025) (granting a stay pending appeal because "[t]he Supreme Court's reasoning fully applies to" the reinstatement of other principal officers).

We respectfully request a stay pending appeal and an immediate administrative stay, consistent with the administrative stays granted in *Trump v. Wilcox*, No. 24A966 (U.S. Apr. 9, 2025), *Trump v. Slaughter*, No. 25A264 (U.S. Sept. 8, 2025), and *Grundmann v. Trump*, No. 25-5165 (D.C. Cir. June 18, 2025), which similarly involved district court orders reinstating principal officers who had been removed by the President.  We also respectfully request that the Court act on the request for an administrative stay or a stay pending appeal by the close of business on Monday, September 15, 2025, as the Federal Open Market Committee— which includes the Board of Governors—is scheduled to meet and may direct open market activities for Federal Reserve Banks on September 16.

## STATEMENT

**1.** There are seven Governors on the Board of the Federal Reserve System, all appointed by the President with the advice and consent of the Senate.  12 U.S.C. §§ 241-242.  Governors serve staggered fourteen-year terms, "unless sooner removed for cause by the President."  *Id.* § 242. "[T]he Government does not contest the constitutionality of the 'for cause'

removal restrictions for [the] Board Governors." Op. 9.

The Federal Reserve Governors "overse[e] the operations of the regional Reserve Banks, including by setting policies for Reserve Banks' lending of money to private banks and provision of other financial services," while also "regulat[ing] certain private financial institutions and activities." *Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*, 43 Op. O.L.C. ____, 2019 WL 11594453, at *2 (Oct. 23, 2019). All the Governors and five presidents of the regional Reserve Banks serve on the Federal Open Market Committee, which "expands [and] contracts the supply of money in the United States." *Id.* at *3. This occurs through open market operations that raise and lower interest rates, which "has a 'substantial impact' on 'investment activity in the economy as a whole,'" *id.*, making these operations "the most important monetary policy instrument of the Federal Reserve System," *Merrill*, 443 U.S. at 343; *see also* 12 U.S.C. § 263.

**2.** In 2023, President Biden nominated Lisa Cook to serve as a Governor and the Senate confirmed her later that year. Op. 4. On August 15, 2025, the Director of the Federal Housing Finance Agency sent a referral letter to the Department of Justice raising evidence of apparent mortgage fraud by Cook based on misstatements in her mortgage

agreements before she was nominated and confirmed to the Board.  Op. 5.
The letter stated that in June 2021, Cook had acquired a $203,000 loan for
a property in Ann Arbor, Michigan, based on Cook's representation that she
would "use the Property as [her] principal residence * * * for at least one
year after the date of occupancy."  Dkt. 1-2 at 2-3.  Two weeks later, in July
2021, Cook obtained a $540,000 loan for a second property in Atlanta,
Georgia, based on her affirmance that this property would "serve as her
primary residence for a full year."  Dkt. 1-2 at 3.  The letter stated that this
Georgia property was listed for rent in 2022, and Cook "has not disclosed
any rental income tied to this address."  *Id.*

The letter was made public on August 20, 2025; that same day, the
President called on Cook to resign.  Op. 5.  The President reiterated that call
two days later in a public interview, stating that he would fire Cook if she
did not resign.  *Id.*  Cook has not made any attempt to explain her actions,
meaningfully dispute the allegations, or otherwise clarify how she obtained
$743,000 in loans for her own benefit by stating that she would live in two
places at once.

On August 25, 2025, the President removed Cook as a Governor for
cause, because the "American people must be able to have full confidence in
the honest of the members entrusted with setting policy and overseeing the

6

Federal Reserve." Op. 6. Based on Cook's misconduct, the President determined that neither he nor the public could "have such confidence in [her] integrity." Op. 6.

**3.** Cook sued the President, Jerome Powell as Chair of the Federal Reserve, and the Federal Reserve Board of Governors to enjoin her removal. Op. 6-7. Cook moved for a temporary restraining order, but because the parties were able to engage in briefing and a court hearing, the court construed the motion as seeking a preliminary injunction. Op. 2.

The district court granted a preliminary injunction, holding that "the permissible grounds 'for cause' removal" in 12 U.S.C. § 242 "are limited to grounds concerning an official's behavior in office and whether they have been faithfully and effectively executing statutory duties." Op. 9. Because the President removed Cook based on her misconduct before she took office, the court ruled the President likely lacked cause to remove her. Op. 26-27.

The court also held that Cook's removal likely violated due process because Cook "has a protected property interest in her 'for cause'-protected role as a member of the Board of Governors." Op. 32. Based on that conclusion, the court further determined that Cook was entitled to a pre-deprivation hearing before being removed, based on the balancing factors

of *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).  Op. 33-39.

The court concluded that Cook would face irreparable harm from being removed from a "unique Presidentially appointed and Senate-confirmed role with significant responsibility," Op. 39, and that the equities weighed in favor of a preliminary injunction ordering Cook's reinstatement to office, Op. 45-47.  The court denied the government's request for a stay pending appeal.  Op. 48-49.

## ARGUMENT

In considering a stay pending appeal, this Court considers four factors: the likelihood of success on the merits, the movant's irreparable injury, the balance of harms, and the public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009).  Because those factors uniformly favor the government, a stay pending appeal is warranted.

## I.    The Government Is Likely To Prevail On The Merits

### A.    The President's Determination Is Unreviewable Or At Most Reviewable Under The *Ultra Vires* Standard

The President's "power to remove—and thus to supervise—those who wield executive power on his behalf" is "conclusive and preclusive."  *Trump v. United States*, 503 U.S. 593, 608-09 (2024).  "Congress cannot act on, and courts cannot examine, the President's actions" within this sphere.  *Id.* Thus the Supreme Court has long held that removal "for cause," but not

further specified, "is a matter of discretion and not reviewable." *Reagan v. United States*, 182 U.S. 419, 425 (1901). *Accord* Montgomery H. Throop, *A Treatise on the Law Relating to Public Officers* § 396, at 387 (1892) ("[W]here a statute gives a power of removal 'for cause,' without any specification of the causes, this power is of a discretionary and judicial nature; and unless the statute otherwise specifically provides, the exercise thereof cannot be reviewed in any other tribunal, with respect either to the cause, or it is sufficiency or existence, or otherwise.").

*Reagan* considered a court officer who by statute could be removed "for causes prescribed by law," 182 U.S. at 424, but Congress had not provided for or further specified such causes, *id.* at 425-26. When the officer challenged his removal as unlawful, the Supreme Court affirmed dismissal of the case, explaining that "when causes are not defined nor removal for cause provided for, [it] is a matter of discretion and not reviewable." *Id.* at 425. That rule applies here with equal force.

If there were any review, it would be extremely narrow and circumscribed, which even the district court recognized. Op. 25 (recognizing that a court may not review whether a specified permissible cause was sufficient to warrant removal). Indeed, Cook's complaint does not identify a free-standing statutory cause of action, and her suit boils

9

down to a claim that the President acted *ultra vires*.  That method of review is "essentially a Hail Mary pass" and requires Cook to demonstrate that the President plainly acted "contrary to a specific prohibition in the statute that is clear and mandatory."  *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).  Cook cannot demonstrate such an "extreme" departure from statutory commands, *id.*, and under any standard of review the government is likely to succeed on the merits.

### B.    The President Had Cause To Remove Cook From Office Based On Her Apparent Contradictory Attestations Made To Benefit Herself

As the district court noted, "for cause" has long been understood to "relat[e] to the conduct, ability, *fitness*, or *competence* of the officer."  Op. 11 (quoting Black's Law Dictionary 796 (3d ed. 1933)) (emphasis added). But the court fundamentally erred in holding that the President lacked such cause for removal here.

The Governors of the Federal Reserve System are entrusted with the critical responsibility of managing the money supply of the United States, ensuring that Federal Reserve notes serve as an elastic currency that can meet the country's demand for liquidity, and appropriately using the purchase and sale of government securities to reach target interest rates for the economy as a whole.

Cook has been accused of financial misconduct, misrepresenting the terms of her personal loans to inure to her own benefit by receiving lower interest rates than might otherwise be offered to her.  Dkt. 1-2 at 2-3.  If those contradictory representations were made knowingly, they could constitute federal felonies.  *See, e.g.*, 18 U.S.C. § 1344 (bank fraud); *id.* § 1014 (false statements to financial institution).  And if they were made inadvertently, they still demonstrate lack of care or negligence with respect to important financial matters.

In this litigation, Cook has offered no meaningful explanation for her apparent contradictory statements about whether she primarily lived in her Michigan house or her Georgia house, both of which she stated would be her primary residence for essentially the same time.  *Supra* pp. 5-6. Instead, Cook has proffered that perhaps President Biden and the Senate might have been on inquiry notice of these misstatements at the time of her confirmation, and that her misconduct does not rise to the level of "'moral turpitude' or criminal convictions."  Dkt. 17 at 13-15.  Nothing in the text of "for cause" suggests that inquiry notice by a previous President eliminates any possible cause, or that only immoral or criminal conduct can be the basis for removal.

Cook's apparent financial misconduct constitutes clear cause for the

President to consider and ultimately order her removal, and at a minimum demonstrates "the sort of gross negligence in financial transactions that calls into question [her] competence and trustworthiness as a financial regulator." Dkt. 1-4 at 2. As Alexander Hamilton made clear when discussing the Federal Reserve's historical predecessor—the Bank of the United States—its principals must be entrusted with the "keen, steady, and, as it were, magnetic sense" of the "prosperity of the institution" for "careful and prudent administration," because that is the "only basis on which an enlightened, unqualified and permanent confidence can be expected to be erected and maintained." 3 The Works of Alexander Hamilton 163 (1885 ed. Henry Cabot Lodge). When Governors by misconduct or gross neglect erode the foundations of such confidence, the President acts properly and lawfully by removing them.

The district court did not question the ultimate merits of that judgment, but instead erroneously held that the President lacked statutory authority to consider Cook's actions *at all* because they occurred before she took office. Op. 26-27. The court reached that result by reasoning that the "for cause" removal limitation must be limited to cover only the same ground as other removal statutes that consider an official's actions in office. Op. 13-19 (citing statutes that provide for removal based on "inefficiency,

neglect of duty, or malfeasance in office"). But if Congress had wanted to limit cause to only in-office conduct, "it easily could have drafted language to that effect," as it has done in other statutes. *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014). Removal "for cause" contemplates a broader range of considerations, and indeed the Supreme Court has recognized that a for-cause removal provision "appears to give the President *more* removal authority than other removal provisions reviewed by this Court," and specifically contrasted "for cause" with "inefficiency, neglect of duty, or malfeasance in office." *Collins v. Yellen*, 594 U.S. 220, 255-56 (2021).

The district court resisted this conclusion, stating that allowing the President to remove "Governors from office based on conduct that was already known and ratified through the confirmation process would allow for" the President to remove Governors effectively at will. Op. 21. It is difficult to understand the district court's concern. Most individuals do not commit financial fraud, much less those selected to lead the Federal Reserve. If an earlier President and earlier Senate had confirmed Bernie Madoff or Charles Ponzi to be Federal Reserve Governors, it would blink reality to suggest that a later President could not remove them based on their misdeeds, regardless of whether they occurred in office or not.

The district court mistakenly viewed the government as "conce[ding]" that conduct that was known to the appointing authorities (the President and Senate) at the time of a Board member's appointment could not be the basis for a later 'for cause' firing." Op. 19. But government counsel simply said that "if it was something that was known at the time, it's much harder to say that it's cause later because the presumption is that has gone through the political process * * * [b]ut again, that's not the facts here." Hearing Tr. at 66:4-9 (Aug. 29, 2025). Counsel also argued that pre-confirmation conduct would be cause if it "was not known at the time of confirmation." *Id.* at 66:15-16. Indeed, Cook's counsel agreed at the hearing that "for cause" did not categorically exclude conduct that predates confirmation. Hearing Tr. at 17:10-18:23 (Aug. 29, 2025). The district court's insistence that "for cause" must be limited to "circumstances that have occurred while [the Governors] are in office," Op. 16, is a categorical definition urged by neither party.

Moreover, the district court's narrow construction of "for cause" butts up against the President's "constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Morrison v. Olson*, 487 U.S. 654, 690 (1988). A construction of "cause" that nevertheless forbids the President from removing a principal officer when there is unrebutted

14

evidence of serious misconduct would raise substantial questions under Article II.  *Cf.* John F. Manning, *The Independent Counsel Statute: Reading "Good Cause" In Light of Article II*, 83 Minn. L. Rev. 1285, 1330 (1999) (discussing "persuasive reasons" why "a narrow construction of 'good cause' * * * would raise a serious question under Article II").

Indeed, the district court seemed to recognize these concerns when it suggested that prior misconduct could support removal if it led to a criminal conviction.  Op. 21-22.  While that is obviously true, it is unclear what textual basis the court used to reach that conclusion—the misconduct would have already "occurred before they assumed the position," and would not count as the "official's behavior in office," which the court had earlier considered to be the only legal grounds for cause.  Op. 9.

The court's acknowledgment that the President may consider pre-office misconduct if it results in extreme consequences underscores that pre-office misconduct is not categorically off limits.  And once it is agreed that the President may properly remove a Governor based on such misconduct, the district court had no authority to inquire further.  When a statute "commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available."  *Dalton v. Specter*, 511 U.S. 462, 477 (1994).  Presidential action may be reviewed for compliance

15

with the Constitution, but mere claims that the President "has acted in excess of his statutory authority" are not judicially cognizable "when the statute in question commits" the discretionary decision to "the President." *Id.* at 474.  The court properly recognized that principle when it clarified that it was "not inquiring into the sufficiency of the evidence presented by President Trump."  Op. 26 n.9; *accord United States ex rel. Garland v. Oliver*, 6 Mackey 47, 56 (Sup. Ct. D.C. 1887) ("[I]f the power to remove is in this President," the court lacks power to review "the sufficiency of the cause which induce him to remove an officer").

### C.    Cook Does Not Have A Due Process Interest In A Hearing

The government is also likely to succeed on Cook's procedural challenge, as there is no basis under the Due Process Clause for enjoining the President's removal of a principal officer.  To establish a due process violation, Cook must show that the President "deprived her of a 'liberty or property interest' to which she had a 'legitimate claim of entitlement,' and that 'the procedures attendant upon that deprivation were constitutionally [in]sufficient.'" *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014).

Cook does not hold a protected property interest in her position, as a "public office is not property" and her role as a principal officer "to the public is inconsistent with either a property or a contract right." *Taylor v.*

16

*Beckham*, 178 U.S. 548, 576-77 (1900). The Supreme Court had "little difficulty" deciding that "an officer appointed for a definite time or good behavior" did not have any "vested interest or contract right in his office" and thus could not maintain a due-process claim. *Crenshaw* v. *United States*, 134 U.S. 99, 104 (1890).[1] That same analysis defeats Cook's claim here.

The district court erred in holding to the contrary, mistakenly reasoning that Cook presented a special case because she is an "independent agency Board Member." Op. 32. The court held *Taylor* inapposite because it involved "elected offices," Op. 30, but *Taylor*'s reasoning was not so limited. Rather, the Supreme Court rejected a property right based on "numerous" decisions "to the effect that public offices are mere agencies or trusts, and not property as such," *Taylor*, 178 U.S. at 577, and that rationale that applies to all officers, elected and appointed. Indeed, *Taylor* began its analysis by discussing how "appointed" officers—who serve as "agents for the effectuating of such public purposes"—do not hold "fixed private rights of property" in their

---

[1] These holdings are consistent with the traditional view of state courts that "office in this country is not property." *Smith v. City of New York*, 10 Tiffany 518, 520 (N.Y. 1868); *Lynch v. Chase*, 40 P. 666, 667 (Kan. 1895) (the theory that a prison warden "has a property or vested right" in the office "is wholly inconsistent with our system of government.").

continued office.  *Id.* at 576 (discussing appointed officers in *Butler v.*
*Pennsylvania*, 51 U.S. 402, 403 (1850)).

The district court was further mistaken in holding *Crenshaw*
inapplicable, suggesting that the case simply concerned whether "*Congress*
was prohibited from passing a law that would modify" an officer's tenure.
Op. 31.  But that misses the key point that *Crenshaw* re-affirmed: a public
office does not become private property merely because its incumbent
enjoys tenure protection.  The naval officer in *Crenshaw* could be removed
only by court-martial, *see* 134 U.S. at 100, but the Supreme Court held that
he had no "vested interest" or "private right of property" in his position, *id.*
at 104.

The district court rested its due process holding almost entirely on
*Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532 (1985), and
*Esparraguera v. Department of the Army*, 101 F.4th 28 (D.C. Cir. 2024).
Op. 28-30.  But those cases concerned whether "civil service *employees*"
with statutory tenure protections had "a property right in continued
employment."  *Loudermill*, 470 U.S. at 538; *accord Esparraguera*, 101
F.4th at 33 (considering whether "a government employee has a
constitutionally protected property interest in her position").  Neither
decision purports to overrule the Supreme Court's earlier precedents

holding that "*offices* are * * * not property," *Taylor*, 178 U.S. at 577 (emphasis added). That distinction matters. It defines how officers may be appointed under the Constitution, *see* U.S. Const. art. II, § 2, cl. 2, what "significant authority" they may wield "pursuant to the laws of the United States," *Lucia* v. *SEC*, 585 U.S. 237, 245 (2018), and their relationship to their office as one of public trust, not of a vested property right. The notion that a principal officer can have a property interest in the authority she wields is "alien to the concept of a republican form of government." *Barnes* v. *Kline*, 759 F.2d at 50 (D.C. Cir. 1985) (Bork, J., dissenting).

And at bottom, Cook still does not explain what difference a hearing would have made. Cook complains that she was denied a chance to make her case, but she does not allege that she sought to offer any evidence to the President or anyone else that would explain her actions, *see* Dkt. 1 at 14, ¶¶ 44-46. Nor has she offered an explanation in this litigation. For a "hearing mandated by the Due Process Clause [] to serve any useful purpose, there must be some factual dispute," and "the absence of" materially disputed facts "is fatal to [plaintiff's] claim under the Due Process Clause that [she] should have been given a hearing." *Codd v.*

19

*Velger*, 429 U.S. 624, 627 (1977).[2]

## II.    The Remaining Factors Favor A Stay

The equitable factors weigh decisively in the government's favor, and "the public interest and balance of equities factors merge" where, as here, "the government is the party" against whom an injunction is sought. *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).  The Supreme Court has emphasized that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty."  *Boyle*, 145 S. Ct. at 2654 (quoting *Wilcox*, 145 S. Ct. at 1415).  The Supreme Court's orders are binding precedent on how to apply the stay factors, *id.*, and this Court has confirmed that "[i]njunctions that require the President to work with removed principal officers interfere with his constitutional power to supervise the Executive Branch" and "inflic[t] irreparable injury."  Order, *LeBlanc v. U.S. Privacy*

---

[2] Although the Court has no need to reach the issue here for all of the reasons explained above, the Court also lacks the equitable power to order reinstatement of a principal officer of the United States. *See In re Sawyer*, 124 U.S. 200, 212 (1888); *White* v. *Berry*, 171 U.S. 366, 377 (1898).  The government acknowledges that this Court has previously declined to grant relief based on that argument but preserves it for further review. *See Harris* v. *Bessent*, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025) (en banc).

*and Civil Liberties Oversight Board*, No. 25-5197 (D.C. Cir. July 1, 2025)
(granting stay pending appeal).

The district court mistakenly concluded that this equitable calculus
did not apply here, because "*Wilcox*'s theory of harm was premised" on
"having a reinstated officer exercise the 'executive power,'" and that *Wilcox*
"expressly disclaimed that its analysis" would include "the Federal
Reserve." Op. 46. The district court was wrong on both counts. Federal
Reserve Governors obviously exercise executive power when they
promulgate rules that bind the regulated public, *Corner Post, Inc. v. Board
of Governors of Federal Reserve System*, 603 U.S. 799, 805-06 (2024), and
when they bring enforcement actions against regulated entities, *Board of
Governors of Federal Reserve System v. MCorp Financial, Inc.*, 502 U.S.
32, 34-36 (1991). Under "our constitutional structure" the Governors'
rulemakings and adjudications "*must be* exercises of[] the 'executive
Power,'" which the President must constitutionally oversee. *City of
Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). And while *Wilcox* noted
that its analysis did not "necessarily implicate the constitutionality of for-
cause removal protections" for the Federal Reserve—based on its "distinct
historical tradition" drawing on the "First and Second Banks of the United
States," 145 S. Ct. at 1415—the President and the government are still

21

unquestionably harmed when a removed officer is reinstated and continues to serve notwithstanding the President's removal.

Even setting these cases aside, Cook has identified no irreparable harm that would tip the balance in her favor.  This Court has set "a high standard for irreparable injury," and a plaintiff must show "that there is a 'clear and present' need for equitable relief,'" and "the injury must be beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  In the removal context, these requirements will be met only in a "genuinely extraordinary situation." *Sampson v. Murray*, 415 U.S. 61, 92 (1974).

The district court concluded that Cook had demonstrated irreparable harm in the form of deprivation of her "high-ranking, public-servant role." Op. 44.  But this Court has rejected the "statutory right to function" theory of irreparable injury.  *See Dellinger v. Bessent*, 2025 WL 887518, at *4 (D.C. Cir. Mar. 10, 2025).  *Dellinger* held that even if the discharged Special Counsel's "removal [wa]s ultra vires," a deprivation of his "statutory right to function in office" was not irreparable.  *Id.*  "At worst," the removed officer "would remain out of office for a short period of time," which was clearly outweighed by "the potential injury to the government" of an injunction reinstating the Special Counsel.  *Id.  Dellinger* did not break new ground;

the longstanding rule is that, absent a "genuinely extraordinary situation," loss of employment does not constitute irreparable harm. *Sampson*, 415 U.S. at 92 n.68. "Cases are legion holding that loss of employment does not constitute irreparable injury." *English v. Trump*, 279 F. Supp. 3d 307, 334 (D.D.C. 2018).

Indeed, although the district court relied on a string cite of cases for the proposition that an official deprived of their "statutory right to function" has demonstrated irreparable harm, *see* Op. 40, many of those decisions were stayed by this Court or the Supreme Court (*Dellinger*, *Grundmann*, *LeBlanc*, *Harris*, and *Harper*). Whatever the district court's view of plaintiff's duties or her alleged harm, they do not support the denial of a stay.

Finally, the district court concluded that the "public interest in Federal Reserve independence weighs in favor of Cook's reinstatement." Op. 47. Even with the Federal Reserve's unique structure and history, its Governors are subject to removal for cause, and the President's actions to remove Cook based on her misconduct should strengthen, not diminish, the Federal Reserve's integrity. As in *Wilcox*, the balance of equities counsels against "the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." 145 S. Ct. at 1415.

23

## CONCLUSION

The Court should grant an immediate administrative stay and issue a stay pending appeal.  We respectfully request that the Court act on either request by Monday, September 15, 2025.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
    *Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
LAURA E. MYRON
 */s/ Daniel Aguilar*
DANIEL AGUILAR
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

24

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,166 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Georgia, a proportionally spaced typeface.

*/s/ Daniel Aguilar*
Daniel Aguilar

**Attachment A**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LISA D. COOK, in her official capacity as a member of the Board of Governors of the Federal Reserve System and her personal capacity, | |
| Plaintiff, | Case No. 25-cv-2903 (JMC) |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

The Federal Reserve Act provides that the President may only remove a member of the Board of Governors of the Federal Reserve System "for cause." 12 U.S.C. § 242. This case involves the first purported "for cause" removal of a Board Governor in the Federal Reserve's 111-year history. Plaintiff Lisa D. Cook brought this action against Defendant Donald J. Trump, in his official capacity as President of the United States, challenging the President's decision to remove her "for cause" from the Board of Governors. ECF 1. Cook also sues Jerome H. Powell, in his official capacity as Chair of the Board of Governors of the Federal Reserve System. *Id.* In addition, she sues the Board of Governors of the Federal Reserve System as a whole and each member in their official capacity. *Id.*

Before the Court is Cook's motion for a temporary restraining order preventing Defendants from removing her from her position as a member of the Board. ECF 2. President Trump's actions and Cook's resulting legal challenge raise many serious questions of first impression that the Court believes will benefit from further briefing on a non-emergency timeline. However, at this preliminary stage, the Court finds that Cook has made a strong showing that her purported removal

1

was done in violation of the Federal Reserve Act's "for cause" provision. The best reading of the "for cause" provision is that the bases for removal of a member of the Board of Governors are limited to grounds concerning a Governor's behavior in office and whether they have been faithfully and effectively executing their statutory duties. "For cause" thus does not contemplate removing an individual purely for conduct that occurred before they began in office. In addition, the Court finds that the removal also likely violated Cook's procedural rights under the Fifth Amendment's Due Process Clause. She has also demonstrated irreparable harm from her removal. Finally, the public interest and the balance of the equities also favor Cook. Because the standard for a temporary restraining order and a preliminary injunction are the same, and because the Court has held an adversarial hearing on the motion and received additional briefing from the Parties, the Court will construe Plaintiff's motion for a temporary restraining order as a motion for a preliminary injunction, and **GRANT** the requested injunction.

## I.    BACKGROUND

### A. Statutory Framework

The Federal Reserve System was established over a century ago by Congress in the Federal Reserve Act. *See* 12 U.S.C. § 221 *et seq.* "The Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). This system involves a "complex set of relationships" between the Board of Governors, the Federal Open Market Committee (FOMC), and the twelve regional Federal Reserve Banks. *United States ex rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588, 592 (2d Cir. 2019); *see also* 12 U.S.C. §§ 222, 225a.

The Board of Governors is tasked with, among other duties, "promot[ing] effectively the goals of maximum employment, stable prices, and moderate long-term interest rates." 12 U.S.C. § 225a. The Board "conducts monetary policy, regulates banking institutions, and maintains the

stability of the nation's financial system." *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67 (D.C. Cir. 2004) (citing 12 U.S.C. § 248). Sound monetary policy often involves making short-term sacrifices for the long-term good of the economy. Congress therefore designed the Federal Reserve and the Board of Governors to possess characteristics that reflect their insulation from other parts of the federal government, in particular with respect to the Board's monetary policy decisions. The Board is funded outside of the annual appropriations process, through bank assessments. 12 U.S.C. §§ 243, 244; *see Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020). Its decisions and deliberations on monetary policy matters are exempt from Government Accountability Office audits and its rules regarding monetary policy are exempt from the Congressional Review Act. 12 U.S.C. § 3910(a)(3); 5 U.S.C. § 807. In addition, the Board is allowed to present legislative recommendations and testimony to Congress without approval of any "officer or agency of the United States." 12 U.S.C. § 250. Finally, the Board has independent litigating authority. *Id.* § 248(p).

As for the seven members of the Board of Governors, each is "appointed by the President, by and with the advice and consent of the Senate." 12 U.S.C. § 241. Board members are appointed to staggered fourteen-year terms, which, notwithstanding unexpected vacancies, typically prevents any single administration from appointing a majority of the Board's members and further shields the Board from partisan influences. *Id.* § 242. And the Board members, also known as Governors, enjoy a limitation on the President's ability to remove them: "[E]ach member shall hold office for a term of fourteen years from the expiration of the term of his predecessor, unless sooner removed *for cause* by the President." 12 U.S.C. § 242 (emphasis added). The statute does not define the term "for cause." *Id.*

Governors also serve on the Federal Open Market Committee, along with five representatives of the Federal Reserve Banks. 12 U.S.C. § 263(a). The FOMC has the authority to direct the regional Federal Reserve Banks in engaging in "open-market transactions." *Id.* § 263(b). "Open market operations—the purchase and sale of Government securities in the domestic securities market—are the most important monetary policy instrument of the Federal Reserve System." *Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 343 (1979). The FOMC meets around eight times a year to "review the overall state of the economy and consider the appropriate course of monetary and open market policy." *Id.* at 344. At these meetings, the FOMC "attempts to agree on specific tolerance ranges for the growth in the money supply and for the federal funds rate." *Id.* at 344–45. The FOMC's interest rate decisions have a "substantial impact on interest rates and investment activity in the economy as a whole." *Id.* at 344. The next meeting of the FOMC is scheduled for September 16–17, 2025. *See* Meeting Calendars, Statements, and Minutes (2020–2027), Board of Governors of the Federal Reserve System, https://perma.cc/S659-T29L (last visited Sept. 7, 2025).

## B. Factual and Procedural Background

President Joseph Biden nominated Plaintiff Lisa Cook for a fourteen-year term on the Federal Reserve Board of Governors on May 12, 2023. ECF 1 ¶ 31. At the time, Cook was already serving on the Board, having previously been appointed by President Biden and confirmed by the Senate, on May 10, 2022, to fill the remainder of an unexpired term that was scheduled to end on January 31, 2024. *Id.* ¶¶ 29–31. Cook's nomination to the new fourteen-year term was confirmed by the Senate on September 6, 2023. *Id.* ¶ 31. Her fourteen-year term was set to expire in 2038. *Id.*

On August 15, 2025, the Director of the Federal Housing Finance Agency (FHFA), William Pulte, sent a referral letter to Attorney General Pamela Bondi and Department of Justice

Special Attorney Edward Martin accusing Cook of committing mortgage fraud in June and July 2021, before she was nominated and confirmed to the Board. *Id.* ¶ 43; ECF 1-2 at 2–3. On August 20, 2025, Pulte publicly released two screenshots of pages from the letter on the social media platform X (formerly known as Twitter). ECF 1 ¶ 43; ECF 1-2 at 2–3. Within thirty minutes, President Trump posted on the social media platform Truth Social that "Cook must resign, now!!!," and shared a link to a news article regarding the allegations. ECF 1 ¶ 44.

The letter (as excerpted in Pulte's social media post) accused Cook of "falsifying residence statuses for an Ann Arbor, Michigan-based residence and an Atlanta, Georgia-based property in order to potentially secure lower interest rates and more favorable loan terms." ECF 1-2 at 2. According to Pulte, on June 18, 2021, Cook had taken out a loan on a property in Michigan. *Id.* at 2. The terms of the mortgage agreement stated that Cook would use the property as her "principal residence" for at least one year after the date of occupancy. *Id.* at 2–3. However, two weeks later, Cook purchased a condominium in Atlanta, and in the mortgage agreement, affirmed that this property would serve as her "primary residence" for a full year. *Id.* at 3.

Two days after Director Pulte posted the referral letter, President Trump said in an interview that "what [Cook] did was bad" and that he would "fire her if she doesn't resign." ECF 1 ¶ 45. Then, on August 25, 2025, President Trump posted screenshots of a two-page letter to his Truth Social account. ECF 1-3 at 2. Cook alleges that she was provided no advance notice of the letter before it was posted. ECF 1 ¶ 47. The letter, dated August 25 and addressed to Cook, provided:

> Pursuant to my authority under Article II of the Constitution of the United States and the Federal Reserve Act of 1913, as amended, you are hereby removed from your position on the Board of Governors of the Federal Reserve, effective immediately.

> The Federal Reserve Act provides that you may be removed, at my discretion, for
> cause. *See* 12 U.S.C. § 242. I have determined that there is sufficient cause to
> remove you from your position.

ECF 1-3 at 2. For support, the letter cited to Director Pulte's August 15 criminal referral.[1] *Id.*
President Trump stated that "there is sufficient reason to believe you may have made false
statements on one or more mortgage agreements." *Id.* Citing to the referral, the President said that
Cook "signed one document attesting that a property in Michigan would be [her] primary residence
for the next year," and "[t]wo weeks later . . . signed another document for a property in Georgia
stating that it would be [her] primary residence for the next year." *Id.* President Trump claimed
that it was "inconceivable that [Cook was] not aware of [her] first commitment when making the
second," and it was "impossible that [she] intended to honor both." *Id.* The President then
acknowledged the Federal Reserve's "tremendous responsibility for setting interest rates and
regulating reserve and member banks." *Id.* He continued:

> The American people must be able to have full confidence in the honesty of the
> members entrusted with setting policy and overseeing the Federal Reserve. In light
> of your deceitful and potentially criminal conduct in a financial matter, they cannot
> and I do not have such confidence in your integrity. At a minimum, the conduct at
> issue exhibits the sort of gross negligence in financial transactions that calls into
> question your competence and trustworthiness as a financial regulator.

*Id.* The President concluded by stating that "I have determined that faithfully executing the law
requires your immediate removal from office." *Id.*

Cook filed a six-count complaint on August 28, 2025. *See* ECF 1. Count One alleges that
the President violated the Federal Reserve Act because his justification for removing her did not
qualify as "cause" under the statute. *Id.* ¶¶ 61–66. Count Two alleges that under the Federal
Reserve Act, Cook was entitled to notice and a hearing before her removal. *Id.* ¶¶ 67–71. Count

---

[1] The removal letter's text states that the criminal referral was "attached to this letter," but the referral letter was not
itself shared as part of President Trump's social media post. ECF 1-3 at 2.

Three alleges that the termination, without notice and any opportunity to be heard, violates the Fifth Amendment's Due Process Clause because she has a property interest in her continued employment as a Governor. *Id.* ¶¶ 72–78. Count Four seeks a declaratory judgment that Defendants lack the authority to remove her without complying with applicable statutes and regulations. *Id.* ¶¶ 79–81. Count Five, brought only against Chair Powell and the Board of Governors, seeks a writ of mandamus commanding these Defendants not to effectuate President Trump's purported termination. *Id.* ¶¶ 82–83. Count Six also seeks equitable relief against Powell and the Board to prevent and restrain ongoing violations of statutory and constitutional law. *Id.* ¶¶ 84–86.

After receiving Cook's motion for a temporary restraining order, also on August 28, 2025, the Court set a motion hearing for the next morning. *See* Notice of Hr'g (Aug. 29, 2025). Shortly before the hearing, Defendant Donald Trump filed his response to the motion. ECF 13. Defendants Powell and the Board of Governors filed a notice stating that they would not be offering arguments concerning Cook's motion. ECF 12. At the hearing, counsel for Cook indicated that they intended to file a reply before the Court ruled, which they did on September 2, 2025. ECF 17. The Court then allowed counsel for President Trump to file an additional response, which they did on September 4, 2025. ECF 23. Finally, Cook requested leave to file an additional reply, ECF 24, which the Court granted in a separate order.

## II.    LEGAL STANDARD

"A temporary restraining order is an extraordinary remedy, one that should be granted only when the moving party, by a clear showing, carries the burden of persuasion." *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The Court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction. *Elec. Priv. Info. Ctr. v. FTC*, 844 F. Supp. 2d 98, 101

(D.D.C. 2012). To prevail on either motion, the movant "must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In a case like this one, where the Government is the non-movant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    ANALYSIS

At this preliminary juncture, Cook has demonstrated that each of the factors weighs in favor of preliminary injunctive relief on at least some of her claims.[2]

### A.    Cook Is Substantially Likely to Succeed on the Merits.

The Court finds Cook substantially likely to succeed on at least two of her claims. First, the Court finds Cook likely to succeed on her argument that President Trump violated the Federal Reserve Act because her purported removal did not comply with the statute's "for cause" requirement. Second, the Court finds Cook likely to succeed on her claim that the purported removal deprived her of procedural rights guaranteed by the U.S. Constitution.[3]

#### 1.    President Trump's Stated Cause for Firing Cook Likely Does Not Satisfy the "For Cause" Requirement in the Federal Reserve Act.

The key question in this dispute is the meaning of the term "for cause" in the Federal Reserve Act. 12 U.S.C. § 242. The history of the repeated litigation over the constitutional validity of similar removal restrictions is too extensive to recount here. *See, e.g.*, *Collins v. Yellen*, 594 U.S.

---

[2] As discussed below, the Court construes Cook's motion for a temporary restraining order as a motion for a preliminary injunction. *See infra* section III.D. Again, the legal standard is the same. *Elec. Priv. Info. Ctr.*, 844 F. Supp. 2d at 101.

[3] Cook also argues that her purported removal violated procedural protections that she was entitled to as a statutory matter under the Federal Reserve Act. ECF 2-1 at 21; ECF 17 at 20–22. Because the Court finds Cook likely to succeed on the merits of her other claims, and that those claims support injunctive relief, it declines to reach Cook's statutory process arguments now.

220, 250 (2021); *Seila L. LLC*, 591 U.S. at 197. But in this case, the Government does not contest the constitutionality of the "for cause" removal restriction for Board Governors. Instead, it argues that President Trump provided a legal cause under the Federal Reserve Act to remove Cook, and that his decision to do so is not subject to judicial review. ECF 13 at 2. The Court disagrees on both points. Cook has shown that President Trump's allegations likely do not qualify as cause justifying her removal under the Federal Reserve Act and that the Court can resolve the Parties' dispute about the interpretation of this statute.

### a.    The Meaning of "For Cause" in the Federal Reserve Act

The Federal Reserve Act does not define the term "for cause." Generally, when a statutory term is undefined, courts look first to what "that term's 'ordinary, contemporary, common meaning' was when Congress enacted" the statute. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 434 (2019) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Additionally, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Jazz Pharms., Inc. v. Kennedy*, 141 F.4th 254, 261 (D.C. Cir. 2025) (citing *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014)). "Statutory history is an important part of this context." *Id.* Applying these tools, the Court concludes that the permissible grounds for "for cause" removal in the Federal Reserve Act are limited to grounds concerning an official's behavior in office and whether they have been faithfully and effectively executing statutory duties. The "for cause" standard thus does not contemplate removing an individual purely for conduct that occurred before they assumed the position.

### i.    Statutory Text and Contemporary Definitions

The Government first urges the Court to look to dictionary definitions of the word "cause" at the time the Federal Reserve Act was first passed in 1913. It claims that "cause" was understood

to simply mean a "motive or reason," or "ground of action," *see* ECF 13 at 11–12 (citing Wharton's Law-Lexicon 150 (11th ed. 1911) and Black's Law Dictionary 178 (2d ed. 1910)), and as a result, "cause" "cover[s] any articulable justification that the President deems sufficient to warrant removal," with the exception that, cause cannot extend to "mere policy disagreement," *id.* Cook argues that "for cause" is a legal term of art and its meaning is not resolved simply by looking to dictionary definitions. ECF 17 at 14.

When identifying the common meaning of the text when Congress enacted the removal provision, the Court looks to the definition as understood in 1935, rather than 1913. The "for cause" removal provision of the Federal Reserve Act was first enacted in 1913. *See* Pub. L. No. 63-43, 38 Stat. 251, 260 (1913). The "for cause" requirement appears, however, to have been removed in the 1933 Banking Act, which amended 12 U.S.C. § 242 to provide merely that "each appointive member shall hold office for a term of twelve years from the expiration of the term of his predecessor." 12 U.S.C. § 242 (1933 supp.); Pub. L. No. 73-66, § 6, 48 Stat. 162, 166–67 (1933). The present "for cause" provision was then returned to the statute following the passage of the 1935 Banking Act, which reorganized the leadership structure of the Federal Reserve. Pub. L. No. 74-305, § 203, 49 Stat. 684, 704–05 (1935); *see also* Gary Richardson & David W. Wilcox, *How Congress Designed the Federal Reserve to be Independent of Presidential Control*, 39 J. of Econ. Perspectives 221, 229 (2025).

At the time of the 1935 amendment, it is true that legal dictionaries defined the word "cause" as the "origin or foundation of a thing," or a "ground of action," consistent with the Government's definition. Black's Law Dictionary 292 (3d ed. 1933). But they also support the notion that "for cause" was itself a separate term that carried meaning independent of its component parts. The 1933 edition of Black's Law Dictionary contains a separate entry for "*for*

cause": "With reference to the power of removal from office, this term means some cause other than the will or pleasure of the removing authority, that is, some cause relating to the conduct, ability, fitness, or competence of the officer." *Id.* at 796 (emphasis added).

Perhaps recognizing that "for cause" has to mean more than just *any* stated reason, at the hearing on this motion, counsel for the Government suggested a new definition of "for cause" as any reason the President can think of so long as that reason (1) is something other than mere policy disagreement, (2) bears on the individual's ability or fitness to do the job, and (3) was not known at the time of the official's confirmation. Hr'g Tr. at 66:13–16 (Aug. 29, 2025). That position is in obvious tension with the Government's preferred dictionary-definition approach to "cause" in its initial briefing, and the Government's supplemental briefing does not resolve the discrepancy. *See* ECF 13 at 9; ECF 23. Thus, even the Government admits that the definition of "for cause" in this context cannot extend to *any* articulable reason the President deems to warrant removal and must have some limitations. More than dictionary definitions are required to resolve this dispute.

### ii. Legislative Context

The President's ability to remove a member of the Board of Governors must also be understood within the "overall statutory scheme" governing the Federal Reserve, *see West Virginia v. EPA*, 597 U.S. 697, 721 (2022), which contemplates a degree of insulation from presidential pressure, particularly with respect to its monetary policymaking decisions. As the Supreme Court has observed when distinguishing the Federal Reserve from other agencies, the Federal Reserve is a "uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States," *Wilcox*, 145 S. Ct. at 1415, one for which Congress has provided significant independence and insulation. *See* Richardson & Wilcox at 223–30 (reviewing the legislative history of the Banking Act of 1935 and concluding that the bill reflected

an intent that "monetary policy was independent of the president"); *Banking Act of 1935: Hearings on S.1715 and H.R. 7617 Before the S. Comm. On Banking & Currency* ("*Senate Banking Act Hearings*"), 74th Cong. 408 (1935). The Federal Reserve's structure, and in particular, the for cause protection, reflects Congress's decision that "a degree of independence was needed to 'increase the ability of the banking system to promote stability.'" *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 92 (D.C. Cir. 2018) (quoting H.R. Rep. No. 74-742, at 1 (1935)), *abrogated on other grounds by Seila L. LLC*, 591 U.S. 197. "By insulating the Board from presidential control and political pressures, Congress sought to ensure that the Federal Reserve would 'reflect, not the opinion of a majority of special interests, but rather the well considered judgment of a body that takes into consideration all phases of national economic life.'" *Id.* (quoting H.R. Rep. No. 74-742, at 6).

The historical context in which Congress enacted the Banking Act of 1935 demonstrates an awareness of the importance of such protections. The Banking Act of 1935 was passed shortly following the Supreme Court's decision in *Humphrey's Executor v. United States*. *Humphrey's Executor* established that a "for cause" protection for members of the Federal Trade Commission (FTC), limiting removal to "inefficiency, neglect of duty, and malfeasance in office," did not violate the Constitution. 295 U.S. 602, 629 (1935). The Court in *Humphrey's Executor* noted that the President's power to remove was a "coercive influence," which naturally "threatens the independence of a commission." *Id.* at 630. Even the Government agrees on this point, when it concedes that a "policy disagreement" with a Federal Reserve Governor cannot qualify as a "for cause" removal ground. ECF 13 at 18 (citing *Wiener v. United States*, 357 U.S. 349, 356 (1958)); *see also* Hr'g Tr. at 55:24–56:2.

At the hearings on the Banking Act, members of Congress and the witnesses took note of the *Humphrey's Executor* case and its implications for the Federal Reserve's independence. *Senate Banking Act Hearings* at 396–97 (witness arguing that the Federal Reserve's "independence from political control must be assured," and that passage of the bill should be postponed until the *Humphrey's Executor* decision clarified the issue of removal protections); *id.* 754–56 (witness noting the pendency of *Humphrey's Executor* and arguing that "no member of the Board shall be removable from office during the term for which he was appointed"). And the final bill reflects that what was true for the FTC in *Humphrey's Executor* is true for the Federal Reserve: "[T]he language of the act, the legislative reports, and the general purposes of the legislation as reflected by the debates," all demonstrate "the congressional intent to create a body of experts who shall gain experience by length of service; a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government." *Humphrey's Ex'r*, 295 U.S. at 625–26. The Federal Reserve Act's "for cause" restriction on the removal of Board Governors is a key part of the statutory scheme protecting the Board of Governors from the naturally "coercive influence" of the power of presidential removal which "threatens [its] independence." *Id.* at 630. This statutory scheme points in favor of a narrower, rather than broader, understanding of "for cause."

### iii.  Relationship to Prior Removal Statutes

"It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013)). Accordingly, the Court finds highly persuasive Cook's argument that the Federal Reserve Act's use of "for cause" should also be read in light of prior statutory removal provisions for Presidentially appointed, Senate-

confirmed roles. Those provisions consistently limited the grounds for presidential removal of agency heads or members to some combination of inefficiency, neglect of duty, or malfeasance (referred to in shorthand as INM), which meant "cases where officials act wrongfully in office" (malfeasance), "fail to perform their statutory duties" (neglect of duty), "or perform them in such an inexpert or wasteful manner that they impair the public welfare" (inefficiency). Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1, 8 (2021).

In 1935, federal statutes imposing restrictions on the President's ability to remove board and agency members had two essential flavors: They either provided that the official could be removed "for cause," with no further elaboration as to the meaning of that term, or they provided that the official could be removed for some combination of INM, with that formula first being used for the removal protections for the Interstate Commerce Commission in 1887. *See* Manners & Menand app. b. at 74–75 (identifying three federal officer removal statutes before August 1935 that used "for cause," and eleven that used some combination of INM); ch. 104, § 11, 24 Stat. 383 (1887). With minor exceptions, the only enumerated removal bases appear to be the INM bases.[4] Statutes did not use "for cause" and INM in the same removal provision. *See* Manners & Menand app. b. at 74–75. As for the statutes that enumerated either inefficiency, neglect, or malfeasance in office as a basis for removal, not all used all three grounds. *See id.*; *see, e.g.*, Pub. L. No. 67-347,

---

[4] There appear to be two minor exceptions. A statute creating a "Board of Mediation" for disputes between employers and employees of common carriers provided that the Commissioner could be removed for "misconduct in office." *See* Pub. L. No. 63-6, § 11, 38 Stat. 103, 108 (1913). The Board of Mediation was later replaced by the National Mediation Board, whose members could only be removed for "inefficiency, neglect of duty, malfeasance in office, *or ineligibility*." Pub. L. No. 73-442, § 4, 48 Stat. 1193, 1193–94 (1934) (emphasis added). While the Court cannot be positive at this preliminary stage that it has reviewed every relevant removal provision in the U.S. Code, a review of the statutes cited in Manners and Menand's article supports Cook's claim that "by 1935, the *only* statutorily enumerated grounds for presidential removal of executive officers were INM." ECF 17 at 12 (emphasis in original). Moreover, the Government has not disputed this characterization of the U.S. Code at the time.

§ 1, 42 Stat. 1023 (1922) (providing that members of the United States Coal Commission were to be appointed by the President with the advice and consent of the Senate, and could "be removed by the President for neglect of duty or malfeasance in office but for no other cause").

So, the overwhelming backdrop of enumerated federal removal restrictions for Presidentially appointed, tenure-protected roles at either the time of the 1913 Federal Reserve Act or the 1935 Banking Act was composed of the INM grounds. Neither the Supreme Court nor lower courts have provided a definitive interpretation of inefficiency, neglect of duty, or malfeasance in office, either jointly or separately, in the context of federal removal protections for independent agency members. *See* Manners & Menand at 4. But recent scholarship shows that before entering the federal lexicon, these terms carried with them historical meanings particular to the context of public administration and officer removal. *See id.* at 6 ("When Congress first used the now-talismanic INM phrase in 1887, it defined these circumstances using terms that were already well-known."). As is relevant here, each of the INM grounds referred to the officer's performance of their statutory duties or their conduct *in office*. The ground of inefficiency, a term first used extensively in state civil service reform bills in the late nineteenth century, was "associated not only with incompetence but with the wasteful expenditure of government resources," and inefficient officers "lacked the skills to perform their duties, rendering them incapable of doing their jobs." *Id.* at 6, 45; *see also id.* at 45–52.[5] Neglect of duty has a multi-century history as a term meaning the failure "to perform one's duties in a way that caused specific harm to" the entity to

---

[5] Inefficiency was "added to the removal lexicon only in the middle of the nineteenth century, when legislators used the term to describe wasteful government administration caused by inept officers." Manners & Menand at 28. Manners and Menand identify inefficiency first being used as a removal ground for tenure-protected officers in Indiana state code provisions from 1843. *Id.* at 47 n.269, 48 n.277 (citing 1843 Ind. Rev. Stat., ch. 4, §§ 37, 47). The term was subsequently used in state law and in a "series of civil service reform bills," before it was included as a removal ground in the Interstate Commerce Act in 1887. *Id.* at 52.

which the officer owed the duties. *Id.* at 29.[6] "Malfeasance in office" also had an extensive history in the common law, colonial practice, and American state law, and referred to a "wrongful act committed in the execution of *one's duties* that caused injuries to others."[7] *Id.* at 6 (emphasis added). While each of these terms addresses different conduct, what ties them together is a concern with an official's *in-office* conduct or performance: they all relate to whether an official is faithfully and effectively executing their statutory duties.

> ### iv. "For Cause" in the Federal Reserve Act Refers to In-Office Conduct that Demonstrates Ineffective or Unfaithful Execution of Statutory Duties.

Based on the statutory context above, the Court finds that the "for cause" provision in the Federal Reserve Act extends only to concerns about the Board member's ability to effectively and faithfully execute their statutory duties, in light of circumstances that have occurred while they are in office. The historical background shows that when creating various agencies, departments, and boards during the period leading up to the passage of the Banking Act of 1935 and enumerating the grounds for removal from those bodies, Congress was narrowly focused on the INM grounds. Under the doctrine of *in pari materia*, statutes "relate[d] to the same subject or object" are "construed together." *Common Cause v. Fed. Election Comm'n*, 842 F.2d 436, 441–42 (D.C. Cir. 1988); *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) ("[The rule] necessarily assumes

---

[6] "Neglect" had been a ground for removing the "officers of English towns and boroughs for hundreds of years," and constituted a type of "misdemeanor," or "bad behavior," that could trigger the removal of life-tenured officers. *Id.* at 6. "Neglect of duty" was also a historical common-law basis for the removal of "good behavior" roles like judges and clerks. *Id.* at 28–29. Manners and Menand also identify state statutes beginning in the early 1800s that either penalize officials for neglect of duty or make them removable on that ground. *Id.* at 43–44.

[7] Malfeasance was featured in the context of common-law municipal officer and public official removal, both in England and the United States. *Id.* at 28–29. Like "neglect of duty," it was considered a misdemeanor that could trigger an officer's removal. *Id.* at 6. Under American state law in the 1800s, it was a ground to find that an officer had failed to engage in the "faithful performance" of the duties of his office. *See id.* at 41 n.224 (citing *Harris v. Hanson*, 11 Me. 241, 245 (1834)).

that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject."). That rule is instructive here. The fact that Congress was narrowly focused on the officer's on-the-job performance in contemporary officer removal statutes supports the conclusion that Congress did not mean "for cause" removal to extend to conduct of a significantly different kind.

Cook argues that this Court should find that "for cause" in the Federal Reserve Act is synonymous with and limited to the prevailing INM standard. ECF 17 at 10. Contemporary usage at the time of the passage of the Banking Act of 1935 indicates that the three terms were indeed often treated synonymously with "for cause." *See Myers v. United States*, 272 U.S. 52, 171–72 (1926) (describing a statute that provided for "removal for inefficiency, neglect of duty, or malfeasance in office," as one containing provisions for "removal *for cause*" (emphasis added)). This might explain why "for cause" and INM were not used in the same statute. If "for cause" was a synonym for INM, using the terms together would have been superfluous.

A traditional presumption of statutory interpretation, however, is that when Congress "employs different words, it usually means different things." *Ortiz v. Sec'y of Def.*, 41 F.3d 738, 740 (D.C. Cir. 1994). So Cook is likely not correct that "for cause" and the INM standard are perfectly synonymous. But that statutory interpretation principle also dooms the Government's initial argument that "for cause" means "any articulable justification that the President deems sufficient to warrant removal." ECF 13 at 12. Congress knew how to state a lesser requirement, and did so in a different section of the Banking Act of 1935, which provided that the Comptroller of the Currency, a Presidentially appointed and Senate-confirmed official, would hold office for "five years unless sooner removed by the President, upon *reasons* to be communicated by him to the Senate." 12 U.S.C. § 2 (emphasis added); Pub. L. No. 74-305, § 209, 49 Stat. 703, 707 (1935).

Thus, as the Government has already conceded, "for cause" must mean something more than any "reason[]" the President could communicate. 12 U.S.C. § 2.

That "for cause" means something broader than INM finds some support in the Supreme Court's analysis in *Collins v. Yellen*, which reviewed the constitutionality of the removal protection for the Director of the FHFA, which, as here, provided for removal "for cause." 594 U.S. at 255. There, the Court did not purport to definitively interpret the meaning of "for cause," although it noted that the language "appear[ed] to give the President more removal authority than other removal provisions," such as one for "inefficiency, neglect of duty, or malfeasance in office." *Id.* Further, the Court was interpreting a "for cause" removal provision passed in 2008, not one passed in 1935. *See* 12 U.S.C. § 4512. Since 1935, the enumerated justifications for independent agency and board member removal have expanded beyond simply INM to consist of grounds such as "immorality, ineligibility, offenses involving moral turpitude, and conviction of a crime." *See* Manners & Menand at 63 n.363; *see, e.g., Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 app. A at 549–56 (Breyer, J., dissenting) (cataloging removal grounds); *Monsalvo Velazquez v. Bondi*, 145 S. Ct. 1232, 1245 n.5 (2025) ("[D]ifferent statutes passed at different times against different regulatory backdrops may bear different meanings."). And the logic in *Collins* demonstrates why "for cause" in one statutory context may not be the same in another. In relying on cases involving the employer-employee relationship, *Collins* observed that "disobeying an order is generally regarded as 'cause' for removal." 594 U.S. at 256 (citing *NLRB v. Loc. Union No. 1229, Int'l Bhd. of Elec. Workers*, 346 U.S. 464, 475 (1953)). But here, the President is not empowered to direct the Board of Governors in the same manner, or to remove a Governor for failing to follow his directions. The ability to do so would be tantamount to being able to fire for policy disagreement, which the Government has admitted the President cannot do.

18

And again, even if "for cause" means something more than the traditional INM grounds, the Court is not convinced that it encompasses reasons of a different kind altogether than those grounds. The fact remains that INM grounds were the key causes recognized in similar federal statutes at the time. Defining "for cause" in 12 U.S.C. § 242 as extending to in-office conduct that is closely related to the INM grounds would still provide "for cause" with some independent meaning separate from INM. The existing landscape of removal statutes indicates that Congress wanted officials to be judged on their performance and conduct while holding the role. Insofar as there were any other recognized grounds for removal at the time, those also involved in-office conduct. For example, the Commissioner of Mediation and Conciliation could only be removed by the President for "misconduct *in office*." Pub. L. No. 63-6, § 11, 38 Stat. 103, 108 (1913) (emphasis added); *see also* Pub. L. No. 73-442, § 4, 48 Stat. 1193, 1193–94 (1934) (providing for removal from the National Mediation Board for either "inefficiency, neglect of duty, malfeasance in office, *or ineligibility*" (emphasis added)). State statutes also contemplated that "misfeasance" could be grounds for punishment or removal from office. Whereas malfeasance is the "doing [of] an act wholly wrongful," misfeasance is "[t]he improper performance of some act which a man may lawfully do." *See, e.g.*, Black's Law Dictionary 1193 (3d ed. 1933) (distinguishing the two terms). While both related to performance in office, they are separate concepts and were treated separately in state removal law. *See* Manners & Menand at 41 n.226, 43.

The Government's alternative reading that "for cause" means "a reason that" is (1) "more than mere policy disagreement," (2) "bears on the individual's ability or fitness to do the job," and (3) "was not known at the time of the official's confirmation," is too broad. Hr'g Tr. at 66:14–16. First, the Government's proposed "ability or fitness" test—particularly when combined with the Government's claim that the President's decision is completely unreviewable—puts little

19

functional limitation on the President's ability to remove a Board Governor. The Government's alternative position, one for which it has provided little textual or historical basis, would allow the President to remove individuals even for arbitrary reasons provided that the President viewed the reasons as relevant to the individual's ability or fitness to do the job. Moreover, it would incentivize the President and subordinates to dig up prior conduct, however insubstantial, to justify removal from the Board, even where the Board member has been up to that point performing their statutory duties impeccably. Second, the Government's concession that conduct that was known to the appointing authorities (the President and Senate) at the time of a Board member's appointment could not be the basis for a later "for cause" firing is at odds with the Government's theory that the conduct that a President may take into account when making a "for cause" determination lacks any temporal limitation.

A little more about that point. In its opening brief, the Government observes that Cook's reading of the statute as providing for potential removal based only upon a Governor's conduct in office "would insulate all manner of gross wrongdoing" and preclude the President from "remov[ing] a Governor who was revealed to have committed massive financial fraud—so long as it happened before confirmation." ECF 13 at 17. But, as the Court has already mentioned, the Government has since recognized a likely exception for conduct—even that amounting to "gross wrongdoing"—if it was known at the time of confirmation. Hr'g Tr. at 66:13–16. Why should the question of whether conduct satisfies the statute's "for cause" requirement turn on whether the conduct was known prior to confirmation? If past fraud provides a sufficient (and in the Government's view, obvious) justification for removal under this statute, it is not clear why the fact that a prior administration was aware of the conduct would sufficiently address a later President's concerns about a Governor's continued service, or cabin what the Government

20

otherwise suggests is the President's unfettered discretion to remove officers for almost any reason. The Court suspects that the Government acknowledged this limitation because a reading of "for cause" that would permit the President to second-guess the judgment of his predecessor and Congress by removing duly confirmed Governors and replacing them with his own nominees would offend the statutory scheme. Removing Governors from office based on conduct that was already known and ratified through the confirmation process would allow for just that.[8]

The Government's argument that a rule that does not take into account pre-confirmation conduct will lead to a parade of horribles also ignores that this is precisely the line that Congress has drawn in dozens of statutes over the past century. *See* Manners & Menand app. b. at 74–75. For the officers that Congress insulated with INM protections, pre-confirmation conduct has never been a basis for removal. The Court is not breaking new ground in interpreting the Federal Reserve Act's "for cause" provision consistent with this historical landscape.

A conclusion that Congress was not particularly concerned with addressing conduct that occurred before the officeholder assumed the position is similarly consistent with the Board of Governors' appointment scheme. That scheme involves extensive opportunities for investigation and rigorous vetting by both the President who appoints the nominee and the Senate who confirms them. Further, the Court's reading of the statute does not mean that a Governor's prior conduct could never relate to in-office conduct to justify removal. For example, an approach that focuses on the individual's in-office conduct and performance would certainly permit "for cause" removal where an officer is convicted of a serious crime and incarcerated while in office, even if that

---

[8] Here the Parties seem to dispute whether information about Cook's property ownership and mortgage financing were "known" at the time she was confirmed. *See* ECF 17 at 17 n.6; ECF 23 at 9. The Court does not have sufficient information to resolve that dispute. Nor does it quite understand how it would go about determining what may have been known at the time of Cook's confirmation, which is another issue with the line the Government has drawn. In any event, it is not necessary for the Court to find this fact at this stage. The Court rules solely on the legal questions raised in resolving this motion, not questions that potentially involve factual disputes.

conviction was the result of earlier conduct. Such a conviction would obviously interfere with the ability of an officer to effectively and faithfully carry out their in-office duties. Indeed, standing alone, a Governor's subsequent conviction would be a significant event occurring in office, regardless of when the conduct giving rise to that conviction occurred.

Finally, the Court is satisfied that this understanding of the "for cause" protection in 12 U.S.C. § 242 does not unduly infringe on the President's Article II powers. The Court's reading of "for cause" provides broader grounds for removal than the removal protection blessed by the Supreme Court in *Humphrey's Executor*, which permitted removal only for the classic INM standard. *Humphrey's Ex'r*, 295 U.S. at 620. And in *Trump v. Wilcox*, which raised concerns about the constitutionality of removal provisions narrower than the one in question here, the Supreme Court made clear that its analysis did not extend to the Federal Reserve Board's "for cause" protection. 145 S. Ct. at 1415; 29 U.S.C. § 153(a) (providing that members of the National Labor Relations Board may only be removed "for neglect of duty or malfeasance in office, but for no other cause"); 5 U.S.C. § 1202(d) (providing that members of the Merit Systems Protection Board may be removed "only for inefficiency, neglect of duty, or malfeasance in office"). Accordingly, the Court finds that permissible cause for removal of a Federal Reserve Governor extends only to concerns about the Board member's ability to effectively and faithfully execute their statutory duties, in light of events that have occurred while they are in office.

### b. The President's Decision is Reviewable to Determine if He Has Stated a Legally Permissible Cause.

The Government argues that whatever the definition of "for cause" in the Federal Reserve Act, this Court lacks the ability to review the President's decision. ECF 13 at 7–9. According to the Government, the determination of cause is committed to the President's discretion by statute, leaving no role for this Court.

The Court disagrees. It is true that when a statute "entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (quoting *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996)). But "where the authorizing statute . . . places discernible limits on the President's discretion," review is available, given that the "responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts." *Id.* (quoting *Reich*, 74 F.3d at 1327).

The Government acknowledges that there are contexts under which Cook's challenge would be reviewable. At oral argument, the Government conceded that Cook's case would be reviewable had President Trump provided Cook with no cause whatsoever. Hr'g Tr. 58:13–16. In such a case, President Trump, required to remove Cook "for cause," would have clearly exceeded his statutory authority in failing to do so. In the Government's view, however, because the statute does not clearly define "for cause," the President "necessarily must make a discretionary judgment in exercising th[e] [removal] power," and the "sufficiency and adequacy of th[e] reason" given is not reviewable. ECF 13 at 11. The Court finds that this is doubly incorrect in the context of this case. First, the Government's argument fails because, as discussed above, the term "for cause" as used in 12 U.S.C. § 242, has definable limits, which include that a member of the Board of Governors may only be removed for in-office conduct demonstrating that they are not effectively and faithfully carrying out their statutory duties. Thus, when confronted with a justification offered by the President that clearly does not fall within the President's statutory authority, this Court has the responsibility to review. It is no different than if the President had attempted to fire Cook without cause or for a reason the Government acknowledges sits outside of the statute. *See*

*Mountain States Legal Found.*, 306 F.3d at 1136. Even when a statute "delegates discretionary authority" to an actor, the "role of the reviewing court . . . is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024); *Marbury v. Madison*, 1 Cranch 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is"). Second, the Government confuses review for the sufficiency and adequacy of a permissible cause (such as the strength of evidence showing that an officer has engaged in misconduct while in office), with whether the President has even provided a legally permissible cause in the first place, which is clearly reviewable.

In arguing otherwise, the Government primarily relies on *Reagan v. United States*, 182 U.S. 419, 425 (1901), a case brought by a commissioner of the U.S. Court for the Indian territory challenging his removal. In *Reagan*, the statute provided that the commissioners were to "hold office under their existing appointments, subject to removal by the judge of the district where said commissioners reside, for causes prescribed by law." *Id.* at 424. The commissioners' terms were not fixed by statute. *Id.* The Court found that despite the appointment statute's reference to "causes prescribed by law," no causes for removal had ever been "affirmatively specified by Congress." *Id.* at 425. As a result, the Court stated that "removal for cause, when causes are not defined nor removal for cause provided for, is a matter of discretion, and not reviewable." *Id.*

*Reagan* does not control this case. First, it is unlikely that *Reagan*'s analysis even applies to a Federal Board Governor. *Reagan* identified term-of-years protection and "causes of removal" provisions as two separate types of limitations on the ability of the "appointing power . . . [to] remove at pleasure or for such cause as it deemed sufficient." *Id.* at 425. Either, the Court noted, were sufficient to trigger a procedural requirement that the removed officer receive a notice and

hearing before removal. *See id.* (noting "the rule . . . that where causes of removal are specified by Constitution or statute, *as also* where the term of office is for a fixed period, notice and hearing are essential" (emphasis added)). But because the commissioner in *Reagan* did not "hold their office[] for life or by any fixed tenure," they therefore "f[ell] within the settled rule that the power of removal is incident to the power of appointment." *Id.* at 424. Here, Cook's position is for a set term of years and thus not covered by the holding in *Reagan*. Second, even if *Reagan*'s analysis applied to an officer with a term-of-years protection, the statute in *Reagan* is substantially different from the "for cause" statute here. The statute in *Reagan* provided that the President could fire "for causes prescribed by law," but Congress had not prescribed any specific causes, permissible or impermissible. *Id.* at 425. Here, the Court has determined that "for cause" is a circumscribed category, the bounds of which are judicially policeable.

Similarly, the Court does not find that the Supreme Court of the District of Columbia's opinion in *United States ex rel. Garland v. Oliver* governs the analysis. There, a statute allowed the President to remove justices of the peace for the District of Columbia "for cause." 6 Mackey 47, 56 (Sup. Ct. D.C. 1887). While the Court at one point suggested that "we suppose it would not be, that . . . this court can review [the President's] action for the purpose of determining the sufficiency of the causes which induce him to remove an officer," this statement was clearly dicta. *Id.* The Court itself acknowledged that the proposition "[was] not argued," in the case, which was not about the sufficiency of the cause but whether the President had the power to remove the officer in the first place. *Id.* at 48, 56. And again, the decision that would have been unreviewable in *Garland* was the "sufficiency" of the causes. Here, Cook presents an argument that the cause presented was statutorily off-limits.

Finally, taken to its logical conclusion, the Government's argument leads to an absurd result: While admitting that the President cannot remove an official for policy disagreements, the Government claims that under *Reagan*, a removal on the grounds of a policy disagreement would nevertheless be unreviewable. Hr'g Tr. at 58:17–59:4. This cannot be the case. Such a rule would provide no practical insulation for the members of the Board of Governors. It would mean that the President could, in practice, "remove a member . . . merely because he wanted his own appointees on the" Board of Governors. *Wiener*, 357 U.S. at 356. Here, there is a disagreement between the Parties about the interpretation of a federal statute. The Court is exercising its appropriate role in resolving this dispute.

### c.  The President's Allegations Fail to State a Qualifying Cause Under the Statute.

Having determined that the "for cause" protection in 12 U.S.C. § 242 restricts presidential removal of members of the Board of Governors to situations where the record of the Governor's in-office behavior demonstrates they cannot effectively and faithfully carry out their statutory duties, the answer is clear: President Trump has not stated a legally permissible cause for Cook's removal.

President Trump's stated cause refers only to allegations regarding Cook's conduct before she began serving on the Federal Reserve Board.[9] As discussed above, such allegations are not a legally permissible cause. The President's equivocal claim that Cook "*may* have made false statements on one or more mortgage agreements," ECF 1-3 at 2 (emphasis added), refers only to conduct that *may* have occurred *before* she was confirmed to her position. It does not address her in-office conduct at all, let alone provide any examples of how Cook's performance or personal

---

[9] Although the Court decides this issue on the ground that President Trump's stated cause falls outside the causes permissible under the statute and is not inquiring into the sufficiency of the evidence presented by President Trump, the Court notes that the allegations are ones to which Cook strenuously objects. *See* ECF 17 at 15.

conduct since assuming the role has been in any way deficient in carrying out her statutory duties. While President Trump states in his letter that he believes that the conduct was "[a]t a minimum" grossly negligent and "calls into question [Cook]'s competence and trustworthiness as a financial regulator," his letter does not identify any conduct that Cook has engaged in while serving as a member of the Board that indicates that Cook lacks the competence or trustworthiness for the role. *Id.*

Again, this outcome aligns with the understanding of "for cause," in light of its legal meaning at the time when the Federal Reserve was created in 1913 and restructured in 1935. The lesson to be drawn from the then-existing history of removal protections is that an independent agency official was meant to be judged by their actual performance in their office. Removal was not meant to be based on the President's assumptions about the official's future performance as extrapolated from unproven conduct dating from before they assumed the office. To do otherwise would open up the officer and agency to the dangers of "control or coercive influence, direct or indirect," that would undermine the independent and expert judgment of the officer. *See Humphrey's Ex'r*, 295 U.S. at 629.

On this record, Cook has shown that she is likely to prevail on her claim that her removal was not "for cause," and therefore violated the Federal Reserve Act.[10]

### 2.  Cook is Likely to Prevail on the Merits of Her Constitutional Due Process Claim.

Cook argues that her purported removal violated procedural rights guaranteed to her by the Fifth Amendment's Due Process Clause, which required that Cook receive notice and be provided

---

[10] For the purposes of this motion, the Court bases its holding on the conclusion that President Trump has stated a legally impermissible reason for firing Cook and does not also need to reach Cook's argument that the President's decision failed to show "cause" under the Federal Reserve Act because the asserted basis for cause was "pretextual." *See* ECF 1 ¶ 60.

an opportunity to be heard before any "for cause" removal occurred. The record currently before the Court demonstrates that Cook did not receive such notice and hearing, and thus has shown a procedural violation.

### a. Cook's Constitutional Due Process Rights Were Likely Violated.

Cook argues that she has a constitutionally protected property right in her continued position as a member of the Board of Governors, and as a result was entitled to notice and a hearing before her termination. ECF 2-1 at 19–20. The Government contests that Cook has a property interest in her position, and even assuming that she does, argues that Cook received all the process due to her under the Fifth Amendment. ECF 13 at 19–22.

The Fifth Amendment's Due Process Clause guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In determining whether an individual's procedural due process rights have been violated, the Court conducts a two-step inquiry. The Court "first determine[s] whether she was deprived of a protected interest," and if so, "then determine[s] whether she received the process she was due." *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) (citing *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trs. of UDC*, 56 F.3d 1469, 1471 (D.C. Cir. 1995)).

### i. Cook Has a Property Interest in Her Fixed-Term, For Cause Protected Position.

"Property interests are not created by the Constitution." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). "[T]hey are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Id.* To establish a protected interest in her position as a Governor on the Federal Reserve Board, Cook argues that this Court should apply the analysis in *Loudermill* and the cases that follow it. ECF 2-1 at 20–21. In *Loudermill*, the Supreme Court found that a "public employee who can be discharged only for

28

cause" had a constitutionally protected property interest in their continued employment. 470 U.S. at 535, 538–39. In that case, the property interest was created by an Ohio statute that entitled the employees to hold their positions "during good behavior and efficient service," and stated that they could not be dismissed "except . . . for . . . misfeasance, malfeasance, or nonfeasance in office." *Id.* at 538–39. Subsequent cases in this Circuit have followed the logic of *Loudermill* and have reiterated that the basis of the property interest in a government employee's position "turns on the extent of any substantive limitations on the government's authority to remove her." *Esparraguera*, 101 F.4th at 33. As is relevant here, courts have found that "a property interest exists if the employee can 'be removed only for cause.'" *Id.* (citing *Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008)).

The Federal Reserve Act unquestionably provides that a Board Governor is entitled to serve for a fourteen-year term unless they are removed by the President "for cause." 12 U.S.C. § 242. The D.C. Circuit has recognized that an employee removable only "for cause" has a property interest in their position because they "can expect to remain employed *unless* they do something warranting their termination." *Esparraguera*, 101 F.4th at 33. On its face, the reasoning of *Loudermill* and the cases that follow it would seem to apply neatly to Cook's situation.

The Government does not contest that the "for cause" language in 12 U.S.C. § 242 is of the type that has previously provided federal employees expectations of job security and a due process-protected property interest. *See* ECF 13 at 19–22. Even under the Government's preferred interpretation of the phrase, Cook still had an expectation to serve out the remainder of her fourteen-year term "*unless* [she did] something warranting [her] termination," i.e., something that weighed negatively on her ability or fitness to do her job as a Federal Reserve Governor. *Esparraguera*, 101 F.4th at 33; *see also* Marshall J. Breger & Gary J. Edles, *Established by*

*Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1147 (2000) (endorsing the notion that "[if] the [agency] member has a statutory right to continued employment, he or she cannot be deprived of the job without due process").

Instead, the Government argues that the *Loudermill* analysis does not apply to a Board Governor like Cook because she was acting as a "*principal officer of the United States*, not a mere 'public employee.'" ECF 13 at 20. The Government claims that it is an established rule that as a principal officer, Cook had no property interest in her office. ECF 13 at 20.

The Court is unable to glean such a rule from the authorities that the Government puts forward. *Taylor v. Beckham*, 178 U.S. 548 (1900), which the Government cites for the proposition that "public offices are mere agencies or trusts, and not property as such," dealt with elected offices—in that case, the governor and lieutenant governor of the state of Kentucky. *Id.* at 570, 576–77. Moreover, the claim in *Taylor* was that the state legislature had denied candidates for those positions due process when resolving a contested election, a context far less analogous to Cook's situation than the for cause termination due process precedents. Subsequent cases applying *Taylor* emphasized that it addressed whether "unlawful denial by state action of a right to state *political office* is . . . a denial of a right of property." *Snowden v. Hughes*, 321 U.S. 1, 7 (1944) (emphasis added). *Taylor* thus does not govern this case. And even modern courts that have followed *Taylor*'s holding with respect to cases involving elected officials have noted that since *Taylor*, the Supreme Court "has adopted a more expansive approach to identifying 'property' in the due process context." *Velez v. Levy*, 401 F.3d 75, 86–87 (2d Cir. 2005) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

Nor does *Crenshaw v. United States*, 134 U.S. 99, 104 (1890)—another case the Government cites—support applying the logic of *Taylor* to appointed officers like Cook.

*Crenshaw* involved a cadet who enrolled in the Navy at a time when statutes provided that successful graduates would "receive appointments as midshipmen," and that "no officer in the military or naval service" would "be dismissed from the service except upon, and in pursuance of, the sentence of a court-martial to that effect." *Id.* at 100. During the cadet's training, Congress changed the law and limited the number of cadets who would become officers each year, and as a result, the cadet was not appointed to a midshipman position after graduation. *Id.* at 101. He sued, arguing that the change in legislation deprived him of a statutorily-created right to "serve for life, or during good behavior." *Id.* at 103. Taking up the case, the Court framed the question as whether an "officer appointed for a definite time, or during good behavior, had any vested interest or contract right in his office of which [C]ongress could not deprive him," and found no such right. *Id.* at 104.

The text of *Crenshaw* makes clear that the question was whether, assuming the truth of the plaintiff's argument that he was entitled to lifetime tenure by statute, *Congress* was prohibited from passing a law that would modify that tenure. *Id.* at 104, 109; *see Glidden Co. v. Zdanok*, 370 U.S. 530, 534 (1962) (stating that *Crenshaw* held that "neither the tenure nor salary of federal officers is constitutionally protected from impairment by Congress"). There is no inconsistency between finding a property right in Cook's "for cause" protected position under the existing statute, and also acknowledging that Congress, should it desire, would not offend due process by passing a statute reorganizing the Federal Reserve and eliminating her position. This is because it is Congress that has "created" and "defined" the "dimensions" of the property, in this case, through

statute. *Loudermill*, 470 U.S. at 538. *Crenshaw* stands merely for the proposition that Congress is not prohibited from amending or repealing the statute that gives rise to the property right.[11]

The Court thus finds that the existing precedent regarding the protectable rights of public officeholders does not apply to the situation of an independent agency Board member such as Cook, who, along with the Federal Reserve itself, occupies a unique space in the American administrative structure. *Wilcox*, 145 S. Ct. at 1415 ("The Federal Reserve is a uniquely structured, quasi-private entity."). Further, the Court must account for the Supreme Court's more recent precedents that cast a broader scope as to the protectable interests under the due process clause. The analysis in *Loudermill* and the cases that follow it do not hinge on the status—public employee or officer—of the individuals in question. "Liberty and property are broad and majestic terms," *Roth*, 408 U.S. at 571, and the analysis established in *Loudermill* and *Roth*, while focused on public employment, was not limited to that context, *see id.* at 576 (noting that "property interests" may "take many forms"). The key issue in these cases was whether the individual had a "legitimate claim of entitlement" to the property interest claimed, a claim that may stem from existing statutory or regulatory understandings. *Id.* at 577–78. The plain language of the Federal Reserve Act's fourteen-year term and "for cause" removal provision create that understanding. 12 U.S.C. § 242.

The Court thus finds that at this preliminary stage, Cook is likely to succeed on her argument that she has a protected property interest in her "for cause"-protected role as a member of the Board of Governors.

---

[11] The discussion of the plaintiff's alleged property right in *Crenshaw* is also likely dicta. The Court in *Crenshaw* addressed whether the plaintiff had a "vested interest or contract right in his office," *id.* at 104, only because it was assuming that "the term of office enjoyed by the [plaintiff] was what he claims it to have been,—a term for life," *id.* at 109. But the Court went on to find that "even if that were true as to other officers," it was not true for the plaintiff in that case, because he had "executed a bond to serve for eight years, unless discharged by competent authority," and therefore should have "recogniz[ed] his liability to be discharged." *Id.*

### ii.  Cook Did Not Receive Sufficient Process for Her Removal.

Having determined that Cook was deprived of a protected interest, the Court must determine "whether she received the process she was due." *Esparraguera*, 101 F.4th at 33 (citing *Bd. of Trs. of UDC*, 56 F.3d at 1471). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). In determining proper process, a Court must balance (1) the private interest affected by the government action; (2) the risk of erroneous deprivation and the value of additional safeguards; and (3) the government's interest, including the fiscal and financial burdens that additional or substitute procedural requirements would entail. *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991) (citing *Mathews*, 424 U.S. at 335). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Loudermill*, 470 U.S. at 542 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 313 (1950)). The opportunity to be heard must be given "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Cook argues that she was at minimum entitled to "oral or written notice of the charges," an "explanation of the . . . evidence," and "an opportunity to present [her] side of the story," as were the discharged individuals in *Loudermill*. 470 U.S. at 546; *see* ECF 2-1 at 20. The Government retorts that, even if applicable to Cook's case, those requirements were satisfied here. It asserts that notice was provided when the President "publicized the FHFA referral on August 20, 2025." ECF 13 at 22. Recall, that was the date that President Trump shared a *Bloomberg* news story on his social media platform about Director Pulte's referral letter and stated "Cook must resign, now!!!" *Id.* (citing ECF 1 ¶ 43–44). As for opportunity to be heard, the Government appears to

argue that this requirement was satisfied by the fact that President Trump waited five days after his August 20 Truth Social post "before proceeding with the threatened termination." ECF 13 at 5, 23. The Government argues that Cook had the opportunity to contest the allegations in the days before the President fired her and simply failed to do so. *Id.*

The Court finds that the due process requirements laid out by the Supreme Court in *Loudermill* apply to Cook's case. And based on the record currently before it, the Court doubts that Cook received *any* notice or opportunity to be heard, let alone notice and a hearing that were constitutionally "meaningful." *Esparraguera,* 101 F.4th at 33. It is difficult to construe President Trump's social media post on August 20, 2025, which itself linked to a third-party news article regarding Director Pulte's allegations, as "written notice of the charges against [her]." *Loudermill*, 470 U.S. at 546. While President Trump's comments to reporters on August 22 arguably indicated that President Trump was considering *firing* Cook, they fall short of providing Cook with an "explanation of the . . . evidence" that President Trump was considering in weighing his dismissal decision. *Id.*; *see Codd v. Velger*, 429 U.S. 624, 627 (1977) ("The purpose of such notice and hearing is to provide the person an opportunity to clear h[er] name."). Even if President Trump's statements could be considered as having incorporated Director Pulte's August 20, 2025, social media post, this was also insufficient notice. Pulte's post included a screenshot of two pages of an apparently longer letter sent to the Department of Justice, which itself contained corresponding exhibits. ECF 1-2 at 2–3. The Government does not claim that President Trump, Director Pulte, or their staff sent the referral letter or its supporting materials to Cook, despite the fact that the President cited and incorporated the DOJ referral letter in his letter informing Cook of her termination. ECF 1-3 at 2. Thus, on the record currently before the Court, it appears that President

Trump did not provide her with the "evidence that formed the factual basis of her removal." *Esparraguera*, 101 F.4th at 40.

The Government argues that Cook has received actual notice of the allegations against her and President Trump's intention to remove her. *See* ECF 23 at 16 (citing *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (finding under the circumstances that "actual notice . . . more than satisfied [the party's] due process rights")). The Court disagrees. The point of notice in the termination cases is to provide the employee "notice of the charges against them" and "explanation of the employer's evidence," *Loudermill*, 470 U.S. at 546, so as to "provide the person an opportunity to clear h[er] name" *Velger*, 429 U.S. at 627. The Court is highly doubtful that Cook should have been required to piece together the evidentiary basis for a "for cause" removal from a scattered assortment of social media posts and news articles.

Even if the notice provided had been sufficient, Cook's due process rights were nevertheless likely violated because she was not given a "meaningful opportunity" to be heard. *Loudermill*, 470 U.S. at 543. At no point did President Trump indicate that Cook would be provided an opportunity to argue that the allegations were untrue or did not merit removal, or invite Cook to submit such evidence. *See id.* at 543–46 (requiring that, at minimum, the pretermination opportunity to be heard should allow for a "meaningful opportunity to invoke the discretion of the decisionmaker" and include sufficient process to allow the decisionmaker to determine "whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action"). Instead, shortly after Director Pulte's social media post was made public, President Trump called for Cook to resign—a far cry from inviting an opportunity to contest the allegations. *See* ECF 1 ¶ 44.

Having found that Cook likely did not receive any due process in her removal, the Court could stop there. The Court need not at this preliminary posture identify the "precise form of notice and the precise kind of hearing required" by the Due Process Clause for a "for cause" protected agency board member. *Propert*, 948 F.2d at 1332. However, a preliminary consideration of the traditional *Mathews* factors further demonstrates why it makes sense to apply the *Loudermill* framework to Cook's case, and why an individual in Cook's position is likely entitled to at least as much process as the individuals in *Loudermill*.

First, much like the employee in *Loudermill*, Cook's "private interest in retaining" her tenure-protected position is strong. 470 U.S. at 543. And unlike the employees in *Loudermill*, whose interest in retaining employment was significant despite the fact that they "may find employment elsewhere," Cook's role as a Senate-confirmed member of the Board of Governors is not easily replaceable. *See id.* Second, considering the risk of erroneous deprivation and the benefits of additional safeguards, as in *Loudermill*, "some opportunity for [Cook] to present [her] side of the case is . . . of obvious value in reaching an accurate decision," given that "[d]ismissals for cause will often involve factual disputes." *Id.*

The third *Mathews* factor, the "government's interest," is far more complicated in this case. Assuming for the purpose of the analysis that President Trump had shown sufficient cause to remove Cook, President Trump undoubtedly shares the same interest as the employer in *Loudermill*, the "expeditious removal of an unsatisfactory" Board member and "the avoidance of administrative burdens." 470 U.S. at 543. In addition, as the head of the Executive Branch, President Trump has significant interests in effectively exercising the "executive Power" and carrying out his obligations under the Take Care Clause, *see* U.S. Const. art. II, §§ 1, 3, which point in favor of expeditious removal in cases where the actions meriting removal are serious or

egregious. Thus, the interest in expeditious removal weighs heavily in favor of President Trump. On the other hand, the potential administrative burdens of providing notice and a hearing to Cook do not weigh as strongly in the President's favor. This is the first "for cause" removal in the Federal Reserve's history. Contested "for cause" removals of other independent agency and board members—specifically on the basis that they met the statutory standard for removal—have been few and far between. *See* Breger & Edles at 1149–50. The infrequency of these kinds of removals (compared to the entire Ohio civil service in *Loudermill*, or recipients of federal disability benefits in *Mathews*, where the burdens pointed in favor of less elaborate hearing procedures) indicates that the total "societal costs" to the Government of providing notice and a hearing in cases like Cook's would be low—even were the hearing to be one that involved formal evidentiary presentation. *Mathews*, 424 U.S. at 347; *see Loudermill*, 470 U.S. at 535. Moreover, as discussed below, there is historical precedent for robust pre-removal procedures that do not unduly infringe on the President's prerogatives but still comport with the requirements of due process.

Further, the interests of the President as chief executive represent only part of the Government's interest in this case. *See Mathews*, 424 U.S. at 347 (defining the relevant interest as the "public interest"). Also at play are the interests of Congress, which enacted the "for cause" provision in the first place and thus made a deliberate choice to structure the Federal Reserve Board of Governors as an independent body "free to exercise its judgment without the leave or hindrance of any other official or any department of the government." *Humphrey's Ex'r*, 295 U.S. at 625–26. Congress thus has an interest in ensuring the fair treatment of the Board members by the Executive Branch. While not all of the considerations in analyzing the *Mathews* factors point in her favor, on balance, they support providing Cook and those in a similar position a pre-deprivation

opportunity to contest the record and determine whether the factual allegations indeed state a statutorily required "cause."

Indeed, the limited historical practice that exists regarding removals of "for cause" protected officials suggests that a "for cause" removal by the President ought to comport with due process indicia like a formal evidentiary hearing, and that such a requirement would not be antithetical to the President's legitimate ability to remove officials who fail to meet the standard. *See Lee v. Garland*, 120 F.4th 880, 891 (D.C. Cir. 2024) ("Historical practice is important in determining the scope of executive power."). In 1913, President Taft removed two members of the Board of Appraisers, who were protected from removal except for INM grounds, following an extensive inquiry by an investigative committee which involved fact-gathering, public hearings, and consideration of the members' rebuttals. *See* Aditya Bamzai, *Taft, Frankfurter, and the First Presidential For-Cause Removal*, 52 U. Rich. L. Rev. 691, 729–37 (2018). Taft removed the officers following the committee's final report and Taft's finding that the committee had "sustained" the charges against the suspect board members. *Id.* at 737. When President Ford considered removing a member of the Civil Aeronautics Board that enjoyed protections limiting removal to INM grounds, the Executive Branch requested that the board member participate in an "evidence-gathering inquiry" presided over by the office of the White House Counsel. *See Timm v. United States*, 223 Ct. Cl. 639, 639–40 (1980) (noting that Timm resigned before such a hearing was held); *see also* Breger & Edles at 1150. The Court notes that these actual and proposed procedures granted the removed officer a significant opportunity to confront the evidence against them and make their case. They did not require that the President be the one to engage in fact-gathering and compilation of the evidence, and thus minimized the burden on the President's time and energy. However, at least in the case of the Taft removals, the President still had a key role in

38

making a final review of the evidence and the officers' rebuttals. While the Court declines to

establish the process due to Cook, it observes that these examples of historical executive process

include the hallmarks of due process—meaningful notice and an opportunity to be heard.

Because Cook received neither of these "fundamental due process requirement[s]" with

respect to her termination, she is substantially likely to succeed on the merits of her due process

claim. *Loudermill*, 470 U.S. at 546.[12]

## B.  Cook Faces Irreparable Harm.

In addition to showing a likelihood of success on the merits, Cook must also establish that

she faces irreparable injury absent the requested preliminary relief. *Nat'l Min. Ass'n v. Jackson*,

768 F. Supp. 2d 34, 50 (D.D.C. 2011); *Chaplaincy*, 454 F.3d at 297. To constitute irreparable

injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond

remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to

prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555

(D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297).

The Court agrees with Cook's argument that preventing her from discharging her duties as

a Federal Reserve Governor, a unique Presidentially appointed and Senate-confirmed role with

significant responsibility, itself constitutes irreparable harm remediable only by her reinstatement.

The Government first contends that this theory of harm is barred by the Supreme Court's decision

in *Sampson v. Murray*, which held that a federal employee seeking injunctive relief must "make a

showing of irreparable injury sufficient in kind and degree to override" the "obviously disruptive

---

[12] The Government argues that Cook's due process challenge should fail because she has not identified arguments or evidence that would have changed the outcome in her case. First, the Court notes that Cook denies that she committed mortgage fraud, and is entitled to present evidence to the contrary at the proper time and place. ECF 17 at 15. Second, and more importantly, the "right to a hearing does not depend on a demonstration of certain success." *Loudermill*, 470 U.S. at 544.

effect which the grant of the temporary relief . . . [is] likely to have on the administrative process."
415 U.S. 61, 83–84 (1974). In *Sampson*, the Court noted that this concern would typically "cut[]
against the general availability of preliminary injunctions in Government personnel cases." *Id.*
*Sampson* dealt with the firing of a probationary employee, who had failed to establish irreparable
harm beyond mere economic loss or reputational harm. *Id.* at 62, 91–92. But *Sampson* held out
that there may well be cases that "so far depart from the normal situation that irreparable injury
might be found," and that a district court will have the authority to grant injunctive relief "in [that]
genuinely extraordinary situation." *Id.* at 92 n.68.

Cook is correct that other courts in this district have almost uniformly found irreparable
harm sufficient to meet the "genuinely extraordinary" exception in *Sampson, id.*, when confronted
with a claim that an official is being wrongfully deprived of their "statutory right to function,"
particularly when the official occupies a Presidentially appointed, Senate-confirmed, fixed-term
role. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983); *see also
Dellinger v. Bessent*, 768 F. Supp. 3d 33, 72 (D.D.C. 2025); *Grundmann v. Trump*, 770 F. Supp.
3d 166, 188 (D.D.C. 2025); *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 25-cv-542 (RBW),
2025 WL 1454010, at *29–32 (D.D.C. May 21, 2025); *Harris v. Bessent*, 775 F. Supp. 3d 164,
186 (D.D.C. 2025); *Harper v. Bessent*, No. 25-cv-01294 (AHA), 2025 WL 2049207, at *13
(D.D.C. July 22, 2025); *Aviel v. Gor*, 780 F. Supp. 3d 1, 14 (D.D.C. 2025); *Aviel v. Gor*, No. 25-
cv-778 (LLA), 2025 WL 2374618, at *15 (D.D.C. Aug. 14, 2025); *Slaughter v. Trump*, No. 25-
cv-909, 2025 WL 1984396, at *17 (D.D.C. July 17, 2025); *see also Abramowitz v. Lake*, No. 25-
cv-887 (RCL), 2025 WL 2480354, at *11 (D.D.C. Aug. 28, 2025) ("Impairing a statutory right to
function in a high-ranking public office is a cognizable harm."); *but see Perlmutter v. Blanche*,
No. 25-cv-1659 (TJK), 2025 WL 2159197, at *7 (D.D.C. July 30, 2025) (finding that a plaintiff's

asserted loss of her "'statutory right to function' [was] not a genuinely extraordinary situation such that her temporary removal [was] irreparable harm—or at least harm that outweigh[ed] any corresponding risk of harm to the Government"); *English v. Trump*, 279 F. Supp. 3d 307, 336 (D.D.C. 2018) (rejecting acting director of the CFPB's "statutory right to function" claim because "she would not be entitled to that position even if the Court granted her an injunction"). These courts have found that being removed from a "Presidentially appointed, Senate-confirmed, high-ranking, public servant role" is "different in caliber and kind from" the typical employee reinstatement cases. *Slaughter*, 2025 WL 1984396, at *18. This is because these roles involve the "ability to influence federal decision-making" at a high level. *Id.*

Many of these cases have also found it appropriate to take into account the harm that the official's removal would have on the agency or board and its ability to function. *See, e.g.*, *Berry*, 1983 WL 538, at *5 (finding irreparable harm partially because "the Commission's ability to fulfill its mandate [was] disrupted by the [plaintiffs'] removal," which left the Commission "without a quorum"); *LeBlanc*, 2025 WL 1454010, at *32 (finding irreparable harm where removals "imped[ed] the ability of the [board] to function as an independent watchdog . . . as envisioned by Congress"); *Harris*, 775 F. Supp. 3d at 97 (acknowledging harms to the board's "congressionally mandated independence" by board member's firing); *Aviel*, 2025 WL 2374618, at *16 (finding additional harm because removed official's "fate [was] intertwined with the [agency's] very survival"); *Slaughter*, 2025 WL 1984396, at *18 ("[Plaintiff] also helps run a multimember commission that is free to exercise its judgment without the leave or hindrance of any other official or any department of the government. . . . Permitting her removal necessarily destroys that legislatively crafted independence in a way that injures [Plaintiff], the FTC, *and* Congress.").

The Government counters that the decisions embracing the kinds of harm Cook alleges here should not have persuasive force because many of them have been stayed on appeal. ECF 13 at 25–26. That is not the whole story. In several of the cases a stay was either not granted or not sought by the Government in the first place, meaning that they have persuasive value. *See Aviel*, 780 F. Supp. 3d at 14; *Aviel*, 2025 WL 2374618, at *15; *see also Berry*, 1983 WL 538, at *5, *vacated as moot*, 732 F.2d 949 (D.C. Cir 1983). In one of the cases, the D.C. Circuit stayed the lower court's decision but did not include any reasoning for doing so beyond citing to the traditional stay factors, leaving this Court unable to determine how and whether the grant of the stay weighs on the merits of Cook's case. *Harper v. Bessent*, No. 25-5268, 2025 WL 2426660, at *1 (D.C. Cir. Aug. 21, 2025). Such a stay order is "not a decision on the merits." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring in grant of application for stays).

As for the cases that have been stayed, the Court is not persuaded that those stay decisions undermine the district courts' logic on irreparable harm as applied to this case. To start, the Supreme Court's stay order in *Trump v. Wilcox*, 145 S. Ct. at 1415, does not speak to whether Cook has adequately demonstrated irreparable harm here. In *Wilcox*, the Supreme Court granted stays of two district courts' reinstatements of members of the National Labor Relations Board and the Merit Systems Protection Board because (1) the plaintiffs had failed to show that they would succeed on their merits challenges, which are significantly different from Cook's, and (2) because the harms to the plaintiffs from "being unable to perform [their] statutory dut[ies]" were outweighed by the "greater risk of harm from an order allowing a removed officer to continue exercising the executive power." *Id. Wilcox* did not directly address whether the harm to the removed officer was irreparable, and only stated that such a harm did not outweigh the

42

Government's greater harm in having the removed officer "exercise the executive power." *Id.*[13]

The Government notes that Chief Justice Roberts recently issued an administrative stay in *Slaughter*, one of the district court cases supporting Cook's theory of irreparable harm, pending full briefing of the Government's request to either stay the district court's judgment or grant certiorari before judgment. *See Trump v. Slaughter*, No. 25A264, 2025 WL 2582814, (U.S. Sept. 8, 2025); ECF 26. But a nonprecedential administrative stay order provides no basis to doubt the logic of *Slaughter* as applied to this case. *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J. concurring in denial of applications to vacate stay) ("Administrative stays do not typically reflect the court's consideration of the merits of the stay application.").

Cook's argument is also not foreclosed by the D.C. Circuit's decision staying the district court's order in *Dellinger v. Bessent. See* No. 25-5052, 2025 WL 887518, at *4 (D.C. Cir. Mar 10, 2025). In that decision, the Circuit granted a stay of the district court's reinstatement of Special Counsel Hampton Dellinger. The Circuit held that even if Dellinger's removal had been ultra vires, "that [did] not mean such injury [was] irreparable and weigh[ed] in his favor." *Id.* The panel held that the circumstances in that case "cut in favor of a stay" pending appeal because, "[a]t worst, Dellinger would remain out of office for a short period of time." *Id.* The Circuit contrasted Dellinger's harms with the substantial harms to the government of having its replacement special counsel "sidelined and unable to act while also having to try and unravel Dellinger's actions." *Id.*

---

[13] For the same reasons, the stay in *Trump v. Boyle* does not resolve the question in this case, premised as it was on the analysis in *Wilcox* that the "Consumer Product Safety Commission exercises executive power" in a similar manner as the National Labor Relations Board. 145 S. Ct. 2653, 2654 (2025). And because the harm analysis in the *LeBlanc* and *Grundmann* stays by the D.C. Circuit were premised on the balance of harms theory endorsed by *Wilcox*, and did not address the merits of the plaintiffs' irreparable harm arguments, they do not provide reason to doubt the district courts' analyses on that issue. *See LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 25-5197, 2025 WL 1840591, at *2 (D.C. Cir. July 1, 2025); *Grundmann v. Trump*, No. 25-5165, 2025 WL 1840641, at *1 (D.C. Cir. July 3, 2025), *reconsideration en banc denied*, No. 25-5165, 2025 WL 1995785 (D.C. Cir. July 16, 2025).

The "circumstances of [this] particular case" differ from those of Dellinger's and point in favor of finding irreparable harm. *Id.* First, in the Circuit's decision in *Dellinger*, as in *Wilcox*, the question before the D.C. Circuit was not the merits of Dellinger's irreparable harm argument as endorsed by the district court below, but whether to grant the *Government's* motion for a stay pending appeal. The panel's decision primarily focused on the balance of the equities. *Id.* at *2 (considering the issue as "weighing the relative harm"). The panel found this prong supported the Government's stay "in the circumstances of [that] particular case," because of the strength of the Government's injury. *Id.* at *4. But here, the calculus is substantially different. In *Dellinger*, the plaintiff was the head of an independent agency that was nevertheless closely entwined with the rest of the Executive Branch. Upon his reinstatement by the district court, the plaintiff in *Dellinger* was continuing to use his statutory powers as Special Counsel to stay the administration's personnel decisions, and his reinstatement was thus found to pose significant and direct disruption to the administration's policy program and personnel decisions. *Id.* at *3. Cook's retention on the Board of Governors does not pose the same harms. She is one member of a multi-member body that the Government concedes cannot be subject to policy pressure from the rest of the Executive Branch. Thus, her continued presence on the Board does not cause a similar degree of harm. Finally, in *Dellinger*, the Circuit's stay addressed only one harm to Dellinger, the deprivation of his "statutory right to function in office," but Cook here presents additional harms that flow from this deprivation that the D.C. Circuit did not consider, including those to the agency's independence and the possibility that President Trump will shortly move to replace her on the Board. ECF 2-1 at 21–22.

Cook has shown irreparable harm. Through her removal, "she has lost the ability to fulfill a high-ranking, public-servant role to which she is entitled." *Aviel*, 2025 WL 2374618, at *15. As

a member of the Board of Governors, she has the "ability to influence federal decision-making" on issues of monetary policy, and serves as part of a "congressionally protected agency that is designed to operate 'independent of executive authority.'" *Slaughter*, 2025 WL 1984396, at *18 (citing *Humphrey's Ex'r*, 295 U.S. at 625). She has "lost the power to guide," along with the other members of the Board of Governors, a "[]century-old independent agency that serves the United States'" interests in expert-driven monetary policy and banking stability. *Aviel*, 2025 WL 2374618, at *15. "Losing" her "role at an independent agency like the" Federal Reserve, *id.* at *16, does not compare to other employee terminations that were not deemed irreparable, like that of the probationary employee in *Sampson*. 415 U.S. at 90–92. Her removal from the Board will result in missed votes and lost time that cannot be remedied by backpay or reinstatement after the fact. *See Harper*, 2025 WL 2049207, at *13 (finding that similar injuries "cannot be retroactively cured by monetary damages"). The Court agrees with the many others in this district that Cook's removal qualifies as irreparable harm sufficient to support preliminary relief in the form of reappointment to her position. As a result, the Court need not address Cook's remaining grounds for irreparable harm at this time.[14]

### C. The Balance of the Equities and the Public Interest Favor Cook's Requested Relief.

The final two stay factors, which merge here, strongly cut in Cook's favor. Cook has demonstrated an ongoing irreparable harm. Against that harm, the Government raises *Wilcox*, *Boyle*, and the D.C. Circuit's stay in *Dellinger*, to argue that the Government suffers a greater harm

---

[14] The Court's analysis on irreparable harm applies both to Cook's claim that her removal was not "for cause" and that she did not receive constitutionally sufficient process. The loss of her unique statutory position results from either violation, a conclusion that the Government conceded at oral argument. *See* Hr'g Tr. at 72:21–73:7 (noting, in response to the Court's question about whether the due process violation is itself a form of irreparable harm, that the harm was similar to the statutory-right-to-function cases, because "the thing that is being deprived is the office or the employment, which is the same thing as in all the other removal cases that we've been talking about").

in "allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." ECF 13 at 25 (citing *Wilcox*, 145 S. Ct. at 1415). It also raises the "disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." *Id.* at 29 (citing *Wilcox*, 145 S. Ct. at 1415).

Again, the Court is not persuaded that the harms cash out here as they did in *Wilcox* and *Boyle*. First, Cook's retention on the Board of Governors does not offend the President's Article II authority in the way the officers' reinstatement was found to in *Wilcox* and *Boyle*. *See supra* n.13. *Wilcox*'s theory of harm was premised on the ground that the Government suffered from having a reinstated officer exercise the "executive power." *Wilcox*, 145 S. Ct. at 1415. But the Supreme Court in *Wilcox* expressly disclaimed that its analysis on this issue implicated the "uniquely structured, quasi-private entity" that is the Federal Reserve. *Id.* Here, Cook is one of seven members of a Board that is, by design, not intended to be susceptible to policy pressure, let alone tasked with implementing the President's agenda. One could frame the Government's harm as an injury to the President's ability to faithfully execute the laws, which is undermined by being required to retain an individual on the Federal Reserve Board in whom he has stated that he lacks confidence. But even in that case, the fact remains that in failing to specify legal "cause," President Trump has not identified anything related to Cook's conduct or job performance as a Board member that would indicate that she is harming the Board or the public interest by executing her duties unfaithfully or ineffectively. The Government's claimed injuries carry less weight here than in *Wilcox* and *Boyle*. *Dellinger* also does not govern this case for the reasons discussed above.

Further, the public interest in this case is not only limited to the interests of the Executive Branch. "[T]here is a substantial public interest in having governmental" actors like the President

"abide by the federal laws." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12

(D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Congress,

which implemented the "for cause" protection and sought to secure the Federal Reserve's

independence, also has an interest in ensuring that Federal Reserve Board members are removed

for only statutorily permitted reasons, and preventing the President from "thwart[ing] . . . the very

ends which Congress sought to realize by definitively fixing the term of office." *Humphrey's Ex'r*,

295 U.S. at 626.

Further, the public interest in Federal Reserve independence weighs in favor of Cook's

reinstatement. That independence is critical in helping the nation's "banking system to promote

stability." *PHH Corp.*, 881 F.3d at 92 (quoting H.R. Rep. No. 74-742, at 1). As Justice Kavanaugh

has observed, insulation of the Federal Reserve from "direct presidential oversight or control"

"may be worthwhile," due to "its power to directly affect the short-term functioning of the U.S.

economy by setting interest rates and adjusting the money supply." Brett M. Kavanaugh,

*Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 Minn. L. Rev. 1454,

1474 (2009). Others have put it more bluntly: Given this significant power and responsibility,

"[s]ubjecting the Fed[eral Reserve] to close political oversight would likely have harmful, perhaps

even disastrous, consequences." Neil H. Buchanan & Michael C. Dorf, *Don't End or Audit the

Fed: Central Bank Independence in an Age of Austerity*, 102 Cornell L. Rev. 1, 8 (2016).

The Court finds that the equitable factors weigh in favor of granting relief to Cook.

### D.  The Court Will Enter a Preliminary Injunction Against Defendants Powell and the Board of Governors.

Because all four factors favor Cook, the Court will grant relief in her favor, in the form of

a preliminary injunction requiring Defendants Powell and the Board of Governors of the Federal

Reserve to allow Cook to remain a member of the Board during the pendency of this litigation.

The Court acknowledges that Cook originally moved for a temporary restraining order. ECF 2. However, since then, the Court has held an adversarial hearing and received additional responsive briefing from both Parties. *See* Aug. 29, 2025 Min. Entry; ECF 13, 17, 23, 24. Further, in the Parties' joint status report, counsel for the Government noted that they would not object to converting Cook's temporary restraining order motion into a request for a preliminary injunction, ECF 20 at 3. The legal standard for a temporary restraining order and a preliminary injunction are the same. *Elec. Priv. Info. Ctr.*, 844 F. Supp. 2d at 101. "When the opposing party actually receives notice of the application for a restraining order, the procedure that is followed does not differ functionally from that on an application for a preliminary injunction and the proceeding is not subject to any special requirements." 11A Wright & Miller's Federal Practice & Procedure § 2951 (3d ed. 2025). Here, given that there has been an adversarial hearing and additional briefing, Cook's request will be treated as one for a preliminary injunction. *See id.*

The Court recognizes that it likely cannot directly "enjoin the President in the performance of his official duties" to require him to reappoint Cook. *Severino v. Biden*, 71 F.4th 1038, 1042 (D.C. Cir. 2023) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion)). However, Cook can still be granted relief because the Circuit has recognized that a court can "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official *'de facto,'* even without a formal presidential reappointment." *Id.* at 1042–43 (citing *Swan v. Clinton*, 100 F.3d 973, 980 (1996)).

Therefore, the Court will enter an injunction directing Powell and the Board of Governors to allow Cook to continue to operate as a member of the Board for the pendency of this litigation. The Government has requested that this Court stay its decision pending any appeal. ECF 20 at 3. The Court declines to do so. The Court recognizes that this case involves the first "for cause"

removal of a Federal Reserve Board Governor, and as a result, raises important matters of first impression. However, for the reasons stated in this opinion, the Court finds that the balance of equities would not be in the Government's favor. *Nken*, 556 U.S. at 434.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for a temporary restraining order, ECF 2, is construed as a motion for a preliminary injunction, and is **GRANTED**.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: September 9, 2025

49

**Attachment B**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LISA D. COOK, in her official capacity as a member of the Board of Governors of the Federal Reserve System and her personal capacity,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　　Defendants. | Case No. 25-cv-2903 (JMC) |

## ORDER

For the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED** that Plaintiff's Motion for a Temporary Restraining Order, ECF 2, is construed as a motion for a preliminary injunction and **GRANTED**.

It is further **ORDERED** that Defendants Jerome H. Powell and the Board of Governors of the Federal Reserve System are preliminarily **ENJOINED** from effectuating in any manner Plaintiff's removal from her position as a member of the Board of Governors on the basis of the grounds stated in the President's letter of August 25, 2025, ECF 1-3, including by treating her as having been removed and denying or obstructing her access to any of the benefits or resources of her office, pending the resolution of this litigation.

This is an appealable Order pursuant to 28 U.S.C. § 1292(a)(1).

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: September 9, 2025

1

**Attachment C**

```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA


LISA D. COOK,
                                    Civil Action
          Plaintiff,                No. 1:25-CV-02903

     vs.                            August 29, 2025
                                    10:00 a.m.
DONALD J. TRUMP, et al,

          Defendants.               Washington, D.C.
_____


                TRANSCRIPT OF THE PROCEEDINGS
             BEFORE THE HONORABLE JIA M. COBB
                UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Plaintiff:      Abbe David Lowell, Esq.
                        LOWELL & ASSOCIATES, PLLC
                        1250 H St NW
                        Suite 250
                        Washington, DC 20005

For the Defendants:     Yaakov M. Roth, Esq.
                        Principal Deputy Assistant Attorney
                        General
                        U.S. Department of Justice
                        Civil Division, Federal Programs Branch
                        1100 L. Street, NW
                        Washington, DC 20530

                        Joshua P. Chadwick, Esq.
                        BOARD OF GOVERNORS OF THE
                        FEDERAL RESERVE SYSTEM
                        20th & Constitution Avenue, NW
                        Washington, DC 20551


Court Reporter:         Stacy Johns, RPR, RCR
                        Official Court Reporter

   Proceedings recorded by mechanical stenography, transcript
           produced by computer-aided transcription
```

**P R O C E E D I N G S**

1

2          DEPUTY CLERK:  Your Honor, this is Civil Action

3    25-2903, Cook versus Trump, et al.

4          Will parties please come forward to the lectern,

5    identify yourselves for the record this morning.  We'll start

6    with plaintiff's counsel first.

7          MR. LOWELL:  Good morning, Your Honor.  Abbe Lowell

8    from Lowell and Associates on behalf of Governor Cook.  Along

9    with me are co-counsel that are on the record and have been

10   identified to the Court.

11         THE COURT:  Okay.  Good morning, everyone.

12         MR. ROTH:  Good morning, Your Honor.  Yaakov Roth on

13   behalf of the President.  I'm here with John Bailey and Stephen

14   Tagert.

15         THE COURT:  Good morning.

16         MR. CHADWICK:  Good morning, Your Honor.  Joshua

17   Chadwick on behalf of the Federal Reserve Board.

18         THE COURT:  Mr. Chadwick, I just want to clarify, it's

19   my understanding that you're not intending to offer any

20   argument.  You're here to the extent necessary to effectuate

21   any potential injunctive relief, and you don't plan to weigh in

22   on the merits separately from the DOJ; is that correct?

23         MR. CHADWICK:  That's correct, Your Honor.  Obviously,

24   this case raises important and consequential questions, but

25   I'll leave the argument to Mr. Roth and Mr. Lowell.  But I'm of

1    course happy to answer any questions -- factual questions or

2    otherwise that Your Honor may have, but not staking out legal

3    positions today.

4              THE COURT:  Okay.  Fair enough.  Before we get

5    started, if I could just get an understanding of the

6    plaintiff's plans for next steps in terms of scheduling.  Do

7    you intend to also file a motion for preliminary injunction?

8              MR. LOWELL:  Yes, Your Honor.  This was something that

9    we needed to do as quickly as possible to get before you.  That

10   is our plan.  And while you've asked me, I'd also point out

11   that on my way into the courthouse today, I received a filing

12   that the government made of 30-some-odd pages, which, to be

13   honest, I have not had a chance to review or to incorporate.

14   So it would be my plan, depending on the Court's schedule, to

15   likely ask, depending on what you want, to respond to that

16   before the Court rules.

17             But to answer your question --

18             THE COURT:  Yes, that was going to be one of my

19   requests.  I do think that it would be helpful to have your

20   response in writing to that.  When do you intend to file that?

21             MR. LOWELL:  If the Court permits, we'll try -- I

22   would say for sure we'll do it by -- I realize Monday is a

23   holiday.  We'd do it over the weekend to get it done and file

24   it over the weekend, if that's permissible with you.

25             THE COURT:  You tell me.

4

```
1              MR. LOWELL:  I will do it by the end of the weekend,
2    for sure.
3              THE COURT:  Okay.
4              MR. LOWELL:  So that was one.  And then in that regard
5    as well, depending on -- and it may be that we can do what Your
6    Honor's question sort of implies.  Because the Federal Reserve
7    Board is waiting for the Court's decision.
8              And so consequently, in terms of turning this into,
9    for example, an expedited preliminary injunction set of briefs,
10   which might include what the government filed this morning,
11   what I'm saying is they are not taking any action today and
12   they won't take any action until the Court rules.  So the idea
13   that we have to decide this based on the TRO, as opposed to
14   your question as to whether we might turn this into a PI or
15   even a summary judgment, we might be able to do that.
16             THE COURT:  Since you're suggesting it, this case
17   obviously raises some important questions that may be of first
18   impressions, specifically as it relates to this Board.  I have
19   not made a judgment about irreparable harm.  So I have to treat
20   every TRO as if I need to address it immediately.
21             But if there is room to set an expedited schedule that
22   allows for all parties to not be -- I know even the government
23   wrote a very helpful brief for its position but it did so
24   overnight.  And so I certainly don't want the parties to not
25   have time to make the arguments that they need to make.
```

5

1          I have questions today.  But I'm also happy to set an

2   expedited schedule for briefing this on the merits in a very

3   short time frame, but that allows the parties to fully present

4   their arguments.

5          MR. LOWELL:  That, in a case like this, makes perfect

6   sense to me, with the following understanding, however.

7          We came to you for a TRO.

8          THE COURT:  Right.

9          MR. LOWELL:  Because it was very unclear whether when

10  the President uses his vehicle of choice, social media post, to

11  fire somebody, that the Fed would either say that's not the way

12  to do it or it would say it is the way to do it or to say we

13  need to consider if it's the way to do it.

14         Governor Cook, we believe, is in her position as she

15  was confirmed to be.  If nobody is going to try to change that

16  until we get the Court's decision on whatever expedition makes

17  sense, we're satisfied to do it in the order that you just

18  suggested.

19         If she has the ability to carry out her constitutional

20  function.  If she has the ability to do her job as the

21  Governor.  If nobody is locking her out of her office.  If

22  nobody is taking her salary away.  If nobody is preventing her

23  from being a governor, then we will conform to a schedule.  And

24  as I said, I don't know.

25         However, if the Fed decides, okay, this -- they talk

```
1   about uncertainty and it is, I understand from their position,

2   uncertain.  We don't think it's so uncertain, given the law.

3       But that being the case, we can do the schedule as

4   long as we're here to preserve the status quo ante.  And if

5   we're going to preserve that, then we have the ability to

6   conform to whatever schedule the Court wants.  And I know

7   that's a much longer-winded answer to your short question.

8       THE COURT:  And there's a lot packed in there,

9   including, essentially, if everyone can agree to the relief

10  sought then we can have a briefing schedule that's longer.

11      MR. LOWELL:  Indeed.  And if that's not the case, then

12  that's why I'm standing at your podium this morning.

13      THE COURT:  Okay.  I thought I was understanding you

14  to say that while there is a significant time pressure, there's

15  not an overnight time pressure.

16      MR. LOWELL:  I feel that that's true, given what the

17  Fed has said their position is and they're here.  I think

18  that's probably right.

19      THE COURT:  I wasn't suggesting a months long -- I was

20  suggesting an expedited briefing schedule over the next week or

21  two.

22      MR. LOWELL:  On a preliminary injunction, that would

23  make sense.

24      THE COURT:  Yes.  Either preliminary injunction or

25  expedited summary judgment briefing.
```

7

1          I actually have a lot of questions about how you

2     propose a Court deal with the pretext issue and whether -- that

3     does not feel like a question of law.  It feels very fact

4     based.

5          And so I guess my question is, does the PI motion

6     resemble the ultimate summary judgment brief?  If it's going to

7     be the same briefs, then we might as well just do an expedited

8     summary judgment schedule and just get the merits of the case

9     resolved.

10         MR. LOWELL:  For a procedural certainty for the issues

11    that you know and are suggesting exist in this case, that would

12    make sense.

13         THE COURT:  Okay.

14         MR. LOWELL:  Except for my caveat, which is the

15    Governor has the right to remain as a Governor until such time

16    as this Court, and then any other Court, depending on the

17    ruling.  That being the case, it may be that we move to what

18    you just said, which is not your first question on preliminary

19    injunction but might be an expedited summary judgment.

20         As you just raised, we have this phenomenon in this

21    administration, which I am totally unused to but it's very

22    helpful to be making these arguments, where I don't know what

23    additional discovery on, for example, pretext I might need,

24    because the President and the guy that carries out his orders,

25    William Pulte, is so vocal in public about what they say that a

```
1    court or trier or fact could make the inferences necessary just

2    from what they said, which I will get to when we get to arguing

3    or answering your questions.

4              So I can't get ahead of the Court on this to tell you

5    on a summary judgment if there's anything other than what's

6    already out there in public that we would need to brief that.

7              I will do that promptly if that's the schedule we do.

8    I've started thinking about it before I came here today because

9    I realized that there was an issue of whether this has been a

10   pretext from the beginning.

11             I don't know what else I would need.

12             So as we progress, Your Honor, if we can, we can

13   figure what would be the need for any discovery when I answer

14   your questions on the pretext part.  And then we could see

15   whether it informs your view that this should be a summary

16   judgment or a preliminary injunction beyond 5:00 today.  Does

17   that make sense?

18             THE COURT:  Yes.  So you're going to file your written

19   response to the government's opposition by --

20             MR. LOWELL:  We could do it by the end of the day, to

21   be honest.  I suspect it would be more likely --

22             THE COURT:  I'm not --

23             MR. LOWELL:  It could be Monday.

24             THE COURT:  You don't need to do that for my benefit.

25   It's your motion.  If you feel that you can get it in -- Monday
```

9

```
 1   is a holiday, so Monday or I would say Tuesday morning.

 2            MR. LOWELL:  I would say early by the first thing on

 3   Tuesday morning.

 4            THE COURT:  Yes.  If that works for you, then that

 5   works for me.

 6            MR. LOWELL:  It works for us.  And I'm not uncognizant

 7   of the fact that you and everybody that is working is working,

 8   and this is supposed to be, quote, Labor Day weekend.  So I

 9   think it's supposed to be the opposite of doing labor, but on

10   the other hand, we don't mind doing the labor.

11            THE COURT:  So maybe we'll talk scheduling at the end.

12   But can I get the government's position or reaction to what was

13   just said about scheduling?

14            MR. ROTH:  Sure, Your Honor.  I'm not totally sure how

15   to react.  I mean, part of what he was saying sounded like

16   they're happy to extend it if they get a TRO in the meantime.

17   It's not our position.

18            THE COURT:  Okay.

19            MR. ROTH:  It's their motion.  We certainly don't have

20   an objection to converting it to a PI motion.  That might make

21   sense, given that we have full briefing already and we'll

22   certainly have complete briefing, it sounds like, within one

23   business day.  So treating it as a PI rather than a TRO might

24   be sensible.  We would not oppose that.  If the plaintiff wants

25   to seek expedited summary judgment, they can do that.  I don't
```

1    really have a position on that.

2        MR. LOWELL:  One more thing -- I'm sorry, Your Honor.

3        THE COURT:  Come on up.

4        MR. LOWELL:  One more thing to keep in mind.  You did

5    already point out what I think everybody knows.  This very well

6    may be some issues of first impression.  I think you've already

7    seen -- I think there may even have been a filing already but I

8    haven't been able to read it -- that there are people in the

9    country, scholars, academicians, former Board governors.

10        So whatever our merits argument were should also

11    envision some schedule in which amicus may participate.  This

12    would be a case in which I think that would be helpful to the

13    Court, certainly to the parties.  These are issues in which

14    various people who have written or teach or have actually

15    served as governors may like to be heard.

16        So if we're going to do that schedule, I'd like to

17    incorporate an idea of when something like that would be due

18    for both sides.  In fact, I think the first filing, lord knows

19    how that person was able to figure it out, wants to be amicus

20    on the side that what the President did was fine.

21        THE COURT:  And while you brought that up, any

22    objection to me granting leave for that brief to be filed?

23        MR. LOWELL:  I didn't see it to know.  But Your Honor,

24    I believe the Court should accept amicus unless it's

25    completely, you know, somebody that's sitting in a mountain

1    cabin that has nothing to say other than I want to be heard,

2    yes.

3              But I think we have to do it on an individual basis.

4    I think this applicant probably meets the standard of let's

5    hear what this applicant has to say, but I know there will be

6    others.

7              THE COURT:  Any objection from the government to me

8    just granting that motion?

9              MR. ROTH:  No.  We generally consent to amicus filing.

10             THE COURT:  I will reflect on the order that that

11   motion for leave to file is granted.

12             Why don't we talk about the merits a little bit and

13   then circle back to scheduling at the end, because I'd like to

14   leave here with a clear schedule of next steps.

15             So I'll hear from plaintiffs.

16             MR. LOWELL:  Thank you, Your Honor.  And especially in

17   light of what you said, I think what I'd like to do is be as

18   brief as to what I think the Court has to consider for purposes

19   of keeping the status quo in place while the rest takes place.

20             And it can be boiled down to a handful of what I'll

21   call the operative facts to maintain the status quo.  And these

22   operative facts are as follows.

23             Governor Cook, an extraordinarily qualified economist

24   and professor, was nominated and confirmed to a 14-year term to

25   the Federal Reserve Board to end on 2038.

1              On August the 25th at around 8:00 in the evening,

2      pursuant to a social media post, the President purported to

3      fire her, citing that he has that ability generally under

4      Article 2, but specifically stating, because he at least read

5      the statute, that he had to intone the word "for cause," which

6      he did.

7              And unlike other cases, of which the government will

8      probably bring to your attention, for example, the one about

9      the Harper case on the NCUA, this statute embeds for cause in

10     its very terms.

11             Cause, according to the President's action, was a

12     released on August 20th, also by way of public communication in

13     social media, of a referral letter that was dated five days

14     before but for which Governor Cook had no notice until it was

15     posted publicly for the world, sent by FHFA Director William

16     Pulte saying -- and I think the words matter, Your Honor, that,

17     quote, it appears, end quote, that Governor Cook did something

18     he deems to be wrong, for what he said, and I quote,

19     potentially, end quote, did for some economic advantage.

20             Not that she did it.  Not that there was any

21     investigation or charge, but just this person's view of what he

22     said, quote, appears, end quote, to be the case.

23             It took the President barely 30 minutes using that

24     public tweet, saying what it said, to demand that Governor Cook

25     resign.

```
 1              Now turning Director Pulte's, quote, appears, end

 2    quote, and, quote, potentially, end quote, to what he said was,

 3    quote, what she did was very bad, end quote.

 4              THE COURT:  Can I interrupt?

 5              MR. LOWELL:  Sure.

 6              THE COURT:  Can we just pause on the cause piece?  And

 7    I know you're going to file a written response to the

 8    government's opposition.  But you're arguing that I should

 9    interpret "cause" as has been defined in other statutes that

10    provide specific grounds for cause for some boards and

11    agencies.

12              The government is saying where cause is not defined,

13    it's actually statutory interpretation 101 that I consider the

14    plain meaning because Congress made a deliberate decision not

15    to define "cause," and that that gives discretion to the

16    President in that instance.  And so I think I'm -- I know you

17    will respond to it in writing.

18              MR. LOWELL:  I can respond to it now, too.

19              THE COURT:  Yes.  But when you respond in writing, it

20    would be very helpful to point to authority as to your response

21    as to why the absence of a specific definition means that I

22    kind of incorporate by reference the definition that might be

23    provided in other statutes.

24              MR. LOWELL:  Here's the Court's dilemma or here's the

25    Court's choice.  If the words "for cause" appear in a statute,
```

1  and we agree it doesn't have a defining section in that same

2  statute for what cause, then the Court has to make a choice.

3       Either it means nothing, in which the President

4  decides what "cause" is when he says it, like Humpty Dumpty

5  deciding what word means when he says it, or it has to have

6  some grounds in something that we can rely on.

7       There are two possibilities there.  The first is to

8  look at the statutes which have traditionally defined "for

9  cause" and the cases interpreting it, which are the ones, for

10  example, about what we call the IMN, the malfeasance and

11  neglect of duty, or you can look to see if there is a different

12  statute -- and the cases have talked about some which include

13  phrases like "mental incapacity" or "physical disability."

14       That's not this.  That's a case in which the statute

15  itself basically left the framework of what is generally

16  accepted to be public misconduct, like malfeasance, neglect of

17  duty and inefficiency.

18       THE COURT:  But my question is where other statutes

19  have provided that and this one doesn't, what is your response

20  to that must have been a deliberate choice and that this means

21  something different than what's outlined in those other

22  statutes?

23       MR. LOWELL:  But because the statute doesn't have its

24  definition section, where should we look for that definition?

25  Why don't we look at when Congress passed that statute and what

1    they had going on at the time.  And as we pointed out in our

2    papers, what they had on at that time was the briefing,

3    litigation and argument in Humphrey's Executor.

4         And in Humphrey's Executor of the statute, the FTC

5    statute very clearly had those three elements as to what it

6    means to be for cause.  Couldn't be more explicit, that's what

7    it said.

8         Congress recognized the Humphrey's executive decision

9    as they were passing the Federal Reserve Act, and including the

10   phrase "for cause" embedded in the statute.  They say that in

11   their legislative history.  They said it on the debate.  They

12   were asked to wait for the decision.  And when they did pass

13   the statute with reference to Humphrey's Executor, they

14   incorporated this 111 or more year definition of "for cause."

15        If Congress says, we are looking at a for-cause

16   statute, and, by the way, Humphrey's Executor defines "for

17   cause" and it says the IMN, it's not a big leap to say that

18   that is a traditional way of interpreting official misconduct.

19        THE COURT:  What about more recent Supreme Court

20   precedent?  I'm thinking of Collins v. Yellen that I read or

21   one could read as suggesting that a for-cause restriction gives

22   the President more removal authority than what was at issue in

23   Humphrey's?  Like how do I square that with --

24        MR. LOWELL:  You square that in the context of what

25   was at stake in both of those cases.  In the Seila case that's

1    referenced by the Collins case, remember that in the Collins

2    case you refer to, the distinctions are vast and apparent.

3            First, it is not the historic agency, which goes back

4    to how the Federal Reserve Act incorporates that.  It was not a

5    multi-member board.  It didn't have the dual functions of being

6    quasi legislative.  Interestingly enough, the parties in that

7    case originally didn't even contest that the decision was going

8    to violate the Separation of Powers Act.  And it was about a

9    single entity, the director.

10           And that is where the President has more authority,

11   and we concede that.  Because that's what the Supreme Court

12   said and that's what it said in Collins, for example.  It says

13   that there are, quote, prohibits even modest restrictions on

14   the President to remove the head of an agency with a single top

15   officer.

16           So that line you quoted about having more authority in

17   this context can't be unmoored from the context in which that

18   line was written.  And that line was written in a case that had

19   that single top officer and all the differences between that

20   agency and the Federal Reserve.

21           So you can take those words, as the government has

22   done, and say, you see, he's got, quote, more discretion.  But

23   that's like taking the words out of why it was written for what

24   it was done.  That's where we would point the Court.

25           THE COURT:  I understand that and I understand this is

1    a unique body.  I'm jumping around a little bit.

2            MR. LOWELL:  I'll follow your lead.

3            THE COURT:  Am I right that it's your position that

4    any conduct that predates confirmation cannot be a basis for

5    cause?  And if that is your position, where do I get that from,

6    the text of the statute or the precedent?  Is that, again, the

7    kind of inefficiency malfeasance in office?  Are you borrowing

8    the in-office from those statutes and asking me to read that

9    into this one?

10           MR. LOWELL:  I think the answer is we're not taking

11   that absolute position, certainly not at this point.  It

12   certainly is a good starting point for the concept of why you

13   get removed from office.

14           THE COURT:  It's helpful for me to understand --

15           MR. LOWELL:  We're not taking that extreme.

16           THE COURT:  You're not taking that position.  So you

17   make room -- we're going to have to discuss this in the

18   discretion part but just to be clear, you're not taking the

19   position that the fact that this alleged conduct predated

20   confirmation is as a basis for it to not rise to the level of

21   cause under the statute.

22           You're making room for the possibility that it is

23   within a President's discretion to remove someone for cause

24   based on conduct that is maybe -- only comes to light

25   post-confirmation but was something that the person did before

1    they took the position?

2          MR. LOWELL:  And you just added one of the elements I

3    would have asked you to consider in your question to me.  It is

4    not an absolute position but it will be sliding scale of a

5    number of factors.

6          Factor number one, was it known at the time of the

7    person's confirmation and addressed?  Because that would

8    basically also inform the requirement of giving a person in

9    that situation notice and opportunity to be heard.

10         What's the nature of the offense that occurred before

11   the person became involved in the office for which that person

12   is being removed?  What was the process by which that event was

13   proven to be the case?  Is it an allegation on a social media

14   tweet at 11:00 at night by the director of the FHA or is it

15   something in which there was an adjudication?

16         A person who was convicted of bank fraud, who wants to

17   be a bank regulator, and that conviction occurred five years

18   before the person was nominated, and for whatever reason that

19   didn't find its way into the confirmation, I could understand

20   the President saying, oh, you know what, I don't know why you

21   confirmed this person but this person shouldn't be on the board

22   you confirmed him.  I don't know why the President would have

23   nominated such a person.

24         THE COURT:  So the President can then say, I don't

25   agree that this person should have been confirmed?

1          MR. LOWELL:  That becomes a hypothetical that's going

2     to be really difficult in a 14-year term in which somebody

3     appoints the person in year one, a new President gets elected,

4     and a President who gets elected, whatever the person's motive

5     is, whether it's honestly they want to have good officers or

6     they want to affect the economic interest rate of the United

7     States, says I've changed the mind of the President's Office

8     and this person should have not been nominated to begin with.

9          That's the slippery slope of where you go prior to the

10    confirmation or the putting the person in power.  To pick an

11    earlier moment could be for cause in its official, but that's

12    not a hypothetical that we have to get to.  That's not a

13    situation because of the facts of this case.

14          So the scale, Your Honor, it seems to me, would be

15    what is the alleged offense that occurred before?  What is the

16    evidence of that offense that occurred before?  Did that person

17    have the opportunity to contest that so-called offense that

18    occurred before?  And if that was the case, what is its

19    relationship to the kind of office that person is serving in?

20          There are so many variables, which is why I said I

21    can't say that it's absolutely impossible --

22          THE COURT:  Everything you just articulated makes

23    perfect sense and I think is something that anyone making these

24    decisions should consider.  But if I were to adopt that and I

25    was going to put a cite to say like see also or see EG or see

1    Supreme Court case that maps onto what you just said, where do
2    I get the authority for that?

3    MR. LOWELL:  Again, because we're in an area where the
4    only removals have occurred for people -- or not.  Sometimes
5    the President has said, I get to remove somebody because I said
6    so and Article 2 says I said so.

7    For example, one of the cases that we said -- I think
8    it was the PCAOB or the NCUI case, the President made no
9    qualms, is that he didn't have cause and he was doing it solely
10   on his Article 2.

11   So I don't know that you find a Supreme Court, let
12   alone lower court, decision that says these are the factors and
13   that's why you indicated that you might be in a case of first
14   impression.

15   THE COURT:  Is there any authority that suggests that
16   if I were to do something like that, that I wouldn't get
17   smacked down?  Basically, is there any authority you can point
18   to from the D.C. Circuit or the Supreme Court that would find
19   it appropriate for me to kind of articulate a framework by
20   which the President exercises -- at least what the government's
21   arguing is discretion and you may, in your written response,
22   frame it a different way?

23   MR. LOWELL:  I think that's what we'll do.  We will
24   address your point in our written response.

25   THE COURT:  Please address that.  Because if this is

1    the President within the President's discretion can remove for

2    cause, I would want to see your best authority that it would be

3    appropriate for a Court then to kind of articulate a framework

4    of all that must be considered before determining whether past

5    conduct could be something that's for cause.

6         MR. LOWELL: And I think on that, Your Honor, I think

7    what I'm thinking, as I'm hearing you speak and I'm trying to

8    figure out what to do the address the question, which is not

9    easily found in other cases, is to flip the question.

10         Which is, I don't know that you're going to be able

11    to, in deciding on the merits of this case, explain which of

12    the things have to exist for it to be some conduct that

13    occurred before an office holder held office when the whole

14    point of the for-cause statute is to remove an office holder,

15    which instinctively means it was for some malfeasance in

16    office, but we can get to that. As opposed to the opposite,

17    which is, well, what can it not be.

18         That's what this case is really about, if you think

19    about it. We're arguing that it's very difficult to come up

20    with an 11-page definition of what it is but it's not hard to

21    come up with a one-sentence definition of what it's not.

22         And what it's not is FHA director sending out a

23    missive to the world that says maybe, I think, potentially, it

24    seems like, it appears that maybe Governor Cook did something

25    wrong. And the President says, that's cause.

1          And so in the facts of this case, what we may have to

2    adjudicate is whatever it is, it's not this.

3          And I understand the Court has to address what it is

4    in some fashion, but I don't think the Court has to address

5    that to dispositively decide this matter.  But that is

6    something we will address.

7          THE COURT:  I think that goes nicely into the pretext

8    argument.  And if you could just explain a little bit more

9    about -- let's assume I were to agree that the circumstances

10   strongly indicate that this was pretext.  I'm not saying I'm

11   making that finding --

12         MR. LOWELL:  I understand.

13         THE COURT:  I'm just having a hypothetical so that we

14   can just address the core issue is -- okay.  So then what does

15   a Court do?  Because it seems to me that -- actually, let me

16   take a step back.

17         Does that mean that if there is legitimate cause,

18   let's say there is a cause that everyone on both sides -- on

19   all sides agrees, that person disappeared for two years and

20   didn't come to any meetings and didn't do any work.  But it's

21   also someone that a President has strong policy disagreements

22   with, has not -- there's no love lost between them, they've

23   made comments about each other and this is just the perfect

24   opportunity now to remove someone that a President really wants

25   to remove.

1          If the cause is legitimate, are you suggesting that I
2    have to find that it was the sole reason, and that despite
3    everyone's agreement that there was a cause in the world that
4    happened that could be legitimate, that I nonetheless would
5    have to inquire into was this the actual real motivation of the
6    action?

7          Because that's what I usually typically think pretext,
8    that there is a reason given.  There's a cause given.  But
9    that's not the real reason.  And we get to the motivation of
10   the actor to figure out what was the real reason.

11         Are you suggesting that that would be my inquiry in a
12   case like that where everyone agreed that there was cause?

13         MR. LOWELL:  No.

14         THE COURT:  Okay.

15         MR. LOWELL:  A President of the United States,
16   especially this President of the United States, could have a
17   really bad motive to take an action to impose his will on
18   things which are unprecedented, like the independence of the
19   Federal Reserve Board.

20         And that motive could be something that he has
21   articulated, and yet, the person against whom he is taking his
22   action has actually done something for cause.

23         THE COURT:  Okay.

24         MR. LOWELL:  Motive would not bear on this Court's
25   ability to confirm that whatever we define as permissible cause

1    is not affected by the bad motive of the actor.

2              THE COURT:  Okay.

3              MR. LOWELL:  These are not independent matters in this

4    case.  When you don't see something that feels like it fits the

5    traditional definition of "cause," and I will in a minute

6    address the facts that you could come to to understand my

7    pretext issue, then they don't stand independently of each

8    other.

9              In other words, if all we have is a tweet and all of

10   it says might, maybe, could, possibly, potentially, and there's

11   no notice, there's no opportunity, it's all based on this

12   litigation by tweet, then it becomes more important to see if

13   the record contains that which illuminates that there was no

14   cause.

15             A bad motive can illuminate that there was no real

16   cause to begin with.  Cause cannot overcome -- cause can

17   overcome bad motive but bad motive can illuminate the fact that

18   there was no cause.

19             THE COURT:  That's helpful.  So when you say pretext,

20   you're using it to say this evidence is further evidence that

21   there was no cause.

22             MR. LOWELL:  Correct.

23             THE COURT:  Because we all can know what was happening

24   here and that's just a bullet point under all of the reasons

25   why there's no cause.  It's not as if you're asking me to dive

1   into the President's motivations to determine what the actual

2   reason was.

3         Why do I even need to look at that?  Couldn't I just

4   decide if I -- assuming it's reviewable, assuming there's the

5   standard that you've asked the Court to adopt is the standard,

6   don't I just look at that and make a decision?  Isn't it kind

7   of messy to then add the pretext point?

8         I understand, like for atmospherics I understand why

9   it would be done.  But in terms of my decision, do I really

10  need to go to that point?

11        MR. LOWELL:  The answer is more complicated than a yes

12  or no.  So I'm going to give it a shorter than what I would

13  normally do to answer your question as briefly as I can.

14        The President's motive is -- let me answer your

15  question directly.  If there is abundantly clear that there --

16  whatever as I said to you five minutes ago, that there was no

17  cause, that this can't be cause, I don't know what it is but I

18  know what it's not.  So your ruling could be, you know, it's

19  not.  You can't have Director Pulte's crazy midnight tweets be

20  the same as cause.  Then, yeah, you don't have to get to motive

21  in a way.

22        On the other hand, because the President is asserting,

23  as I understand the supplemental brief does, that he has wide

24  discretion in these contexts and is going to say that you don't

25  have to worry about the definition of what really cause is,

 1    that's where you probably do have to address the atmospherics.

 2          You say the word "pretext."  We use the word

 3    "pretext."  Pretext is not an end to itself.  Pretext informs,

 4    as I said before, the possibility that it shows that there was

 5    no actual cause.

 6          But the Court is right in that one sentence, that if

 7    there is literally no chance, no permutation, no possible

 8    mathematical formula in which what he did was cause, then maybe

 9    you don't have to talk about the atmospherics.

10          On the other hand, I don't know how the Court gets to

11    that, given what happened in this case, without taking into

12    consideration what happened even the day before Director Pulte

13    went public on August 20th, on the 19th, when the President is

14    still demanding that members of the Federal Reserve Board

15    resign so that, quote, he can affect the interest rate.

16          You can't detach them in that fashion, although in a

17    theoretical way the Court was right in that sense.  But I don't

18    think in this case you can detach them.

19          And in order to then further address your point about

20    context and my point about how it informs cause or the lack of

21    cause, let's just make sure we get this timeline right.

22    Because if -- to put it another way, if there had been no

23    demands by President Trump or Director Pulte to have Chairman

24    Powell or Governor Barr or Governor Cook resign, so that the

25    President, as he bragged on August the 26th at a cabinet

1    meeting, that he was now in a position to be able to, to use

2    his words, quote, have a majority on the Federal Reserve Board.

3        If there was none of that and on August the 20th the

4    President fired Governor Cook on the basis of a single social

5    media posting by the director that said maybe, could have,

6    seems, appears, possibly, had some effect before she was a

7    Governor, then I wouldn't be sitting here and saying that what

8    he said informs your decision on cause.  On the other hand, I

9    can't ignore what he said that gives ground to the idea that

10   there was no cause.

11       You see what I'm saying?  It could be but that's not

12   what we have here.  So that's where if you go through that or

13   if you give me the two minutes, I will remind and put on the

14   record why that is important, but you can tell me if that's

15   okay.

16       THE COURT:  Sure.

17       MR. LOWELL:  Let me do that.  Remember that this

18   starts by somehow in April or May, which is not long before

19   they take the actions they took -- and they're taking these

20   actions in concert.  By that, I mean the President and his FHA

21   director.

22       They started seeking to pressure the Board to lower

23   the interest rates.  And when the Board, which has decades of

24   history of taking economic analysis into account before they

25   make that decision, said they were doing that and they weren't

1    ready to make that decision, they immediately started to call

2    for the resignation of the chair.  That happened in June.  It

3    happened in July.  It even happened in August.

4         Governor Cook has stood fast with other members of the

5    Board, including Chairperson Powell, agreeing that it was not

6    ready for interest rate.  And miraculously, the President's ire

7    turned from Chairman Powell to Governor Cook.  Both those

8    individuals, when they were attacking Chairman Powell, what a

9    surprise, came up with an allegation of fraud.

10        They said Chairman Powell had to resign because he was

11   involved as the chair when there were renovations on the Fed

12   building, and the Fed building renovations were riddled with,

13   quote, fraud.  This allegation of fraud has become the weapon

14   of choice in removing at least the people on the Board, let

15   alone other officers in the country.

16        In late July and early August, again, using the

17   President's vehicles of social media, and more importantly his

18   habit of calling people that he doesn't like nicknames, like

19   children, started saying that Jay Powell was Jay "Too Late"

20   Powell.  And he says that often in whatever he has posted and

21   said at his press conferences.

22        And then as I pointed out, Your Honor, not likely a

23   coincidence that he did it again on August 19th, the day before

24   Director Pulte took public aim at Governor Cook for the first

25   time.

1    And then Director Pulte, who's been at the center of

2    trying to create the atmospherics to create what he calls cause

3    for the President to act on, and is far from being an objective

4    arbiter of what really "wrongdoing" or what "cause" means, said

5    the following, that maybe, maybe this is a violation, and he's

6    put into words, therefore, taking the direction from the public

7    aspect of Jay Powell committing fraud in his public body doing

8    the renovations of a public building, which could, maybe, if

9    they were true, become his in-office for-cause conduct to move

10   backwards in time to 20 years before when Governor Cook applied

11   for her first mortgage.

12       And so when you put in context the background, that's

13   why, divorced from a definition that made any sense, the

14   context and our allegation that it's pretextual comes into the

15   Court's consideration of whether there was any cause to begin

16   with.

17       I will point out, although it's not in the record but

18   it will certainly be true soon, since the President acted and

19   we challenged it, this is also something the Court should take

20   into consideration.  Not today, necessarily, but as we --

21       Director Pulte has posted 31 different additional

22   tweets to backfill his original referral, as if you say

23   something and, oh, wait, that wasn't so good, and the President

24   acts on your not so good, and she is alleged to have been fired

25   on the 25th, that what he posted last night or this morning at

1  2 in the morning can somehow rectify the problem.

2         That's evidence, again, that there was never cause to

3  begin and it's just their efforts to get rid of governors, as

4  the President bragged on the cabinet, so that he could have,

5  quote, a majority.  So that's the context in which we are

6  asking the Court to consider this.

7         And then, as the cases say, and I know you already

8  said it back to me in one of your questions, what we know about

9  "for cause" is that it's not a policy dispute.  That's what the

10  Supreme Court has said in various contexts in various cases.

11         And what's interesting is what the President said on

12  the 26th is bearing additional.  What he said was, if Governor

13  Cook had done the right thing, then we would have a proper

14  board.  And when said, what is proper, he said, not one that's

15  honest, not one that is above board, not one that has never

16  committed an infraction in their life, but he said, a Board

17  that would lower the interest rates that I have demanded occur.

18         When the President of the United States makes clear to

19  the public that what it takes to be a for-cause is somebody who

20  will do what he says so that he can have a majority and lower

21  the interest rate, this Court knows, as everybody in this

22  courtroom, everybody in America, that what he's saying, let's

23  take him at his word.  "For cause" for the President means she

24  won't go along with an interest rate drop and it's the context

25  of all of those.

1          If you understand what he's trying to do, I don't mean

2     to be hyperbolic, but given what we have seen him and his

3     member of his administration say, almost any of them will make

4     a public social tweet allegation against somebody, saying that

5     before they took office or while they took office, and if

6     that's what it takes to both define "cause," have the evidence,

7     have the opportunity for notice and opportunity, then we might

8     as well strike those provisions out of the Constitution.

9          And so that is why I'm asking the Court to consider

10    how his conduct and his public statements basically prove the

11    point that we're making.

12         And the Court, in another context, in the TRW case in

13    2001.  When we're trying, as you are asking me, to come up with

14    a statutory construction, certainly repeated the old statutory

15    construction law that says courts should not adopt an

16    interpretation that, quote, in practical terms would render the

17    phrase entirely superfluous.

18         So that is a longer-winded answer to your question

19    that was yes or no, but I do think, again, even if you don't

20    use the word "pretext," we now understand what "for cause"

21    means in the context of the facts of this case.

22         THE COURT:  Going back just to kind of put a finer

23    point on "cause," I understand the concerns and questions

24    raised about acting on mere allegations and all kinds of

25    circumstances.  So I understand that these are allegations and

1    there was a referral letter and there's no finding of any kind,

2    so I understand that.

3        Two questions.  One is, if this were a situation where

4    there was some admission of the underlying conduct -- I'm just

5    trying to pose a hypothetical where the conduct is not in

6    dispute, we're beyond allegations and everyone agrees that the

7    conduct at issue here happened.  Is that cause, or no, under

8    your formulation?

9        I understand your briefs to be saying that even if

10   everything alleged is accurate, that still wouldn't be cause.

11   And so I want you to explain that position.

12       MR. LOWELL:  An admission of conduct is not an

13   admission of the following factors.  A person's intentionality

14   in the conduct.  The materiality to either the offense -- I say

15   offense in quotes, not that it's a formal charge but the

16   allegation of wrongdoing.

17       THE COURT:  Let me stop you there.  I understand that.

18   But those are the elements of criminal liability.

19       MR. LOWELL:  Right.

20       THE COURT:  So are you saying it has -- my

21   hypothetical wasn't assuming criminal liability, even -- yes,

22   my hypothetical is not necessarily assuming criminal liability,

23   that you meet the mens rea requirements and the materiality

24   requirements.

25       I'm just saying in a case where there is -- there's

1    allegations of fraud and then there's cases -- well, I guess it

2    is.  If you're calling it fraud, I guess you have to

3    incorporate that.  Let me not call it fraud.

4         Let's say in this case there were what people now

5    understand to be misstatements on forms that don't rise to the

6    level of fraud or that a government body in its discretion

7    decides it's not going to pursue criminally, which --

8         MR. LOWELL:  Happens.

9         THE COURT:  People make that determination all the

10   time, that for whatever reason they're not going to pursue the

11   case.

12        But assume that there are no criminal charges, no

13   investigation, but otherwise the elements are met, that there

14   were misstatements on forms, that they were knowing

15   misstatements, that the person apologizes.  Is that cause?

16        MR. LOWELL:  You're loading your question with words

17   like "knowing."  And as a lawyer, I can't accept the word

18   without making sure we're on common ground.

19        THE COURT:  I'm starting with "knowing."  I'm starting

20   with there's no criminal prosecution because the government, in

21   its discretion for whatever reason, decides it's not going to

22   pursue the case.

23        This is not this case.  I'm taking you in a different

24   case.  That there's a fraud that is -- everyone agrees it's

25   fraud and there's no dispute that what the person did was

1    unlawful, despite the fact that they're not being prosecuted or

2    there are no legal findings to that effect.  Would that be for

3    cause?

4            MR. LOWELL:  Could be.  But as you said, that's hard

5    to take out of the context.  So let me answer it the way you

6    first asked it to me, if you'd let me do that.

7            You said an admission of conduct.  If a nominee who

8    gets in office fills out a form that they were required to go

9    get a loan or to fill out their financial disclosure form, and

10   they are sitting there on their computer and it asks your

11   income and they put in $10,000, because they made a

12   typographical and it should have said a hundred thousand, and

13   that person did that, then you have to find out whether that's

14   an admission of conduct.

15           The form says what the form says.  It says $10,000.

16   It doesn't say 100,000.  Then you have to figure out why does

17   it say 10,000 and not 100,000, which is why you asked and I

18   asked you what you meant by "knowing."  And therefore, you have

19   to factor that in.

20           Somebody could admit the conduct:  I put $10,000 on

21   the form, I did that.  Then you have to ask the next question.

22   Was it knowing?  Was it intentional?  Does it have any impact

23   on what happened after that?

24           And that's why when we're in the hypothetical land, I

25   can't just accept the premise that an admission of conduct is

1  enough to amount to cause without thinking about some of the

2  other terms.

3          And you even yourself asked me, well, what if

4  everybody agrees it was a violation but in prosecutorial

5  discretion all these cases are rarely ever pursued.  Those that

6  have intentional misstatements on an application to a bank

7  don't always get prosecuted as bank fraud.

8          But everybody admits that the person did it, that

9  there was some level of knowing, it was intentionality, could

10  that be cause?  In that theoretical way, I suspect it could be

11  cause.  But we don't have any of those facts in this case.

12          THE COURT:  What about the statement in the letter

13  along the lines of at minimum this shows a degree of

14  carelessness that I think, in my judgment, doesn't make you

15  suitable to remain in this position?

16          Can you respond to that directly?

17          MR. LOWELL:  I can.  If I was disbarred or you were

18  impeached because in one of our opinions we made a mistake that

19  was not intentional but is what happens when human beings serve

20  in the positions we are given, and that becomes cause for

21  those, then that's a threshold that I don't think we can ever

22  live up to.  That would be way too severe.

23          But the problem with, again, that question back to me,

24  is that this is not yet and this is the point.  There's no

25  basis to conclude that Governor Cook did anything that would

1    amount to what is being asked of me in the hypothetical.

2            For example, no one's asked, did she have an

3    accountant that told her whatever it is that Pulte is accusing

4    her of was the right way to do it?  Is there a lawyer involved

5    in the process?

6            That's the kind of development of when a person is

7    supposed to be given an opportunity to be heard.  That creates

8    a record on which a President can take action for cause.

9            So in your question to me, you're right.  If you and I

10   can construct a hypothetical, everybody agrees on the conduct,

11   everybody agrees on the knowing, everybody agrees on the

12   intentionality, everybody agrees on the materiality, everybody

13   agrees on its seriousness but no prosecution occurred, can that

14   be for cause?

15           Yes.  That can be for cause, given what it is,

16   depending if it's, I don't know, something that deals with the

17   person's economy as opposed to whether or not somebody lied

18   about having a nonprescription drug that they shouldn't have

19   had.

20           That depends as well.

21           But in your construct and my response to you, that's

22   the factors that would have to be considered.

23           THE COURT:  Okay.  I think that takes us to -- I have

24   a few questions about the due process argument.  My

25   understanding is that this statute does not lay out any

1    specific procedural requirements in connection with removal.

2    We're all on the same page there?

3           MR. LOWELL:  The statute itself --

4           THE COURT:  Yeah.  I mean, there's no scheme here.

5    The statute doesn't outline what notice and opportunity to be

6    heard has to look like in the context of removing someone.

7           MR. LOWELL:  Not itself but the statute does talk

8    about the need for a notice and an opportunity to be heard as

9    creating that right, and then you refer to what does that mean

10    in other contexts, like the Loudermill case, and I never --

11           THE COURT:  What part of the statute are you -- you

12    said the statute talks about notice and opportunity?

13           MR. LOWELL:  The Federal Reserve Act itself creates --

14    give me one second.

15           THE COURT:  Sure.

16           MR. LOWELL:  With your indulgence.

17           THE COURT:  Sure.

18           MR. LOWELL:  I misspoke in the sense that the statute,

19    you're right, doesn't say it, but the statute does create the

20    right, the property right.  And then you look to the cases

21    which interpret the property right to determine what that

22    means.

23           THE COURT:  Okay.  So this might be a case where

24    you're saying she got absolutely no procedure, so I might not

25    need to get into all of this.  But what would those procedures

1    at minimum look like from your perspective?

2         MR. LOWELL:  Reference to when -- let's do the

3    building block of how you get to notice.  What's adequate

4    notice and opportunity to be heard?  First, you have to decide

5    whether or not there is a right that gives you that.  And we, I

6    think, are beyond the right.

7         All the cases point out that a for-cause candidate in

8    this kind of a term, that is a property right.  So when you do

9    that, then you turn to what are the cases that interpret what

10   that is.

11        And then you look to Loudermill or Esparraguerra and

12   it says things like, an oral or written notice of charges, an

13   explanation of the evidence supporting it and an opportunity to

14   present her side of the story, are the words of those two

15   D.C. -- the more recent D.C. Circuit referring to an earlier

16   Supreme Court, and the important phrase that that has to be

17   given to somebody, quote, prior, end quote, to the discharge.

18        There is a body of law that would define what proper

19   notice and hearing is.  And even the Reagan case that the Court

20   is aware of in the 1901 Supreme Court mirrors that the Supreme

21   Court stated that for-cause protection means in statutes some

22   basis of notice and hearing are, quote, to use the terms of the

23   Supreme Court, essential.

24        Now, I don't have the ability in all of the cases that

25   you and I might talk about when we submit, or what we've

1    already submitted, to say more than what, again, it isn't.  If

2    it's supposed to be an oral or written notice of the charges,

3    and we have Director Pulte saying, you know, maybe, it seems,

4    it could have been, it appears, it was a potentiality.

5            Okay, that's not much.  But let's say that was the

6    notice of the charges, and it says possible mortgage fraud.

7    Well, again, what was the mortgage fraud?  Was it a possibility

8    that when she applied to the mortgage and she was moving. from

9    one primary residence to a second primary residence there was

10   an overlap when both of them were called primary residence

11   because she teaches at Harvard or she teaches in Massachusetts

12   or she teaches in Michigan?

13           That's not clear.  That's not notice of the charges.

14   And if you're asking for an explanation of the evidence, I

15   don't know what that phrase means but it certainly doesn't mean

16   Director Pulte's in-the-middle-of-the-night allegations of the

17   possibility of anything.

18           And then an opportunity to present her side of the

19   story has never been given.  And even in that last 31 tweets

20   over the last 36 hours, I know one thing.  I know that

21   opportunity to be heard and to tell your side of the story is

22   not for me to finally sign up after all these years to a social

23   media account so that I can rebut his charges in the same

24   ethernet that he's making them.

25           THE COURT:  This is raised in the government's

1    opposition, so you'll respond in writing, but just even before

2    the government's opposition I was trying to figure out the

3    cases deal with employees.  Is it your position that Governor

4    Cook is analogous to employees?

5             MR. LOWELL:  For purposes of what the due process

6    clause gives her?

7             THE COURT:  Yes.  For purposes of whether she has a

8    property right.  And the government, in its opposition, which

9    you'll respond to, indicates that she's a public official.

10   I'll have some questions for them about this because I think

11   the case deals with an elected official and I see a strong

12   reason why an elected official wouldn't have a property right

13   in his or her position.

14             But then that asks the question -- this is a kind of

15   unique position.  It's not quite an employee.  It's not an

16   elected official.  It isn't a government official.  And so --

17             MR. LOWELL:  There are cases that you pointed out to.

18   One that comes to mind -- let's set the framework.  So you have

19   me, an American citizen who somebody is taking action against,

20   and what is the notice and opportunity that I get under the due

21   process clause.

22             Then you have somebody that is at a position more

23   official than I, and that can be, if you will, the elected

24   official.  Then you have a person to the side, which is an

25   appointed official.

1        What we know is people in Governor Cook's position is

2   not some sort of officer -- doesn't get less due process.  In

3   fact, because her position as a Presidentially-appointed,

4   Senate-confirmed set of terms of a 14-year term has absolutely

5   been deemed to be giving somebody in that position with a

6   for-cause exclusion -- only way of being taken out of office,

7   that has been held to be a property right.

8        And as to it being an officer, one of the cases will

9   respond and admit to is the Shurtleff case, where an individual

10  was an officer.  So I haven't seen how they articulate their

11  position yet.

12       THE COURT:  What kind of officer?  Remind me in that

13  case.

14       MR. LOWELL:  Again, with the Court's indulgence.

15       THE COURT:  Okay.

16       MR. LOWELL:  I think it was the general appraiser of

17  the context of the agency.  But again, we will address that in

18  specific.

19       THE COURT:  Would that person have had a statutory

20  process prescribed?

21       MR. LOWELL:  I will address that.  I can't answer

22  that.  The case is just being brought to my attention.

23       THE COURT:  I think here's what's interesting about

24  this question and why I started asking what the process looks

25  like.  Because there's no -- we can talk about what the minimum

1    requirements are, but in terms of an opportunity to explain her

2    side, that would be to the President and the decision maker.

3          Because there's some veins of due process cases that

4    suggest that due process requires an independent decision maker

5    from the person who makes the decision.  And I don't think we

6    would say that maps here, right?

7          MR. LOWELL:  Right.  That one is easy, right.

8          THE COURT:  So it would be just the opportunity to

9    explain -- I guess baked into that, if someone has a

10   due-process right, I have to assume good-faith reception from

11   the person getting the explanation.  Otherwise, it's not a

12   meaningful process.

13         But you're not suggesting anything more than notice

14   and a clear explanation of the allegations, charges, however

15   you want to frame them, against them and an opportunity to

16   rebut and contest the explanations or otherwise explain them

17   before the decision is made.

18         MR. LOWELL:  Right.

19         THE COURT:  And you're not suggesting that there's any

20   other requirements that the statute would require me to map on

21   to that basic minimum framework.

22         MR. LOWELL:  What Your Honor just said is correct.

23   And we can then put it into the context of this case.  Because

24   we could be here -- I would be at your podium depending on what

25   happens in my answer to your question.

1              So let's say that the allegation against Governor Cook

2    was made and let's say it was made -- President acted on the

3    allegation but he didn't decide that on his own.  He based it

4    on an allegation made by one of the people in his

5    administration, in this case the FHA director Bill Pulte.

6              Bill Pulte writes that he thinks Governor Cook did

7    something wrong.  It is in front of that person that we get the

8    opportunity of notice and the opportunity to be heard --

9              THE COURT:  In front of the --

10             MR. LOWELL:  Before the President acts, if it is an

11   agency that's implementing his action, then there's -- I don't

12   pretend that I was going to walk into the Oval Office and make

13   a 20-minute presentation to President Trump and say, by the

14   way, Pulte is wrong.  Maybe that is what could happen.

15             I certainly know that to give any meaning to notice

16   and opportunity to be heard, there has to be that place

17   somewhere.  So where is it?  President acts on the basis of

18   what Pulte said.  Pulte says it on the basis of who knows what.

19   Maybe it's at that who-knows-what basis that we get the notice

20   and opportunity to be heard, but it certainly has to be

21   somewhere between him carrying it out and the allegation being

22   made.  It could have been at that point.

23             And the point I was going to make is let's say we have

24   that opportunity, and Director Pulte says, yeah, I made the

25   charge of mortgage fraud.  You gave it your best shot.  You

```
 1   told us that it was advised by an accountant, there was a

 2   lawyer involved, it's not intentional, there's no materiality,

 3   there was no financial gain to her.  I'm using the

 4   hypothetical.

 5          And then he says, I think it's anyway, and the

 6   President acts on that.  Then I might be in front of you and

 7   saying, on the basis of this record, it's like an APA claim.

 8   It was an arbitrary and capricious decision by an agency

 9   carrying out an improper motive of the President, but we're not

10   there.

11          And that's the problem with these hypotheticals.

12   Because what I do know is that nothing that's happened could

13   satisfy any court's requirement that there was proper notice

14   and an opportunity --

15          THE COURT:  So what you're suggesting is even if

16   minimum procedural requirements that satisfy constitutional

17   standards are met, there could be a challenge to a decision at

18   that point?

19          MR. LOWELL:  No.  I think -- no, because --

20          THE COURT:  I guess yes, because you have a separate

21   claim that this didn't rise to cause.  This is not sufficient

22   cause.  So --

23          MR. LOWELL:  That's difficult and you and I are both

24   squinting because it is difficult.

25          If the President acts on his definition of cause, that
```

1  I, the President, have said this is cause, you certainly have

2  the opportunity to see what the "this" is in the sentence.

3        If the "this" in the sentence is what Pulte says,

4  which is what we have now, and we know that doesn't satisfy, I

5  can't sit here and give you the five elements of what Pulte

6  could have done better for which I would concede, okay, that's

7  cause.

8        But I can say there is room for that without my

9  saying -- because, again, it's not a criminal case.  It's not a

10 disciplinary action in front of the Bar or in front of the

11 judicial conference.  So I can't answer your question because

12 that one is way into the hypothetical land.

13       I can say, though, that if there's notice and an

14 opportunity to be heard, the Court would be equipped to decide

15 whether it conforms to the case law and what that means.

16       And I can't answer today where that would be.  As I

17 said, I'm not trying to be flip, but I don't think it's me

18 making a presentation in the Oval, but I know it has to be

19 somewhere.

20       THE COURT:  If we could finally talk about irreparable

21 harm, just because I personally think the cases are all over

22 the place here in this context.  There is authority suggesting

23 that kind of the right to continue in a statutorily-prescribed

24 position is not irreparable.  So if you could outline very

25 clearly what the irreparable harm is.

1          MR. LOWELL:  We did that a bit and we will address it

2     to the extent that they challenge our having done that a bit.

3     We think the case law is not that ambiguous, that a person

4     appointed by the President, confirmed by the Senate -- and

5     again, you can't detach this from the unique role that the

6     Federal Reserve plays.

7          THE COURT:  Right.

8          MR. LOWELL:  I don't know whether the irreparable harm

9     is the same in one of the cases in which it's an inferior

10    officer who has been taken out of that person's job for things

11    that we believe not to have been proper basis.  And I'll come

12    back to that in just a second as to the special place that the

13    Federal Reserve -- and therefore, a special place that the

14    federal governors play in the system, in which you're asking

15    what is notice, what is opportunity to be heard and, now, what

16    is irreparable harm.

17          But a Presidential appointee in a historic agency that

18    every entity indicates has a special place in the constellation

19    of the United States government informs whether or not removing

20    that person, who took an oath and said I hereby will defend and

21    uphold the Constitution of the United States, and then for a

22    Governor even more than that, says I will make sure that we

23    perform the job of Governors independently as we were charted

24    to do back from the time that the central bank of the United

25    States was formed, and you are taking away from me my ability

 1    to do that.

 2          It's not about the salary, as in those cases.  It's

 3    not a monetary damage issue.  You've taken my right away to do

 4    my job, and my job is confirmed by the Senate and it is sworn

 5    to that I do it.  And I think the cases we already cited

 6    indicate that that is irreparable harm.  And to the extent the

 7    government's brief indicates that we're not right, that will be

 8    something that --

 9          THE COURT:  You're saying that's just -- that sounds

10    like an argument that I can't perform my statutory functions.

11    Which I understood cases -- I'm trying to think the state of

12    play in recent Circuit and Supreme Court decisions, that there

13    was some suggestion that that type of argument is not

14    irreparable harm, the inability of the person to carry out

15    statutorily-mandated functions.

16          Are you saying that -- it is true that none of those

17    cases involved this body.  So are you saying that those are

18    distinguishable by nature of the unique functions of this

19    Board, and, if so, if you could just explain that and spin that

20    out a little more.

21          MR. LOWELL:  We will do that but I'll look at the

22    Albert versus Employment Benefits case of the D.C. Circuit, an

23    integral part of the federal government.  The Board conducts

24    the monetary policy, regulates institutions, maintains the

25    stability.

1              Governor Cook, along with her brothers and sisters,

2     agreed that that was the charge that they accepted to do that

3     created in her being a Governor that was confirmed and has only

4     a for-cause removal, a property right.

5              If she is not allowed to pursue what she was given the

6     statutory and Senate-confirmed reason to do, and she's being

7     able -- and being taken it away, we believe that that now is in

8     the area in which that does equal irreparable harm.

9              And we will, again, further address it because I

10    haven't seen the way that they have attacked that issue.

11             THE COURT:  You also reference the fact that you say

12    that the executive -- the President is having discussions about

13    a replacement, and that that is irreparable -- your point there

14    is that if a replacement is put on and there's nothing that --

15             MR. LOWELL:  Well, that gets us into -- and there has

16    been case law now -- as to whether reinstatement, for example.

17    But how do you do that -- now, again, I don't know how this all

18    works at the speed of light.

19             The President has already announced a number of

20    candidates that he has in mind.  The President has stated as

21    recently as three days ago -- today's the 29th, three days ago,

22    that he will now have a majority of the Board.

23             The Senate of the United States, under the present

24    administration -- how should I say this -- has not necessarily

25    been stellar in its advise and consent role.  So theoretically,

1   that could end up being something that he nominates and says

2   the vacancy exists.  There's an opening.  I now nominate John

3   Doe.  The Senate takes it up next week.  The Senate decides to

4   confirm or the President says it's there.

5         That is irreparable harm and that hypothetical isn't

6   so hypothetical in the world we live in these days.  He's

7   already said that.  He's already said he wants a majority.

8   He's bragged that he's going to get it.  And he has nominees,

9   and I think that would qualify for sure under the factual

10  circumstances of this matter as we are appearing in front of

11  you.

12        THE COURT:  And is it also your argument in terms of

13  irreparable harm that deprivation of the due-process rights are

14  irreparable?  That that --

15        MR. LOWELL:  They are in the context of, then, before

16  we get a chance to say, wait, don't do it, she's already out of

17  office and kicked out of the building and doesn't have the

18  ability to function.  Then those overlap in terms of that

19  function.

20        THE COURT:  Is there any authority -- and if you don't

21  have it now, I would be interested to see it in your reply --

22  where a person was fired or removed in violation of due process

23  requirements, and the relief was interim restatement to receive

24  potentially more process?

25        MR. LOWELL:  I have to look at what Judge Ali ruled in

1   the NCUI case.  Because the issue there was, for example, was

2   reinstatement with whatever.  And I think the issue was not

3   just, okay, you get back pay.  Back pay wasn't enough, et

4   cetera.  So I will look at that.  We will address that as well

5   in our supplement.  So we will do that as well.

6        THE COURT:  Okay.  And if you were -- if I were to

7   grant some sort of preliminary relief, can we just confirm that

8   we're on the same page about what you're saying the remedy is?

9   You're agreeing -- and that's why you've sued the Federal

10  Reserve -- or named the Federal Reserve and its chair, because

11  any injunctive relief, you're acknowledging, could not be

12  directed to the President; is that correct?

13       MR. LOWELL:  We've acknowledged that -- and it's been

14  interesting, in the last two days I've been looking at the law

15  about why it's always assumed that you can't enjoin the

16  President from being unconstitutional.

17       And I know that there's some academic and scholarly

18  works out there, but for the purposes of this case, we don't

19  have to decide that.  We have to decide that -- this is the

20  famous, Judge.  If a tree falls in the forest and there's

21  nobody there, does it make a noise?

22       If the President was sitting around and saying, I

23  think Governor Cook is fired and nobody took any action against

24  it, then I might not have to be here.  But given that the Fed

25  is saying we are an uncertain terms, that's very trepidatious.

1    Who knows what they'll do tomorrow and the next day.

2          So consequently, we do believe that what you just said

3    creates the need for the relief.  And the relief, for purposes

4    of the preliminary place we're at, is that at least for now we

5    have shown likelihood of success on the merits, either because,

6    whatever it means, "for cause" can't be this.  And whatever

7    "notice" and "opportunity" means, it can't be this.  So we then

8    only need for now a likelihood of success on those in order to

9    meet that criterion of preliminary relief.

10          We've addressed the issue of whether or not there's

11    irreparable harm, and we believe that there is.

12          THE COURT:  Can we talk a little bit more about that.

13    Because I'm thinking specifically of the D.C. Circuit's stay

14    decision in the Dellinger case, where it said, even assuming

15    the removal was unlawful and even assuming that that creates a

16    cognizable injury, that's not an irreparable injury.

17          MR. LOWELL:  But again, I have to remember that in the

18    Dellinger case we're talking, again, about that other criteria,

19    single director, Board staggered, term, special circumstance of

20    what a Governor does.

21          THE COURT:  I understand that.  And I understand that

22    specifically in my consideration of the balance of the

23    equities.  But why is that relevant for irreparable harm, the

24    nature of the entity?

25          MR. LOWELL:  I think for three reasons.  One, I think

1    irreparable harm also depends on what is the property right.

2    And if there's a property right as well, then the question

3    becomes what is being -- what is she being deprived of?

4          And if what she's being deprived of is more than

5    simply I want my paycheck, but I want the ability to satisfy

6    the oath I took, the statutory right I was given not to be

7    removed for anything but cause, that I have also committed

8    myself to the independence of the Federal Reserve Board, all

9    those will stack up to amount to irreparable harm, and we'll

10   address Dellinger as well when we do that.

11         THE COURT:  Okay.

12         MR. LOWELL:  So back to your question.  Then if we got

13   to that piece, at least for now until we flesh out these and

14   some of the other questions, then what we need to do is

15   basically to tell everybody that the status quo stays in place.

16   That's the relief we're asking this Court to do.

17         She should not be taken out of her office.  She

18   shouldn't be disconnected to her electronics.  She should be

19   able to participate in the meetings.  She should do all the

20   things that she did a week ago before all this started because

21   that is the status quo ante.

22         That's the relief we're asking this Court, at least at

23   the TRO or at the preliminary level.  If that's what you asking

24   me as to what is the relief we're asking for, that's the relief

25   we're asking for.

1          THE COURT:  Okay.

2          MR. LOWELL:  I know you have questions.  You'll

3     probably get me allowed to stand up again when the government

4     is done.

5          THE COURT:  Yes.

6          MR. LOWELL:  I think I would like to just -- because

7     so many of the things you asked does reflect on the unique

8     position that the Federal Reserve and its Governors play, I

9     could not be more struck by the irony of what I was able to

10    glance -- and I want to point out just glance because it

11    deserves more than a glance -- the brief filed by the

12    government before I had a chance to read all 30-some-odd pages

13    this morning and what it says about the President's power.

14          What it says about the President's power that now they

15    want to apply to the Federal Reserve.  What they say the

16    President's power is to apply to the Federal Reserve,

17    notwithstanding the many years of Humphrey's Executor and

18    Wilcox and others.

19          But what struck me, Your Honor, was they made that

20    filing today.  And I couldn't help but notice that filing of

21    30 pages, among others, is signed by my brother, Mr. Roth, who

22    now says that position.  So when he gets up, maybe he'll

23    address why in the brief he filed in the Harris versus Bessent

24    case, he put his signature on the following quote.

25          The early Congresses further provided that the banks

1    of the United States, like the Federal Reserve, would have a

2    degree of insulation from the President's control.  Congress

3    provided that all -- emphasis added -- all of the first bank's

4    directors and 80 percent of the second bank's directors would

5    not be subject to Presidential removal; emphasis at all.

6              While the Federal Reserve Governors may be removed by

7    the President only for cause, the Federal Reserve Act, quote,

8    the banks of the United States and their successors in the

9    Federal Reserve represent, quote -- well, this is all a

10   quote -- sub-quote, a unique institution with unique history

11   and background.  Its historical pedigree cannot be general

12   extrapolated to other federal entities or agents.

13             That was just three months ago.  And now I read that

14   part in his brief today.  He signed both but he's changed his

15   view.

16             Thank you for your time.

17             THE COURT:  Okay.  Thank you.  I'll hear from

18   government.

19             MR. ROTH:  Good morning, Your Honor.

20             THE COURT:  Good morning.

21             MR. ROTH:  I'm happy to just proceed unless Your Honor

22   has questions you want to start with.

23             THE COURT:  I have questions.  So with respect to

24   cause, I understand the government's acknowledged that cause

25   should be -- it's limited -- it can't be a policy disagreement.

1          MR. ROTH:  Correct.

2          THE COURT:  So beyond that it could be any reason

3    that's articulated?

4          MR. ROTH:  Yes.

5          THE COURT:  Okay.  What if -- would a policy

6    disagreement cover if a president said there are members of the

7    board who are refusing to look at all of this data suggesting

8    there's no inflation and there's no reason to keep interest

9    rates at the current level, and I'm concerned that they're only

10   taking these positions to make my administration look bad and

11   they're not faithfully discharging their duties to at least

12   consider this other evidence and whatever.  And so I don't

13   think that they have the intellectual ability or the judgment

14   to remain.  Is that a political disagreement or is that

15   something else?

16         MR. ROTH:  Still sounds like a policy decision to me.

17         THE COURT:  All right.  So anything that relates to

18   firing based on a position that the officer takes is off

19   limits?

20         MR. ROTH:  I don't know if I would go quite that far.

21   I mean, you can imagine some extreme case where someone

22   exercises their power in an abusive way, and that's sort of

23   beyond the pale and is treated as cause.

24         But I think if you're within the realm of reasonable

25   policy disputes, the Supreme Court has told us that's not cause

 1   for purposes of these statutes and we're not disputing that

 2   here.

 3          THE COURT:  Given the specific information that

 4   plaintiff's counsel just made about the unique nature of this

 5   Board and the need for independence, does it make sense that

 6   there would be such broad discretion?

 7          MR. ROTH:  Yeah, I mean, just to go back to what

 8   counsel was saying at the end, I don't understand what the

 9   contradiction is.  We've said in many other cases, including

10   the one that he cites, that, generally speaking, Congress does

11   not have the authority to restrict Presidential removal of

12   executive officers.

13          And we've always carved out in our briefs in --

14   Federal Reserve, and said Federal Reserve might be different

15   because it has a unique historical background.

16          And that's why in this removal letter the President

17   did not say, like he has in other removals, You are removed

18   pursuant to Article 2, period.  He have said, You are removed

19   for cause and here's why.  So he is invoking the statutory

20   for-cause removal provision, and our position is he has

21   satisfied that provision, not that that provision is

22   unconstitutional.

23          The reason for that difference relates to the unique

24   historical features of the Federal Reserve.  And that is why

25   there is a -- we're not at this point saying no limits

1    whatsoever.

2            The limit is that it can't be just, well, I want my

3    people there or I don't like the way you are -- as a policy

4    matter, the way you're exercising your duties.  That's what the

5    Supreme Court said in Wiener and Humphrey's Executor that

6    "cause" means.  But beyond that, the statute doesn't provide

7    any further description.

8            And Reagan does say when the statute just says "cause"

9    or "causes" without further specification, that means it's

10   discretionary and it's not reviewable by the Court.

11           THE COURT:  It can really be for any -- the most de

12   minimis reason one could think of that's unrelated to policy

13   decisions?  It could really just be any reason at all?

14           MR. ROTH:  Your Honor, maybe I want to separate sort

15   of the reviewability question from the sort of, like, what does

16   the statute mean.

17           THE COURT:  Okay.

18           MR. ROTH:  The statute means a reason that calls into

19   question the individual's fitness or ability to serve.

20           THE COURT:  Okay.

21           MR. ROTH:  And then it's the President's determination

22   as to whether that standard has been satisfied.  And I think

23   under Reagan, there isn't supposed to be review of that

24   determination.  Certainly, to the extent there is review, it's

25   going to be very deferential review.

1          And I was sort of struck by counsel's statements about

2     how, look, it's a sliding scale.  And there's so many factors,

3     there's so many variables.  The type of conduct, its

4     relationship to the office, how serious it is, when it

5     happened, all of these things have to be taken into account.

6          Well, that sounds to me like the epitome of a

7     discretionary determination and that's when the President's

8     power is at its apex, in making those judgment calls and

9     weighing those variables.

10     THE COURT:  What is reviewable in this context?

11     Certainly someone could say I was fired without cause and that

12     would be something that a court could review?

13     MR. ROTH:  I think what would be reviewable is if the

14     President did not give a cause, then somebody could say, hey,

15     I'm entitled to cause, and that hasn't been satisfied because

16     he didn't give a cause.

17          Once you have the cause, I think the only question

18     really under the cases is is it just a mere policy disagreement

19     that is out of bounds.

20     THE COURT:  And is that reviewable?

21     MR. ROTH:  I think it's what the statute means.  I

22     don't think it's reviewable under Reagan but I think it's what

23     the statute means.

24     THE COURT:  But if there was a violation of that,

25     there's no recourse for someone?

1          MR. ROTH:  That's how I read Reagan, but I'll be quick

2    to add that to the extent the Court thinks there's room for

3    judicial review, that would be what would be the most obvious

4    situation for judicial review.

5          THE COURT:  I think plaintiff's counsel could tell I'm

6    uncomfortable with the pretext argument, but I also am

7    uncomfortable with an idea that could someone explicitly say I

8    want to get a majority on the board, so let's go dig in and

9    find reasons to kick all these people off so I can get my

10   people in.

11         MR. ROTH:  Right.

12         THE COURT:  And then the letter says, this is the

13   reason.

14         MR. ROTH:  Right.  The Supreme Court decisions say, we

15   look at the President's determination and the rationale he has

16   given.  They're very, very reluctant to allow courts to probe

17   that or probe the sincerity of that.  That's Trump versus

18   Hawaii but it also goes back to Nixon.

19         And Your Honor's questions about, like, well, how are

20   we going to tell?  We need to depose the President and say did

21   he really mean it?  No.  I mean, the courts don't do that.  And

22   so it's kind of a dead end in that way, and I think that is why

23   we are stuck with a determination the President made on its

24   face.

25         Now, I will add that in addition to being legally

1    foreclosed, I don't think this is a particularly strong pretext

2    argument.  There is -- until this referral came out, I'm not

3    aware of any statements the President ever made about Dr. Cook.

4    They say, well, he tried to get Chairman Powell to resign.

5    Okay, but this isn't Chairman Powell.  This is Dr. Cook.  And

6    the referral came about her.  That's when this arose.

7         There's nothing in the President's statements, either

8    contemporaneous or after, that suggests that the removal was

9    for any reason other than the reason given in the letter.

10        Now, maybe he's happy to have an opening that he can

11   fill, but that's different from the question of what was the

12   reason and the basis for the removal.

13        THE COURT:  My question was -- let's put it purely

14   hypothetical, because I don't want to suggest or have you

15   acknowledge that this might have happened here.

16        But in a case where there are explicit statements of a

17   desire to remove members who have policy disagreements, can I

18   look to those?  Or you're saying no?

19        MR. ROTH:  The way I read Trump versus Hawaii is there

20   is, at minimum, extreme reluctance to go down that path.  I

21   don't want to make categorical statements, never, no

22   hypothetical.  But generally speaking, the rule is we look at

23   what the President has said and we evaluate it on its own

24   terms.

25        And that's the presumption of good faith that the

1    Supreme Court has reiterated over and over again in this

2    context.

3           I'll also just say while we're talking about the cause

4    and the referral, counsel said repeatedly, oh, it's just a

5    maybe, we don't know, it's allegations.  That's not really

6    what's going on.

7           The referral letter attaches the documents.  It's not

8    like, oh, maybe something happened.  They're right there.  I

9    looked at them.  They have the signature.  They make

10   contradictory representations.  They're within two weeks of

11   each other.

12          Now, maybe there's an explanation that that goes to

13   certainly criminal liability.  Maybe she didn't read it.  Maybe

14   her lawyer told her it was fine.  I don't know.  They haven't

15   said any of that.

16          They've been very careful in this brief not to make

17   any representations about what actually happened, any defense,

18   any articulation of what the explanation is for what, on its

19   face, is a contradictory representation about the intent to use

20   and occupy two properties as principal residence at the same

21   time.

22          THE COURT:  What if a stated cause is demonstrably

23   false?  That's still not anything that anyone can do anything

24   about?

25          MR. ROTH:  I'm glad we don't have that case, Your

1    Honor.  It's a difficult situation.  I acknowledge it's a

2    difficult hypothetical.  And that's the thing about

3    non-reviewability rules is they allow for hypotheticals that

4    are uncomfortable.

5         But again, to the extent that we're going to have

6    judicial review at all, it's going to be a deferential form of

7    review where we're looking at the material and saying is this

8    an extreme abuse of discretion or is this within the range.

9         And I just don't see the argument that for a very

10   senior financial regulatory official, making contradictory

11   representations on financial documents with no explanation

12   given -- and again, we're now a week later.  We have filings,

13   still no explanation given.  That that's not a reasonable

14   ground to say a person -- that there's cause for removal?  I

15   just don't see it.

16        THE COURT:  I read your brief and I had a strong

17   reaction to the suggestion that there was notice and an

18   opportunity here because of the social media post, and that she

19   didn't respond to it and so that in five days the President

20   acted.

21        We'll go back to your argument that this is not a

22   protected property interest.  But if it was, I mean, you're not

23   suggesting that what happened here would satisfy due process

24   requirements?

25        MR. ROTH:  Oh, yeah, no, I absolutely am.  And we can

 1  look at it step by step.

 2          Notice of the concern was given on August 20th.

 3          THE COURT:  That's the social media post?

 4          MR. ROTH:  It's a -- yes.

 5          THE COURT:  Was anything sent to her directly?

 6          MR. ROTH:  Well, she certainly knew about it because

 7  she was asked about it.

 8          THE COURT:  I'm not necessarily equating this to a

 9  civil case but you still have to serve someone.  You have to

10  give them information.

11          MR. ROTH:  But if there's actual notice, Your Honor,

12  that generally satisfies.

13          THE COURT:  So actual notice.  And then in terms of --

14  how did she know that she had five days to respond?

15          MR. ROTH:  She didn't know she had five days, Your

16  Honor.  But the President certainly made clear in that initial

17  statement that he considers this as potential grounds for

18  removal.

19          And there was, at least as far as the record appears,

20  no response, no intent, no letter saying, hey, I disagree with

21  this, give me a chance to tell you why.  No statement of, this

22  is false, I never signed this, or the President is wrong

23  because my lawyer told me this was allowed.  Nothing.

24          No communication at all to the President from a

25  principal officer of the United States over this period of

1    time.  And, again, still today we don't know.

2            THE COURT:  Again, this is why I was asking

3    plaintiff's counsel what the procedures would look like.  But

4    at minimum, when you -- when someone has an opportunity to be

5    heard, don't they have to be given information about what their

6    rights and obligations are with respect to that?

7            MR. ROTH:  Well, Your Honor, I think part of the

8    problem of importing this framework into this context is that

9    it doesn't map on very well because a lot of these concepts

10   are -- they're built around sort of civil service statutes that

11   give precise procedures and rights and remedies.

12           And none of that applies when we're talking about a

13   senior level principal officer, and that's why no case has held

14   that those protections apply to principal officers of the

15   United States, to my knowledge.

16           THE COURT:  Yeah, I agree.  I'm struggling with that.

17           MR. ROTH:  But I'm trying to get to the purpose of it.

18   The purpose of it is is there some sort of obvious mistake that

19   is sort of potentially being made and is there a chance to

20   remedy that mistake?

21           And I'm not sure here what the mistake, possible

22   mistake would have been, and they haven't said it.  The point

23   of a hearing -- it's not a formal hearing, It's an opportunity

24   to tell your side of the story -- is is there some material,

25   factual dispute.  You got it wrong, right?  That's not my

1   signature.

2           What is that?  Like, they haven't said what it is.

3   And I think if there was something like that, then we would

4   have heard it by now, if not in public, then in the filings.

5           So what's the purpose of saying the President needs to

6   hear her out?  Well, what is it that she's going to say and how

7   is it going to change the conclusion in his letter that either

8   this was intentional and, therefore, potentially criminal or,

9   at minimum, it was negligent and therefore itself grounds for

10  removal?  I just haven't heard what the story is that she wants

11  to share that would change that in any conceivable way.

12          THE COURT:  What is your reaction to -- when I read

13  the plaintiff's opening brief, I thought they were taking the

14  position that pre-office or pre-position conduct was off

15  limits.  They're not going that far.

16          What is your response to -- what if it's something

17  that was known to the President making the appointment and

18  known to the Senate who confirmed the person?

19          MR. ROTH:  Yeah.

20          THE COURT:  It feels weird to then allow -- and look,

21  there are a lot of things that courts can't review that feel

22  weird.  So I'm not suggesting that I fill in a gap that doesn't

23  exist.  I'm going to look very closely at the reviewability

24  question.

25          But if this were reviewable to some degree, it feels

```
1    weird that an administration could kind of go back and

2    second-guess the determinations of prior administrations and

3    Congress in their advise and consent role.

4            MR. ROTH:  I had a similar reaction.  I think if it

5    was something that was known at the time, it's much harder to

6    say that it's cause later because the presumption is that has

7    gone through the political process and a judgment has been

8    made.  But again, that's not the facts here.

9            THE COURT:  I know.  But if I rule in a certain way, I

10   want to make sure that it's not something that's just unique to

11   this situation.

12           MR. ROTH:  Of course.  I absolutely understand that.

13   I said before that I thought cause is a reason that is more

14   than mere policy disagreement that bears on the individual's

15   ability or fitness to do the job.  You could add to that that

16   was not known at the time of confirmation.

17           THE COURT:  How is that fleshed out?  What if there's

18   disagreements about what's known at the time?  Then you have to

19   look at their materials that they submitted to the Senate and

20   depose the White House officials who did the vetting.

21           MR. ROTH:  I don't think we're going to depose.

22   That's usually a hard no.

23           THE COURT:  Right.  That's why I'm thinking of the

24   most kind of extreme example of how you would look into this.

25           MR. ROTH:  Right.  And look, that plays into the
```

1    reviewability argument, which is maybe we don't go down the

2    road at all.  We can define what we think the statute means.

3    And the President is constitutionally obligated to follow the

4    laws of the United States faithfully.  And so that applies

5    whether it's reviewable or not.

6          But yeah, once you start getting into review, we do

7    have a lot of questions that are going to come up.

8          THE COURT:  But then I keep going back to what

9    everyone has agreed is the unique nature of this Board and the

10   need for independence and how that maps on to all of these

11   questions.

12         Because in other areas where matters aren't

13   reviewable, their independence is not what's going on.  This is

14   purely within the prerogative of the President to decide who to

15   pardon, to decide a number of things that courts don't get

16   involved with.

17         What about the unique nature and the importance of

18   this being an independent body that is not supposed to be

19   responsive to any type of political pressure?

20         MR. ROTH:  Right.  Your Honor, all I could really say

21   is that's why we are not contesting for present purposes the

22   legitimacy of the for-cause removal provision.  Which is very

23   different from arguments that have been made in the other

24   removal cases over the past number of months.

25         But that is separate from reviewability.  They're two

1    separate questions.  I think on reviewability the governing

2    case law is Reagan, which says it's still committed to the

3    President's discretion.  The President has a constitutional

4    obligation to follow the law.  It doesn't always mean it's

5    subject to judicial review.

6         THE COURT:  Right.  But I think it's kind of circular.

7    In the sense that where there is cause, it's not reviewable, to

8    me is different from the question of if there's cause, which

9    necessarily requires a court to determine what cause is.

10         If I adopt your definition or if the case law compels

11    that definition, then once a reason is articulated that's

12    outside that definition, it could be highly differential,

13    nothing to do, nothing further to review.

14         But in the first instance, do you dispute that a court

15    has an obligation to consider an argument?  Because their

16    argument essentially boils down to this is not cause.  So I was

17    essentially removed from my position without cause.

18         MR. ROTH:  Yeah.  We are -- our initial position is

19    that under Reagan it's not reviewable.  But I am sort of

20    quickly pivoting to the point that, to the extent it's

21    reviewable, it's a discretionary and therefore deferential

22    level of review.

23         And all of the factors that counsel on the other side

24    said are relevant are things that are appropriate for the

25    President to take into account, and I don't think this

1    determination sort of comes close to the edges of that.  And,

2    therefore, they can't show likelihood of success on the merits

3    on the substantive claim.

4          THE COURT:  I agree with you when I think about kind

5    of what procedural protections would look like; it is difficult

6    to map on.  But I also, as I said, understand very clearly why

7    the case law makes clear that elected officials don't have a

8    protected property interest in their positions.  And I

9    understand very clearly why employees do.

10          MR. ROTH:  Right.

11          THE COURT:  This doesn't seem to fit neatly in either

12    category.  And it I guess if I had to say what it's closer to,

13    I think I would put it closer to an employee than an elected

14    official.  How do I decide --

15          MR. ROTH:  Let me make two points on that.  Number

16    one, I think Taylor is the case we cited that involves an

17    elected official.

18          THE COURT:  Yeah.

19          MR. ROTH:  I think that the other case we cited,

20    Crenshaw, not an elected official.

21          THE COURT:  Okay.  I'll look at that.

22          MR. ROTH:  And then the second thing I would say is

23    for constitutional purposes the relevant distinction is not

24    elected versus appointed.  That's not really a distinction that

25    has a lot of significance legally in the doctrine.

1          It's between officers and employees.  That's the

2     distinction that comes up over and over again in the case law.

3     And of course, you have principal officers and inferior

4     officers and then employees.  So there's really three

5     categories.

6          But the way I see it, the higher you get through that,

7     the lower the standard of sort of any procedural due process

8     protections that apply, because those are much more sensitive

9     political positions than mere employees.

10         THE COURT:  Anything you want to say about irreparable

11     harm?

12         MR. ROTH:  Yeah, I do.  I think of irreparable harm,

13     often I think of it as together with the other equitable

14     factors.  It's sort of the balance, sort of trying to figure

15     out, all right, if the Court gets it wrong one way versus the

16     other way, who's going to be hurt more.

17         And I think Wilcox and Boyle resolve it pretty

18     decisively in the government's favor in these removal cases.

19         The Supreme Court said in Wilcox, I think the harm of

20     having somebody in office who was -- sort of is wrongfully

21     there, that harm outweighs the harm of somebody being

22     wrongfully removed from office for a period --

23         THE COURT:  Isn't that in the context of the Article 2

24     power?  Do you agree that this Board doesn't exercise

25     substantial executive power or would you take issue with that?

1          MR. ROTH:  I don't think we've said that and I don't

2     know that I've taken a position on that.

3          THE COURT:  Okay.

4          MR. ROTH:  But yes, Wilcox is different in the sense

5     that the argument we were making in Wilcox -- the government

6     was making in Wilcox was that the restriction on removal was

7     unconstitutional and, therefore, the President had the power to

8     remove at will.

9          Whereas the argument we're making here is that the

10    President has satisfied the statutory restriction of for-cause

11    removal.  To me, that's a difference that goes to the merits.

12          For the purposes of the balance-of-harms

13    consideration, where we're just looking at what's worse,

14    somebody being out of office when they should be in or somebody

15    being in office when they should be out, I read the Supreme

16    Court's decision in Wilcox to say that one outweighs the other.

17          And then the Supreme Court reiterated in Boyle that

18    that governs.  Lower courts need to follow that in materially

19    similar cases.  And I think those are the same factors we're

20    considering here for purposes of the non-merits piece of the

21    injunction calculus.

22          THE COURT:  If I could go back to the due process

23    question, because you were drawing a distinction between

24    employees and officers.

25          MR. ROTH:  Yeah.

1          THE COURT:  And I'm recalling cases that seem to

2     equate the protections because they arise from the for-cause

3     provisions of the statutes.  Meaning that where a statute

4     allows removal for cause, that that's what provides a property

5     interest.  Can you speak to that?

6          MR. ROTH:  They make sort of a constitutional due

7     process argument and then they make a sort of the statute

8     confers the protection.  But I think, again, they'll take the

9     Court back to Reagan because I think that -- respectfully, I

10    think they're misreading the case.

11         What the Supreme Court said was that if the statute

12    provides a list of causes, then you need to be told which one

13    is the one that covers you.  And then there's some opportunity

14    to say, no, that's wrong, it's not -- I don't fit within it.

15         But the court said when there's no list, that doesn't

16    apply.  That was true in Reagan and it's equally true here.

17    And that makes sense because when we're not talking about a

18    sort of reticulated scheme where you could say, no, I'm not

19    covered by C-5, this is cause.  It's very open-ended.  That

20    standard doesn't really make any sense in that context.

21         THE COURT:  Let's make a huge assumption that there

22    was a due process violation of some sort.  What would be the

23    appropriate remedy and is that in and of itself a form of

24    irreparable harm that maybe makes it distinct from other cases

25    that I don't necessarily understand if those cases also involve

1    specific constitutional --

2         MR. ROTH:  Let me take the second piece of that first.

3    I don't think it's different from an irreparable harm

4    standpoint because I think that the thing that is being

5    deprived is the office or the employment, which is the same

6    thing as in all the other removal cases that we've been talking

7    about.

8         By the way, the most recent one to sort of catalog the

9    law is the Perlmutter.  The Library of Congress case goes

10    through this in a lot of detail.

11         THE COURT:  Yeah.

12         MR. ROTH:  So I understand, like often we say

13    deprivation of First Amendment rights is irreparable harm.

14    That's because you want to speak.  You're not speaking.  You

15    can't go back in time and speak.

16         Here, if the argument is, well, I was entitled to an

17    opportunity to challenge this in advance, I didn't get it,

18    what's the consequence?  The consequence is I'm not in office

19    right now when I should be.  That's exactly the same harm that

20    is addressed in those other cases.

21         In terms of what the remedy would be if the Court

22    found that there should have been that opportunity, I think

23    that's really tricky because, again, I have not heard -- I

24    still have not heard, at least, from my understanding, what

25    they think the hearing would accomplish, what is the fact they

1    want to present.  And I think --

2            THE COURT:  I don't even know if they're saying that

3    there needs to be a hearing, so to speak.

4            MR. ROTH:  I'm using that in a colloquial sense.  The

5    opportunity to be heard, to say what.

6            THE COURT:  A response.  Using it colloquially, like

7    that it's just responding by letter and having it read might be

8    sufficient.

9            MR. ROTH:  Right.  So the remedy really isn't

10    reinstatement.  It's like, okay, send the letter and maybe the

11    President will change his mind.  Sometimes he changes his mind

12    about things.

13            But I don't see how that gets them to reinstatement.

14    And I just don't think they've made the showing that would be

15    necessary for a preliminary injunction, that that would make a

16    difference under these circumstances when I think the

17    President's letter was pretty clear.

18            Either it's A or it's B but either way I conclude that

19    it's cause.  And I have not heard anything from them to say,

20    oh, no, it's neither A nor B, there's some third explanation

21    for this that doesn't actually track either of those

22    possibilities.  And if that existed, I would have expected to

23    have heard it.

24            THE COURT:  If I can go back, again, I think the

25    acknowledgment that it can't be for policy disagreements, I'm

1    trying to think how that -- when there is an accusation or an

2    allegation in a complaint that someone has been fired for

3    personal policy agreements, President's letter does not reflect

4    that, yes, it's highly deferential.  But what does a Court do?

5        Deferential doesn't mean that there's no probing of

6    it, it just means that you assume good faith and defer.  But it

7    doesn't mean that there's not a review, that there's not an

8    inquiry that takes place.  So what does that look like?

9        MR. ROTH:  Well, I think the Supreme Court decisions

10   really don't contemplate it.  So it's hard for me to tell you

11   like, oh, in these circumstances that would be allowed.

12       The way I read those cases, you don't probe.  When the

13   President is statutorily empowered to make a determination

14   that's discretionary and he makes the determination and on its

15   face it's valid, we don't probe the sincerity or the motives.

16   That's just the general rule.

17       And again, if there's some extreme case, I don't want

18   to be super categorical but I can't concede that like, oh,

19   yeah, if it was on these facts we think the Court would be

20   allowed to call them in for a deposition and ask him, did you

21   really mean it, or override it when its on its face it's valid.

22   That's Trump versus Hawaii.  We litigated that.

23       THE COURT:  Okay.  I don't have any other questions

24   unless you wanted to say more in response.

25       MR. ROTH:  No.  I think I covered the points I wanted

1    to cover.

2              Thank you, Your Honor, for your time.

3              THE COURT:  All right.  Thank you.

4              MR. LOWELL:  Let me take the time to respond to what

5    counsel said and only what counsel said.

6              THE COURT:  Okay.  You have the last word.  It's your

7    motion.

8              MR. LOWELL:  Thank you.  First thing that I wrote down

9    that he said was this is not that case where the President is

10   just asserting, I have Article 2 power, period.  He said the

11   President concedes that he has Article 2 power but had to frame

12   it in the statute's requirement for cause.

13             But, Your Honor, there's no difference if the

14   President says, I have Article 2 power, and by the way, I am

15   putting in the single word "cause" without explaining in any

16   fashion the basis of that cause.  Or, as we have been spending

17   many minutes on, what does it mean to get to the point where

18   there is the ability to contest that cause.

19             In other words, just putting the word "cause" next to

20   Article 2 doesn't make it better.  The cause has to stand for

21   something, and just simply using the word doesn't seem enough.

22             So if that's not enough, the President gave you what

23   he meant.  Again, I point out the August 26th public statement,

24   when he said if she had acted properly.

25             And you would have thought that that would have then

1    followed with look what she did on her alleged form.  But

2    that's not what he said.  The propriety of what he said was

3    that she wouldn't go along with an interest rate, which the

4    government agrees would be a policy issue, which the courts

5    have said is not the same as cause.

6         Counsel then said you defer to the President if

7    there's, quote, any reason to call into question a person's

8    fitness.

9         Any reason?  Not in the face of something that calls

10   for cause.  So they're synonymous?  Any reason now is cause.

11        Well, what does he mean by any reason?  I have to

12   because you and I and he are dealing with hypotheticals.  I

13   don't know what that could possibly mean.

14        Could the President decide that it was cause because

15   Federal Governor Cook decides to attend her meetings in a pants

16   suit versus a dress, and he doesn't think that is enough

17   respect for the institution?  That's cause.

18        Did he mean that she teaches at a school that he

19   disagrees with because of their DEI policies, and that's cause?

20   Or you don't agree with my decision to lower the interest rates

21   because you didn't consider the right factors?

22        Well, we know that can't be.  So where along the

23   continuum is, to use counsel's phrase, any reason to call into

24   question a person's fitness?

25        Then, as to the issue of my explaining that, again,

1    we're being very cautious, I use the word "pretext" in its

2    context of what you asked me about.  When there's no cause, you

3    look at its surrounding.  If a word in a statute isn't clear,

4    you look for the surrounding words to make it clear and other

5    such things.

6         And he said, well, sure, he said that about Chairman

7    Powell.  He never said anything about Governor Cook at the time

8    that he was railing about Chairman Powell.  Okay, we'll accept

9    that.  But when he took his best swing in his baseball bat

10   against the Chairman and that didn't get him what he wanted,

11   then he took the swing at the next person up at the plate.  And

12   that has context.

13        It doesn't answer the question if he misuses the word

14   "fraud" or he misuses the FHA, and it doesn't succeed against

15   the first Governor and then he moves to the next Governor, that

16   has context.

17        Counsel said you look at what the President said.  And

18   I've already indicated more than once, and I won't do it a

19   third time, what it is the President said when it was asked

20   what it was to be proper.

21        And then I want to talk about this idea that Governor

22   Cook has had all this opportunity to respond and hasn't.

23   Really?  She's had all this opportunity?  It was this posting

24   at a social media by Director Pulte.

25        And then in the brief, counsel for the government says

1   they took great pains not to discuss the allegations.  But

2   today in court stands up and says, well, look at the

3   allegations.  She had these two different entries and he says

4   they're contradictory.

5        I don't accept his conclusion that they're

6   contradictory.  Certainly not here.  But at the same time he

7   can't have it both ways.  He can't say that she had an

8   opportunity -- and we're not getting into the merits.  And he

9   says in all this briefing there's not one part which talks

10   about what she would have answered.

11        That's not the place for this.  The place is not in

12   the pleading in which we say she hasn't been given an

13   opportunity.  By the way, we don't say here is the response to

14   the President having no basis to remove her, but let me tell

15   you in the next 15 pages what her defense to an allegation

16   would be if it was properly made against her.

17        There is, then, opportunity but it's not in the

18   briefing as to whether or not there should be a TRO because

19   whatever "cause" means, it means something different than what

20   was done to seek her removal.

21        And it can't be, as I said when I rose to the podium

22   the first time, that we're supposed to litigate the merits of

23   this underlying, unsubstantiated charge by way of, as I said,

24   my now having to sign on to social media, which I've avoided

25   for however many years, so that I can respond in that fashion.

1        There's a place for that response, with documents and

2   facts and that could be the chair -- to the Pulte or whatever.

3   But it's certainly not in a brief that's raising that this

4   shouldn't have happened the way it did.  And it's not because

5   we have the ability to respond even to the 31 remaining tweets.

6   I guess you call it a tweet even if it's not on Twitter.  I

7   don't remember.  But anyway, that's not the place.

8        And as to his saying look at what the President did,

9   boy, did she have an opportunity.  Wow, 30 minutes after

10  Director Pulte posted, 30 minutes, the President said she needs

11  to resign because what she did was bad.  And if she doesn't

12  resign -- not answer the charge, not give me information, not

13  give Pulte.  If she doesn't resign, I'm going to fire her.

14        That is not an opportunity to be heard.

15        As to the issue of the officers of not having -- and

16  we will address this but I did before raise the issue of the

17  case.  It is Shurtleff versus United States.  It's a Supreme

18  Court case in 1903.

19        I thought in their brief and at the podium he said

20  that if there's an officer, there's no due process right.

21  You're parsing whether it's an employee or an officer or an

22  elected officer and appointed officer.  That case directly

23  contradicts the idea that if the person is an officer, and

24  whether it doesn't distinguish between senior and not, that

25  officer's removal does get the right to have due process.

1          So we will address that.  But I think that parsing as

2   to what kind of officer gets that you'll see doesn't solve the

3   problem of what happened here.

4          And again, I point out this notion that if we're

5   trying to figure out what processes do, which is always the

6   phrase a court uses, not only as what processes do is where

7   that should take place, and we haven't had that opportunity.

8          And if what the government is now saying is, well, you

9   should have -- first, Pulte does it privately to the Attorney

10  General on the 15th.  No one knows about that.  Then he decides

11  to make it public, not to her but to the world, on the 20th,

12  making the allegations in that first one.  There's no

13  particular way that you could address that.

14          And that decision or lack of decision to answer him

15  right away in a public media is what the due process clause

16  allows or requires?  I don't think so.

17          And then he has added now the phrase "reason to call

18  into question a person's fitness."  So I question, okay, by

19  who?  We know.  The President.

20          And he has added, okay, so now we'll add that was

21  known at the time.  And Your Honor has already come to that

22  question.

23          So that's an interesting concession.  I can assure you

24  that in the vetting process of the United States Senate for

25  something as important as the Governor of the Federal Reserve

1    Board, her financial documents, bank records, loans, et cetera

2    were submitted as part of the vetting and part of the

3    presentation, and the Senate had the opportunity to look at

4    them.

5         And so if they're saying that there's this glaring

6    contradiction between two houses that at one point might have

7    been, quote, contradictory because they're both principal,

8    well, again, I don't know how you want to go back in time but I

9    will tell you that -- and if all I need to do is in our next

10   show that we submitted -- we, the Governor submitted all of

11   that into the Senate, we can do that as well.

12        So I like the concession and, therefore, if that's the

13   case, we'll take it.  And therefore, a new President shouldn't

14   undo what the past President did of everything that Director

15   Pulte did was before them at the time that they made their

16   decision to confirm.

17        The next thing he said was on the irreparable harm,

18   and I think Your Honor questioned that and questioned it in the

19   right way as to whether we were talking about an agency that

20   has that executive power when he talks about Wilcox and others.

21        And consequently, he mentioned -- or you mentioned

22   Dellinger.  I think the question was Dellinger was allowed to

23   remain in office for the period that goes to the litigation,

24   which goes, again, to not removing somebody in the context of

25   these issues being litigated for the irreparable harm.

1          And then, I think, he also then concluded with two

2     points that I'll conclude on.  The first is that he said, so if

3     the issue is whether somebody should be out, is out when they

4     should be in, versus the harm about that she is in when she

5     should be out, that's a tautology that basically turns on its

6     head everything we've been discussing for the last however many

7     minutes or hours.

8          Again, it goes to the issue of what do you mean should

9     be out when she should be in.  That, then, underscores all the

10    issues of what is for cause, what is the opportunity to contest

11    that cause.

12         And it's certainly not counsel for the government

13    sitting at a podium or me representing Governor Cook that

14    should be the ones to figure out, now, at this juncture, that

15    she should have been out when in or should have been in when

16    out.  That's what a process requires.

17         Then you ask if the due process, what is the remedy.

18    And I think I need to point out the slight contradiction in the

19    positions of the government, where at one hand they say, well,

20    she had five days to answer a tweet and she didn't.  And they

21    say, well, you could have put it into your brief on the issues

22    we're here today for, but that's not the place it should be.

23         And so, consequently, she got all the opportunity she

24    needed and she didn't take it.  So consequently, it stands

25    uncontradicted.  So consequently, everything that happened is

1    okay and this should stand.  None of that is the case.

2            And finally, I just want to, again, point out that we

3    are in a unique situation because of the history of the Fed and

4    its Governors, et cetera.

5            But it shouldn't be that the government gets to say

6    look at how unique the Fed is as a way of defending their

7    dismissal of an NLRB member or a Consumer Product Safety Board

8    member or a PCAOB member.  Because they say, so look, if it was

9    the Fed we wouldn't be saying this, and now it is the Fed and

10   they're saying the same thing.  Thank you.

11           MR. ROTH:  Am I able to make just a couple quick

12   points?

13           THE COURT:  Sure.

14           MR. ROTH:  Sorry, I know it's surrebuttal but just to

15   clean up a couple things.

16           THE COURT:  Okay.

17           MR. ROTH:  So counsel mentioned a few times this

18   August 26th press statement.

19           THE COURT:  Yes.

20           MR. ROTH:  I think it's a YouTube clip.  I confess, I

21   haven't watched it.  But based on the way it was quoted in

22   their brief, I understood it to be saying something very

23   different.

24           I thought the quote was that if the reporters had done

25   their job, we would not have Dr. Cook on the Board because

1    these issues would have been fleshed out years ago.  So I did

2    not understand that at all to be some sort of concession of,

3    oh, well, the real reason was something about interest rates.

4    But I have to watch it.

5          The second point, counsel says the brief is not the

6    place to make our case about why this was unfair or not a

7    legitimate rationale for termination because we were entitled

8    to make that argument to the President first.  That seems to be

9    what he's saying.

10          But Your Honor, we're here in equity.  They're asking

11   for preliminary injunction.  They need to show why it matters.

12   They need to show what is the fact in dispute that they would

13   have contested had they been given the chance, because

14   otherwise this is all futile.

15          And I don't need to go as far as to say it's unclean

16   hands that they haven't contested, like the underlying facts,

17   but it's certainly not enough to get an injunction.

18          And then, finally, on Dellinger and the balance of

19   harms, the way the injunction factors work, you consider the

20   merits and then separately you ask if one side is -- we assume

21   one side is right on the merits and the Court goes the other

22   way, what's the harm?  Compare that to if --

23          THE COURT:  Right.

24          MR. ROTH:  The opposite.  That's what I was saying

25   with you weigh the harm of a wrongful person -- you know, a

1    person being in when they should be out versus being out when

2    they should be in, it assumes the weight of the merits because

3    that's a separate factor on the preliminary injunction test.

4         And under Dellinger, Dellinger was stayed.  I don't

5    know what counsel's referring to.  Yes, he was allowed to -- he

6    was reinstated and then the D.C. Circuit stayed that and said

7    that's wrong, and then he dismissed the case.

8         So yes, he was temporarily allowed to remain but the

9    D.C. Circuit overturned that decision.  So I don't know how it

10   helps him.

11        Thank you for your indulgence.

12        MR. LOWELL:  Last sentence and then I'm done.

13        THE COURT:  Okay.

14        MR. LOWELL:  The difference is that the President has

15   made clear what he'll do that's different than the facts of

16   Dellinger.  So by the time we get to the point of where

17   Dellinger was, she'd be out of her job, her seat would be

18   filled, it wouldn't be possible to do what was done to get her

19   back when she should have never been taken out to begin with.

20   We will address that further.

21        THE COURT:  Okay.

22        MR. LOWELL:  You've been very indulgent.  I appreciate

23   it.

24        THE COURT:  No, this is very helpful.

25        Can I have you stay at the podium so we can just

1   figure out scheduling.

2          So you're going to file a reply on Tuesday.  And then

3   in terms of next -- does it make sense for me to ask the

4   parties to just confer about next steps?

5          Because what's on the table is, instead of a TRO, this

6   is a PI -- this converts to a PI.  Or you're going to

7   separately file a PI and then summary judgment, or we just

8   expedite summary judgment and dispense with some of these

9   preliminary steps.

10          MR. LOWELL:  I think -- I'm sorry, go ahead.

11          MR. ROTH:  I'm happy to confer.  I'm not sure there's

12   a purpose served to another motion.

13          THE COURT:  Right.  I'm trying to avoid --

14          MR. ROTH:  Like if you're going to file a reply and

15   maybe we have something we want to say, but that doesn't

16   require a whole new motion, starting over.

17          MR. LOWELL:  I don't disagree with that.  I do think

18   that as you have given us the ability, I want to read the

19   30 pages in detail and I will have a response.  If I said

20   something that you feel like you need to, I don't know, you

21   should probably do that.

22          I don't know that we need that interim step but what

23   we do need to figure out is what's going to happen in between.

24          And again, using your Dellinger point, it's not going

25   to work.  If the government's position is let this play out for

```
1    another day or three days, seven days, and in the interim the
2    president fills the seat that Governor Cook should have never
3    been relieved of -- I will talk to counsel and the Federal
4    Reserve --
5              THE COURT:  I do agree.  I have so many cases where
6    there's different iterations of the same brief being filed over
7    and over with different labels, and if we could just get to the
8    point and give me a little time to think about these novel
9    issues.
10             So yeah, if you want to just talk and let me know what
11   you're going to do.  I certainly would give you -- both sides
12   an opportunity to supplement what they filed, because I know
13   everyone did it on very quick timelines.
14             Okay.  And if you could do that on Tuesday in
15   connection with this reply and let me know what's coming, that
16   would be helpful.
17             MR. LOWELL:  We'll try to do that.  We'll figure out a
18   way to get in touch.
19             THE COURT:  Okay.  If there's nothing else, thank you
20   everyone.
21        (Proceedings concluded at 12:02 PM)
22
23
24
25
```

C E R T I F I C A T E

I, Stacy Johns, certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.


/s/ Stacy Johns                 Date: August 29, 2025

Stacy Johns, RPR, RCR
Official Court Reporter