## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

LISA D. COOK, in her official capacity as a member of the Board of Governors of the Federal Reserve System and her personal capacity,

    Plaintiff,

  v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

    Defendants.

</td><td>

Case No. 25-cv-2903 (JMC)

</td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

The Federal Reserve Act provides that the President may only remove a member of the Board of Governors of the Federal Reserve System "for cause." 12 U.S.C. § 242. This case involves the first purported "for cause" removal of a Board Governor in the Federal Reserve's 111-year history. Plaintiff Lisa D. Cook brought this action against Defendant Donald J. Trump, in his official capacity as President of the United States, challenging the President's decision to remove her "for cause" from the Board of Governors. ECF 1. Cook also sues Jerome H. Powell, in his official capacity as Chair of the Board of Governors of the Federal Reserve System. *Id.* In addition, she sues the Board of Governors of the Federal Reserve System as a whole and each member in their official capacity. *Id.*

Before the Court is Cook's motion for a temporary restraining order preventing Defendants from removing her from her position as a member of the Board. ECF 2. President Trump's actions and Cook's resulting legal challenge raise many serious questions of first impression that the Court believes will benefit from further briefing on a non-emergency timeline. However, at this preliminary stage, the Court finds that Cook has made a strong showing that her purported removal

was done in violation of the Federal Reserve Act's "for cause" provision. The best reading of the "for cause" provision is that the bases for removal of a member of the Board of Governors are limited to grounds concerning a Governor's behavior in office and whether they have been faithfully and effectively executing their statutory duties. "For cause" thus does not contemplate removing an individual purely for conduct that occurred before they began in office. In addition, the Court finds that the removal also likely violated Cook's procedural rights under the Fifth Amendment's Due Process Clause. She has also demonstrated irreparable harm from her removal. Finally, the public interest and the balance of the equities also favor Cook. Because the standard for a temporary restraining order and a preliminary injunction are the same, and because the Court has held an adversarial hearing on the motion and received additional briefing from the Parties, the Court will construe Plaintiff's motion for a temporary restraining order as a motion for a preliminary injunction, and **GRANT** the requested injunction.

## I.    BACKGROUND

### A. Statutory Framework

The Federal Reserve System was established over a century ago by Congress in the Federal Reserve Act. *See* 12 U.S.C. § 221 *et seq.* "The Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). This system involves a "complex set of relationships" between the Board of Governors, the Federal Open Market Committee (FOMC), and the twelve regional Federal Reserve Banks. *United States ex rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588, 592 (2d Cir. 2019); *see also* 12 U.S.C. §§ 222, 225a.

The Board of Governors is tasked with, among other duties, "promot[ing] effectively the goals of maximum employment, stable prices, and moderate long-term interest rates." 12 U.S.C. § 225a. The Board "conducts monetary policy, regulates banking institutions, and maintains the

stability of the nation's financial system." *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67 (D.C. Cir. 2004) (citing 12 U.S.C. § 248). Sound monetary policy often involves making short-term sacrifices for the long-term good of the economy. Congress therefore designed the Federal Reserve and the Board of Governors to possess characteristics that reflect their insulation from other parts of the federal government, in particular with respect to the Board's monetary policy decisions. The Board is funded outside of the annual appropriations process, through bank assessments. 12 U.S.C. §§ 243, 244; *see Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020). Its decisions and deliberations on monetary policy matters are exempt from Government Accountability Office audits and its rules regarding monetary policy are exempt from the Congressional Review Act. 12 U.S.C. § 3910(a)(3); 5 U.S.C. § 807. In addition, the Board is allowed to present legislative recommendations and testimony to Congress without approval of any "officer or agency of the United States." 12 U.S.C. § 250. Finally, the Board has independent litigating authority. *Id.* § 248(p).

As for the seven members of the Board of Governors, each is "appointed by the President, by and with the advice and consent of the Senate." 12 U.S.C. § 241. Board members are appointed to staggered fourteen-year terms, which, notwithstanding unexpected vacancies, typically prevents any single administration from appointing a majority of the Board's members and further shields the Board from partisan influences. *Id.* § 242. And the Board members, also known as Governors, enjoy a limitation on the President's ability to remove them: "[E]ach member shall hold office for a term of fourteen years from the expiration of the term of his predecessor, unless sooner removed *for cause* by the President." 12 U.S.C. § 242 (emphasis added). The statute does not define the term "for cause." *Id.*

Governors also serve on the Federal Open Market Committee, along with five representatives of the Federal Reserve Banks. 12 U.S.C. § 263(a). The FOMC has the authority to direct the regional Federal Reserve Banks in engaging in "open-market transactions." *Id.* § 263(b). "Open market operations—the purchase and sale of Government securities in the domestic securities market—are the most important monetary policy instrument of the Federal Reserve System." *Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 343 (1979). The FOMC meets around eight times a year to "review the overall state of the economy and consider the appropriate course of monetary and open market policy." *Id.* at 344. At these meetings, the FOMC "attempts to agree on specific tolerance ranges for the growth in the money supply and for the federal funds rate." *Id.* at 344–45. The FOMC's interest rate decisions have a "substantial impact on interest rates and investment activity in the economy as a whole." *Id.* at 344. The next meeting of the FOMC is scheduled for September 16–17, 2025. *See* Meeting Calendars, Statements, and Minutes (2020–2027), Board of Governors of the Federal Reserve System, https://perma.cc/S659-T29L (last visited Sept. 7, 2025).

### B. Factual and Procedural Background

President Joseph Biden nominated Plaintiff Lisa Cook for a fourteen-year term on the Federal Reserve Board of Governors on May 12, 2023. ECF 1 ¶ 31. At the time, Cook was already serving on the Board, having previously been appointed by President Biden and confirmed by the Senate, on May 10, 2022, to fill the remainder of an unexpired term that was scheduled to end on January 31, 2024. *Id.* ¶¶ 29–31. Cook's nomination to the new fourteen-year term was confirmed by the Senate on September 6, 2023. *Id.* ¶ 31. Her fourteen-year term was set to expire in 2038. *Id.*

On August 15, 2025, the Director of the Federal Housing Finance Agency (FHFA), William Pulte, sent a referral letter to Attorney General Pamela Bondi and Department of Justice

4

Special Attorney Edward Martin accusing Cook of committing mortgage fraud in June and July 2021, before she was nominated and confirmed to the Board. *Id.* ¶ 43; ECF 1-2 at 2–3. On August 20, 2025, Pulte publicly released two screenshots of pages from the letter on the social media platform X (formerly known as Twitter). ECF 1 ¶ 43; ECF 1-2 at 2–3. Within thirty minutes, President Trump posted on the social media platform Truth Social that "Cook must resign, now!!!," and shared a link to a news article regarding the allegations. ECF 1 ¶ 44.

The letter (as excerpted in Pulte's social media post) accused Cook of "falsifying residence statuses for an Ann Arbor, Michigan-based residence and an Atlanta, Georgia-based property in order to potentially secure lower interest rates and more favorable loan terms." ECF 1-2 at 2. According to Pulte, on June 18, 2021, Cook had taken out a loan on a property in Michigan. *Id.* at 2. The terms of the mortgage agreement stated that Cook would use the property as her "principal residence" for at least one year after the date of occupancy. *Id.* at 2–3. However, two weeks later, Cook purchased a condominium in Atlanta, and in the mortgage agreement, affirmed that this property would serve as her "primary residence" for a full year. *Id.* at 3.

Two days after Director Pulte posted the referral letter, President Trump said in an interview that "what [Cook] did was bad" and that he would "fire her if she doesn't resign." ECF 1 ¶ 45. Then, on August 25, 2025, President Trump posted screenshots of a two-page letter to his Truth Social account. ECF 1-3 at 2. Cook alleges that she was provided no advance notice of the letter before it was posted. ECF 1 ¶ 47. The letter, dated August 25 and addressed to Cook, provided:

> Pursuant to my authority under Article II of the Constitution of the United States and the Federal Reserve Act of 1913, as amended, you are hereby removed from your position on the Board of Governors of the Federal Reserve, effective immediately.

> The Federal Reserve Act provides that you may be removed, at my discretion, for cause. *See* 12 U.S.C. § 242. I have determined that there is sufficient cause to remove you from your position.

ECF 1-3 at 2. For support, the letter cited to Director Pulte's August 15 criminal referral.[1] *Id.* President Trump stated that "there is sufficient reason to believe you may have made false statements on one or more mortgage agreements." *Id.* Citing to the referral, the President said that Cook "signed one document attesting that a property in Michigan would be [her] primary residence for the next year," and "[t]wo weeks later . . . signed another document for a property in Georgia stating that it would be [her] primary residence for the next year." *Id.* President Trump claimed that it was "inconceivable that [Cook was] not aware of [her] first commitment when making the second," and it was "impossible that [she] intended to honor both." *Id.* The President then acknowledged the Federal Reserve's "tremendous responsibility for setting interest rates and regulating reserve and member banks." *Id.* He continued:

> The American people must be able to have full confidence in the honesty of the members entrusted with setting policy and overseeing the Federal Reserve. In light of your deceitful and potentially criminal conduct in a financial matter, they cannot and I do not have such confidence in your integrity. At a minimum, the conduct at issue exhibits the sort of gross negligence in financial transactions that calls into question your competence and trustworthiness as a financial regulator.

*Id.* The President concluded by stating that "I have determined that faithfully executing the law requires your immediate removal from office." *Id.*

Cook filed a six-count complaint on August 28, 2025. *See* ECF 1. Count One alleges that the President violated the Federal Reserve Act because his justification for removing her did not qualify as "cause" under the statute. *Id.* ¶¶ 61–66. Count Two alleges that under the Federal Reserve Act, Cook was entitled to notice and a hearing before her removal. *Id.* ¶¶ 67–71. Count

---

[1] The removal letter's text states that the criminal referral was "attached to this letter," but the referral letter was not itself shared as part of President Trump's social media post. ECF 1-3 at 2.

Three alleges that the termination, without notice and any opportunity to be heard, violates the Fifth Amendment's Due Process Clause because she has a property interest in her continued employment as a Governor. *Id.* ¶¶ 72–78. Count Four seeks a declaratory judgment that Defendants lack the authority to remove her without complying with applicable statutes and regulations. *Id.* ¶¶ 79–81. Count Five, brought only against Chair Powell and the Board of Governors, seeks a writ of mandamus commanding these Defendants not to effectuate President Trump's purported termination. *Id.* ¶¶ 82–83. Count Six also seeks equitable relief against Powell and the Board to prevent and restrain ongoing violations of statutory and constitutional law. *Id.* ¶¶ 84–86.

After receiving Cook's motion for a temporary restraining order, also on August 28, 2025, the Court set a motion hearing for the next morning. *See* Notice of Hr'g (Aug. 29, 2025). Shortly before the hearing, Defendant Donald Trump filed his response to the motion. ECF 13. Defendants Powell and the Board of Governors filed a notice stating that they would not be offering arguments concerning Cook's motion. ECF 12. At the hearing, counsel for Cook indicated that they intended to file a reply before the Court ruled, which they did on September 2, 2025. ECF 17. The Court then allowed counsel for President Trump to file an additional response, which they did on September 4, 2025. ECF 23. Finally, Cook requested leave to file an additional reply, ECF 24, which the Court granted in a separate order.

## II.    LEGAL STANDARD

"A temporary restraining order is an extraordinary remedy, one that should be granted only when the moving party, by a clear showing, carries the burden of persuasion." *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The Court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction. *Elec. Priv. Info. Ctr. v. FTC*, 844 F. Supp. 2d 98, 101

(D.D.C. 2012). To prevail on either motion, the movant "must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In a case like this one, where the Government is the non-movant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.   ANALYSIS

At this preliminary juncture, Cook has demonstrated that each of the factors weighs in favor of preliminary injunctive relief on at least some of her claims.[2]

### A.   Cook Is Substantially Likely to Succeed on the Merits.

The Court finds Cook substantially likely to succeed on at least two of her claims. First, the Court finds Cook likely to succeed on her argument that President Trump violated the Federal Reserve Act because her purported removal did not comply with the statute's "for cause" requirement. Second, the Court finds Cook likely to succeed on her claim that the purported removal deprived her of procedural rights guaranteed by the U.S. Constitution.[3]

#### 1.   President Trump's Stated Cause for Firing Cook Likely Does Not Satisfy the "For Cause" Requirement in the Federal Reserve Act.

The key question in this dispute is the meaning of the term "for cause" in the Federal Reserve Act. 12 U.S.C. § 242. The history of the repeated litigation over the constitutional validity of similar removal restrictions is too extensive to recount here. *See, e.g.*, *Collins v. Yellen*, 594 U.S.

---

[2] As discussed below, the Court construes Cook's motion for a temporary restraining order as a motion for a preliminary injunction. *See infra* section III.D. Again, the legal standard is the same. *Elec. Priv. Info. Ctr.*, 844 F. Supp. 2d at 101.

[3] Cook also argues that her purported removal violated procedural protections that she was entitled to as a statutory matter under the Federal Reserve Act. ECF 2-1 at 21; ECF 17 at 20–22. Because the Court finds Cook likely to succeed on the merits of her other claims, and that those claims support injunctive relief, it declines to reach Cook's statutory process arguments now.

220, 250 (2021); *Seila L. LLC*, 591 U.S. at 197. But in this case, the Government does not contest the constitutionality of the "for cause" removal restriction for Board Governors. Instead, it argues that President Trump provided a legal cause under the Federal Reserve Act to remove Cook, and that his decision to do so is not subject to judicial review. ECF 13 at 2. The Court disagrees on both points. Cook has shown that President Trump's allegations likely do not qualify as cause justifying her removal under the Federal Reserve Act and that the Court can resolve the Parties' dispute about the interpretation of this statute.

### a.   The Meaning of "For Cause" in the Federal Reserve Act

The Federal Reserve Act does not define the term "for cause." Generally, when a statutory term is undefined, courts look first to what "that term's 'ordinary, contemporary, common meaning' was when Congress enacted" the statute. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 434 (2019) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Additionally, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Jazz Pharms., Inc. v. Kennedy*, 141 F.4th 254, 261 (D.C. Cir. 2025) (citing *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014)). "Statutory history is an important part of this context." *Id.* Applying these tools, the Court concludes that the permissible grounds for "for cause" removal in the Federal Reserve Act are limited to grounds concerning an official's behavior in office and whether they have been faithfully and effectively executing statutory duties. The "for cause" standard thus does not contemplate removing an individual purely for conduct that occurred before they assumed the position.

### i.   Statutory Text and Contemporary Definitions

The Government first urges the Court to look to dictionary definitions of the word "cause" at the time the Federal Reserve Act was first passed in 1913. It claims that "cause" was understood

to simply mean a "motive or reason," or "ground of action," *see* ECF 13 at 11–12 (citing Wharton's Law-Lexicon 150 (11th ed. 1911) and Black's Law Dictionary 178 (2d ed. 1910)), and as a result, "cause" "cover[s] any articulable justification that the President deems sufficient to warrant removal," with the exception that, cause cannot extend to "mere policy disagreement," *id.* Cook argues that "for cause" is a legal term of art and its meaning is not resolved simply by looking to dictionary definitions. ECF 17 at 14.

When identifying the common meaning of the text when Congress enacted the removal provision, the Court looks to the definition as understood in 1935, rather than 1913. The "for cause" removal provision of the Federal Reserve Act was first enacted in 1913. *See* Pub. L. No. 63-43, 38 Stat. 251, 260 (1913). The "for cause" requirement appears, however, to have been removed in the 1933 Banking Act, which amended 12 U.S.C. § 242 to provide merely that "each appointive member shall hold office for a term of twelve years from the expiration of the term of his predecessor." 12 U.S.C. § 242 (1933 supp.); Pub. L. No. 73-66, § 6, 48 Stat. 162, 166–67 (1933). The present "for cause" provision was then returned to the statute following the passage of the 1935 Banking Act, which reorganized the leadership structure of the Federal Reserve. Pub. L. No. 74-305, § 203, 49 Stat. 684, 704–05 (1935); *see also* Gary Richardson & David W. Wilcox, *How Congress Designed the Federal Reserve to be Independent of Presidential Control*, 39 J. of Econ. Perspectives 221, 229 (2025).

At the time of the 1935 amendment, it is true that legal dictionaries defined the word "cause" as the "origin or foundation of a thing," or a "ground of action," consistent with the Government's definition. Black's Law Dictionary 292 (3d ed. 1933). But they also support the notion that "for cause" was itself a separate term that carried meaning independent of its component parts. The 1933 edition of Black's Law Dictionary contains a separate entry for "*for*

cause": "With reference to the power of removal from office, this term means some cause other than the will or pleasure of the removing authority, that is, some cause relating to the conduct, ability, fitness, or competence of the officer." *Id.* at 796 (emphasis added).

Perhaps recognizing that "for cause" has to mean more than just *any* stated reason, at the hearing on this motion, counsel for the Government suggested a new definition of "for cause" as any reason the President can think of so long as that reason (1) is something other than mere policy disagreement, (2) bears on the individual's ability or fitness to do the job, and (3) was not known at the time of the official's confirmation. Hr'g Tr. at 66:13–16 (Aug. 29, 2025). That position is in obvious tension with the Government's preferred dictionary-definition approach to "cause" in its initial briefing, and the Government's supplemental briefing does not resolve the discrepancy. *See* ECF 13 at 9; ECF 23. Thus, even the Government admits that the definition of "for cause" in this context cannot extend to *any* articulable reason the President deems to warrant removal and must have some limitations. More than dictionary definitions are required to resolve this dispute.

## ii. Legislative Context

The President's ability to remove a member of the Board of Governors must also be understood within the "overall statutory scheme" governing the Federal Reserve, *see West Virginia v. EPA*, 597 U.S. 697, 721 (2022), which contemplates a degree of insulation from presidential pressure, particularly with respect to its monetary policymaking decisions. As the Supreme Court has observed when distinguishing the Federal Reserve from other agencies, the Federal Reserve is a "uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States," *Wilcox*, 145 S. Ct. at 1415, one for which Congress has provided significant independence and insulation. *See* Richardson & Wilcox at 223–30 (reviewing the legislative history of the Banking Act of 1935 and concluding that the bill reflected

11

an intent that "monetary policy was independent of the president"); *Banking Act of 1935: Hearings on S.1715 and H.R. 7617 Before the S. Comm. On Banking & Currency* ("*Senate Banking Act Hearings*"), 74th Cong. 408 (1935). The Federal Reserve's structure, and in particular, the for cause protection, reflects Congress's decision that "a degree of independence was needed to 'increase the ability of the banking system to promote stability.'" *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 92 (D.C. Cir. 2018) (quoting H.R. Rep. No. 74-742, at 1 (1935)), *abrogated on other grounds by Seila L. LLC*, 591 U.S. 197. "By insulating the Board from presidential control and political pressures, Congress sought to ensure that the Federal Reserve would 'reflect, not the opinion of a majority of special interests, but rather the well considered judgment of a body that takes into consideration all phases of national economic life.'" *Id.* (quoting H.R. Rep. No. 74-742, at 6).

The historical context in which Congress enacted the Banking Act of 1935 demonstrates an awareness of the importance of such protections. The Banking Act of 1935 was passed shortly following the Supreme Court's decision in *Humphrey's Executor v. United States*. *Humphrey's Executor* established that a "for cause" protection for members of the Federal Trade Commission (FTC), limiting removal to "inefficiency, neglect of duty, and malfeasance in office," did not violate the Constitution. 295 U.S. 602, 629 (1935). The Court in *Humphrey's Executor* noted that the President's power to remove was a "coercive influence," which naturally "threatens the independence of a commission." *Id.* at 630. Even the Government agrees on this point, when it concedes that a "policy disagreement" with a Federal Reserve Governor cannot qualify as a "for cause" removal ground. ECF 13 at 18 (citing *Wiener v. United States*, 357 U.S. 349, 356 (1958)); *see also* Hr'g Tr. at 55:24–56:2.

At the hearings on the Banking Act, members of Congress and the witnesses took note of the *Humphrey's Executor* case and its implications for the Federal Reserve's independence. *Senate Banking Act Hearings* at 396–97 (witness arguing that the Federal Reserve's "independence from political control must be assured," and that passage of the bill should be postponed until the *Humphrey's Executor* decision clarified the issue of removal protections); *id.* 754–56 (witness noting the pendency of *Humphrey's Executor* and arguing that "no member of the Board shall be removable from office during the term for which he was appointed"). And the final bill reflects that what was true for the FTC in *Humphrey's Executor* is true for the Federal Reserve: "[T]he language of the act, the legislative reports, and the general purposes of the legislation as reflected by the debates," all demonstrate "the congressional intent to create a body of experts who shall gain experience by length of service; a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government." *Humphrey's Ex'r*, 295 U.S. at 625–26. The Federal Reserve Act's "for cause" restriction on the removal of Board Governors is a key part of the statutory scheme protecting the Board of Governors from the naturally "coercive influence" of the power of presidential removal which "threatens [its] independence." *Id.* at 630. This statutory scheme points in favor of a narrower, rather than broader, understanding of "for cause."

### iii.    Relationship to Prior Removal Statutes

"It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013)). Accordingly, the Court finds highly persuasive Cook's argument that the Federal Reserve Act's use of "for cause" should also be read in light of prior statutory removal provisions for Presidentially appointed, Senate-

confirmed roles. Those provisions consistently limited the grounds for presidential removal of agency heads or members to some combination of inefficiency, neglect of duty, or malfeasance (referred to in shorthand as INM), which meant "cases where officials act wrongfully in office" (malfeasance), "fail to perform their statutory duties" (neglect of duty), "or perform them in such an inexpert or wasteful manner that they impair the public welfare" (inefficiency). Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1, 8 (2021).

In 1935, federal statutes imposing restrictions on the President's ability to remove board and agency members had two essential flavors: They either provided that the official could be removed "for cause," with no further elaboration as to the meaning of that term, or they provided that the official could be removed for some combination of INM, with that formula first being used for the removal protections for the Interstate Commerce Commission in 1887. *See* Manners & Menand app. b. at 74–75 (identifying three federal officer removal statutes before August 1935 that used "for cause," and eleven that used some combination of INM); ch. 104, § 11, 24 Stat. 383 (1887). With minor exceptions, the only enumerated removal bases appear to be the INM bases.[4] Statutes did not use "for cause" and INM in the same removal provision. *See* Manners & Menand app. b. at 74–75. As for the statutes that enumerated either inefficiency, neglect, or malfeasance in office as a basis for removal, not all used all three grounds. *See id.*; *see, e.g.*, Pub. L. No. 67-347,

---

[4] There appear to be two minor exceptions. A statute creating a "Board of Mediation" for disputes between employers and employees of common carriers provided that the Commissioner could be removed for "misconduct in office." *See* Pub. L. No. 63-6, § 11, 38 Stat. 103, 108 (1913). The Board of Mediation was later replaced by the National Mediation Board, whose members could only be removed for "inefficiency, neglect of duty, malfeasance in office, *or ineligibility*." Pub. L. No. 73-442, § 4, 48 Stat. 1193, 1193–94 (1934) (emphasis added). While the Court cannot be positive at this preliminary stage that it has reviewed every relevant removal provision in the U.S. Code, a review of the statutes cited in Manners and Menand's article supports Cook's claim that "by 1935, the *only* statutorily enumerated grounds for presidential removal of executive officers were INM." ECF 17 at 12 (emphasis in original). Moreover, the Government has not disputed this characterization of the U.S. Code at the time.

14

§ 1, 42 Stat. 1023 (1922) (providing that members of the United States Coal Commission were to be appointed by the President with the advice and consent of the Senate, and could "be removed by the President for neglect of duty or malfeasance in office but for no other cause").

So, the overwhelming backdrop of enumerated federal removal restrictions for Presidentially appointed, tenure-protected roles at either the time of the 1913 Federal Reserve Act or the 1935 Banking Act was composed of the INM grounds. Neither the Supreme Court nor lower courts have provided a definitive interpretation of inefficiency, neglect of duty, or malfeasance in office, either jointly or separately, in the context of federal removal protections for independent agency members. *See* Manners & Menand at 4. But recent scholarship shows that before entering the federal lexicon, these terms carried with them historical meanings particular to the context of public administration and officer removal. *See id.* at 6 ("When Congress first used the now-talismanic INM phrase in 1887, it defined these circumstances using terms that were already well-known."). As is relevant here, each of the INM grounds referred to the officer's performance of their statutory duties or their conduct *in office*. The ground of inefficiency, a term first used extensively in state civil service reform bills in the late nineteenth century, was "associated not only with incompetence but with the wasteful expenditure of government resources," and inefficient officers "lacked the skills to perform their duties, rendering them incapable of doing their jobs." *Id.* at 6, 45; *see also id.* at 45–52.[5] Neglect of duty has a multi-century history as a term meaning the failure "to perform one's duties in a way that caused specific harm to" the entity to

---

[5] Inefficiency was "added to the removal lexicon only in the middle of the nineteenth century, when legislators used the term to describe wasteful government administration caused by inept officers." Manners & Menand at 28. Manners and Menand identify inefficiency first being used as a removal ground for tenure-protected officers in Indiana state code provisions from 1843. *Id.* at 47 n.269, 48 n.277 (citing 1843 Ind. Rev. Stat., ch. 4, §§ 37, 47). The term was subsequently used in state law and in a "series of civil service reform bills," before it was included as a removal ground in the Interstate Commerce Act in 1887. *Id.* at 52.

which the officer owed the duties. *Id.* at 29.[6] "Malfeasance in office" also had an extensive history in the common law, colonial practice, and American state law, and referred to a "wrongful act committed in the execution of *one's duties* that caused injuries to others."[7] *Id.* at 6 (emphasis added). While each of these terms addresses different conduct, what ties them together is a concern with an official's *in-office* conduct or performance: they all relate to whether an official is faithfully and effectively executing their statutory duties.

### iv.  "For Cause" in the Federal Reserve Act Refers to In-Office Conduct that Demonstrates Ineffective or Unfaithful Execution of Statutory Duties.

Based on the statutory context above, the Court finds that the "for cause" provision in the Federal Reserve Act extends only to concerns about the Board member's ability to effectively and faithfully execute their statutory duties, in light of circumstances that have occurred while they are in office. The historical background shows that when creating various agencies, departments, and boards during the period leading up to the passage of the Banking Act of 1935 and enumerating the grounds for removal from those bodies, Congress was narrowly focused on the INM grounds. Under the doctrine of *in pari materia*, statutes "relate[d] to the same subject or object" are "construed together." *Common Cause v. Fed. Election Comm'n*, 842 F.2d 436, 441–42 (D.C. Cir. 1988); *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) ("[The rule] necessarily assumes

---

[6] "Neglect" had been a ground for removing the "officers of English towns and boroughs for hundreds of years," and constituted a type of "misdemeanor," or "bad behavior," that could trigger the removal of life-tenured officers. *Id.* at 6. "Neglect of duty" was also a historical common-law basis for the removal of "good behavior" roles like judges and clerks. *Id.* at 28–29. Manners and Menand also identify state statutes beginning in the early 1800s that either penalize officials for neglect of duty or make them removable on that ground. *Id.* at 43–44.

[7] Malfeasance was featured in the context of common-law municipal officer and public official removal, both in England and the United States. *Id.* at 28–29. Like "neglect of duty," it was considered a misdemeanor that could trigger an officer's removal. *Id.* at 6. Under American state law in the 1800s, it was a ground to find that an officer had failed to engage in the "faithful performance" of the duties of his office. *See id.* at 41 n.224 (citing *Harris v. Hanson*, 11 Me. 241, 245 (1834)).

16

that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject."). That rule is instructive here. The fact that Congress was narrowly focused on the officer's on-the-job performance in contemporary officer removal statutes supports the conclusion that Congress did not mean "for cause" removal to extend to conduct of a significantly different kind.

Cook argues that this Court should find that "for cause" in the Federal Reserve Act is synonymous with and limited to the prevailing INM standard. ECF 17 at 10. Contemporary usage at the time of the passage of the Banking Act of 1935 indicates that the three terms were indeed often treated synonymously with "for cause." *See Myers v. United States*, 272 U.S. 52, 171–72 (1926) (describing a statute that provided for "removal for inefficiency, neglect of duty, or malfeasance in office," as one containing provisions for "removal *for cause*" (emphasis added)). This might explain why "for cause" and INM were not used in the same statute. If "for cause" was a synonym for INM, using the terms together would have been superfluous.

A traditional presumption of statutory interpretation, however, is that when Congress "employs different words, it usually means different things." *Ortiz v. Sec'y of Def.*, 41 F.3d 738, 740 (D.C. Cir. 1994). So Cook is likely not correct that "for cause" and the INM standard are perfectly synonymous. But that statutory interpretation principle also dooms the Government's initial argument that "for cause" means "any articulable justification that the President deems sufficient to warrant removal." ECF 13 at 12. Congress knew how to state a lesser requirement, and did so in a different section of the Banking Act of 1935, which provided that the Comptroller of the Currency, a Presidentially appointed and Senate-confirmed official, would hold office for "five years unless sooner removed by the President, upon *reasons* to be communicated by him to the Senate." 12 U.S.C. § 2 (emphasis added); Pub. L. No. 74-305, § 209, 49 Stat. 703, 707 (1935).

Thus, as the Government has already conceded, "for cause" must mean something more than any "reason[]" the President could communicate. 12 U.S.C. § 2.

That "for cause" means something broader than INM finds some support in the Supreme Court's analysis in *Collins v. Yellen*, which reviewed the constitutionality of the removal protection for the Director of the FHFA, which, as here, provided for removal "for cause." 594 U.S. at 255. There, the Court did not purport to definitively interpret the meaning of "for cause," although it noted that the language "appear[ed] to give the President more removal authority than other removal provisions," such as one for "inefficiency, neglect of duty, or malfeasance in office." *Id.* Further, the Court was interpreting a "for cause" removal provision passed in 2008, not one passed in 1935. *See* 12 U.S.C. § 4512. Since 1935, the enumerated justifications for independent agency and board member removal have expanded beyond simply INM to consist of grounds such as "immorality, ineligibility, offenses involving moral turpitude, and conviction of a crime." *See* Manners & Menand at 63 n.363; *see, e.g., Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 app. A at 549–56 (Breyer, J., dissenting) (cataloging removal grounds); *Monsalvo Velazquez v. Bondi*, 145 S. Ct. 1232, 1245 n.5 (2025) ("[D]ifferent statutes passed at different times against different regulatory backdrops may bear different meanings."). And the logic in *Collins* demonstrates why "for cause" in one statutory context may not be the same in another. In relying on cases involving the employer-employee relationship, *Collins* observed that "disobeying an order is generally regarded as 'cause' for removal." 594 U.S. at 256 (citing *NLRB v. Loc. Union No. 1229, Int'l Bhd. of Elec. Workers*, 346 U.S. 464, 475 (1953)). But here, the President is not empowered to direct the Board of Governors in the same manner, or to remove a Governor for failing to follow his directions. The ability to do so would be tantamount to being able to fire for policy disagreement, which the Government has admitted the President cannot do.

And again, even if "for cause" means something more than the traditional INM grounds, the Court is not convinced that it encompasses reasons of a different kind altogether than those grounds. The fact remains that INM grounds were the key causes recognized in similar federal statutes at the time. Defining "for cause" in 12 U.S.C. § 242 as extending to in-office conduct that is closely related to the INM grounds would still provide "for cause" with some independent meaning separate from INM. The existing landscape of removal statutes indicates that Congress wanted officials to be judged on their performance and conduct while holding the role. Insofar as there were any other recognized grounds for removal at the time, those also involved in-office conduct. For example, the Commissioner of Mediation and Conciliation could only be removed by the President for "misconduct *in office*." Pub. L. No. 63-6, § 11, 38 Stat. 103, 108 (1913) (emphasis added); *see also* Pub. L. No. 73-442, § 4, 48 Stat. 1193, 1193–94 (1934) (providing for removal from the National Mediation Board for either "inefficiency, neglect of duty, malfeasance in office, *or ineligibility*" (emphasis added)). State statutes also contemplated that "misfeasance" could be grounds for punishment or removal from office. Whereas malfeasance is the "doing [of] an act wholly wrongful," misfeasance is "[t]he improper performance of some act which a man may lawfully do." *See, e.g.*, Black's Law Dictionary 1193 (3d ed. 1933) (distinguishing the two terms). While both related to performance in office, they are separate concepts and were treated separately in state removal law. *See* Manners & Menand at 41 n.226, 43.

The Government's alternative reading that "for cause" means "a reason that" is (1) "more than mere policy disagreement," (2) "bears on the individual's ability or fitness to do the job," and (3) "was not known at the time of the official's confirmation," is too broad. Hr'g Tr. at 66:14–16. First, the Government's proposed "ability or fitness" test—particularly when combined with the Government's claim that the President's decision is completely unreviewable—puts little

functional limitation on the President's ability to remove a Board Governor. The Government's alternative position, one for which it has provided little textual or historical basis, would allow the President to remove individuals even for arbitrary reasons provided that the President viewed the reasons as relevant to the individual's ability or fitness to do the job. Moreover, it would incentivize the President and subordinates to dig up prior conduct, however insubstantial, to justify removal from the Board, even where the Board member has been up to that point performing their statutory duties impeccably. Second, the Government's concession that conduct that was known to the appointing authorities (the President and Senate) at the time of a Board member's appointment could not be the basis for a later "for cause" firing is at odds with the Government's theory that the conduct that a President may take into account when making a "for cause" determination lacks any temporal limitation.

A little more about that point. In its opening brief, the Government observes that Cook's reading of the statute as providing for potential removal based only upon a Governor's conduct in office "would insulate all manner of gross wrongdoing" and preclude the President from "remov[ing] a Governor who was revealed to have committed massive financial fraud—so long as it happened before confirmation." ECF 13 at 17. But, as the Court has already mentioned, the Government has since recognized a likely exception for conduct—even that amounting to "gross wrongdoing"—if it was known at the time of confirmation. Hr'g Tr. at 66:13–16. Why should the question of whether conduct satisfies the statute's "for cause" requirement turn on whether the conduct was known prior to confirmation? If past fraud provides a sufficient (and in the Government's view, obvious) justification for removal under this statute, it is not clear why the fact that a prior administration was aware of the conduct would sufficiently address a later President's concerns about a Governor's continued service, or cabin what the Government

otherwise suggests is the President's unfettered discretion to remove officers for almost any reason. The Court suspects that the Government acknowledged this limitation because a reading of "for cause" that would permit the President to second-guess the judgment of his predecessor and Congress by removing duly confirmed Governors and replacing them with his own nominees would offend the statutory scheme. Removing Governors from office based on conduct that was already known and ratified through the confirmation process would allow for just that.[8]

The Government's argument that a rule that does not take into account pre-confirmation conduct will lead to a parade of horribles also ignores that this is precisely the line that Congress has drawn in dozens of statutes over the past century. *See* Manners & Menand app. b. at 74–75. For the officers that Congress insulated with INM protections, pre-confirmation conduct has never been a basis for removal. The Court is not breaking new ground in interpreting the Federal Reserve Act's "for cause" provision consistent with this historical landscape.

A conclusion that Congress was not particularly concerned with addressing conduct that occurred before the officeholder assumed the position is similarly consistent with the Board of Governors' appointment scheme. That scheme involves extensive opportunities for investigation and rigorous vetting by both the President who appoints the nominee and the Senate who confirms them. Further, the Court's reading of the statute does not mean that a Governor's prior conduct could never relate to in-office conduct to justify removal. For example, an approach that focuses on the individual's in-office conduct and performance would certainly permit "for cause" removal where an officer is convicted of a serious crime and incarcerated while in office, even if that

---

[8] Here the Parties seem to dispute whether information about Cook's property ownership and mortgage financing were "known" at the time she was confirmed. *See* ECF 17 at 17 n.6; ECF 23 at 9. The Court does not have sufficient information to resolve that dispute. Nor does it quite understand how it would go about determining what may have been known at the time of Cook's confirmation, which is another issue with the line the Government has drawn. In any event, it is not necessary for the Court to find this fact at this stage. The Court rules solely on the legal questions raised in resolving this motion, not questions that potentially involve factual disputes.

conviction was the result of earlier conduct. Such a conviction would obviously interfere with the ability of an officer to effectively and faithfully carry out their in-office duties. Indeed, standing alone, a Governor's subsequent conviction would be a significant event occurring in office, regardless of when the conduct giving rise to that conviction occurred.

Finally, the Court is satisfied that this understanding of the "for cause" protection in 12 U.S.C. § 242 does not unduly infringe on the President's Article II powers. The Court's reading of "for cause" provides broader grounds for removal than the removal protection blessed by the Supreme Court in *Humphrey's Executor*, which permitted removal only for the classic INM standard. *Humphrey's Ex'r*, 295 U.S. at 620. And in *Trump v. Wilcox*, which raised concerns about the constitutionality of removal provisions narrower than the one in question here, the Supreme Court made clear that its analysis did not extend to the Federal Reserve Board's "for cause" protection. 145 S. Ct. at 1415; 29 U.S.C. § 153(a) (providing that members of the National Labor Relations Board may only be removed "for neglect of duty or malfeasance in office, but for no other cause"); 5 U.S.C. § 1202(d) (providing that members of the Merit Systems Protection Board may be removed "only for inefficiency, neglect of duty, or malfeasance in office"). Accordingly, the Court finds that permissible cause for removal of a Federal Reserve Governor extends only to concerns about the Board member's ability to effectively and faithfully execute their statutory duties, in light of events that have occurred while they are in office.

### b.  The President's Decision is Reviewable to Determine if He Has Stated a Legally Permissible Cause.

The Government argues that whatever the definition of "for cause" in the Federal Reserve Act, this Court lacks the ability to review the President's decision. ECF 13 at 7–9. According to the Government, the determination of cause is committed to the President's discretion by statute, leaving no role for this Court.

The Court disagrees. It is true that when a statute "entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (quoting *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996)). But "where the authorizing statute . . . places discernible limits on the President's discretion," review is available, given that the "responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts." *Id.* (quoting *Reich*, 74 F.3d at 1327).

The Government acknowledges that there are contexts under which Cook's challenge would be reviewable. At oral argument, the Government conceded that Cook's case would be reviewable had President Trump provided Cook with no cause whatsoever. Hr'g Tr. 58:13–16. In such a case, President Trump, required to remove Cook "for cause," would have clearly exceeded his statutory authority in failing to do so. In the Government's view, however, because the statute does not clearly define "for cause," the President "necessarily must make a discretionary judgment in exercising th[e] [removal] power," and the "sufficiency and adequacy of th[e] reason" given is not reviewable. ECF 13 at 11. The Court finds that this is doubly incorrect in the context of this case. First, the Government's argument fails because, as discussed above, the term "for cause" as used in 12 U.S.C. § 242, has definable limits, which include that a member of the Board of Governors may only be removed for in-office conduct demonstrating that they are not effectively and faithfully carrying out their statutory duties. Thus, when confronted with a justification offered by the President that clearly does not fall within the President's statutory authority, this Court has the responsibility to review. It is no different than if the President had attempted to fire Cook without cause or for a reason the Government acknowledges sits outside of the statute. *See*

23

*Mountain States Legal Found.*, 306 F.3d at 1136. Even when a statute "delegates discretionary authority" to an actor, the "role of the reviewing court . . . is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024); *Marbury v. Madison*, 1 Cranch 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is"). Second, the Government confuses review for the sufficiency and adequacy of a permissible cause (such as the strength of evidence showing that an officer has engaged in misconduct while in office), with whether the President has even provided a legally permissible cause in the first place, which is clearly reviewable.

In arguing otherwise, the Government primarily relies on *Reagan v. United States*, 182 U.S. 419, 425 (1901), a case brought by a commissioner of the U.S. Court for the Indian territory challenging his removal. In *Reagan*, the statute provided that the commissioners were to "hold office under their existing appointments, subject to removal by the judge of the district where said commissioners reside, for causes prescribed by law." *Id.* at 424. The commissioners' terms were not fixed by statute. *Id.* The Court found that despite the appointment statute's reference to "causes prescribed by law," no causes for removal had ever been "affirmatively specified by Congress." *Id.* at 425. As a result, the Court stated that "removal for cause, when causes are not defined nor removal for cause provided for, is a matter of discretion, and not reviewable." *Id.*

*Reagan* does not control this case. First, it is unlikely that *Reagan*'s analysis even applies to a Federal Board Governor. *Reagan* identified term-of-years protection and "causes of removal" provisions as two separate types of limitations on the ability of the "appointing power . . . [to] remove at pleasure or for such cause as it deemed sufficient." *Id.* at 425. Either, the Court noted, were sufficient to trigger a procedural requirement that the removed officer receive a notice and

hearing before removal. *See id.* (noting "the rule . . . that where causes of removal are specified by Constitution or statute, *as also* where the term of office is for a fixed period, notice and hearing are essential" (emphasis added)). But because the commissioner in *Reagan* did not "hold their office[] for life or by any fixed tenure," they therefore "f[ell] within the settled rule that the power of removal is incident to the power of appointment." *Id.* at 424. Here, Cook's position is for a set term of years and thus not covered by the holding in *Reagan*. Second, even if *Reagan*'s analysis applied to an officer with a term-of-years protection, the statute in *Reagan* is substantially different from the "for cause" statute here. The statute in *Reagan* provided that the President could fire "for causes prescribed by law," but Congress had not prescribed any specific causes, permissible or impermissible. *Id.* at 425. Here, the Court has determined that "for cause" is a circumscribed category, the bounds of which are judicially policeable.

Similarly, the Court does not find that the Supreme Court of the District of Columbia's opinion in *United States ex rel. Garland v. Oliver* governs the analysis. There, a statute allowed the President to remove justices of the peace for the District of Columbia "for cause." 6 Mackey 47, 56 (Sup. Ct. D.C. 1887). While the Court at one point suggested that "we suppose it would not be, that . . . this court can review [the President's] action for the purpose of determining the sufficiency of the causes which induce him to remove an officer," this statement was clearly dicta. *Id.* The Court itself acknowledged that the proposition "[was] not argued," in the case, which was not about the sufficiency of the cause but whether the President had the power to remove the officer in the first place. *Id.* at 48, 56. And again, the decision that would have been unreviewable in *Garland* was the "sufficiency" of the causes. Here, Cook presents an argument that the cause presented was statutorily off-limits.

Finally, taken to its logical conclusion, the Government's argument leads to an absurd result: While admitting that the President cannot remove an official for policy disagreements, the Government claims that under *Reagan*, a removal on the grounds of a policy disagreement would nevertheless be unreviewable. Hr'g Tr. at 58:17–59:4. This cannot be the case. Such a rule would provide no practical insulation for the members of the Board of Governors. It would mean that the President could, in practice, "remove a member . . . merely because he wanted his own appointees on the" Board of Governors. *Wiener*, 357 U.S. at 356. Here, there is a disagreement between the Parties about the interpretation of a federal statute. The Court is exercising its appropriate role in resolving this dispute.

### c. The President's Allegations Fail to State a Qualifying Cause Under the Statute.

Having determined that the "for cause" protection in 12 U.S.C. § 242 restricts presidential removal of members of the Board of Governors to situations where the record of the Governor's in-office behavior demonstrates they cannot effectively and faithfully carry out their statutory duties, the answer is clear: President Trump has not stated a legally permissible cause for Cook's removal.

President Trump's stated cause refers only to allegations regarding Cook's conduct before she began serving on the Federal Reserve Board.[9] As discussed above, such allegations are not a legally permissible cause. The President's equivocal claim that Cook "*may* have made false statements on one or more mortgage agreements," ECF 1-3 at 2 (emphasis added), refers only to conduct that *may* have occurred *before* she was confirmed to her position. It does not address her in-office conduct at all, let alone provide any examples of how Cook's performance or personal

---

[9] Although the Court decides this issue on the ground that President Trump's stated cause falls outside the causes permissible under the statute and is not inquiring into the sufficiency of the evidence presented by President Trump, the Court notes that the allegations are ones to which Cook strenuously objects. *See* ECF 17 at 15.

conduct since assuming the role has been in any way deficient in carrying out her statutory duties. While President Trump states in his letter that he believes that the conduct was "[a]t a minimum" grossly negligent and "calls into question [Cook]'s competence and trustworthiness as a financial regulator," his letter does not identify any conduct that Cook has engaged in while serving as a member of the Board that indicates that Cook lacks the competence or trustworthiness for the role. *Id.*

Again, this outcome aligns with the understanding of "for cause," in light of its legal meaning at the time when the Federal Reserve was created in 1913 and restructured in 1935. The lesson to be drawn from the then-existing history of removal protections is that an independent agency official was meant to be judged by their actual performance in their office. Removal was not meant to be based on the President's assumptions about the official's future performance as extrapolated from unproven conduct dating from before they assumed the office. To do otherwise would open up the officer and agency to the dangers of "control or coercive influence, direct or indirect," that would undermine the independent and expert judgment of the officer. *See Humphrey's Ex'r*, 295 U.S. at 629.

On this record, Cook has shown that she is likely to prevail on her claim that her removal was not "for cause," and therefore violated the Federal Reserve Act.[10]

### 2.    Cook is Likely to Prevail on the Merits of Her Constitutional Due Process Claim.

Cook argues that her purported removal violated procedural rights guaranteed to her by the Fifth Amendment's Due Process Clause, which required that Cook receive notice and be provided

---

[10] For the purposes of this motion, the Court bases its holding on the conclusion that President Trump has stated a legally impermissible reason for firing Cook and does not also need to reach Cook's argument that the President's decision failed to show "cause" under the Federal Reserve Act because the asserted basis for cause was "pretextual." *See* ECF 1 ¶ 60.

an opportunity to be heard before any "for cause" removal occurred. The record currently before the Court demonstrates that Cook did not receive such notice and hearing, and thus has shown a procedural violation.

### a.  Cook's Constitutional Due Process Rights Were Likely Violated.

Cook argues that she has a constitutionally protected property right in her continued position as a member of the Board of Governors, and as a result was entitled to notice and a hearing before her termination. ECF 2-1 at 19–20. The Government contests that Cook has a property interest in her position, and even assuming that she does, argues that Cook received all the process due to her under the Fifth Amendment. ECF 13 at 19–22.

The Fifth Amendment's Due Process Clause guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In determining whether an individual's procedural due process rights have been violated, the Court conducts a two-step inquiry. The Court "first determine[s] whether she was deprived of a protected interest," and if so, "then determine[s] whether she received the process she was due." *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) (citing *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trs. of UDC*, 56 F.3d 1469, 1471 (D.C. Cir. 1995)).

### i.  Cook Has a Property Interest in Her Fixed-Term, For Cause Protected Position.

"Property interests are not created by the Constitution." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). "[T]hey are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Id.* To establish a protected interest in her position as a Governor on the Federal Reserve Board, Cook argues that this Court should apply the analysis in *Loudermill* and the cases that follow it. ECF 2-1 at 20–21. In *Loudermill*, the Supreme Court found that a "public employee who can be discharged only for

cause" had a constitutionally protected property interest in their continued employment. 470 U.S. at 535, 538–39. In that case, the property interest was created by an Ohio statute that entitled the employees to hold their positions "during good behavior and efficient service," and stated that they could not be dismissed "except . . . for . . . misfeasance, malfeasance, or nonfeasance in office." *Id.* at 538–39. Subsequent cases in this Circuit have followed the logic of *Loudermill* and have reiterated that the basis of the property interest in a government employee's position "turns on the extent of any substantive limitations on the government's authority to remove her." *Esparraguera*, 101 F.4th at 33. As is relevant here, courts have found that "a property interest exists if the employee can 'be removed only for cause.'" *Id.* (citing *Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008)).

The Federal Reserve Act unquestionably provides that a Board Governor is entitled to serve for a fourteen-year term unless they are removed by the President "for cause." 12 U.S.C. § 242. The D.C. Circuit has recognized that an employee removable only "for cause" has a property interest in their position because they "can expect to remain employed *unless* they do something warranting their termination." *Esparraguera*, 101 F.4th at 33. On its face, the reasoning of *Loudermill* and the cases that follow it would seem to apply neatly to Cook's situation.

The Government does not contest that the "for cause" language in 12 U.S.C. § 242 is of the type that has previously provided federal employees expectations of job security and a due process-protected property interest. *See* ECF 13 at 19–22. Even under the Government's preferred interpretation of the phrase, Cook still had an expectation to serve out the remainder of her fourteen-year term "*unless* [she did] something warranting [her] termination," i.e., something that weighed negatively on her ability or fitness to do her job as a Federal Reserve Governor. *Esparraguera*, 101 F.4th at 33; *see also* Marshall J. Breger & Gary J. Edles*, Established by*

*Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1147 (2000) (endorsing the notion that "[if] the [agency] member has a statutory right to continued employment, he or she cannot be deprived of the job without due process").

Instead, the Government argues that the *Loudermill* analysis does not apply to a Board Governor like Cook because she was acting as a "*principal officer of the United States*, not a mere 'public employee.'" ECF 13 at 20. The Government claims that it is an established rule that as a principal officer, Cook had no property interest in her office. ECF 13 at 20.

The Court is unable to glean such a rule from the authorities that the Government puts forward. *Taylor v. Beckham*, 178 U.S. 548 (1900), which the Government cites for the proposition that "public offices are mere agencies or trusts, and not property as such," dealt with elected offices—in that case, the governor and lieutenant governor of the state of Kentucky. *Id.* at 570, 576–77. Moreover, the claim in *Taylor* was that the state legislature had denied candidates for those positions due process when resolving a contested election, a context far less analogous to Cook's situation than the for cause termination due process precedents. Subsequent cases applying *Taylor* emphasized that it addressed whether "unlawful denial by state action of a right to state *political office* is . . . a denial of a right of property." *Snowden v. Hughes*, 321 U.S. 1, 7 (1944) (emphasis added). *Taylor* thus does not govern this case. And even modern courts that have followed *Taylor*'s holding with respect to cases involving elected officials have noted that since *Taylor*, the Supreme Court "has adopted a more expansive approach to identifying 'property' in the due process context." *Velez v. Levy*, 401 F.3d 75, 86–87 (2d Cir. 2005) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

Nor does *Crenshaw v. United States*, 134 U.S. 99, 104 (1890)—another case the Government cites—support applying the logic of *Taylor* to appointed officers like Cook.

*Crenshaw* involved a cadet who enrolled in the Navy at a time when statutes provided that successful graduates would "receive appointments as midshipmen," and that "no officer in the military or naval service" would "be dismissed from the service except upon, and in pursuance of, the sentence of a court-martial to that effect." *Id.* at 100. During the cadet's training, Congress changed the law and limited the number of cadets who would become officers each year, and as a result, the cadet was not appointed to a midshipman position after graduation. *Id.* at 101. He sued, arguing that the change in legislation deprived him of a statutorily-created right to "serve for life, or during good behavior." *Id.* at 103. Taking up the case, the Court framed the question as whether an "officer appointed for a definite time, or during good behavior, had any vested interest or contract right in his office of which [C]ongress could not deprive him," and found no such right. *Id.* at 104.

The text of *Crenshaw* makes clear that the question was whether, assuming the truth of the plaintiff's argument that he was entitled to lifetime tenure by statute, *Congress* was prohibited from passing a law that would modify that tenure. *Id.* at 104, 109; *see Glidden Co. v. Zdanok*, 370 U.S. 530, 534 (1962) (stating that *Crenshaw* held that "neither the tenure nor salary of federal officers is constitutionally protected from impairment by Congress"). There is no inconsistency between finding a property right in Cook's "for cause" protected position under the existing statute, and also acknowledging that Congress, should it desire, would not offend due process by passing a statute reorganizing the Federal Reserve and eliminating her position. This is because it is Congress that has "created" and "defined" the "dimensions" of the property, in this case, through

statute. *Loudermill*, 470 U.S. at 538. *Crenshaw* stands merely for the proposition that Congress is not prohibited from amending or repealing the statute that gives rise to the property right.[11]

The Court thus finds that the existing precedent regarding the protectable rights of public officeholders does not apply to the situation of an independent agency Board member such as Cook, who, along with the Federal Reserve itself, occupies a unique space in the American administrative structure. *Wilcox*, 145 S. Ct. at 1415 ("The Federal Reserve is a uniquely structured, quasi-private entity."). Further, the Court must account for the Supreme Court's more recent precedents that cast a broader scope as to the protectable interests under the due process clause. The analysis in *Loudermill* and the cases that follow it do not hinge on the status—public employee or officer—of the individuals in question. "Liberty and property are broad and majestic terms," *Roth*, 408 U.S. at 571, and the analysis established in *Loudermill* and *Roth*, while focused on public employment, was not limited to that context, *see id.* at 576 (noting that "property interests" may "take many forms"). The key issue in these cases was whether the individual had a "legitimate claim of entitlement" to the property interest claimed, a claim that may stem from existing statutory or regulatory understandings. *Id.* at 577–78. The plain language of the Federal Reserve Act's fourteen-year term and "for cause" removal provision create that understanding. 12 U.S.C. § 242.

The Court thus finds that at this preliminary stage, Cook is likely to succeed on her argument that she has a protected property interest in her "for cause"-protected role as a member of the Board of Governors.

---

[11] The discussion of the plaintiff's alleged property right in *Crenshaw* is also likely dicta. The Court in *Crenshaw* addressed whether the plaintiff had a "vested interest or contract right in his office," *id.* at 104, only because it was assuming that "the term of office enjoyed by the [plaintiff] was what he claims it to have been,—a term for life," *id.* at 109. But the Court went on to find that "even if that were true as to other officers," it was not true for the plaintiff in that case, because he had "executed a bond to serve for eight years, unless discharged by competent authority," and therefore should have "recogniz[ed] his liability to be discharged." *Id.*

**ii. Cook Did Not Receive Sufficient Process for Her Removal.**

Having determined that Cook was deprived of a protected interest, the Court must determine "whether she received the process she was due." *Esparraguera*, 101 F.4th at 33 (citing *Bd. of Trs. of UDC*, 56 F.3d at 1471). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). In determining proper process, a Court must balance (1) the private interest affected by the government action; (2) the risk of erroneous deprivation and the value of additional safeguards; and (3) the government's interest, including the fiscal and financial burdens that additional or substitute procedural requirements would entail. *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991) (citing *Mathews*, 424 U.S. at 335). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Loudermill*, 470 U.S. at 542 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 313 (1950)). The opportunity to be heard must be given "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Cook argues that she was at minimum entitled to "oral or written notice of the charges," an "explanation of the . . . evidence," and "an opportunity to present [her] side of the story," as were the discharged individuals in *Loudermill*. 470 U.S. at 546; *see* ECF 2-1 at 20. The Government retorts that, even if applicable to Cook's case, those requirements were satisfied here. It asserts that notice was provided when the President "publicized the FHFA referral on August 20, 2025." ECF 13 at 22. Recall, that was the date that President Trump shared a *Bloomberg* news story on his social media platform about Director Pulte's referral letter and stated "Cook must resign, now!!!" *Id.* (citing ECF 1 ¶ 43–44). As for opportunity to be heard, the Government appears to

argue that this requirement was satisfied by the fact that President Trump waited five days after his August 20 Truth Social post "before proceeding with the threatened termination." ECF 13 at 5, 23. The Government argues that Cook had the opportunity to contest the allegations in the days before the President fired her and simply failed to do so. *Id.*

The Court finds that the due process requirements laid out by the Supreme Court in *Loudermill* apply to Cook's case. And based on the record currently before it, the Court doubts that Cook received *any* notice or opportunity to be heard, let alone notice and a hearing that were constitutionally "meaningful." *Esparraguera,* 101 F.4th at 33. It is difficult to construe President Trump's social media post on August 20, 2025, which itself linked to a third-party news article regarding Director Pulte's allegations, as "written notice of the charges against [her]." *Loudermill,* 470 U.S. at 546. While President Trump's comments to reporters on August 22 arguably indicated that President Trump was considering *firing* Cook, they fall short of providing Cook with an "explanation of the . . . evidence" that President Trump was considering in weighing his dismissal decision. *Id.*; *see Codd v. Velger*, 429 U.S. 624, 627 (1977) ("The purpose of such notice and hearing is to provide the person an opportunity to clear h[er] name."). Even if President Trump's statements could be considered as having incorporated Director Pulte's August 20, 2025, social media post, this was also insufficient notice. Pulte's post included a screenshot of two pages of an apparently longer letter sent to the Department of Justice, which itself contained corresponding exhibits. ECF 1-2 at 2–3. The Government does not claim that President Trump, Director Pulte, or their staff sent the referral letter or its supporting materials to Cook, despite the fact that the President cited and incorporated the DOJ referral letter in his letter informing Cook of her termination. ECF 1-3 at 2. Thus, on the record currently before the Court, it appears that President

Trump did not provide her with the "evidence that formed the factual basis of her removal." *Esparraguera*, 101 F.4th at 40.

The Government argues that Cook has received actual notice of the allegations against her and President Trump's intention to remove her. *See* ECF 23 at 16 (citing *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (finding under the circumstances that "actual notice . . . more than satisfied [the party's] due process rights")). The Court disagrees. The point of notice in the termination cases is to provide the employee "notice of the charges against them" and "explanation of the employer's evidence," *Loudermill*, 470 U.S. at 546, so as to "provide the person an opportunity to clear h[er] name" *Velger*, 429 U.S. at 627. The Court is highly doubtful that Cook should have been required to piece together the evidentiary basis for a "for cause" removal from a scattered assortment of social media posts and news articles.

Even if the notice provided had been sufficient, Cook's due process rights were nevertheless likely violated because she was not given a "meaningful opportunity" to be heard. *Loudermill*, 470 U.S. at 543. At no point did President Trump indicate that Cook would be provided an opportunity to argue that the allegations were untrue or did not merit removal, or invite Cook to submit such evidence. *See id.* at 543–46 (requiring that, at minimum, the pretermination opportunity to be heard should allow for a "meaningful opportunity to invoke the discretion of the decisionmaker" and include sufficient process to allow the decisionmaker to determine "whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action"). Instead, shortly after Director Pulte's social media post was made public, President Trump called for Cook to resign—a far cry from inviting an opportunity to contest the allegations. *See* ECF 1 ¶ 44.

Having found that Cook likely did not receive any due process in her removal, the Court could stop there. The Court need not at this preliminary posture identify the "precise form of notice and the precise kind of hearing required" by the Due Process Clause for a "for cause" protected agency board member. *Propert*, 948 F.2d at 1332. However, a preliminary consideration of the traditional *Mathews* factors further demonstrates why it makes sense to apply the *Loudermill* framework to Cook's case, and why an individual in Cook's position is likely entitled to at least as much process as the individuals in *Loudermill*.

First, much like the employee in *Loudermill*, Cook's "private interest in retaining" her tenure-protected position is strong. 470 U.S. at 543. And unlike the employees in *Loudermill*, whose interest in retaining employment was significant despite the fact that they "may find employment elsewhere," Cook's role as a Senate-confirmed member of the Board of Governors is not easily replaceable. *See id.* Second, considering the risk of erroneous deprivation and the benefits of additional safeguards, as in *Loudermill*, "some opportunity for [Cook] to present [her] side of the case is . . . of obvious value in reaching an accurate decision," given that "[d]ismissals for cause will often involve factual disputes." *Id.*

The third *Mathews* factor, the "government's interest," is far more complicated in this case. Assuming for the purpose of the analysis that President Trump had shown sufficient cause to remove Cook, President Trump undoubtedly shares the same interest as the employer in *Loudermill*, the "expeditious removal of an unsatisfactory" Board member and "the avoidance of administrative burdens." 470 U.S. at 543. In addition, as the head of the Executive Branch, President Trump has significant interests in effectively exercising the "executive Power" and carrying out his obligations under the Take Care Clause, *see* U.S. Const. art. II, §§ 1, 3, which point in favor of expeditious removal in cases where the actions meriting removal are serious or

egregious. Thus, the interest in expeditious removal weighs heavily in favor of President Trump. On the other hand, the potential administrative burdens of providing notice and a hearing to Cook do not weigh as strongly in the President's favor. This is the first "for cause" removal in the Federal Reserve's history. Contested "for cause" removals of other independent agency and board members—specifically on the basis that they met the statutory standard for removal—have been few and far between. *See* Breger & Edles at 1149–50. The infrequency of these kinds of removals (compared to the entire Ohio civil service in *Loudermill*, or recipients of federal disability benefits in *Mathews*, where the burdens pointed in favor of less elaborate hearing procedures) indicates that the total "societal costs" to the Government of providing notice and a hearing in cases like Cook's would be low—even were the hearing to be one that involved formal evidentiary presentation. *Mathews*, 424 U.S. at 347; *see Loudermill*, 470 U.S. at 535. Moreover, as discussed below, there is historical precedent for robust pre-removal procedures that do not unduly infringe on the President's prerogatives but still comport with the requirements of due process.

Further, the interests of the President as chief executive represent only part of the Government's interest in this case. *See Mathews*, 424 U.S. at 347 (defining the relevant interest as the "public interest"). Also at play are the interests of Congress, which enacted the "for cause" provision in the first place and thus made a deliberate choice to structure the Federal Reserve Board of Governors as an independent body "free to exercise its judgment without the leave or hindrance of any other official or any department of the government." *Humphrey's Ex'r*, 295 U.S. at 625–26. Congress thus has an interest in ensuring the fair treatment of the Board members by the Executive Branch. While not all of the considerations in analyzing the *Mathews* factors point in her favor, on balance, they support providing Cook and those in a similar position a pre-deprivation

opportunity to contest the record and determine whether the factual allegations indeed state a statutorily required "cause."

Indeed, the limited historical practice that exists regarding removals of "for cause" protected officials suggests that a "for cause" removal by the President ought to comport with due process indicia like a formal evidentiary hearing, and that such a requirement would not be antithetical to the President's legitimate ability to remove officials who fail to meet the standard. *See Lee v. Garland*, 120 F.4th 880, 891 (D.C. Cir. 2024) ("Historical practice is important in determining the scope of executive power."). In 1913, President Taft removed two members of the Board of Appraisers, who were protected from removal except for INM grounds, following an extensive inquiry by an investigative committee which involved fact-gathering, public hearings, and consideration of the members' rebuttals. *See* Aditya Bamzai, *Taft, Frankfurter, and the First Presidential For-Cause Removal*, 52 U. Rich. L. Rev. 691, 729–37 (2018). Taft removed the officers following the committee's final report and Taft's finding that the committee had "sustained" the charges against the suspect board members. *Id.* at 737. When President Ford considered removing a member of the Civil Aeronautics Board that enjoyed protections limiting removal to INM grounds, the Executive Branch requested that the board member participate in an "evidence-gathering inquiry" presided over by the office of the White House Counsel. *See Timm v. United States*, 223 Ct. Cl. 639, 639–40 (1980) (noting that Timm resigned before such a hearing was held); *see also* Breger & Edles at 1150. The Court notes that these actual and proposed procedures granted the removed officer a significant opportunity to confront the evidence against them and make their case. They did not require that the President be the one to engage in fact-gathering and compilation of the evidence, and thus minimized the burden on the President's time and energy. However, at least in the case of the Taft removals, the President still had a key role in

38

making a final review of the evidence and the officers' rebuttals. While the Court declines to establish the process due to Cook, it observes that these examples of historical executive process include the hallmarks of due process—meaningful notice and an opportunity to be heard.

Because Cook received neither of these "fundamental due process requirement[s]" with respect to her termination, she is substantially likely to succeed on the merits of her due process claim. *Loudermill*, 470 U.S. at 546.[12]

### B. Cook Faces Irreparable Harm.

In addition to showing a likelihood of success on the merits, Cook must also establish that she faces irreparable injury absent the requested preliminary relief. *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011); *Chaplaincy*, 454 F.3d at 297. To constitute irreparable injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297).

The Court agrees with Cook's argument that preventing her from discharging her duties as a Federal Reserve Governor, a unique Presidentially appointed and Senate-confirmed role with significant responsibility, itself constitutes irreparable harm remediable only by her reinstatement. The Government first contends that this theory of harm is barred by the Supreme Court's decision in *Sampson v. Murray*, which held that a federal employee seeking injunctive relief must "make a showing of irreparable injury sufficient in kind and degree to override" the "obviously disruptive

---

[12] The Government argues that Cook's due process challenge should fail because she has not identified arguments or evidence that would have changed the outcome in her case. First, the Court notes that Cook denies that she committed mortgage fraud, and is entitled to present evidence to the contrary at the proper time and place. ECF 17 at 15. Second, and more importantly, the "right to a hearing does not depend on a demonstration of certain success." *Loudermill*, 470 U.S. at 544.

effect which the grant of the temporary relief . . . [is] likely to have on the administrative process." 415 U.S. 61, 83–84 (1974). In *Sampson*, the Court noted that this concern would typically "cut[] against the general availability of preliminary injunctions in Government personnel cases." *Id.* *Sampson* dealt with the firing of a probationary employee, who had failed to establish irreparable harm beyond mere economic loss or reputational harm. *Id.* at 62, 91–92. But *Sampson* held out that there may well be cases that "so far depart from the normal situation that irreparable injury might be found," and that a district court will have the authority to grant injunctive relief "in [that] genuinely extraordinary situation." *Id.* at 92 n.68.

Cook is correct that other courts in this district have almost uniformly found irreparable harm sufficient to meet the "genuinely extraordinary" exception in *Sampson, id.*, when confronted with a claim that an official is being wrongfully deprived of their "statutory right to function," particularly when the official occupies a Presidentially appointed, Senate-confirmed, fixed-term role. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983); *see also Dellinger v. Bessent*, 768 F. Supp. 3d 33, 72 (D.D.C. 2025); *Grundmann v. Trump*, 770 F. Supp. 3d 166, 188 (D.D.C. 2025); *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 25-cv-542 (RBW), 2025 WL 1454010, at *29–32 (D.D.C. May 21, 2025); *Harris v. Bessent*, 775 F. Supp. 3d 164, 186 (D.D.C. 2025); *Harper v. Bessent*, No. 25-cv-01294 (AHA), 2025 WL 2049207, at *13 (D.D.C. July 22, 2025); *Aviel v. Gor*, 780 F. Supp. 3d 1, 14 (D.D.C. 2025); *Aviel v. Gor*, No. 25-cv-778 (LLA), 2025 WL 2374618, at *15 (D.D.C. Aug. 14, 2025); *Slaughter v. Trump*, No. 25-cv-909, 2025 WL 1984396, at *17 (D.D.C. July 17, 2025); *see also Abramowitz v. Lake*, No. 25-cv-887 (RCL), 2025 WL 2480354, at *11 (D.D.C. Aug. 28, 2025) ("Impairing a statutory right to function in a high-ranking public office is a cognizable harm."); *but see Perlmutter v. Blanche*, No. 25-cv-1659 (TJK), 2025 WL 2159197, at *7 (D.D.C. July 30, 2025) (finding that a plaintiff's

asserted loss of her "'statutory right to function' [was] not a genuinely extraordinary situation such that her temporary removal [was] irreparable harm—or at least harm that outweigh[ed] any corresponding risk of harm to the Government"); *English v. Trump*, 279 F. Supp. 3d 307, 336 (D.D.C. 2018) (rejecting acting director of the CFPB's "statutory right to function" claim because "she would not be entitled to that position even if the Court granted her an injunction"). These courts have found that being removed from a "Presidentially appointed, Senate-confirmed, high-ranking, public servant role" is "different in caliber and kind from" the typical employee reinstatement cases. *Slaughter*, 2025 WL 1984396, at *18. This is because these roles involve the "ability to influence federal decision-making" at a high level. *Id.*

Many of these cases have also found it appropriate to take into account the harm that the official's removal would have on the agency or board and its ability to function. *See, e.g.*, *Berry*, 1983 WL 538, at *5 (finding irreparable harm partially because "the Commission's ability to fulfill its mandate [was] disrupted by the [plaintiffs'] removal," which left the Commission "without a quorum"); *LeBlanc*, 2025 WL 1454010, at *32 (finding irreparable harm where removals "imped[ed] the ability of the [board] to function as an independent watchdog . . . as envisioned by Congress"); *Harris*, 775 F. Supp. 3d at 97 (acknowledging harms to the board's "congressionally mandated independence" by board member's firing); *Aviel*, 2025 WL 2374618, at *16 (finding additional harm because removed official's "fate [was] intertwined with the [agency's] very survival"); *Slaughter*, 2025 WL 1984396, at *18 ("[Plaintiff] also helps run a multimember commission that is free to exercise its judgment without the leave or hindrance of any other official or any department of the government. . . . Permitting her removal necessarily destroys that legislatively crafted independence in a way that injures [Plaintiff], the FTC, *and* Congress.").

The Government counters that the decisions embracing the kinds of harm Cook alleges here should not have persuasive force because many of them have been stayed on appeal. ECF 13 at 25–26. That is not the whole story. In several of the cases a stay was either not granted or not sought by the Government in the first place, meaning that they have persuasive value. *See Aviel*, 780 F. Supp. 3d at 14; *Aviel*, 2025 WL 2374618, at *15; *see also Berry*, 1983 WL 538, at *5, *vacated as moot*, 732 F.2d 949 (D.C. Cir 1983). In one of the cases, the D.C. Circuit stayed the lower court's decision but did not include any reasoning for doing so beyond citing to the traditional stay factors, leaving this Court unable to determine how and whether the grant of the stay weighs on the merits of Cook's case. *Harper v. Bessent*, No. 25-5268, 2025 WL 2426660, at *1 (D.C. Cir. Aug. 21, 2025). Such a stay order is "not a decision on the merits." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring in grant of application for stays).

As for the cases that have been stayed, the Court is not persuaded that those stay decisions undermine the district courts' logic on irreparable harm as applied to this case. To start, the Supreme Court's stay order in *Trump v. Wilcox*, 145 S. Ct. at 1415, does not speak to whether Cook has adequately demonstrated irreparable harm here. In *Wilcox*, the Supreme Court granted stays of two district courts' reinstatements of members of the National Labor Relations Board and the Merit Systems Protection Board because (1) the plaintiffs had failed to show that they would succeed on their merits challenges, which are significantly different from Cook's, and (2) because the harms to the plaintiffs from "being unable to perform [their] statutory dut[ies]" were outweighed by the "greater risk of harm from an order allowing a removed officer to continue exercising the executive power." *Id. Wilcox* did not directly address whether the harm to the removed officer was irreparable, and only stated that such a harm did not outweigh the

Government's greater harm in having the removed officer "exercise the executive power." *Id.*[13]
The Government notes that Chief Justice Roberts recently issued an administrative stay in
*Slaughter*, one of the district court cases supporting Cook's theory of irreparable harm, pending
full briefing of the Government's request to either stay the district court's judgment or grant
certiorari before judgment. *See Trump v. Slaughter*, No. 25A264, 2025 WL 2582814, (U.S. Sept.
8, 2025); ECF 26. But a nonprecedential administrative stay order provides no basis to doubt the
logic of *Slaughter* as applied to this case. *United States v. Texas*, 144 S. Ct. 797, 798 (2024)
(Barrett, J. concurring in denial of applications to vacate stay) ("Administrative stays do not
typically reflect the court's consideration of the merits of the stay application.").

Cook's argument is also not foreclosed by the D.C. Circuit's decision staying the district
court's order in *Dellinger v. Bessent*. *See* No. 25-5052, 2025 WL 887518, at *4
(D.C. Cir. Mar 10, 2025). In that decision, the Circuit granted a stay of the district court's
reinstatement of Special Counsel Hampton Dellinger. The Circuit held that even if Dellinger's
removal had been ultra vires, "that [did] not mean such injury [was] irreparable and weigh[ed] in
his favor." *Id.* The panel held that the circumstances in that case "cut in favor of a stay" pending
appeal because, "[a]t worst, Dellinger would remain out of office for a short period of time." *Id.*
The Circuit contrasted Dellinger's harms with the substantial harms to the government of having
its replacement special counsel "sidelined and unable to act while also having to try and unravel
Dellinger's actions." *Id.*

---

[13] For the same reasons, the stay in *Trump v. Boyle* does not resolve the question in this case, premised as it was on the analysis in *Wilcox* that the "Consumer Product Safety Commission exercises executive power" in a similar manner as the National Labor Relations Board. 145 S. Ct. 2653, 2654 (2025). And because the harm analysis in the *LeBlanc* and *Grundmann* stays by the D.C. Circuit were premised on the balance of harms theory endorsed by *Wilcox*, and did not address the merits of the plaintiffs' irreparable harm arguments, they do not provide reason to doubt the district courts' analyses on that issue. *See LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 25-5197, 2025 WL 1840591, at *2 (D.C. Cir. July 1, 2025); *Grundmann v. Trump*, No. 25-5165, 2025 WL 1840641, at *1 (D.C. Cir. July 3, 2025), *reconsideration en banc denied*, No. 25-5165, 2025 WL 1995785 (D.C. Cir. July 16, 2025).

The "circumstances of [this] particular case" differ from those of Dellinger's and point in favor of finding irreparable harm. *Id.* First, in the Circuit's decision in *Dellinger*, as in *Wilcox*, the question before the D.C. Circuit was not the merits of Dellinger's irreparable harm argument as endorsed by the district court below, but whether to grant the *Government's* motion for a stay pending appeal. The panel's decision primarily focused on the balance of the equities. *Id.* at *2 (considering the issue as "weighing the relative harm"). The panel found this prong supported the Government's stay "in the circumstances of [that] particular case," because of the strength of the Government's injury. *Id.* at *4. But here, the calculus is substantially different. In *Dellinger*, the plaintiff was the head of an independent agency that was nevertheless closely entwined with the rest of the Executive Branch. Upon his reinstatement by the district court, the plaintiff in *Dellinger* was continuing to use his statutory powers as Special Counsel to stay the administration's personnel decisions, and his reinstatement was thus found to pose significant and direct disruption to the administration's policy program and personnel decisions. *Id.* at *3. Cook's retention on the Board of Governors does not pose the same harms. She is one member of a multi-member body that the Government concedes cannot be subject to policy pressure from the rest of the Executive Branch. Thus, her continued presence on the Board does not cause a similar degree of harm. Finally, in *Dellinger*, the Circuit's stay addressed only one harm to Dellinger, the deprivation of his "statutory right to function in office," but Cook here presents additional harms that flow from this deprivation that the D.C. Circuit did not consider, including those to the agency's independence and the possibility that President Trump will shortly move to replace her on the Board. ECF 2-1 at 21–22.

Cook has shown irreparable harm. Through her removal, "she has lost the ability to fulfill a high-ranking, public-servant role to which she is entitled." *Aviel*, 2025 WL 2374618, at *15. As

a member of the Board of Governors, she has the "ability to influence federal decision-making" on issues of monetary policy, and serves as part of a "congressionally protected agency that is designed to operate 'independent of executive authority.'" *Slaughter*, 2025 WL 1984396, at *18 (citing *Humphrey's Ex'r*, 295 U.S. at 625). She has "lost the power to guide," along with the other members of the Board of Governors, a "[]century-old independent agency that serves the United States'" interests in expert-driven monetary policy and banking stability. *Aviel*, 2025 WL 2374618, at *15. "Losing" her "role at an independent agency like the" Federal Reserve, *id.* at *16, does not compare to other employee terminations that were not deemed irreparable, like that of the probationary employee in *Sampson*. 415 U.S. at 90–92. Her removal from the Board will result in missed votes and lost time that cannot be remedied by backpay or reinstatement after the fact. *See Harper*, 2025 WL 2049207, at *13 (finding that similar injuries "cannot be retroactively cured by monetary damages"). The Court agrees with the many others in this district that Cook's removal qualifies as irreparable harm sufficient to support preliminary relief in the form of reappointment to her position. As a result, the Court need not address Cook's remaining grounds for irreparable harm at this time.[14]

### C. The Balance of the Equities and the Public Interest Favor Cook's Requested Relief.

The final two stay factors, which merge here, strongly cut in Cook's favor. Cook has demonstrated an ongoing irreparable harm. Against that harm, the Government raises *Wilcox*, *Boyle*, and the D.C. Circuit's stay in *Dellinger*, to argue that the Government suffers a greater harm

---

[14] The Court's analysis on irreparable harm applies both to Cook's claim that her removal was not "for cause" and that she did not receive constitutionally sufficient process. The loss of her unique statutory position results from either violation, a conclusion that the Government conceded at oral argument. *See* Hr'g Tr. at 72:21–73:7 (noting, in response to the Court's question about whether the due process violation is itself a form of irreparable harm, that the harm was similar to the statutory-right-to-function cases, because "the thing that is being deprived is the office or the employment, which is the same thing as in all the other removal cases that we've been talking about").

in "allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." ECF 13 at 25 (citing *Wilcox*, 145 S. Ct. at 1415). It also raises the "disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." *Id.* at 29 (citing *Wilcox*, 145 S. Ct. at 1415).

Again, the Court is not persuaded that the harms cash out here as they did in *Wilcox* and *Boyle*. First, Cook's retention on the Board of Governors does not offend the President's Article II authority in the way the officers' reinstatement was found to in *Wilcox* and *Boyle*. *See supra* n.13. *Wilcox*'s theory of harm was premised on the ground that the Government suffered from having a reinstated officer exercise the "executive power." *Wilcox*, 145 S. Ct. at 1415. But the Supreme Court in *Wilcox* expressly disclaimed that its analysis on this issue implicated the "uniquely structured, quasi-private entity" that is the Federal Reserve. *Id.* Here, Cook is one of seven members of a Board that is, by design, not intended to be susceptible to policy pressure, let alone tasked with implementing the President's agenda. One could frame the Government's harm as an injury to the President's ability to faithfully execute the laws, which is undermined by being required to retain an individual on the Federal Reserve Board in whom he has stated that he lacks confidence. But even in that case, the fact remains that in failing to specify legal "cause," President Trump has not identified anything related to Cook's conduct or job performance as a Board member that would indicate that she is harming the Board or the public interest by executing her duties unfaithfully or ineffectively. The Government's claimed injuries carry less weight here than in *Wilcox* and *Boyle*. *Dellinger* also does not govern this case for the reasons discussed above.

Further, the public interest in this case is not only limited to the interests of the Executive Branch. "[T]here is a substantial public interest in having governmental" actors like the President

"abide by the federal laws." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Congress, which implemented the "for cause" protection and sought to secure the Federal Reserve's independence, also has an interest in ensuring that Federal Reserve Board members are removed for only statutorily permitted reasons, and preventing the President from "thwart[ing] . . . the very ends which Congress sought to realize by definitively fixing the term of office." *Humphrey's Ex'r*, 295 U.S. at 626.

Further, the public interest in Federal Reserve independence weighs in favor of Cook's reinstatement. That independence is critical in helping the nation's "banking system to promote stability." *PHH Corp.*, 881 F.3d at 92 (quoting H.R. Rep. No. 74-742, at 1). As Justice Kavanaugh has observed, insulation of the Federal Reserve from "direct presidential oversight or control" "may be worthwhile," due to "its power to directly affect the short-term functioning of the U.S. economy by setting interest rates and adjusting the money supply." Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 Minn. L. Rev. 1454, 1474 (2009). Others have put it more bluntly: Given this significant power and responsibility, "[s]ubjecting the Fed[eral Reserve] to close political oversight would likely have harmful, perhaps even disastrous, consequences." Neil H. Buchanan & Michael C. Dorf, *Don't End or Audit the Fed: Central Bank Independence in an Age of Austerity*, 102 Cornell L. Rev. 1, 8 (2016).

The Court finds that the equitable factors weigh in favor of granting relief to Cook.

### D.  The Court Will Enter a Preliminary Injunction Against Defendants Powell and the Board of Governors.

Because all four factors favor Cook, the Court will grant relief in her favor, in the form of a preliminary injunction requiring Defendants Powell and the Board of Governors of the Federal Reserve to allow Cook to remain a member of the Board during the pendency of this litigation.

The Court acknowledges that Cook originally moved for a temporary restraining order. ECF 2. However, since then, the Court has held an adversarial hearing and received additional responsive briefing from both Parties. *See* Aug. 29, 2025 Min. Entry; ECF 13, 17, 23, 24. Further, in the Parties' joint status report, counsel for the Government noted that they would not object to converting Cook's temporary restraining order motion into a request for a preliminary injunction, ECF 20 at 3. The legal standard for a temporary restraining order and a preliminary injunction are the same. *Elec. Priv. Info. Ctr.*, 844 F. Supp. 2d at 101. "When the opposing party actually receives notice of the application for a restraining order, the procedure that is followed does not differ functionally from that on an application for a preliminary injunction and the proceeding is not subject to any special requirements." 11A Wright & Miller's Federal Practice & Procedure § 2951 (3d ed. 2025). Here, given that there has been an adversarial hearing and additional briefing, Cook's request will be treated as one for a preliminary injunction. *See id.*

The Court recognizes that it likely cannot directly "enjoin the President in the performance of his official duties" to require him to reappoint Cook. *Severino v. Biden*, 71 F.4th 1038, 1042 (D.C. Cir. 2023) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion)). However, Cook can still be granted relief because the Circuit has recognized that a court can "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official *'de facto,'* even without a formal presidential reappointment." *Id.* at 1042–43 (citing *Swan v. Clinton*, 100 F.3d 973, 980 (1996)).

Therefore, the Court will enter an injunction directing Powell and the Board of Governors to allow Cook to continue to operate as a member of the Board for the pendency of this litigation. The Government has requested that this Court stay its decision pending any appeal. ECF 20 at 3. The Court declines to do so. The Court recognizes that this case involves the first "for cause"

removal of a Federal Reserve Board Governor, and as a result, raises important matters of first impression. However, for the reasons stated in this opinion, the Court finds that the balance of equities would not be in the Government's favor. *Nken*, 556 U.S. at 434.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for a temporary restraining order, ECF 2, is construed as a motion for a preliminary injunction, and is **GRANTED**.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: September 9, 2025