(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TRUMP, PRESIDENT OF THE UNITED STATES *v.* COOK, MEMBER OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, ET AL.

ON APPLICATION FOR STAY

No. 25A312.  Argued January 21, 2026—Decided June 29, 2026

In August 2025, President Trump purported to fire Lisa Cook, a member of the Board of Governors of the Federal Reserve System.  Cook was the first Governor to be fired in the central bank's 111-year history. She promptly filed suit.  She alleged that the attempted removal was not "for cause," as required by statute, and that the President had in any event failed to comply with the statute's (and the Constitution's) requirement that she receive pretermination process.  The District Court issued a preliminary injunction to prevent her removal.  This Court must decide whether the District Court's order should remain in effect pending the conclusion of litigation over the attempted removal.

The United States has a long tradition of independent central banking.  The Nation's first *de facto* central bank, the Bank of North America, predates even our Constitution.  The structure of the Bank of North America was unusual; it was owned in part by the Government and in part by the public, run by directors accountable only to private stockholders, and yet tasked with public purposes—specifically, the maintenance of a sound national currency.

Although the Bank of North America was short lived, two more national banks soon followed in its footsteps.  Both had similar goals to the Bank of North America—and a similar degree of independence from the Federal Government.  The first came in 1791, when the First Congress chartered a bank that came to be known as the First Bank of the United States.  After the charter for the First Bank was allowed to expire in 1811, Chief Justice Marshall remarked that "a short experience of the embarrassments to which the refusal to revive [the First Bank] exposed the government"—severe financial instability following

2                       TRUMP *v.* COOK

Syllabus

the War of 1812—"convinced those who were most prejudiced against [a central bank] of the measure of its necessity."  *McCulloch* v. *Maryland*, 4 Wheat. 316, 402.  That necessity led to the Second Bank of the United States, chartered in 1816.  In 1832, however, President Jackson, unconvinced of the wisdom of an independent national bank, vetoed a bill passed by Congress to extend the Second Bank's charter.

Eighty years later, after an era of ruinous financial panics, a bipartisan congressional commission recommended the creation of another central bank to assume "the serious duty of protecting public and private interests at times when they are imperiled."  Report of the National Monetary Commission, S. Doc. No. 243, 62d Cong., 2d Sess., 36.  What emerged is today's central bank—called the Federal Reserve System—first created in 1913, and then restructured in 1933 and 1935.  The Federal Reserve consists of 12 "independent but affiliated banks," one for each region.  C. Glass, An Adventure in Constructive Finance 173.  These regional banks, called Federal Reserve Banks, are privately owned (and operated) by the commercial banks of the area.  See 38 Stat. 254, 12 U. S. C. §341.  Above those banks sits the Board of Governors, which supervises the system with an eye to the economy's "long run growth."  §225a.  The Board consists of seven members, each appointed by the President and confirmed by the Senate.  §241.  Like the directors of its three predecessors, the Federal Reserve's Governors do not serve at the President's pleasure—they instead serve staggered 14-year terms, and may be removed only "for cause."  §242.

Cook's term on the Board of Governors was set to expire in 2038.  On August 20, 2025, the Federal Housing Finance Agency's Director posted to social media a letter in which he accused Cook of mortgage fraud.  President Trump posted to social media that "Cook must resign, now!!!" and he later told reporters that he would "fire her if she doesn't resign."  Complaint in No. 1:25-cv-02903 (D DC), ECF Doc. 1, p. 14.  Three days later, the President purported to fire Cook for cause.  In a letter to Cook, he stated that he had "reason to believe" that she "may have made false statements on one or more mortgage agreements."  ECF Doc. 1–4, p. 2.  He told her that he lacked "confidence in [her] integrity" and that he had determined that "faithfully executing the law requires [her] immediate removal from office."  *Id*., at 3.  After Cook filed suit, the District Court issued a preliminary injunction to prevent her removal.  The Court of Appeals declined to stay the injunction, and the Government filed an application for stay in this Court.

*Held*: The Government's application is denied.  Pp. 8–27.

(a) The Government has not shown that it is likely to prevail on the legal arguments advanced in its stay application.  See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (*per curiam*); *Nken* v. *Holder*, 556 U. S. 418, 434.  Acceptance of the Government's position would in effect

Syllabus

transform the Federal Reserve's for-cause protection into at-will employment—an interpretive leap out of step with the statute Congress enacted and our Nation's tradition of central banking protected from political interference. Pp. 8–16.

(1) The Government first contends that the President's determination of "cause" is wholly unreviewable because the statute "commits the determination of cause to" the President alone. Application 20. The Court sees no such commitment. Whether a Governor should be "removed for cause" is a decision only the President can make (short of impeachment). 12 U. S. C. §242. But that does not mean that he may make that decision for any reason, or no reason. Even when a statute "delegates discretionary authority" to the Executive Branch, a court must "independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 395. As the Government eventually acknowledges, it falls to the courts to "discern the boundaries of the President's power" under the Federal Reserve Act. Supp. Brief for Applicant 13 (internal quotation marks omitted).

Unlike the Government, the Court sees no indication that the common law forecloses all judicial review of removals. See *State ex rel. Hart* v. *Common Council of City of Duluth*, 53 Minn. 238, 244, 55 N. W. 118, 120 ("The sufficiency and reasonableness of the cause of removal are questions for the courts. . . . This has been the settled law ever since Bagg's Case, [11 Co. Rep. 93b, 77 Eng. Rep. 1271 (K. B. 1615) (Coke, C. J.)], and we are not aware of any respectable authority to the contrary."). The cases the Government cites for its contrary view are distinguishable because they addressed statutes that specified not only *causes* for removal but also *procedures* for removal, which the reviewing courts interpreted to be exclusive. Pp. 9–11.

(2) Even if the President's determination is judicially reviewable, the Government contends, "cause" sets a very low bar—one that the President easily cleared. Cook, by contrast, argues that "cause" sets a very high bar that the President failed to meet. The Court rejects both parties' positions. Congress enacted this statute "against the backdrop of the common law," *Comcast Corp.* v. *National Assn. of African American-Owned Media*, 589 U. S. 327, 335, such that the Court must look to the common law to decipher what "cause" (a term of art) requires. For present purposes, it is sufficient to observe that any definition of "cause" in this context must reflect the Federal Reserve's unique historical status and role. Like its predecessors, the Federal Reserve operates at a deliberate remove from the ordinary political process, including a budget free of congressional control, §243, and policies set not only by Governors, but also by representatives of the private regional banks, §263. Not only the *fact* of independence but also the

4 TRUMP *v.* COOK

Syllabus

*appearance* of independence is key to the Federal Reserve's design.

That counsels a substantial threshold for "cause." Whether "cause" for removal exists in any given situation will depend, at least in part, on the seriousness of the alleged misconduct, and the extent of any nexus that may exist to the Governor's professional duties. The key issue is whether "[t]he cause assigned" truly "impl[ies] an unfitness for the place"—or whether it simply represents an effort to secure a "more congenial" replacement. *In re Nichols*, 6 Abb. N. Cas. 474, 482. Without such constraints in place, any perceived or alleged misstep (past or present) could provide a ready pretext for a Governor's removal—a fact that he would surely know, and that would surely weigh on him as he decided what to say and how to vote. Nothing could be more corrosive of the independence that Congress sought to preserve. Pp. 11–15.

(3) The Court rejects the Government's contention that federal courts cannot grant a preliminary injunction ordering reinstatement during the pendency of litigation. Historically, a court of equity could not finally determine whether a plaintiff was validly removed—that was a question only a court of law could settle by *quo warranto* or mandamus. In the meantime, however, equity could ensure that "the actual incumbents of an office may be protected, pending a contest as to their title, from interference with their possession, and with the exercise of their functions," at least to the extent that they had a likely meritorious claim. 2 J. High, Law of Injunctions §1315, p. 866. The District Court sought to do just that here. Pp. 15–16.

(b) The Court decides this application on the narrow ground that the President failed to afford Cook the procedural protections to which she was entitled by statute. Without such protections, she could not properly dispute the charges the President laid against her. The Court need not address Cook's constitutional due process argument, for the statute alone makes it unlikely that the Government will prevail on appeal as to the validity of the procedures used to fire Cook. Pp. 17–27.

(1) Under the Court's precedents, Cook was entitled to notice and some opportunity to respond before her termination. When Congress created the Federal Reserve, it gave Governors a set term in office and permitted removal only "for cause." That form of tenure—a term of years limited only by removal "for cause"—carried with it a settled interpretation at common law, one that the Court had expressly adopted just a decade before. "[T]he rule," the Court explained in 1901, is that "notice and hearing are essential" before an officer's removal "where the term of office is for a fixed period." *Reagan* v. *United States*, 182 U. S. 419, 425; see also *Shurtleff* v. *United States*, 189 U. S. 311, 314. *Reagan* and *Shurtleff* established the baseline against which Congress legislated, and the Court must construe its work accordingly. That is

Cite as: 609 U. S. ___ (2026)          5

Syllabus

not to say that a Federal Reserve Governor is entitled to a full-blown judicial trial. All that is required is "the right to support his allegations by argument however brief, and, if need be, by proof, however informal," before a final decision is made. *Londoner* v. *City and County of Denver*, 210 U. S. 373, 386. Pp. 18–21.

(2) The protection from removal enjoyed by Governors of the Federal Reserve is consistent with the Constitution. The Founders knew from experience the calamities that could arise from even the "suspicion" of political manipulation of monetary policy. Report on a National Bank (Dec. 13, 1790), in 7 Papers of Alexander Hamilton 305, 331. So when they established the First Bank of the United States, they guaranteed its independence from Presidential control, and their successors did the same for the Second Bank. That enabled both banks to serve as the "great regulating wheel" of the early American financial system. E. Lomazoff, Reconstructing the National Bank Controversy 53.

The Federal Reserve follows in this tradition, with a similar degree of independence from Presidential control. What matters is that the Federal Reserve remains consistent with the principles that underpin the First and Second Banks—namely, that monetary policy should not be subject to political interference. In the Court's view, the Federal Reserve maintains the balance struck by the founding generation under modern circumstances.

Although this extraordinary case arises on the Court's interim docket, the Court has had the benefit of not only *amici* and oral argument but months of internal consultation and deliberation. The Court declines to sow doubt as to the status of one of the Nation's (and the world's) most important financial institutions, and would not so quickly unsettle this "special arrangement sanctioned by history." *Consumer Financial Protection Bureau* v. *Community Financial Services Assn. of America, Ltd.*, 601 U. S. 416, 467, n. 16 (ALITO, J., dissenting). Pp. 22–24.

(3) The Court rejects the Government's halfhearted contention that Cook in fact received due process. At minimum, Cook was entitled to some explanation of the evidence at issue, some avenue for a response, and a deadline by which a response would be due. Cf. *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 314–315. Only after Cook has had the opportunity to respond to the charges made against her may a final decision be made. And only then can the courts assess the validity and sufficiency of such charges. Pp. 24–27.

Application for stay denied.

ROBERTS, C. J., delivered the opinion of the Court, in which SOTOMAYOR, KAGAN, KAVANAUGH, and JACKSON, JJ., joined. KAVANAUGH and JACKSON, JJ., filed concurring opinions. THOMAS, J., filed a

6                          TRUMP *v.* COOK

Syllabus

dissenting opinion.    ALITO, J., filed a dissenting opinion, in which
GORSUCH, J., joined.  BARRETT, J., filed a dissenting opinion.

Cite as: 609 U. S. \_\_\_\_ (2026)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 25A312

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, APPLICANT *v.* LISA D. COOK, MEMBER OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, ET AL.

ON APPLICATION FOR STAY

[June 29, 2026]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Last August, for the first time in the Federal Reserve's 111-year history, the President attempted to fire one of its Governors. A few weeks later, a federal court issued an injunction to prevent him from doing so. We decide whether that order should remain in effect pending the conclusion of litigation over the attempted removal.

I

A

Our Nation's first *de facto* central bank predates even our Constitution. Through the early years of the Revolutionary War, the Continental Congress had been forced to print so much money to finance the war that its currency had become all but worthless. See G. Wood, The American Revolution 145–147 (2002). ("Not worth a Continental," as the saying goes.) "Duty . . . compells me," General Washington wrote to Congress in 1780, to request some solution to "the great depreciation of the Money," for fear of "mutiny" in the ranks. Letter from G. Washington to S. Huntington (May

2                    TRUMP *v.* COOK

Opinion of the Court

27–28, 1780), in 26 Papers of George Washington 202–206 (B. Huggins & A. Garbooshian-Huggins eds. 2018). To solve the problem, Congress realized, it would have to tie its own hands—to place the power to create money elsewhere, in an entity that could credibly serve as "a principal Pillar of American Credit . . . by the ties of private interest." Letter from R. Morris to B. Franklin (July 13, 1781), in 35 Papers of Benjamin Franklin 262–266 (B. Oberg ed. 1999).

Thus was born the Bank of North America. Its structure was unusual. It was to be owned in part by the Government (at least at first) and in part by the public, run by directors accountable only to private stockholders and yet tasked with public purposes—specifically, the maintenance of a sound national currency. See 20 Journals of the Continental Congress, 1774–1789, pp. 545–546 (G. Hunt ed. 1912); 21 *id.*, at 1185–1190; see also E. Kaplan, The Bank of the United States and the American Economy 10–14 (1999). But it worked. See R. Wright & D. Cowen, Financial Founding Fathers 127–131 (2006) (Wright & Cowen). Such a bank was a "necessity," Thomas Paine later wrote, "for what with the depreciation of the currency, the slow operation of taxes, and the petitions to be exempt therefrom, the treasury was moneyless, and the government creditless." Dissertations on Government, the Affairs of the Bank, and Paper Money 21–22 (1786). Alexander Hamilton said the same. "The aid afforded to the United States, by this institution, during the remaining period of the war," he wrote, "was of essential consequence." Report on a National Bank (Dec. 13, 1790), in 7 Papers of Alexander Hamilton 305, 323 (H. Syrett & J. Cooke eds. 1963) (Report on a National Bank). But the bank was short lived as a solely national institution—it accepted state charters in 1782, and its national charter lapsed alongside the Articles of Confederation in 1789. See 1 J. Markham, A Financial History of the United States 71–72 (2002) (Markham).

Opinion of the Court

Another national bank, however, quickly followed in its footsteps. In 1791, at Hamilton's urging, the First Congress chartered a bank that came to be known as the First Bank of the United States, with similar goals to the Bank of North America—and a similar degree of independence from the Congress that gave it life. Like the Bank of North America, the First Bank would be owned in part by the Federal Government, but run by directors accountable only to private stockholders. See Act of Feb. 25, 1791, §4, 1 Stat. 192–193; see also Wright & Cowen 10–13; E. Perkins, American Public Finance and Financial Services, 1700–1815, p. 236 (1994); E. Lomazoff, Reconstructing the National Bank Controversy 33–38 (2018) (Lomazoff). To Hamilton, that was key. "To attach full confidence to an institution of this nature," he wrote, "it appears to be an essential ingredient in its structure, that it shall be under a *private* not a *public* Direction," one that could resist "the temptations of momentary exigencies." Report on a National Bank 331. Under a public direction, Hamilton feared, "suspicion" of political manipulation "would continually corrode the vitals of the credit of the Bank, and would be most likely to prove fatal in those situations, in which the public good would require, that they should be most sound and vigorous." *Ibid.*

Although the charter for the First Bank was allowed to expire in 1811, it took only five years for Congress to reverse course. As Chief Justice Marshall remarked in our Court's first major decision on the breadth of the Federal Government's enumerated powers, "a short experience of the embarrassments to which the refusal to revive [the First Bank] exposed the government"—severe financial instability following the War of 1812—"convinced those who were most prejudiced against the measure of its necessity." *McCulloch* v. *Maryland*, 4 Wheat. 316, 402 (1819). That necessity led to the Second Bank of the United States—encouraged even by President Madison, previously an ardent foe. See J.

4                    TRUMP *v.* COOK

Opinion of the Court

Madison, Seventh Annual Message (Dec. 5, 1815), in 1 Compilation of the Messages and Papers of the Presidents, 1789–1897, pp. 562, 564–566 (J. Richardson ed. 1897) (Compilation). Like its predecessors, the Second Bank was not to be controlled by the Federal Government that brought it into existence. Of its 25 directors, only five were appointed (and removable) by the President. The remaining 20 were appointed by and accountable only to private stockholders. See Act of Apr. 10, 1816, §8, 3 Stat. 269–270.

The Second Bank's independence, however, was to prove its downfall. Unlike James Madison, Andrew Jackson had not and would not change his mind on the wisdom of a national bank, at least one he could not control. He savaged the Second Bank as a "[h]ydra of corruption" only he could slay. Letter from A. Jackson to J. Hamilton (June 3, 1830), in 8 Papers of Andrew Jackson 343 (D. Feller, T. Coens, & L. Moss eds. 2010).[1] So in 1832, when Congress passed a bill to extend the Second Bank's charter, it met with Jackson's veto and his famous veto message. He refused "to make the rich richer and the potent more powerful" at the expense of "the humble members of society—the farmers, mechanics, and laborers." Veto Message (July 10, 1832), in 2 Compilation 590. As Tocqueville observed, "the common people" rallied "round the President," Jackson easily won reelection, and that was the end of the Second Bank. 1 A. de Tocqueville, Democracy in America 178 (H. Reeve transl. 1899).

—————

[1] J. Hamilton (James) was in fact Alexander's fourth child. He was an avid supporter of and advisor to Jackson (and later Lincoln), and an accomplished yachtsman, a last-minute addition to the crew that won the first America's Cup. See J. Hamilton, Reminiscences of James A. Hamilton 76–77, 400–403, 529–536 (1869). The wayward son would come to rue Jackson's decision "to destroy the Bank of the United States," which (he argued) led to "a most disastrous inflation of the currency, reckless speculation, and the extended ruin of 1837." *Id.*, at 279–280.

Opinion of the Court

It would take almost 80 years before Congress would try again, and only after an era of ruinous financial panics—the ones of 1837, 1857, 1873, 1893, and 1907. These crises were in no small part attributable to Jackson's crusade. See R. Lowenstein, America's Bank 11–28, 59–76 (2015). Without an independent central bank, there was no way to contain the damage whenever a major institution fell—no lender of last resort that could allow sound banks with good but temporarily illiquid assets to access cash, no elastic currency that could expand to meet demand, and no mechanism to ensure that small banks issued loans only within their means in the first place. See 1 Markham 168–180, 330–333, 380. It was a system "devised for fair weather, not for storms," said President McKinley's Secretary of the Treasury. Dept. of Treasury, L. Gage, Ann. Rep. of the Secretary of the Treasury 73 (Doc. No. 2238, 1901). It took the Panic of 1907 to force action. A failed attempt by speculators to corner the copper market led to the quick collapse of two banks, and the contagion spread from there, ultimately toppling some 2,000 firms and 130 banks. See 2 Markham 29–41. A bipartisan congressional commission eventually recommended the creation of a central bank to assume "the serious duty of protecting public and private interests at times when they are imperiled." Report of the National Monetary Commission, S. Doc. No. 243, 62d Cong., 2d Sess., 36 (1912).

What emerged from these debates is today's central bank—called the Federal Reserve System—first created in 1913, and then restructured in 1933 and 1935. "[M]odelled upon our federal political system," the Federal Reserve consists of two layers. C. Glass, An Adventure in Constructive Finance 173 (1927) (Glass). At its base sit 12 "independent but affiliated banks," one for each region, with "their own responsibility in local affairs." *Ibid.* These regional banks, called Federal Reserve Banks, are privately owned (and operated) by the commercial banks of the area. See 38 Stat.

6                       TRUMP *v.* COOK

Opinion of the Court

254, 12 U. S. C. §341.  Above those banks are two national bodies, the Federal Open Market Committee and the Board of Governors.  The former sets monetary policy nationwide. See §263.  And the latter supervises the system "from the national point of view," Glass 173–174, with an eye to the economy's "long run growth," §225a.  It consists of seven members, appointed by the President and confirmed by the Senate.  §241.  Like the directors of its three predecessors, however, the Federal Reserve's Governors do not serve at the President's pleasure—they instead serve staggered 14-year terms, and may be removed only "for cause."  §242.

B

Lisa Cook was appointed to the Board of Governors in 2022, at first to complete only the final two years of Janet Yellen's unexpired term.  A year later, however, President Biden nominated Cook to a full 14-year term, and the Senate again voted to confirm her.  In the normal course, then, Cook's term on the Federal Reserve was set to expire in 2038.

Over the course of one week in August 2025, however, the longevity of Cook's tenure was to be called into question. On August 20, the Federal Housing Finance Agency's Director, William Pulte, posted to social media a letter dated a week before.  The letter was addressed to Attorney General Pamela Bondi, and it accused Cook of mortgage fraud. "According to mortgage documents obtained by" the Agency, it stated, "it appears" that Cook "falsified bank documents and property records to acquire more favorable loan terms" in 2021, by claiming two homes simultaneously as her principal residence.  Attachment to Complaint in No. 1:25–cv–02903 (D DC), ECF Doc. 1–2, p. 2.  Less than 30 minutes later, President Trump posted to social media that "Cook must resign, now!!!" and linked to a news article about Pulte's letter.  ECF Doc. 1, p. 14.  Two days later, the

Opinion of the Court

President told reporters that "[w]hat [Cook] did was bad" and that he would "fire her if she doesn't resign." *Ibid.*

Three days after that, President Trump purported to fire Cook for cause. In a letter to Cook, he stated that he had "reason to believe" that she "may have made false statements on one or more mortgage agreements." ECF Doc. 1–4, p. 2. "The American people must be able to have full confidence in the honesty of the members entrusted with setting policy and overseeing the Federal Reserve," he explained. *Ibid.* But he lacked "such confidence in [Cook's] integrity," he continued, "[i]n light of [her] deceitful and potentially criminal conduct," which "[a]t a minimum" exhibited "gross negligence." *Ibid.* He thus determined that "faithfully executing the law requires [Cook's] immediate removal from office." *Id.*, at 3.

Cook promptly filed suit, seeking relief at law and at equity to allow her to stay in office. She alleged that the removal was not "for cause," as required by statute. And in any case, she alleged, the President had failed to comply with the statute's (and the Constitution's) requirement that she receive notice and some opportunity to respond to the charges against her before being fired.

The District Court agreed, issuing a preliminary injunction to prevent her removal. It noted first that the scope of the dispute was narrowed by the Government's concession (for purposes of this proceeding) that the statute itself is constitutional. It then turned to Cook's two claims, both of which it considered likely to succeed. As to the first, it held that the President had failed to state "a legally permissible cause," because "cause" refers only to "an official's *in-office* conduct or performance"—a standard that could not be met here, given that the mortgages at issue predated Cook's tenure at the Federal Reserve. 804 F. Supp. 3d 14, 26, 32 (DC 2025). And as to the second, it held that the Constitution entitled Cook "to notice and a hearing before her termination"—process she had not received. *Id.*, at 33. The District

8                    TRUMP *v.* COOK

Opinion of the Court

Court finally concluded that Cook faced irreparable harm
without injunctive relief, and that the final two factors—
the balance of equities and the public interest—"strongly
cut" in her favor. *Id.*, at 43.

The Court of Appeals declined to stay the injunction.
Judge Garcia, joined by Judge Childs, filed a concurrence
focused solely on Cook's due process claim. As a public offi-
cial who may be removed only "for cause," he contended,
Cook has a property interest in her position, and may not
be removed summarily. 2025 WL 2654786, *1 (CADC, Sept.
15, 2025). Judge Katsas dissented. He would have rejected
Cook's due process claim on the basis that a public official,
unlike an employee, can have no property right in her posi-
tion. And he would have held that a termination "for cause"
merely requires some reference to a person's "conduct, abil-
ity, fitness, or competence"—a requirement that the Presi-
dent "plainly" met here. *Id.*, at *7.

The Government applied for a stay in this Court. We de-
ferred the application pending oral argument. 606 U. S.
1062 (2025).

II

This case comes to us not directly on the merits but on
the Government's application for a stay—an order prevent-
ing the District Court's ruling from going into effect pend-
ing appeal to the Court of Appeals and, if necessary, to this
Court. The standards for such relief are well established:
The applicant must show that it is likely to succeed on the
merits of its appeal, that we would likely grant certiorari to
review any decision to the contrary, that it will likely suffer
irreparable harm in the interim, and that the balance of eq-
uities tip in its favor. See *Hollingsworth* v. *Perry*, 558 U. S.
183, 190 (2010) (*per curiam*); *Nken* v. *Holder*, 556 U. S. 418,
434 (2009).

We start and stop with the first factor. In our view, the
Government has not shown that it is likely to prevail on the

Opinion of the Court

various legal arguments advanced in its stay application. The Government raises three alternative arguments: that a removal for cause under the statute is not judicially reviewable; that even if the removal is reviewable, cause is a low bar satisfied by any concerns about a Governor's conduct, ability, fitness, or competence; and that even if the Government did not show cause to remove Cook, she is nevertheless not entitled to remain in office while litigation over the removal is pending. We disagree on all three points. To accept any one of those arguments would in effect transform the Federal Reserve's for-cause protection into at-will employment—an interpretive leap out of step with the statute Congress enacted and our Nation's tradition of central banking protected from political interference. We therefore deny the Government's application.

A

The Government (but not JUSTICE THOMAS) contends that the President's determination of "cause" is wholly unreviewable. "The statutory 'for cause' language at issue," the Government argues, "commits the determination of cause to" the President alone. Application 20.

We see no such textual commitment. The statute provides that each member of the Board of Governors "shall hold office for a term of fourteen years . . . , unless sooner removed for cause by the President." 12 U. S. C. §242. Whether a Governor should be removed, it is true, is a decision only the President can make (short of impeachment). But that does not mean that he may make that decision for any reason, or no reason. Even when a statute "delegates discretionary authority" to the Executive Branch, we have explained, our role "is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 395 (2024). Congress could of course afford the President the power to remove Federal Reserve

10                          TRUMP *v.* COOK

Governors at will. Or Congress could exempt the President's removal of Governors for cause from judicial review. But Congress has done neither.

The Government appears to concede that at least some judicial review of a removal is available. It admits that "federal courts may review the removal of a Federal Reserve Board member when, for instance, the President identifies no cause at all." Application 20. But the only way for us to tell whether the President has identified cause *under the statute* is to interpret the statute, and decipher what precisely it means by "cause." As the Government acknowledges in its supplemental brief, it is the task of a "[r]eviewing court[]" to "discern the boundaries of the President's power" under the Federal Reserve Act. Supp. Brief for Applicant 13 (internal quotation marks omitted).

The Government relies on *Reagan* v. *United States*, 182 U. S. 419 (1901), but that case offers it no help. In *Reagan*, as the Government explains, we said that the removal at issue was "a matter of discretion and not reviewable," *id.*, at 425—but not because all removals are. Just the reverse. The statute at issue in *Reagan* limited removal for certain court officers to "causes *prescribed by law*." *Ibid.* (emphasis added). The trouble was that no "causes for removal . . . were ever affirmatively specified by Congress." *Ibid.* The plaintiff thus argued that he was entitled to "hold office during life," or at least until "Congress passes a law defining such causes." *Ibid.* We rejected his argument. We said that we could not review the removal because no enumerated causes were "defined" by law "*nor removal for cause provided for*" by the statute. *Ibid.* (emphasis added). The statute at issue here, by contrast, provides just that. See 12 U. S. C. §242 (removal may be made only "for cause").

With no support in *Reagan*, the Government turns to the common law, which (it says) forecloses all judicial review. The common law, however, appears to cut the other way. See *State ex rel. Hart* v. *Common Council of City of Duluth*,

Opinion of the Court

53 Minn. 238, 244, 55 N. W. 118, 120 (1893) ("The sufficiency and reasonableness of the cause of removal are questions for the courts. . . . This has been the settled law ever since Bagg's Case, [11 Co. Rep. 93b, 77 Eng. Rep. 1271 (K. B. 1615) (Coke, C. J.)], and we are not aware of any respectable authority to the contrary."). The Government's four cited cases do not persuade us otherwise. The first two expressly declined to resolve the issue. See *United States ex rel. Garland* v. *Oliver*, 6 Mackey 47, 56 (D. C. 1887) (issue "not argued"); *The Mayor and Council of the City of Hoboken* v. *Gear*, 3 Dutch. 265, 287 (NJ 1859) (*seriatim* opinion of Vredenburgh, J.) ("not a question upon review"). And the last two addressed statutes that specified not only *causes* for removal but also *procedures* for removal, which the court interpreted to be exclusive. See *Trimble* v. *People ex rel. Phelps*, 19 Colo. 187, 197, 34 P. 981, 985 (1893) (interpreting "the lawmaking body" to have been "of the opinion" that no other "check" was "necessary to prevent an arbitrary and oppressive abuse of the power" of removal); *People ex rel. Platt* v. *Stout*, 19 How. Pr. 171, 173, 181 (NY Sup. Ct. 1860) (*seriatim* opinion of Sutherland, J.) (interpreting "the legislature" to have "intended by the act to give, so far as it regards the sufficiency . . . of the cause, the whole discretionary power to the mayor and [the] board of aldermen," which must "consent" to the mayor's decision for the removal to be effective). We see no indication in the common law that the President should have a free hand.

B

Even if the President's determination is judicially reviewable, the Government (and JUSTICE THOMAS) contend, "cause" sets a very low bar—one that the President easily cleared. In the Government's view, "cause" includes any concern the President may have about a person's "conduct, ability, fitness, or competence." Application 25–26 (quoting Black's Law Dictionary 508 (2d ed. 1910)); see also *post*, at

Opinion of the Court

14–15 (THOMAS, J., dissenting).  That excludes a "mere policy disagreement," according to the Government, but it includes (among many other things) "concerns" about a person's "integrity"—precisely the cause given here. Application 26, 31.

Cook, on the other hand, argues that "cause" sets a very high bar—one that the President failed to meet.  In her view, Congress used "for cause" merely as a shorthand to refer to "the existing causes for presidential removal of executive officers" as defined by various other statutes.  Brief in Opposition 20.  And at the time of this statute's reenactment in 1935, she explains, those causes were few—either poor performance in office ("inefficiency," "neglect of duty," or "malfeasance") or "ineligibility" for office in the first place.  *Id.*, at 21–23 (internal quotation marks omitted). But, she argues, the President alleged neither.  Her "private, pre-office conduct," she concludes, can offer no cause at all.  *Id.*, at 22–23.

We find neither explanation persuasive.  Although neither the Government nor JUSTICE THOMAS say as much, both seem to acknowledge that Congress enacted this statute "against the backdrop of the common law," *Comcast Corp.* v. *National Assn. of African American-Owned Media*, 589 U. S. 327, 335 (2020), such that we must look to the common law to decipher what "cause" (a term of art) requires.  See *Jam* v. *International Finance Corp.*, 586 U. S. 199, 211 (2019) ("[W]e ordinarily presume that Congress intends to incorporate the well-settled meaning of the common-law terms it uses . . . ." (internal quotation marks omitted)).  Indeed, the one authority upon which the Government relies for its definition of "cause," the second edition of Black's Law Dictionary, itself defined "cause" based on two cases—each of which sought (in the common-law tradition) to distill "cause" from general principles, customs, and judicial decisions across all States.  See *Board of Street Comm'rs of Hagerstown* v. *Williams*, 96 Md. 232, 236–239,

53 A. 923, 924–925 (1903) (discussing decisions from Maine, Missouri, Ohio, and Pennsylvania, as well as various treatises); *In re Nichols*, 6 Abb. N. Cas. 474, 479–495 (NY Sup. Ct. 1879) (discussing decisions from Indiana, Massachusetts, Michigan, and Ohio, as well as various treatises). Neither one of those cases, however, nor Black's itself, suggested that *any* reason would do. Contra, *post*, at 15 (THOMAS, J., dissenting). They instead emphasized that the cause identified must be "substantial, reasonable and just," *Nichols*, 6 Abb. N. Cas., at 480 (internal quotation marks omitted), a "disqualification" akin to "inefficiency" or "incompetency," *Board of Street Comm'rs*, 96 Md., at 239, 53 A., at 925.

If the Government's (and JUSTICE THOMAS's) test is too lenient, however, Cook's is too stringent. Cook argues that we should interpret "cause" to refer only to the *specific* causes provided in *other* statutes as bases "for presidential removal"—specifically, as of 1935, inefficiency, neglect of duty, malfeasance, and ineligibility. Brief in Opposition 20. But we see no reason why that should be so. It is true, of course, that some statutes by their terms incorporate an "external body of law," as when a statute refers generally to defenses "available by law." *Jam*, 586 U. S., at 210 (emphasis deleted; internal quotation marks omitted). That inference, however, works only if the statute actually *references* that body of law. The statute here does not. It refers to "cause" generally, 12 U. S. C. §242, a concept familiar to the common law. It does not refer to "causes that Congress has otherwise recognized as adequate."

Having rejected both parties' positions, we need not fully demarcate the contours of "cause" today. For present purposes, it is sufficient to observe that any definition of "cause" in this context must reflect the Federal Reserve's unique historical status and role. See *supra*, at 1–6; cf., *e.g.*, *Board of Street Comm'rs*, 96 Md., at 237–238, 53 A., at 924 (focusing upon "the nature of the service to be performed"

14                    TRUMP *v.* COOK

Opinion of the Court

and "the duties of the office"); *Hart*, 53 Minn., at 244, 55 N. W., at 120 (similarly focusing upon "the character of the office" and "the qualifications necessary to fill it"). Like its predecessors, the Federal Reserve operates at a deliberate remove from the ordinary political process. It sets its own budget, free of congressional control. §243. It consists in large part of privately owned (and operated) entities, namely, the regional banks. §222. And its policies are set not only by Governors, but also by representatives of the private regional banks. §263. Indeed, it is the Federal Reserve's independence that allows it to pursue its mandate of "maximum employment, stable prices, and moderate long-term interest rates," §225a, goals that may be thwarted if (to quote Hamilton) "suspicion" arose that its operations were "at the disposal of the Government," which often may favor ephemeral short-term gains over long-term growth, Report on a National Bank 331. Not only the *fact* of independence but also the *appearance* of independence is key to the Federal Reserve's design.

That counsels a substantial threshold for "cause." It is true, of course, that "cause" cannot be reduced to a precise set of rules, and some close calls are inevitable. Whether "cause" for removal exists in any given situation will depend, at least in part, on the seriousness of the alleged misconduct, and the extent of any nexus that may exist to the Governor's professional duties. The key issue is whether "[t]he cause assigned" truly "impl[ies] an unfitness for the place"—or whether it simply represents an effort to secure a "more congenial" replacement. *In re Nichols*, 6 Abb. N. Cas., at 482. "Our review is deferential, but we are not required to exhibit a naiveté from which ordinary citizens are free." *Department of Commerce* v. *New York*, 588 U. S. 752, 785 (2019) (internal quotation marks omitted). Without such constraints in place, any perceived or alleged misstep (past or present) could provide a ready pretext for a Governor's removal—a fact that he would surely know, and that

Opinion of the Court

would surely weigh on him as he decided what to say and how to vote. Nothing could be more corrosive of the independence that Congress sought to preserve.

C

Even if the determination of cause is judicially reviewable and the definition of cause imposes a substantial threshold, the Government (joined by JUSTICE THOMAS) contends that federal courts cannot grant a preliminary injunction ordering reinstatement during the pendency of litigation. On their view, all that a court may do is wait, and perhaps award backpay later—even if the President fires a member of the Board for an absurd reason, or no reason, and even if the court holds that he broke the law in doing so. See Application 31–32; *post*, at 30–31 (THOMAS, J., dissenting).

The law does not require such a result. The very treatise upon which the Government and JUSTICE THOMAS rely, in fact, rebuts their argument. At least as a historical matter, as the Government and JUSTICE THOMAS explain, courts of equity would "not interfere by injunction to determine questions concerning the appointment of public officers or their title to office." Application 33 (quoting 2 J. High, Law of Injunctions §1312, p. 863 (2d ed. 1880) (High)); *post*, at 30 (THOMAS, J., dissenting) (same). But such courts "frequently recognize[d] and protect[ed] the possession of officers *de facto*, . . . pending a litigation" at law "to determine their title." 2 High §1315, at 866. Put another way, a court of equity would not and could not finally determine whether a plaintiff was validly removed—that was a question only a court of law could settle (again, historically) by *quo warranto* or mandamus. See S. Bray, Remedies in the Officer Removal Cases, 17 J. Legal Analysis 236, 241–246 (2025) (Bray). In the meantime, however, equity could ensure that "the actual incumbents of an office may be protected, pending a contest as to their title, from interference with their possession, and with the exercise of their functions," at

16    TRUMP *v.* COOK

Opinion of the Court

least to the extent that they had a likely meritorious claim. 2 High, §1315, at 866; see also, *e.g.*, 1 J. Pomeroy, Equitable Remedies §335, pp. 591–593 (1905). The District Court sought to do just that here. See App. to Application 23a. No equitable bar stood in its way.

Neither *In re Sawyer*, 124 U. S. 200 (1888), nor *White* v. *Berry*, 171 U. S. 366 (1898), says otherwise. Both cases stand for the far more limited proposition, already discussed, that "a court of equity has no jurisdiction over the appointment and removal of public officers," for such jurisdiction "belongs exclusively to the courts of law." *Sawyer*, 124 U. S., at 212; *White*, 171 U. S., at 376–377. Neither case holds that equity is unavailable in the interim. As Professor Bray has explained, *Sawyer* and *White* reflect "equity's overriding concern about the adequacy of legal remedies." Bray 246. Because the plaintiffs in those cases had "effective legal remedies" (like mandamus and *quo warranto*) to finally settle title to their offices—the only relief they sought—"equity could not intervene." *Ibid.* But that was not to preclude equitable remedies for *de facto* officers, like Cook, who required immediate relief "to protect [their status] during the course of th[e] litigation" at law. *Ibid.*

In sum, a court may order that a removed Governor remain in office during the pendency of litigation if the Governor is otherwise entitled to a preliminary injunction. Otherwise, a President could remove a Governor even while litigation over the removal was ongoing—and could do so for very lengthy periods of time without substantial cause for removal. That would significantly interfere with the independence of the Federal Reserve.[2]

---

[2] As a final procedural roadblock, JUSTICE THOMAS contends that Cook may not herself "enforce the terms of the Federal Reserve Act," for "[n]o plaintiff . . . can sue without a right of action" that "come[s] from Congress." *Post*, at 28. That is mistaken. We have often held that plaintiffs may sue "in equity" without a congressionally-provided cause of action "'to prevent an injurious act by a public officer.'" *Armstrong* v.

Cite as: 609 U. S. ____ (2026)      17

Opinion of the Court

## III

Having rejected the Government's view that the courts are to play no role in assessing the validity of a Governor's removal, we may decide this application on narrow grounds. No matter the precise definition of cause, or the scope of our review of any such determination, the President failed to afford Cook the procedural protections to which she was entitled by statute. Without such protections, she could not properly dispute the charges the President laid against her. We thus need not address Cook's constitutional due process argument, for the statute alone makes it unlikely that the Government will prevail on appeal as to the validity of the procedures used to fire Cook.[3]

_____

*Exceptional Child Center, Inc.*, 575 U. S. 320, 327 (2015) (quoting *Carroll* v. *Safford*, 3 How. 441, 463 (1845)); see also W. Baude, J. Goldsmith, J. Manning, J. Pfander, & A. Tyler, Hart and Wechsler's The Federal Courts and the Federal System 1348–1350 (8th ed. 2025) (noting "the availability of Ex parte Young-style litigation to challenge the legality of federal official action"). We see no reason why Cook may not pursue such a challenge here.

[3] Perhaps dissatisfied with the responses offered by the Government (and JUSTICE THOMAS), JUSTICE ALITO would ignore the statute altogether. We should do so, he contends, because the lower courts did so, ruling in Cook's favor based solely on the Due Process Clause. See *post*, at 4–5 (dissenting opinion). But we "revie[w] judgments, not statements in opinions." *California* v. *Rooney*, 483 U. S. 307, 311 (1987) (*per curiam*) (internal quotation marks omitted). That is why the question before us is whether we would likely "reverse the *judgment* below," *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*) (emphasis added), not whether we would likely disagree with some of the *reasons* given by the lower courts. JUSTICE ALITO does not contend that we would have to reverse the judgment below *even if* Cook were to prevail as to the statute. Nor does he contend that the statute was somehow waived or forfeited; it was, after all, one of Cook's lead points below, see Brief for Appellee in No. 25–5326 (CADC), pp. 1, 11–13, and in this Court, see Brief in Opposition 1–2, 30–33; Reply Brief 5–8. What he says instead is that the question is "complicated and novel," *post*, at 4, a concern we of course share. When a party comes to us for interim relief, however, we "cannot hide in the tall grass." *Trump* v. *CASA, Inc.*, 606 U. S. 831, 874 (2025) (KAVANAUGH, J., concurring). Ultimately, "we must grant or deny." *Ibid.*

18                    TRUMP *v.* COOK

Opinion of the Court

A

Under our precedents, Cook was entitled to notice and some opportunity to respond prior to her termination. That comes down to the words Congress chose, first in 1913, and then again in 1935. When Congress created the Federal Reserve, it gave Governors a set term in office and permitted removal only "for cause." At that time, and indeed afterward, that form of tenure—a term of years limited only by removal "for cause"—carried with it a settled interpretation at common law, one that we had expressly adopted just a decade before. "[T]he rule," we explained in 1901, is that "notice and hearing are essential" before an officer's removal "where the term of office is for a fixed period." *Reagan*, 182 U. S., at 425. We said the same in 1903. See *Shurtleff* v. *United States*, 189 U. S. 311, 314. *Reagan* and *Shurtleff* established the baseline against which Congress legislated, and we must construe its work accordingly. See *Williams* v. *Taylor*, 529 U. S. 420, 434 (2000).

Of course, that is not to say that a Federal Reserve Governor is entitled to an audience with the President or a full-blown judicial trial. But cf. A. Bamzai, Taft, Frankfurter, and the First Presidential For-Cause Removal, 52 U. Rich. L. Rev. 691 (2018) (describing the formal "committee of inquiry" convened by President Taft to assess whether he had cause to fire two members of the Board of General Appraisers).[4] Instead, all that is required is notice "to the officer of the charges made against him" and "an opportunity to be heard in his defense." F. Mechem, Law of Public Offices and Officers §454, p. 287 (1890) (Mechem); see also 2 J. Dillon, Commentaries on the Law of Municipal Corporations §§473, 477, pp. 792, 798–802 (5th ed. 1911) (similarly

_____

That means resolving (at least tentatively) the legal issues properly before us—and not just the easy ones.

[4] This is a prime example of the view that Taft was our "most judicial president," as he was our most "presidential chief justice." J. Rosen, William Howard Taft 137 (2018).

Opinion of the Court

emphasizing the necessity of a particular "formulated charge against the officer" and "an opportunity given to the party of making defence"). We see no reason why that opportunity "may not be had on written materials only," with no oral presentation. H. Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1270 (1975). All that is required is "the right to support his allegations by argument however brief, and, if need be, by proof, however informal," before a final decision is made. *Londoner* v. *City and County of Denver*, 210 U. S. 373, 386 (1908).

The Government (joined by JUSTICE THOMAS) resists even this minimal process. It contends that we may not "read atextual requirements into statutes" and instead must focus only on "the plain language." Supp. Brief for Applicant 7 (internal quotation marks omitted). It is hardly atextual, however, to read text in context, or to examine how this Court interpreted such language at the time of the statute's enactment. If anything, it would be atextual to do otherwise.

Indeed, even the Government concedes that Congress, at least sometimes, should be taken to have implicitly incorporated these procedural requirements. The Government acknowledges, for instance, that a statute limiting removal to "specified causes"—like inefficiency or malfeasance— would require pretermination "notice and a hearing," because "this Court expressly recognized" as much in "both *Shurtleff* and *Reagan*." Tr. of Oral Arg. 30; see also *id.*, at 58 (reiterating the point). But *Shurtleff* and *Reagan* said the same about statutes, like the one at issue here, that promise officeholders a term of years—indeed, they said so in the exact same sentence. See *Shurtleff*, 189 U. S., at 314 ("[W]here causes of removal are specified by Constitution or statute, *as also where the term of office is for a fixed period*, notice and hearing are essential." (quoting *Reagan*, 182 U. S., at 425; emphasis added)). The Government's concession all but gives up its case.

20    TRUMP *v.* COOK

Opinion of the Court

That disposes, too, of the Government's related argument that Congress "knows how to impose notice-and-hearing requirements"—that is, "expressly"—and did not do so here. Supp. Brief for Applicant 7–8; see also *post*, at 22–23, and n. 4 (THOMAS, J., dissenting) (cataloging examples of such laws). Again, what is true for a statute with "specified causes" is true for this statute, too—in both instances, "notice and hearing are essential." *Reagan*, 182 U. S., at 425; *Shurtleff*, 189 U. S., at 314. And in any case, as we have said many times before, Congress not infrequently legislates in a "hyper-vigilant way, to remove any doubt as to things not particularly doubtful in the first instance." *Cyan, Inc.* v. *Beaver County Employees Retirement Fund*, 583 U. S. 416, 435 (2018) (internal quotation marks and alteration omitted). That Congress acted "out of an abundance of caution" in other statutes (most enacted decades after the one at issue here) hardly permits us to ignore the default rule our precedent had already made clear. *Fort Stewart Schools* v. *FLRA*, 495 U. S. 641, 646 (1990).

Perhaps recognizing the Government's bind, JUSTICE THOMAS would simply discard the rule announced in *Reagan* and *Shurtleff* as "a single line of dicta." *Post*, at 20. A single line, yes; dicta, no. *Reagan* and *Shurtleff* could hardly have been clearer about "the rule" they applied— that (to repeat once more) "notice and hearing are essential" if "the term of office is for a fixed period." *Reagan*, 182 U. S., at 425; *Shurtleff*, 189 U. S., at 314. Thus (as JUSTICE THOMAS emphasizes) the officers in *Reagan* and *Shurtleff* ultimately lost, because neither one enjoyed a fixed tenure. *Reagan*, 182 U. S., at 426; *Shurtleff*, 189 U. S., at 316. That does not make the rule "dicta."

Even so, JUSTICE THOMAS insists, we cannot presume that Congress intended to incorporate *Reagan* and *Shurtleff*'s rule in the absence of some broader "judicial consensus." *Post*, at 18. We are not sure what more JUSTICE THOMAS wants. It is true, of course, that we have

Opinion of the Court

required "broad and unquestioned" "consensus" in *the Courts of Appeals* before presuming that Congress intended to incorporate into new legislation *the lower courts'* interpretation of a particular word or phrase. *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 349 (2005). (The one case cited by JUSTICE THOMAS on this point, *Learning Resources, Inc.* v. *Trump*, 607 U. S. 229 (2026), stands for just that proposition. See *id.*, at 252–253.) We have never said the same, however, about *our own cases*, of which Congress presumptively is aware. See, *e.g.*, *Ysleta del Sur Pueblo* v. *Texas*, 596 U. S. 685, 700–701 (2022) (finding that Congress implicitly relied upon an interpretation offered in just one of our prior opinions). Indeed, as a matter of vertical *stare decisis*, the lower courts have no choice but to follow our lead. When we define a term or establish a background rule, we need not repeat ourselves—once is enough.[5]

_____

[5]JUSTICE THOMAS acknowledges that our rule applies only to officers with a term of years who are *not* removable at will. See *post*, at 17–18. He notes that "hundreds" of federal officers with a term of years do *not* fall under this rule, because they *are* removable at will. *Post*, at 20. So far, so good. JUSTICE THOMAS errs, however, in suggesting that we have "rephrase[d]" *Reagan* and *Shurtleff* to arbitrarily exclude such officers, because (he says) they have "fixed terms" too. *Post*, at 20–21. But without some form of protection from removal—whether "for cause," "during good behavior," or something else entirely—an officer's "term" is not "for a fixed period" at all. *Reagan*, 182 U. S., at 425; *Shurtleff*, 189 U. S., at 314. He may be fired at *any* time for *any* reason. The "expiration" date set by statute (whether one, two, or more years) merely serves as a ceiling on his time in office, not a floor. *Parsons* v. *United States*, 167 U. S. 324, 338–339 (1897). *Reagan* and *Shurtleff* made just this distinction, see *Reagan*, 182 U. S., at 425; *Shurtleff*, 189 U. S., at 317–318, as did the common law, see M. Throop, Law Relating to Public Officers §364, pp. 359–360 (1892) ("settled law" that notice and hearing required for officers "appointed for a fixed term, and removable only for cause," but not those removable "at pleasure"). Contra, *post*, at 15, 18 (THOMAS, J., dissenting) (contending that no "eminent common-law authorities" support our interpretation, while citing Throop for a different point).

22                    TRUMP *v.* COOK

Opinion of the Court

With no support in *Reagan* and *Shurtleff*, JUSTICE THOMAS goes for broke. Once again far outflanking the Government, which "does not contest the constitutionality of the" statute, Application 2, n. 1, JUSTICE THOMAS declares the statute "unconstitutional," an infringement on the President's power to "remove his subordinates at will," *post*, at 24–25.

We disagree, as did "the founders of our Government and framers of our Constitution" when they "were actively participating in public affairs." *Myers* v. *United States*, 272 U. S. 52, 175 (1926). They knew from experience (and Hamilton reminded them) of the calamities that could arise from even the "suspicion" of political manipulation of monetary policy. Report on a National Bank 331. So when they established the First Bank of the United States, they guaranteed its independence from Presidential control. Their successors did the same for the Second Bank. That enabled both banks to serve as the "great regulating wheel" of the early American financial system. Lomazoff 53; see also *id.*, at 51–68, 142–146 (discussing the banks' role as a "watchdog over state banks and the economy"). The Federal Reserve follows in this lineage. See *supra*, at 1–6. Contra, *post*, at 3–6, 26–27 (THOMAS, J., dissenting) (contending that the First and Second Banks, unlike the Federal Reserve, served no regulatory function).

It is true, of course, that this tradition has not stood still; as JUSTICE THOMAS notes, the Federal Reserve is more powerful than its predecessors, managing a vastly more complex economy in a vastly more complex world. See *post*, at 27.[6] We see no reason, however, why our central bank ought to be "trapped in amber" any more than any other aspect of our constitutional scheme. *United States* v.

———————
[6] In upholding the constitutionality of the Federal Reserve as currently structured and with its existing enforcement authorities, we do not suggest that Congress could assign the Federal Reserve additional regulatory powers that are attenuated from monetary policy.

Cite as: 609 U. S. \_\_\_\_ (2026)          23

Opinion of the Court

*Rahimi*, 602 U. S. 680, 691 (2024); see also *NLRB* v. *Noel Canning*, 573 U. S. 513, 524 (2014); *id.*, at 572–573 (Scalia, J., concurring in judgment). What matters is that the Federal Reserve remains "consistent with the principles that underpin" the First and Second Banks—namely, that monetary policy should not be subject to political interference. *Rahimi*, 602 U. S., at 692. In our view, the Federal Reserve maintains the "balance struck by the founding generation" under "modern circumstances." *Ibid.* We thus look to history not as an end in itself, but (as we often do) to give "essential content to undefined provisions in the frame of our government." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 610 (1952) (Frankfurter, J., concurring).[7]

JUSTICE BARRETT objects that we discuss this issue at all, even if only in response to JUSTICE THOMAS. See *post*, at 1–2 (dissenting opinion); see also *post*, at 2–4 (ALITO, J., dissenting) (similarly contending that we should not issue a "comprehensive opinion at this juncture"). How much to say on our interim docket—and how much to say in

─────────

[7] In the absence of *actual* unconstitutionality, JUSTICE THOMAS appeals to the canon of constitutional *avoidance*. See *post*, at 26. That move fails too. For one, the canon applies only in cases of "ambiguit[y]," where "text, context, and structure" leave us with two plausible interpretations of a statute. *Bondi* v. *VanDerStok*, 604 U. S. 458, 484 (2025) (internal quotation marks omitted). Here, however, we see no ambiguity. For another, as JUSTICE THOMAS has ably explained elsewhere, "the force of constitutional-avoidance principles is inherently limited where, as here, the choice of interpretations is tangential to the constitutional questions at stake." *United States ex rel. Polansky* v. *Executive Health Resources, Inc.*, 599 U. S. 419, 452, n. 3 (2023) (dissenting opinion). All agree that the Federal Reserve Act limits the President's power—the only question is *how much*. See Application 3–4 (acknowledging that the "'for cause' provision rules out removal for no reason at all, or for policy disagreement"); *post*, at 15 (THOMAS, J., dissenting) (adopting the Government's view). But if *any* limitation on the President's power to remove Governors "is constitutionally problematic," as JUSTICE THOMAS contends, then his interpretation "does not cure the problem" at all. *Polansky*, 599 U. S., at 452, n. 3 (opinion of THOMAS, J.). Either way, the constitutional question remains.

24 TRUMP *v.* COOK

Opinion of the Court

response to a dissent—is not reducible to any mechanical formula; it is ultimately a matter of prudence, upon which reasonable minds can (and often do) disagree. See *Mirabelli* v. *Bonta*, 607 U. S. 492, 501 (2026) (BARRETT, J., concurring) ("Interim applications routinely require the Court to balance the lock-in risk of saying too much against the transparency cost of saying too little"); compare *Trump* v. *Illinois*, 607 U. S. ___ (2025), with *id.*, at ___ (KAVANAUGH, J., concurring in judgment) (slip op., at 6), and *id.*, at ___ (GORSUCH, J., dissenting) (slip op. at 2). In this extraordinary case, we have had the benefit of not only *amici* and oral argument but months of internal consultation and deliberation. We see no reason to leave the public in limbo, or to sow doubt as to the status of one of our Nation's (and the world's) most important financial institutions. Although we appreciate that others may see matters differently, we would not so quickly unsettle this "special arrangement sanctioned by history." *Consumer Financial Protection Bureau* v. *Community Financial Services Assn. of America, Ltd.*, 601 U. S. 416, 467, n. 16 (2024) (ALITO, J., dissenting).

B

As a last resort, the Government halfheartedly contends that Cook in fact received due process after all. In its view, the President gave Cook notice and an opportunity to be heard when he first posted about the matter on social media. That is despite the fact that the President's post did not suggest that a response from Cook would be appropriate, nor did it even provide a clear account of the charge made against her. It instead read simply "Cook must resign, now!!!" and linked to a news article about Pulte's letter. ECF Doc. 1, p. 14.

That will not do. At minimum, Cook was entitled to some explanation of the evidence at issue, some avenue for a response, and a deadline by which a response would be due. Cf. *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S.

Opinion of the Court

306, 314–315 (1950).  Because Cook did not receive such process, her removal was "erroneous and void" from the start, M. Throop, Law Relating to Public Officers §364, p. 360 (1892), a principle recognized succinctly by Lord Coke as early as 1615, see *Bagg's Case*, 11 Co. Rep., at 93b, 77 Eng. Rep., at 1272 ("A removal, without hearing the party removed, is bad.").

Of course, that is not to say that a response from Cook necessarily would have changed the President's mind.  But as the Government rightly acknowledges, "the right to a hearing does not depend on demonstration of certain success."  Application 18–19 (internal quotation marks omitted).  It at least remains an open question what precisely happened here, and indeed whether Cook committed "gross negligence," let alone "deceitful and potentially criminal conduct," as the President's letter alleges.  ECF Doc. 1–4, p. 2.  Those are factual issues that we cannot determine in the first instance, and certainly not on the sparse record here (which does not even include the mortgage documents at issue nor any other evidence that the Government or Cook may consider relevant).  Only after Cook has had the opportunity to respond to the charges made against her "by argument however brief, and, if need be, by proof, however informal," may a final decision be made.  *Londoner*, 210 U. S., at 386.  And only then can the courts assess the validity and sufficiency of such charges.[8]

———————

[8] JUSTICE BARRETT suggests that the injunction in fact goes far beyond process, forbidding the President from removing Cook "for her alleged mortgage fraud" no matter what. *Post*, at 4.  Neither party agrees, and neither do we.  See Application 10 (explaining that the Court of Appeals "relied solely on" Cook's "procedural claim," holding only that she is entitled "to notice and opportunity for a hearing before her removal"); Brief in Opposition 8–9.  Like the parties, we read the injunction to forbid the implementation of "the President's letter of August 25" in which he purported to fire Cook—but not to forbid the President from trying again, if he chooses to do so.  App. to Application 23a.  At that point, Cook may seek judicial review under the framework described in this opinion,

26                    TRUMP *v.* COOK

Opinion of the Court

\*    \*    \*

As the Government concedes, Congress limited the President's power to remove Governors for good reason—"[t]o preserve the independence of the Federal Reserve" and to continue the "long tradition" of "monetary policy . . . exercised independent of . . . executive influence." Tr. of Oral Arg. 48 (statement of the Solicitor General).

Any change in that scheme must come from Congress, not the courts. That is why we cannot accept the Government's contentions in this case. To do so would allow the President to remove a member of the Federal Reserve at any time, for any reason, without any notice before, and without any judicial check after. That would turn for-cause protection into little more than at-will employment.

To be clear, the ultimate question of whether the President can remove Cook for cause will depend in part on the underlying facts. In this opinion, we have not addressed the facts, as they have yet to be found or analyzed under the relevant legal standards. Rather, we have simply addressed the parties' arguments about the appropriate legal standards under which the facts must be evaluated.

The application for a stay is denied.

*It is so ordered.*

---

without the "broad" prohibition on removal "for mortgage fraud" that JUSTICE BARRETT fears, *post*, at 5. (Indeed, even if the injunction *were* overbroad, that still would not warrant JUSTICE BARRETT's proposed course of action—granting the Government's application *in full*, and thus removing Cook from office immediately, as opposed to merely clarifying the injunction's limited scope. Cf. *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753, 765 (1994) (relief must be "no broader than necessary" to prevent irreparable harm to applicant).)

# SUPREME COURT OF THE UNITED STATES

---

No. 25A312

---

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, APPLICANT *v.* LISA D. COOK, MEMBER OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, ET AL.

### ON APPLICATION FOR STAY

[June 29, 2026]

JUSTICE KAVANAUGH, concurring.

I join the Court's opinion in full and write separately to emphasize two points.

*First*, today's interim ruling does not decide whether the President may lawfully remove Governor Cook for cause. The ultimate decision about whether the President may remove Governor Cook for cause will largely depend on the facts regarding the Governor's actions. And those facts have yet to be determined. The Court's opinion today simply settles some of the legal and procedural ground rules under which (i) the Executive Branch may determine and assess the facts and (ii) courts may then "assess the validity and sufficiency" of any asserted grounds for removal. *Ante,* at 25.

*Second*, in establishing some of those legal and procedural ground rules, the Court confirms the longstanding historical practice and understanding that the Federal Reserve is an independent agency whose Governors enjoy for-cause removal protection consistent with Article II of the Constitution. The Government itself expressly "acknowledge[d]" and did "not disput[e]" that point in this case, even as the Government simultaneously (and successfully) argued that the for-cause removal protections for most independent agencies violate Article II.

2                    TRUMP *v.* COOK

Tr. of Oral Arg. 6, 48; see *Trump* v. *Slaughter*, ___ U. S. ___ (2026).  Specifically, the Government recognized the "long tradition of having this exercise of monetary policy be exercised independent of . . . executive influence."  Tr. of Oral Arg. 48.  The Government further "acknowledge[d] what the Court said in *Wilcox*, which is that" the Federal Reserve is "a quasi-private, uniquely structured entity that stands in the distinct historical tradition of the First and Second Banks of the United States, and, therefore, we have not challenged the—the removal restriction in this case." Tr. of Oral Arg. 6 (referring to *Trump* v. *Wilcox*, 605 U. S. 922, 923 (2025)).  The Government also stated that the purpose of the Federal Reserve's independence is to "protec[t] the governors from removal for policy disagreement or for no reason at all."  Tr. of Oral Arg. 47. And it added that it does not "dispute the importance of that" independence "for many of the reasons that [Cook's] amici say."  *Id.*, at 48.

I agree with the Court, moreover, that we should not leave open the question whether the Federal Reserve can remain an independent agency in the wake of *Slaughter*. After *Slaughter*, there is a clear choice:  Either the Federal Reserve may remain independent (with the Governors removable for cause, not at will), or it may not.  Leaving that question open would create significant uncertainty about whether the Court might soon eliminate the Federal Reserve's independence, and thereby expose the Federal Reserve to political influences and jeopardize the efficacy of U. S. monetary policy.  Even temporary uncertainty about the status of the Federal Reserve could spark political upheaval, including confusion about whether the President could immediately remove multiple Governors at will, as well as turmoil in the U. S. and world economies.

I would not go down that road.  I would not risk destabilizing the U. S. economy just so that we can further mull over an issue that, in various permutations, we have

KAVANAUGH, J., concurring

been thinking about for many years. As the Court's opinion explains and the Government agrees, the Federal Reserve occupies a unique role in the U. S. Government and maintains critical responsibility for the stability and success of the U. S. and world economies. See *ante,* at 1–6. Most importantly for constitutional purposes, the Federal Reserve follows in a distinct historical tradition of central bank independence that has long coexisted with Article II. That history of course carries great weight in Article II cases. See *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 610–611 (1952) (Frankfurter, J., concurring); *id.,* at 634–638 (Jackson, J., concurring). In my view, in light of that historical practice and precedent, the Federal Reserve may continue as an independent agency after *Slaughter*. If the Federal Reserve's for-cause removal protections are to be eliminated, that change must occur through the legislative process.[1]

In short, like the Court, I see no good reason here to unsettle a critical constitutional question that has long been settled and that should remain settled.

\* \* \*

With those additional comments, I join the Court's opinion in full.

———————

[1] Only JUSTICE THOMAS contends that, under Article II, the Federal Reserve may not remain an independent agency and that the Governors therefore should be removable at will. See *post*, at 24–27 (dissenting opinion).

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 25A312

––––––––––

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, APPLICANT *v.* LISA D. COOK, MEMBER OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, ET AL.

ON APPLICATION FOR STAY

[June 29, 2026]

JUSTICE JACKSON, concurring.

Whether to issue a stay is fundamentally an equitable determination. Fairness concerns compel courts to ask, in essence, whether a stay applicant "can be made to wait until the conclusion of the litigation to vindicate their purported legal rights, or whether irreparable harm will befall the applicant in the interim such that the court must act early to stave off that damage, for equity's sake." *Noem* v. *Doe*, 605 U. S. ___, ___ (2025) (JACKSON, J., dissenting from grant of application for stay) (slip op., at 3). Because the authority to grant a stay is "justified by the perceived need 'to prevent irreparable injury to the parties or to the public' pending review," *Nken* v. *Holder*, 556 U. S. 418, 432 (2009) (quoting *Scripps-Howard Radio, Inc.* v. *FCC*, 316 U. S. 4, 9 (1942)), the most important considerations are "whether the applicant will suffer irreparable harm absent emergency intervention, as well as the relative harm to the parties and the public interest in the grant or denial of a stay." *Trump* v. *Orr*, 607 U. S. ___, ___ (2025) (JACKSON, J., dissenting from grant of application for stay) (slip op., at 2).

I write separately to explain that, in this case, the Government falls far short with respect to these equitable factors. I have joined the Court's opinion because I also agree

2                          TRUMP *v.* COOK

JACKSON, J., concurring

that the Government's merits arguments are unlikely to succeed.

On the equities, the Government has not identified any injury whatsoever beyond the harm that a President purportedly suffers when a Governor of the Board of the Federal Reserve exercises power "over [his] objection." Application to Stay Preliminary Injunction 36; see also *post*, at 32 (THOMAS, J., dissenting from denial of application for stay) (insisting that the Government is harmed simply because the District Court "allow[ed] a removed officer to continue exercising the executive power" (internal quotation marks omitted)). But "that assertion is just another species of the far-fetched contention that the President [is] injured whenever he is prevented from doing as he wishes." *Orr*, 607 U. S., at ___ (JACKSON, J., dissenting) (slip op., at 10). As such, it does not amount to the sort of tangible harm that warrants setting the interim status of a dispute in the President's favor.*

Even if the Government had alleged an irreparable injury, the stay inquiry still requires consideration of "whether issuance of the stay will substantially injure the other parties interested in the proceeding" and "where the public interest lies." *Nken*, 556 U. S., at 426 (internal quotation marks omitted). On the facts presented here, the public interest unmistakably weighs against the Government's application.

Economic experts of all stripes agree that "[t]he Federal Reserve's independence is critical to fostering the long-term

———————

*If the President were able to point to a real-world injury that flows from Governor Lisa Cook's continued service during the pendency of this litigation, the equitable harm assessment might be different. But having to maintain an officer the President wants to fire does not count, because whether he is entitled to fire Cook is the subject of the pending lawsuit. If, as it turns out, the law does not permit this firing, the President is not injured at all—much less irreparably—by having to retain Cook during the litigation.

JACKSON, J., concurring

health and stability of the national economy." Brief for Former Treasury Secretaries et al. as *Amici Curiae* 6. That is because "effective monetary policy requires a commitment" to the often politically unpopular "long-term goals of price stability and steady growth." *Id.*, at 10, 14. But those long-term goals are not served if the officials responsible for the Nation's monetary policy are subject to the whims of politicians—many of whom "have an incentive to respond to their constituents' immediate interests by prioritizing short-term economic growth." *Id.*, at 11.

Put differently, the public's interest is not served if a President can intimidate members of the Federal Reserve into doing his bidding. Experience has taught that high inflation, price variability, and, ultimately, financial panic can result when the Federal Reserve is subjected to rank politicization. See *id.*, at 14–16; *ante*, at 5. Indeed, even the mere *perception* of partisan influence over that body can trigger these disastrous consequences. See Brief for Former Treasury Secretaries et al. as *Amici Curiae* 9. Allowing Governor Lisa Cook "to be removed now, without even full merits review, would send an unmistakable signal that the Federal Reserve is vulnerable" to exactly this kind of influence. Brief for Former Government Officials et al. as *Amici Curiae* 10.

When it comes to the President's ability to fire members of the Federal Reserve, the public's interest in the continued viability of our Nation's economy is at stake. The thought that the President suffers a comparable level of harm simply because he is temporarily unable to remove Cook from office is "facially absurd." *Department of Homeland Security* v. *D. V. D.*, 606 U. S. ___, ___ (2025) (SOTOMAYOR, J., dissenting from grant of application for stay) (slip op., at 11).

4                          TRUMP *v.* COOK

JACKSON, J., concurring

\*      \*      \*

In my view, today's application could be resolved by eval-
uating the equities alone.  But we have had the benefit of
multiple rounds of briefing, oral argument, and the time to
consider carefully the legal issues this particular applica-
tion presents, unlike in many other consequential emer-
gency-docket cases we have decided recently.  See, *e.g.*, *Lab-
rador* v. *Poe*, 601 U. S. ___, ___ (2024) (JACKSON, J.,
dissenting from grant of application for stay) (slip op., at 7).
So, I join the Court in reaching a merits conclusion in this
case.  Still, on the most important stay considerations (the
risk of irreparable harm and the equities) this application
is not a close call.  The Government misses the mark by a
mile.

Cite as: 609 U. S. \_\_\_\_ (2026)        1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 25A312

———————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, APPLICANT *v.* LISA D. COOK, MEMBER OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, ET AL.

ON APPLICATION FOR STAY

[June 29, 2026]

JUSTICE THOMAS, dissenting.

The President of the United States seeks relief from a court order that restores a principal executive officer to her position after the President removed her. President Biden appointed Lisa Cook to the Board of Governors of the Federal Reserve System in 2022. The Board, unlike the Federal Reserve Banks, is a federal executive agency that regulates much of the Nation's economy. After President Trump was elected, he learned that Cook may have committed mortgage fraud, a federal crime punishable by up to 30 years in prison, shortly before she took office. He thus removed Cook from the Board. He did so pursuant to his authority to remove principal executive officers under Article II of the Constitution and a statute that expressly authorizes him to remove officers on the Board for "cause."

Cook sued in federal court to reclaim her office. She argued that her office was her "property," which the President could not deprive her of without "due process of law." She also argued that her apparent mortgage fraud was not a "cause" to remove her, and that the statute authorizing the President to remove her for "cause" implicitly required that the President provide her with notice and a hearing before any such removal. The District Court entered an injunction

2                        TRUMP *v.* COOK

against Cook's removal.  Today, this Court denies the President a stay of that injunction, allowing Cook to continue to exercise executive power after being removed by the President.

The Court's decision is incorrect.  Cook's office was not her "property" because, in this country, government officials do not own the public offices in which they serve.  Apparent mortgage fraud was a "cause" to remove Cook.  And, the statute authorizing the President to remove Cook for "cause" says nothing about notice or a hearing, so it does not require notice and a hearing.  Any other result would violate Article II of the Constitution, under which the President may remove executive officers at will.  The Court makes many policy arguments for an "independent" banking agency that exercises executive power free from accountability, *ante,* at 5, but those are ultimately arguments against the Constitution.

The federal courts also lack the authority to enter the relief that the Court upholds today.  This Court has held that a plaintiff cannot obtain relief against anyone, let alone the sovereign, without a right of action, but now it rules that Cook may obtain such relief without identifying one.  It has held that federal courts lack equitable authority to interfere with the removal of public officers, but it recognizes an exception to that rule for Cook.  And, it has held that Congress and the Judiciary cannot encroach on the President's exclusive and preclusive powers, which include his power to remove executive officers, but it prevents the President from exercising that power here.  Although the Court expresses concern that the President removed a Board member for "the first time in the Federal Reserve's 111-year history," *ante,* at 1, it expresses no such concern that it today upholds an injunction against the President's removal of an executive officer for the first time in the Constitution's 237-year history.

I respectfully dissent.

THOMAS, J., dissenting

## I

## A

When President Wilson signed the Federal Reserve Act in 1913, few would have described it as following in a "'long tradition.'" *Ante*, at 26. Before the Federal Reserve Act, the American tradition of central banking consisted mainly of the First and Second Banks of the United States, two short-lived corporations. See Act of Feb. 25, 1791, ch. 10, 1 Stat. 191; Act of Apr. 10, 1816, ch. 44, 3 Stat. 266. Congress chartered the First and Second Banks of the United States to provide banking services to the Federal Government. See ch. 10, 1 Stat. 191–196; ch. 44, 3 Stat. 266. These banks possessed no sovereign power. See ch. 10, 1 Stat. 191; ch. 44, 3 Stat. 266. "Unlike modern central banks," the First and Second Banks of the United States "did not officially set monetary policy" and did not "regulate, hold the reserves of, or act as a lender of last resort for other banks." Fed. Reserve Bank of Philadelphia, The First Bank of the United States 8 (2021) (emphasis deleted); accord, Fed. Reserve Bank of Philadelphia, The Second Bank of the United States 9 (2021). Alexander Hamilton defended the First Bank of the United States precisely because its capabilities would "only concern the disposition of its own property" and "essentially resemble the rules of a private mercantile partnership." Final Version of an Opinion on the Constitutionality of an Act to Establish a Bank, in 8 The Papers of Alexander Hamilton 110 (H. Syrett & J. Cooke eds. 1965).

The advocates of the Federal Reserve Act did not take themselves to be following in this tradition. Instead, they ridiculed it, describing the United States before the Federal Reserve Act as "at about the same point that had been reached by Europe at the time of the Medicis, and by Asia, in all likelihood, at the time of Hammurabi." P. Warburg, Defects and Needs of Our Banking System, N. Y. Times, Jan. 6, 1907, p. 14 (Defects and Needs). Paul Warburg, the architect of the Federal Reserve Act and himself a German

4                    TRUMP *v.* COOK

THOMAS, J., dissenting

citizen at the time, began advocating in 1907 for this country to follow the model of the German Reichsbank, which he described as "the most perfect organization of its kind." *Ibid.*; see Warburg a Leader in Banking Reform, N. Y. Times, Jan. 25, 1932, p. 5. The Reichsbank and other European banks could, unlike American banks, rediscount notes, serve as a lender of last resort, and adjust the money supply. See Defects and Needs 14. In Warburg's view, "the system of all other important nations has proved to be excellent and ours has proved to be defective." *Ibid.*

The champion of the Federal Reserve Act in Congress shared this understanding. Senator Nelson Aldrich, "the most influential figure in Congress on financial matters," joined forces with Warburg to enact banking legislation. M. Whitehouse, Paul Warburg's Crusade to Establish a Central Bank in the United States, 3 The Region 7, 9 (May 1989) (Whitehouse). Aldrich too "envisioned a European-type central bank for the United States." *Id.*, at 10; accord, 1 P. Warburg, The Federal Reserve System: Its Origin and Growth 33, 56 (1930) (Warburg). Aldrich, like Warburg, wanted "to transplant the system of one of the great European banks . . . bodily to America." N. Stephenson, Nelson W. Aldrich: A Leader in American Politics 378 (1930) (Stephenson).

Warburg and Aldrich formulated the "Aldrich Plan" that would eventually lead to the Federal Reserve Act. They met in 1910 with "representatives of three extremely significant New York banks," *id.*, at 373, "to formulate a plan for U. S. banking and currency reform that Aldrich could present to Congress," Whitehouse 11. According to Warburg, "Senator Aldrich pledged all participants to secrecy." 1 Warburg 60, and n. 2; accord, Whitehouse 11; Stephenson 373, 484. In 1911, Senator Aldrich published the eventual plan, which proposed new reserve banks with the capabilities of European banks. See The Aldrich Plan for Banking Legislation (1911); Whitehouse 11–12; 1 Warburg 42, 61–62, 178–423.

THOMAS, J., dissenting

Newly elected President Woodrow Wilson agreed with much of the Aldrich Plan, but "insist[ed] upon" an executive agency that would exercise "governmental control" over the banking economy. A. Link, Woodrow Wilson and the Progressive Era, 1910–1917, p. 48 (1954) (Link); see also 1 Warburg 81–91. Wilson, in this respect, was also departing from tradition. He had long believed that "bureaucrats might more effectively govern the country than the American people." *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, 130, n. 6 (2015) (THOMAS, J., concurring in judgment). Wilson's ideal system of government was not the tripartite and limited one enshrined in our Constitution, but the German Empire's system of unified administrative power, which he, echoing Warburg, saw as "nearly perfected." W. Wilson, The Study of Administration, 2 Pol. Sci. Q. 197, 204 (1887); see *id.*, at 207, 214–219. Wilson disliked the American system of government because it ultimately depended on the will of the people, whom Wilson believed were "selfish, ignorant, timid, stubborn," and "foolish." *Id.*, at 208; see also, *e.g.*, *id.*, at 214; W. Wilson, Constitutional Government in the United States 4–5, 56–57 (1908); 1 W. Wilson, College and State 106–107, 111–129, 396–415 (1925). America, Wilson said, did "too much by vote" and too little by expert administrative bodies (or, in his words, "executive expertness"). Wilson, 2 Pol. Sci. Q., at 207, 214. So, when Wilson learned of the Aldrich Plan, he asked for it to include a novel executive agency to govern the banking economy. See Link 47–48; 1 Warburg 421–423; R. Cushman, The Independent Regulatory Commissions 151 (1941) (Cushman).

Thus was born the Federal Reserve Board. The Board was the "second independent regulatory commission" in American history, following the Interstate Commerce Commission. *Id.*, at 146. Unlike the First and Second National Banks, which possessed no sovereign power, the Federal Reserve Board would be a "new federal agency" with "broad powers affecting the entire banking and currency system."

6                          TRUMP *v.* COOK

*Id*., at 153; see also Link 43–53.  The Board would regulate the newly created reserve banks, private commercial banks, and private individuals.  See *infra* this page and 7.  Warburg saw the Board as an "expert government body" for "the state of the future."  2 Warburg 494, 502; see *id*., at 491.

Wilson signed the Federal Reserve Act into law in December 1913.  Act of Dec. 23, 1913, ch. 6, 38 Stat. 251.  He appointed Warburg to the Federal Reserve Board the following year.  1 Warburg 144.  Warburg would soon reflect that "[t]he Federal Reserve Act brought about a most radical change."  2 *id*., at 447.

B

The Federal Reserve Act authorized the incorporation of up to twelve Federal Reserve Banks and created the Federal Reserve Board.  §§2, 4, 10–11, 38 Stat. 251–257, 260–263.  The Federal Reserve Banks were "private corporations in which the government has an interest."  *Emergency Fleet Corp.* v. *Western Union Telegraph Co.*, 275 U. S. 415, 426 (1928).  The reserve banks had the capabilities, like the European banks after which they were modeled, to rediscount notes, serve as a lender of last resort, and adjust the money supply.  See §§4, 13, 14, 19, 38 Stat. 254–257, 263–265, 270–271.  They had corporate boards and the ordinary powers of private corporations, such as to contract, and to sue and be sued.  §4, *id*., at 254–257; 12 U. S. C. §§301, 341.  They were owned by "national banks," a class of private commercial banks required by the Federal Reserve Act to purchase stock in the reserve banks.  Ch. 6, §2, 38 Stat. 251–253.

The Federal Reserve Board, by contrast, was an executive agency.  The Board, now called the Board of Governors of the Federal Reserve System, was the "keystone" of the Act.  E. Kemmerer, The ABC of the Federal Reserve System 84 (5th ed. 1920); see 12 U. S. C. §241.  At its inception, as today, the Board had the power to regulate most of the bank-

THOMAS, J., dissenting

ing economy. The "Board of Governors of the Federal Reserve System" has thus always been understood as "an agency of the United States Government." *9 to 5 Org. for Women Office Workers* v. *Board of Governors of Fed. Reserve*, 721 F. 2d 1, 2 (CA1 1983); see also Who We Are, The Federal Reserve, www.federalreserve.gov/aboutthefed/fed-explained/who-we-are.htm (archived at perma.cc/AT2P-MT3W) ("a federal agency located in Washington, D. C."); *Corner Post, Inc.* v. *Board of Governors*, 603 U. S. 799, 806 (2024) ("agency").

The original Federal Reserve Act gave the Board a wide range of powers that this Court has held to be executive. See *Trump* v. *Slaughter*, 609 U. S. \_\_\_, \_\_\_ (2026); *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 218–219 (2020). The Act granted the Board the power to, among other things, impose "rules and regulations" on ordinary commercial banks, §9, 38 Stat. 259; "examine at its discretion" the papers and effects of reserve banks and national banks, §11(a), *id.*, at 261; regulate national banks in establishing foreign branches, §25, *id.*, at 273–274; set rates to be charged by reserve banks, §14(d), *id.*, at 265; fix "by rule" national bank check-clearing charges, §16, *id.*, at 266–268; and impose penalties on national banks, §19(c), *id.*, at 270–271.[1] Over the years, Congress has given the Board more powers, including the power

———————
[1] This list of powers is far from comprehensive. The Federal Reserve Act also gave the Board the power to "adopt and promulgate rules and regulations governing the transfers of . . . stock," §2, 38 Stat. 253; impose "rules and regulations" on the boards of the reserve banks, §3, *id.*, at 254; impose "orders" on the boards of the reserve banks, §4, *id.*, at 255; order banks that violate the law or its own regulations to "surrender [their] stock," §9, *id.*, at 260; levy semiannual assessments on the reserve banks, §10, *id.*, at 261; "require" any "statements and reports" deemed necessary from reserve banks and national banks, §11(a), *ibid.*; require reserve banks to rediscount at fixed interest rates, §11(b), *id.*, at 262; suspend reserve requirements, §11(c), *ibid.*; "establish a graduated tax" on reserve deficiencies, *ibid.* "suspend or remove" reserve bank officers and

8                    TRUMP *v.* COOK

THOMAS, J., dissenting

to issue fines of $1 million per day on banks that violate
Board reporting requirements, 12 U. S. C. §324; to author-
ize persons to act as law enforcement officers, §248(q); and
to regulate nonbank financial companies and bank holding
companies, §5365.  This Court recently heard a challenge to
a Board regulation that set the fees on consumer debit-card
transactions.  See *Corner Post*, 603 U. S., at 805–806; 76
Fed. Reg. 43394 (2011).  The Board also regularly issues or-
ders prohibiting private individuals from working for
banks, enforceable with civil and criminal penalties.  See
Board of Governors of the Federal Reserve, Enforcement
Actions (July 28, 2023), www.federalreserve.gov/supervi-
sionreg/enforcementactions.htm            (archived        at
perma.cc/UVQ4-99ZR); see 12 U. S. C. §1818(g).

The Federal Reserve Act authorizes the seven members
of the Board to serve 14-year terms unless the President
dismisses them for "cause."  §242.  Congress included the
"cause" requirement in the original 1913 Act, see §10, 38
Stat. 260, inadvertently removed it in 1933, and restored it
in 1935.  See Cushman 167–169; Act of June 16, 1933, §6(a),
48 Stat. 166–167; Act of Aug. 23, 1935, §10, 49 Stat. 704–
705.  In full, the Act's relevant provision, which is the sole
basis for the Court's decision today, states that "each mem-
ber shall hold office for a term of fourteen years from the
expiration of the term of his predecessor, unless sooner re-
moved for cause by the President."  12 U. S. C. §242.  Unlike

―――――――

directors, §11(f ), *ibid.*; suspend, liquidate, and reorganize reserve banks,
§11(h), *ibid.*; adopt "rules and regulations" for the purchase and sale of
cable transfers, bankers' acceptances, and bills of exchange eligible for
rediscount, §14, *id.*, at 264–265; prescribe "regulations" for the substitu-
tion of collateral, §16, *id.*, at 265–268; "make and promulgate . . . regula-
tions governing the transfer of funds and charges therefor" among re-
serve banks and their branches, §16, *id.*, at 268; require reserve banks
to exercise the functions of a clearing house and to purchase bonds, §§16,
18, *id.*, at 265–268, 268–270; and order examination of state banks and
trust companies, §21, *id.*, at 271–272.

many other contemporaneous statutes that provided for removal only after "notice and a hearing," see *infra*, at 19–21, the Act does not mention notice or a hearing.

## C

In 2022, President Biden appointed and the Senate confirmed Lisa Cook to the Board. President Biden reappointed Cook to serve a full 14-year term in 2023. She remained in office after President Trump's election and inauguration.

In 2025, the Director of the Federal Housing Finance Agency referred evidence to the Department of Justice suggesting that, shortly before taking her position on the Board, Cook committed mortgage fraud. On June 18, 2021, Cook obtained a $203,000 mortgage to purchase a property in Michigan. In the mortgage agreement, Cook indicated that she would use the Michigan property as her "principal residence for at least one year" starting shortly after signing. Complaint in No. 1:25–cv–02903 (D DC), ECF Doc. 1–2, Exh. A, p. 3. Just 14 days later, Cook obtained a second mortgage of $540,000 for a property in Georgia. *Ibid*. In her agreement for that mortgage, she also said that she would use the Georgia property as her primary residence for one year. *Ibid*. These commitments were relevant because primary-residence mortgages are often eligible for lower interest rates than other mortgages. See Fannie Mae, Getting It Right—Reverification of Occupancy 1 (June 2021). For that reason, the Federal Government can criminally prosecute mortgage applicants for falsely claiming that a property is a principal residence, with penalties of up to 30 years in prison. See 18 U. S. C. §§1014, 1344; K. Harney, A Little Lie on Mortgage Application Can Cost You Big, Wash. Post, July 1, 2015, p. SS1–9.

The President responded by removing Cook from office. He wrote to her: "Pursuant to my authority under Article II

10                              TRUMP *v.* COOK

of the Constitution of the United States and the Federal Re-
serve Act of 1913, as amended, you are hereby removed
from your position on the Board of Governors of the Federal
Reserve, effective immediately."   ECF Doc. 1–3, Exh. B,
p. 2.  He explained that "there is sufficient reason to believe
that you may have made false statements on one or more
mortgage agreements" because "you signed one document
attesting that a property in Michigan would be your pri-
mary residence for the next year," then "[t]wo weeks later,
you signed another document for a property in Georgia stat-
ing that it would be your primary residence for the next
year." *Ibid.* "It [was] inconceivable that you were not aware
of your first commitment when making the second," the
President said, and "[i]t [was] impossible that you intended
to honor both." *Ibid.*

The President explained why, in his view, Cook should
not remain on the Board.  The Board "has tremendous re-
sponsibility for setting interest rates and regulating reserve
and member banks." *Ibid.* "The American people must be
able to have full confidence in the honesty of the members
entrusted with setting policy and overseeing the Federal
Reserve." *Ibid.*  Thus, the President explained to Cook that
because of "deceitful and potentially criminal conduct in a
financial matter," neither he nor the American people could
any longer "have such confidence in your integrity." *Ibid.*
"At a minimum," the President concluded, "the conduct at
issue exhibits the sort of gross negligence in financial trans-
actions that calls into question your competence and trust-
worthiness as a financial regulator." *Ibid.*  The President
informed Cook that he had "determined that faithfully exe-
cuting the law requires your immediate removal from of-
fice." *Ibid.*

                                D

Cook sued President Trump, then-Board Chairman Je-
rome Powell, and the Board.  As relevant here, she brought

THOMAS, J., dissenting

three claims. First, she argued that the President's removal violated her rights under the Due Process Clause, which forbids the deprivation of "life, liberty, or property, without due process of law," Amdt. 5, because the public office was her "property," ECF Doc. 1, p. 20. Second, she argued that the President's removal violated the Federal Reserve Act's provision authorizing him to remove her for "cause," 12 U. S. C. §242, because he "did not cite appropriate cause for removing her," ECF Doc. 1, p. 18. Third, she argued that the President's removal violated the same provision because the term "for cause" is a "term of art" that includes a "right to notice and a hearing." *Id.*, at 19–20. Cook presented no evidence that the allegations against her were false.

For a right of action, Cook invoked the Declaratory Judgment Act, the All Writs Act, and the District Court's "traditional equitable jurisdiction." *Id.*, at 18–22. As to relief, Cook sought an injunction against Powell and the other officers of the Board ordering that they refrain from "effectuating" her removal and that they "treat" her as if she were not removed. *Id.*, at 23. She sought a writ of mandamus commanding the same. She also sought a declaration that the removal was void and that she is "an active member of the Board of Governors of the Federal Reserve." *Ibid.*

The District Court entered an injunction restoring Cook to her position. It "requir[ed] Defendants Powell and the Board of Governors of the Federal Reserve to allow Cook to remain a member of the Board during the pendency of this litigation." 804 F. Supp. 3d 14, 44 (DC 2025). The District Court held that Cook's removal likely violated the Due Process Clause. *Id.*, at 33. It reasoned that Cook had a "property" right to "her continued position as a member of the Board of Governors," so the President's removal deprived her of property without due process of law. *Ibid.* It also held that President Trump did not remove Cook for "cause"

12                     TRUMP *v.* COOK

THOMAS, J., dissenting

because he removed her for conduct preceding her appoint-
ment. *Id.*, at 22–30. It did not address Cook's argument
that she was statutorily entitled to notice and a hearing.
The District Court concluded that the harms and equities
favored Cook because she was prevented from "discharging
her duties as a Federal Reserve Governor" and the Presi-
dent's removal harmed "the agency's independence." *Id.*, at
40, 43. The District Court did not hold that Cook satisfied
the heightened standard for ultra vires or mandamus relief.

The Court of Appeals for the D. C. Circuit denied a stay
pending appeal. Although there was no opinion for the
court, Judge Garcia, joined by Judge Childs, wrote a con-
curring opinion. Judge Garcia relied solely on the Due Pro-
cess Clause, explaining that the President's removal of
Cook likely deprived her of her "property interest in her po-
sition." 2025 WL 2654786, *1 (Sept. 15, 2025). He did not
address Cook's argument that the President's removal was
not for "cause" under the Federal Reserve Act or that a "for
cause" removal provision implicitly requires notice and a
hearing. He also did not hold that Cook satisfied the
heightened standard for ultra vires or mandamus relief.

Judge Katsas dissented. He explained that Cook lacked
a right of action to sue government officials otherwise enti-
tled to sovereign immunity, so she could succeed only if she
satisfied "the demanding standards for raising an *ultra
vires* claim," which this Court has described as "'essentially
a Hail Mary pass'" that requires showing an extreme legal
error. *Id.*, at *6 (quoting *NRC* v. *Texas*, 605 U. S. 665, 681–
82 (2025)). Judge Katsas then explained that the Presi-
dent's removal of Cook was not unlawful at all, let alone so
extremely unlawful as to warrant ultra vires relief. As to
the process for the removal, Judge Katsas explained that
President Trump did not deprive Cook of property without
due process, because, under this Court's precedents, "'pub-
lic offices are mere agencies or trusts, and not property as
such.'" 2025 WL 2654786, *8 (quoting *Taylor* v. *Beckham*,

Cite as: 609 U. S. \_\_\_\_ (2026)            13

THOMAS, J., dissenting

178 U. S. 548, 577 (1900)). As to the basis for the removal, Judge Katsas explained that "[f]raud is an excellent reason for removal, not merely a permissible one." 2025 WL 2654786, *7 (internal quotation marks and brackets omitted).

President Trump applied to this Court for a stay. The President is entitled to a stay if he is likely to succeed on the merits and the balance of the harms and equities favors him. See *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). This Court deferred its decision on the application pending oral argument. Today, citing the need to maintain "the independence of the Federal Reserve," *ante,* at 16, the Court denies the President's application. It holds that the Federal Reserve Act provision authorizing the President to remove Cook for "cause" prohibited him from removing her for cause unless he first provided notice and a hearing. It also holds that federal courts can enter injunctive relief restoring a principal executive officer to her position after the President removes her.

II

The President is likely to succeed on the merits. The President's removal complied with the Due Process Clause because, in our system of government, officials do not own the public offices that they hold. The President's removal likewise complied with the statute because he removed Cook for "cause" and because the statute does not require notice and a hearing. Were there any doubt about what the statute requires, the canon of constitutional avoidance counsels strongly against reading it to implicitly restrict the President's Article II removal power. Finally, federal courts lack the power to grant the relief that Cook received.

A

The President is likely to succeed as to each of Cook's three claims.

14                          TRUMP *v.* COOK

THOMAS, J., dissenting

1

The President's removal of Cook did not violate the Due Process Clause. That Clause prohibits the Federal Government from depriving a person of "life, liberty or property, without due process of law." Amdt. 5. To succeed in her due-process challenge, Cook must show that she "has been deprived of a protected interest in 'property.'" *American Mfrs. Mut. Ins. Co.* v. *Sullivan*, 526 U. S. 40, 59 (1999).

Cook has no property right to hold power on the Board. In our system of government, a "public office is not property." *Taylor*, 178 U. S., at 576. Cook's claim that she has a property right to exercise governmental power is "alien to the concept of a republican form of government." *Barnes* v. *Kline*, 759 F. 2d 21, 50 (CADC 1985) (Bork, J., dissenting). And, this Court's precedents have "consistently recognized" that "government employment [is] not property or [an] otherwise cognizable interes[t] under the Due Process Claus[e]." *Gutierrez* v. *Saenz*, 606 U. S. 305, 332 (2025) (THOMAS, J., dissenting). Even "an officer appointed for a definite time or during good behavior" lacks a "vested interest or contract right in his office." *Crenshaw* v. *United States*, 134 U. S. 99, 104 (1890). "An unlawful denial" of "political office is not a denial of a right of property or of liberty secured by the due process clause." *Snowden* v. *Hughes*, 321 U. S. 1, 7 (1944).

Because the President did not deprive Cook of any protected interest in property, the Court rightly does not accept Cook's due-process claim.

2

The President's removal of Cook was also for "cause." 12 U. S. C. §242. By authorizing the President to remove Cook for "cause" in the Federal Reserve Act, Congress gave Cook the weakest available removal protection, which this Court has described as weaker even than the relatively deferen-

Cite as: 609 U. S. ____ (2026)     15

THOMAS, J., dissenting

tial "inefficiency, neglect, or malfeasance in office" standard. *Collins* v. *Yellen*, 594 U. S. 220, 255–256 (2021) (internal quotation marks omitted); see, *e.g.*, 15 U. S. C. §41. The "for cause" standard required nothing more than what the plain meaning suggests—a cause. Any "cause relating to the conduct, ability, fitness, or competence of the officer" would do. Black's Law Dictionary 796 (3d ed. 1933). A removal was for-cause if it was based on the removed officer's "bad habits, slovenliness, want of discretion, incompetency, or anything else which would show unfitness." *Fuller* v. *Ellis*, 98 Mich. 96, 106, 57 N. W. 33, 36 (1893). The standard was so low as to be functionally unreviewable. See M. Throop, The Law Relating to Public Officers §396, p. 387 (1892).

Cook's alleged mortgage fraud is a "cause" for removing her. Because Cook purports to bring a freestanding equitable claim against the President, the Court's precedents require it to presume "[t]he validity of the reasons" given by the President for her removal and "the basis of fact on which they rest." *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1, 15 (1926); see also *United States* v. *Armstrong*, 517 U. S. 456, 464–465 (1996). The President determined that Cook, a principal executive officer, engaged in "deceitful and potentially criminal conduct" that called into question her "integrity," "competence," and "trustworthiness." ECF Doc. 1–3, Exh. B, p. 2. Cook's job is to regulate the banking economy, but she is alleged to have made facially contradictory representations to obtain her own mortgages by committing to primarily reside in two different places at the same time. ECF Doc. 1–2, Exh. A, pp. 2–3. The President determined that it was "inconceivable" that she was unaware of the contradiction and "impossible" that she "intended to honor both." ECF Doc. 1–3, Exh. B, p. 2. This alleged conduct would have been grounds to remove a loan officer at a bank, let alone someone vested with "broad

16                     TRUMP *v.* COOK

powers affecting the entire banking and currency system." Cushman 153.

The Court rightly does not accept Cook's claim that the President lacked "cause" to remove her. The Court opines that "cause" means a "'substantial, reasonable, and just'" reason, or a "'disqualification' akin to 'inefficiency' or 'incompetency.'" *Ante*, at 13. Given the presumption of regularity, the accusation of mortgage fraud—a financial crime punishable by up to 30 years in prison—satisfies that standard. The Court does not hold otherwise.

3

The President's removal of Cook complied with the statute regardless of whether he provided notice and a hearing. The statute, as its plain text makes clear, did not require the President to provide Cook with notice and a hearing. The Court errs in concluding otherwise. Its interpretation also renders the statute unconstitutional.

a

We, as courts, have no authority to change what statutes say. "Our duty is to read the statute according to the natural and obvious import of the language, without resorting to subtle and forced construction for the purpose of either limiting or extending its operation." *United States* v. *Temple*, 105 U. S. 97, 99 (1882). We have no power to "assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 341 (2005). When we do, we improperly assume the legislative power.

In the Federal Reserve Act, Congress chose not to require that the President provide notice or a hearing to officers on the Board before removing them. The Federal Reserve Act specifies "only *causes* for removal," not "*procedures* for re-

THOMAS, J., dissenting

moval." *Ante*, at 11 (emphasis in original). The Act establishes a maximum term of service for members of the Board of Governors and sets only a substantive requirement for removal. In full, the relevant provision states:

> "[E]ach member shall hold office for a term of fourteen years from the expiration of the term of his predecessor, unless sooner removed for cause by the President." 12 U. S. C. §242.

Although some contemporaneous statutes required that an officer be removed only "after notice and hearing," Act of July 11, 1919, ch. 6, §6, 41 Stat. 68, see also *infra*, at 20, n. 2, the Federal Reserve Act conspicuously required neither notice nor a hearing.

b

The Court nonetheless interprets the Federal Reserve Act to say what it obviously does not—that notice and a hearing are required.

To justify its holding, the Court relies on the interpretive principle that common-law terms bear their common-law meanings. When "Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice," those terms of art take on their common-law meanings rather than their ordinary ones. *Sekhar* v. *United States*, 570 U. S. 729, 733 (2013) (internal quotations omitted); see *ante,* at 17. The term of art that the Court posits "carried with it a settled interpretation at common law," *ante*, at 18, is the Federal Reserve Act's statutory text providing that "each member shall hold office for a term of fourteen years from the expiration of the term of his predecessor, unless sooner removed for cause by the President." 12 U. S. C. §242. According to the Court, by providing for a "term of years limited only by removal 'for cause,'" this statutory text is a common-law term of art that means

18                   TRUMP *v.* COOK

THOMAS, J., dissenting

that a removed officer is "entitled to notice and some opportunity to respond prior to her termination." *Ante,* at 18.

The Federal Reserve Act's removal provision is not a common-law term of art that means perforce that a removed officer is entitled to notice and a hearing. The Court's interpretation of the removal provision is not based on the common law at all. In support of its notice-and-hearing requirement, the Court cites no "eminent common-law authorities" interpreting any of the terms of the Federal Reserve Act's removal provision. *Kahler* v. *Kansas*, 589 U. S. 271, 279 (2020). The Court's reasoning is instead based on two statutory-interpretation decisions that said nothing about the common law. See *ante,* at 18–21 (citing *Reagan* v. *United States*, 182 U. S. 419 (1901); *Shurtleff* v. *United States*, 189 U. S. 311 (1903)).

The Court thus invokes, apparently in the alternative, the principle that statutory terms should be interpreted consistently with prior judicial constructions of those terms. Under the prior-construction principle, "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute is presumed to incorporate that interpretation." *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U. S. 320, 330 (2015) (internal quotation marks omitted). Earlier this Term, this Court held that the prior-construction principle does not permit a court to depart from the ordinary meaning of a statutory term, as the Court does here, unless the earlier judicial constructions of that term were ubiquitous and unanimous: "[T]o conclude that Congress incorporated a judicial definition into a statutory term," "we have required" a "'broad and unquestioned' 'judicial consensus.'" *Learning Resources, Inc.* v. *Trump*, 607 U. S. 229, 252–253, n. 5 (2026).

When Congress enacted the Federal Reserve Act, there was no "'broad and unquestioned'" judicial consensus that a "term of years limited only by removal 'for cause,'" *ante,*

THOMAS, J., dissenting

at 18, 21, forbade removals without notice and a hearing. In point of fact, many courts held the opposite. A "for cause" removal provision, courts explained, "not only fails to require any hearing or proceeding, but also strongly implies that the removal shall be summary, and without any antecedent proceeding." *In re Carter*, 141 Cal. 316, 321, 74 P. 997, 998 (1903). When an officer was "removable for cause," a court had no power to "review his action for the purpose of determining the sufficiency of the causes," even when the "order of removal" specified no cause. *United States ex rel. Garland* v. *Oliver*, 17 D. C. 47, 56 (1887). "[W]here the appointing power may remove for cause," it followed that the removed officer was not "entitled to notice and to a trial." *Patton* v. *Vaughan*, 39 Ark. 211, 215 (1882); see also, *e.g.*, *State ex rel. Ulrick* v. *Sanchez*, 32 N. M. 265, 291, 255 P. 1077, 1087 (1926) ("[N]either notice [n]or hearing is a necessary condition precedent to a valid removal").

The Court thus does not even attempt to muster the "required" "'judicial consensus.'" *Learning Resources*, 607 U. S., at 252–253, n. 5. The Court instead relies on only two opinions, each of which is an odd fit for the Court's conclusion. See *ante,* at 18–21. Both opinions, *Reagan* v. *United States*, 182 U. S. 419, and *Shurtleff* v. *United States*, 189 U. S. 311, ruled against officers who were, like Cook, removed without notice and a hearing. *Reagan* ruled against a commissioner "subject to removal . . . for causes prescribed by law" after he was removed for old age. 182 U. S., at 424; see *id.*, at 427. The removed officer was "given no notice of any charge against him," and "no hearing." *Id.*, at 424. *Shurtleff* likewise ruled against an appraiser who could be "removed . . . by the President for inefficiency, neglect of duty, or malfeasance in office." 189 U. S., at 313; see *id.*, at 318–319. He was removed for no reason at all and with no process at all. *Id.*, at 312. *Reagan* and *Shurtleff* are not typically invoked in support of removed officers like Cook.

20                              TRUMP *v.* COOK

THOMAS, J., dissenting

The Court's entire argument is built on a single line of dicta (which the Court repeats four times) from those opinions. *Ante,* at 18, 19–20. In an aside, *Reagan* stated (and *Shurtleff* repeated) that "notice and hearing are essential" if "causes of removal are specified by constitution or statute, as also where the term of office is for a fixed period." *Reagan*, 182 U. S., at 425; see *Shurtleff*, 189 U. S., at 314. This one line does not interpret the "same language" that the Federal Reserve Act's removal provision used, so the prior-construction canon "has no application here." *Armstrong*, 575 U. S., at 330; contra, *ante,* at 20. The statute in *Reagan* provided for removals for "causes prescribed by law," 182 U. S., at 424, and the one in *Shurtleff* provided for removals "for inefficiency, neglect of duty, or malfeasance in office," 189 U. S., at 313. None of those phrases appears in the Federal Reserve Act. See 12 U. S. C. §242 ("shall hold office for a term of fourteen years from the expiration of the term of his predecessor, unless sooner removed for cause by the President").

Not even the underlying logic of the one line of dicta on which the Court relies supports its conclusion. In the Federal Reserve Act, no "causes of removal are specified," and this Court has never interpreted a mere "fixed" "term of office," *Reagan*, 182 U. S., at 425, to guarantee notice and a hearing. After all, hundreds of statutes provide for fixed terms of office, and nobody believes that all of those statutes implicitly require notice and a hearing.[2]

─────────

[2] In a footnote, the Court reasons that when officers are appointed for a fixed term but can be removed freely, their terms are not truly "'fixed'" (and so the language in *Reagan* and *Shurtleff* does not apply to them). *Ante,* at 21, n. 5. That reasoning contradicts both settled usage and this Court's precedents. See, *e.g.*, *Myers* v. *United States*, 272 U. S. 52, 190 (1926) (statute providing that each deputy postmaster "'shall hold his office for the term of four years, unless sooner removed by the President'" gave the deputy postmasters "fixed terms"); *Severino* v. *Biden*, 71 F. 4th 1038, 1046 (CADC 2023) ("when Congress provided for a three-year term of office, it did so with the settled understanding that its fixed term of

Cite as: 609 U. S. \_\_\_\_ (2026)    21

THOMAS, J., dissenting

The Court thus has to rephrase even the one line of dicta to describe a new "form of tenure": a "term of years limited only by removal 'for cause.'" *Ante,* at 18. This "form of tenure" does not appear in either *Reagan* or *Shurtleff*; it is a

———————

service in no way limited the President's removal power"); *Parsons* v. *United States*, 167 U. S. 324, 328 (1897) (4-year term with no removal restriction was "fixed").

The language in *Reagan* and *Shurtleff* that the Court relies on thus implicates hundreds of statutes. See, *e.g.*, 2 U. S. C. §179n(c)(1) ("The term of each member of the Board shall be 4 years"); accord, 2 U. S. C. §§474(a), 476(d), 601(a)(3), 803(b), 1103(c), 1381(e), 1722(d)(1); 5 U. S. C. §§424(b)(2)(B), 424(d)(2)(B), 595(b), 1102(a), 1211(b), 7104(c), 7702(d)(6), 8472(e), 8473(c); 6 U. S. C. §§191(c), 204(c)(4), 318(c)(4), 665e(c); 7 U. S. C. §§2, 1627b, 5331, 5843, 6005, 6407(b)(5), 7104, 7414(b)(5), 7444, 7804(b)(5); 10 U. S. C. §§152, 177(a)(5), 178, 183(b)(2), 942(b), 1114, 2113a(c), 7037, 7455, 8088, 8468, 9037, 9455, 10505; 12 U. S. C. §§302, 635a, 1427, 1441b(c)(2), 1701j–2, 1701y(b)(2), 1752a(c), 1812, 2242, 3013; 13 U. S. C. §21(b); 14 U. S. C. §§302, 318(a), 1903(b)(4); 15 U. S. C. §§41, 77cc, 78d, 78*o*–4, 78ccc(4), 278, 278g–4, 278k(m), 1275, 2053, 3717, 4102, 4603; 16 U. S. C. §§410y–4, 410cc–31, 410ww–21, 410yy–8, 410iii–7, 450jj–6, 460u–7, 460x–3, 460bb–4, 460cc–3, 460ii–5, 460ss–2, 460ss–3, 460zz–2, 460kk(q)(2), 590h, 773a, 792, 831a, 932, 953, 1055, 1401, 1852, 2105, 4004, 4403, 5003, 7002, 7003, 7004, 7005; 17 U. S. C. §802; 18 U. S. C. §3006A; 19 U. S. C. §§1330, 2605; 20 U. S. C. §§43, 76h, 76cc, 80, 80f, 80n, 954, 955, 956, 957, 1066f, 1134a, 2004, 2103, 3702, 4303, 4412, 4502, 4703, 5508, 5603, 9105a, 9578; 21 U. S. C. §379dd; 22 U. S. C. §§283a, 286a, 290f, 290i–1, 1469, 1622c, 2131, 4605, 6203, 6205, 6431; 25 U. S. C. §§305, 2704; 26 U. S. C. §7443; 28 U. S. C. §§152, 541, 561, 581, 629, 631, 992; 29 U. S. C. §§153, 175, 49*l*–2, 780, 792, 1302; 30 U. S. C. §823; 31 U. S. C. §§703, 751, 5135; 33 U. S. C. §§857–14, 892c, 1128, 1363; 36 U. S. C. §§2302, 40702, 151703, 152403, 300104; 38 U. S. C. §§547, 7101, 7253; 39 U. S. C. §202; 41 U. S. C. §§1501, 8502; 42 U. S. C. §§218, 242c–1, 242k, 280e–11, 280i–2, 281, 282, 283k, 284a, 285c–4, 285d–7, 285m–4, 285q–2, 286a, 290b, 290aa–1, 291k, 294*o*, 294q, 300j–5, 300u–6, 300aa–19, 902, 903, 1395b–6, 1395ee, 1395*oo*, 1396, 1397k–1, 1863, 1864, 1975, 2000e–4, 2286, 2495, 2996c, 3934, 4273, 5841, 7171, 7412(r)(6)(B), 10262, 10703, 12651a; 44 U. S. C. §§301, 3616; 45 U. S. C. §§154, 231f; 47 U. S. C. §154; 48 U. S. C. §§1422, 1424b, 1614, 1821, 2121; 49 U. S. C. §§106, 114, 1111, 1301, 1325, 44946; 50 U. S. C. §§1803, 3041a, 4216; 52 U. S. C. §§20923, 30106; 54 U. S. C. §304101.

22                         TRUMP *v.* COOK

THOMAS, J., dissenting

classification that the Court discovers for the first time to-
day. *Ante,* at 18. And, as far as I am aware, no court ever
before today (including the two courts below) has held that
any federal statute implicitly requires notice and a hearing
when it provides for a term of years limited by removal for
cause. The Court thus "falls well short" of the standard "re-
quired to conclude that Congress incorporated a judicial
definition into a statutory term." *Learning Resources*, 607
U. S., at 252–253, n. 5.[3]

The Court's interpretation is also inconsistent with "con-
gressional practice." *Id.*, at 243 (opinion of ROBERTS, C. J.).
Congress has enacted dozens of statutes that require notice
and a hearing before an officer can be removed. They all do
so "in explicit terms." *Ibid.* These statutes, for instance,
provide that an officer "may be removed by the President
*only upon notice and hearing,*" 5 U. S. C. §7104(b) (empha-
sis added), or that "[a]ny such . . . removal may be made
*only after notice and opportunity for a hearing,*" 17 U. S. C.
§802(i) (emphasis added).[4] A month before the for-cause re-
moval protection was restored to the Federal Reserve Act,

——————

[3] The Court characterizes the one line in *Reagan* and *Shurtleff* as not
dicta, but a holding. *Ante,* at 20. It was dicta. Both cases were decided
on other grounds: *Reagan* upheld a removal because the statute refer-
enced an empty set of statutory protections, 182 U. S., at 425–427, and
*Shurtleff* upheld a removal because the statute did not in "clear and ex-
plicit language" limit the President's power to remove for reasons beyond
the statute, 189 U. S., at 315. The one line that the Court relies on con-
cerned two categories of statutes that were not before the Court in either
case.

[4] Other examples abound. See 5 U. S. C. §7521 (limiting agency's
power to effect "a removal" of an administrative law judge to "good cause
established and determined by the Merits Systems Protection Board on
the record after opportunity for hearing before the Board"); 10 U. S. C.
§942(c) ("Judges [of the Court of Appeals for the Armed Forces] may be
removed from office by the President, upon notice and hearing, for—(1)
neglect of duty; (2) misconduct; or (3) mental or physical disability"); 15
U. S. C. §7217(d)(3) ("The Commission may . . . remove from office . . . a
member of the Board, if the Commission finds, on the record, after notice

THOMAS, J., dissenting

Congress provided that members of the National Labor Relations Board would serve "for a term of five years" unless "removed by the President, *upon notice and hearing*, for neglect of duty or malfeasance in office." Act of July 5, 1935, §3(a), 49 Stat. 451 (emphasis added). Congress also enacted

_____

and opportunity for a hearing, that such member" met certain criteria); 16 U. S. C. §1852(b)(6)(B) ("The Secretary may remove for cause any member . . . found by the Secretary, after notice and an opportunity for a hearing . . . to have committed an act prohibited by section 1857(1)(O) of this title"); 22 U. S. C. §4106(e) ("The Chairperson may remove any other Board member, upon written notice, for corruption, neglect of duty, malfeasance, or demonstrated incapacity to perform his or her functions, established at a hearing, except where the right to a hearing is waived in writing"); §4135(d) ("The Secretary of State may, upon written notice, remove a Board member for corruption, neglect of duty, malfeasance, or demonstrated incapacity to perform his or her functions, established at a hearing (unless the right to a hearing is waived in writing by the Board member)"); 26 U. S. C. §7443(f ) ("Judges of the Tax Court may be removed by the President, after notice and opportunity for public hearing, for inefficiency, neglect of duty, or malfeasance in office, but for no other cause"); 28 U. S. C. §152(e) ("Before any order of removal may be entered, a full specification of charges shall be furnished to such bankruptcy judge who shall be accorded an opportunity to be heard on such charges"); §176(b) ("Before any order of removal may be entered, a full specification of the charges shall be furnished to the judge involved, and such judge shall be accorded an opportunity to be heard on the charges"); §631(i) ("Before any order or removal shall be entered, a full specification of the charges shall be furnished to the magistrate judge, and he shall be accorded by the judge or judges of the removing court, courts, council, or councils an opportunity to be heard on the charges"); 31 U. S. C. §703(e) ("A Comptroller General or Deputy Comptroller General . . . may be removed at any time by . . . joint resolution of Congress, after notice and an opportunity for a hearing, only for" five specified causes); §751(d) ("A member may be removed by a majority of the Board . . . only for inefficiency, neglect of duty, or malfeasance in office. A member subject to removal shall be given notice and an opportunity for a hearing before the Board unless the member waives the opportunity in writing"); 38 U. S. C. §7101(b)(2) ("Any such removal may only be made after notice and opportunity for hearing"); §7253(f )(2) ("Before a judge may be removed from office under this subsection, the judge shall be provided with a full specification of the reasons for the removal and an opportunity to be heard").

THOMAS, J., dissenting

many other statutes, including the Federal Reserve Act, that do not require notice or a hearing.[5]  Congress of course has many reasons not to require notice and a hearing, including that they can cause delay and uncertainty, can waste resources, and can empower the Judiciary at the expense of the political branches.

It is thus difficult to rationalize the Court's interpretation of the Federal Reserve Act in terms of ordinary meaning, the common law, or any statutory precedents.  The more obvious rationale for the Court's interpretation today is not any principle of law, but instead the Court's view of "the Federal Reserve's unique historical status and role." *Ante,* at 13.

c

The Court's interpretation is also inconsistent with Article II and the canon of constitutional avoidance.

Limits on the President's ability to remove executive officers are unconstitutional.  "Under our Constitution," "the 'executive power'—all of it—is 'vested in a President.'" *Seila Law*, 591 U. S., at 203 (plurality opinion).  "To 'discharg[e] the duties of his trust,' the President must have

_____

[5] See 12 U. S. C. §3013(a) ("Any member appointed by the President may be removed for cause by the President"); 14 U. S. C. §309(c)(1) ("An officer may be removed from the position of Director for cause at any time"); 39 U. S. C. §202(a)(1) ("The Governors . . . may be removed only for cause"); §502(a) ("The Commissioners . . . may be removed by the President only for cause"); 48 U. S. C. §1424b ("[A] judge for the District Court of Guam . . . shall hold office for the term of ten years . . . unless sooner removed by the President for cause"); §1614(a) ("[T]wo judges for the District Court of the Virgin Islands . . . shall hold office for terms of ten years . . . unless sooner removed by the President for cause"); §1821(b)(1) ("[A] judge for the District Court for the Northern Mariana Islands . . . shall hold office for the term of ten years . . . unless sooner removed by the President for cause"); §2121(e)(5)(B) ("The President may remove any member of the Oversight Board only for cause"); 49 U. S. C. §49106(c)(6)(C) ("A member appointed by the President may be removed by the President for cause").

THOMAS, J., dissenting

the assistance of officers he can trust." *Slaughter*, 609 U. S., at ___–___ (slip op., at 36). Thus, we explained in an opinion also released today, "the President may remove his subordinates at will," without cause, without notice, and without a hearing, so long as they exercise any executive power. *Id.*, at ___ (slip op., at 13). Any statute that limits "[t]he President's power to remove—and thus supervise— those who wield executive power on his behalf" is unconstitutional. *Seila Law*, 591 U. S., at 204 (plurality opinion). This principle admits no exceptions: "The Constitution places all Executive power in the hands of the President." *Slaughter*, 609 U. S., at ___ (slip op., at 10) (internal quotation marks omitted). "He and he alone is vested with '[t]he executive Power' of the United States." *Id.*, at ___ (slip op., at 36). "Subordinates who exercise the President's power are subject to removal by him." *Ibid.* In recent decades, this Court has without fail held restrictions on the President's power of removal to be unconstitutional. See *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477 (2010); *Seila Law*, 591 U. S. 197; *Collins*, 594 U. S. 220; *Slaughter*, 609 U. S., at ___ (slip op., at 25). The Court has not upheld a removal restriction for a principal officer, like Cook, for nearly seven decades. See *Wiener* v. *United States*, 357 U. S. 349, 356 (1958) (relying on the "philosophy of *Humphrey's Executor*"); but see *Slaughter*, 609 U. S., at ___ (slip op., at 21) (overruling *Humphrey's Executor*).

The Board "unquestionably exercises executive power, and must therefore be controlled by the Chief Executive, in whom such power is vested." *Slaughter*, 609 U. S., at ___ (slip op., at 27). The Board "has the power to promulgate substantive rules that carry the force of law." *Id.*, at ___ (slip op., at 25); see *supra*, at 6–7. Cook can use her regulatory power, for example, to change the fees on consumer debit-card transactions. *Corner Post*, 603 U. S., at 805. The Board also has the power to impose monetary penalties,

26                    TRUMP *v.* COOK

THOMAS, J., dissenting

levy assessments, and examine private books and records.
See *supra*, at 6–7; *Seila Law,* 591 U. S., at 206–207, 219
(plurality opinion).  Since Cook was restored to her position,
the Board has issued many orders banning private individ-
uals from banking, punishable with civil and criminal pen-
alties.  See Board of Governors of the Federal Reserve, En-
forcement Actions (July 28, 2023), www.federalreserve.gov/
supervisionreg/enforcementactions.htm          (archived      at
perma.cc/UVQ4-99ZR); *Slaughter*, 609 U. S., at ___ (slip
op., at 22) ("When an agency 'executes' a congressional
mandate against private parties, it exercises executive
power").  The President, therefore, may remove Cook for
any reason that he wants and by any procedure that he
wants.

The President invoked the canon of constitutional avoid-
ance in asking this Court to not interpret the Federal Re-
serve Act to require notice and a hearing.  See Application
26–27; Reply Brief 8.  Under the canon of constitutional
avoidance, this Court does "not read the statute in a way"
that renders it "unconstitutional if we can reasonably read
it otherwise."  *Kennedy* v. *Braidwood Management, Inc.*,
606 U. S. 748, 775 (2025).  So, "where a statute is suscepti-
ble of two constructions, by one of which grave and doubtful
constitutional questions arise and by the other of which
such questions are avoided, our duty is to adopt the latter."
*United States ex rel. Attorney General* v. *Delaware & Hud-
son Co.*, 213 U. S. 366, 408 (1909).  Thus, if the Court's in-
terpretation of the Federal Reserve Act would render it un-
constitutional,    then    the    Court    must    avoid    that
interpretation so long as another interpretation is "fairly
possible."  *United States* v. *Hansen*, 599 U. S. 762, 781
(2023) (internal quotation marks omitted).

The Court today upholds the constitutionality of a limita-
tion on the President's ability to remove a principal execu-
tive officer for only the third time in American history.  Its
constitutional reasoning consists of two paragraphs.  The

THOMAS, J., dissenting

Court does not dispute that members of the Federal Reserve Board exercise (a great deal of) federal executive power. It does not dispute that any person who exercises federal executive power must be freely removable by the President. And it does not dispute that its holding today contravenes those principles by preventing the President from freely removing members of the Federal Reserve Board. Instead, the Court endorses a contradiction: "the Constitution vests the whole executive power in the President alone," *Slaughter*, 609 U. S., at ___ (slip op., at 21) (internal quotation marks omitted), but the Board can exercise executive power "independen[t] from Presidential control," *ante,* at 22.

The Court's constitutional reasoning depends entirely on an ahistorical analogy between the Board and the First and Second Banks of the United States. See *ante,* at 22–23. The problem for the Court is that the First and Second Banks were banks with no executive power, whereas the Board is unquestionably a federal agency that wields considerable executive power. See *supra*, at 3–9. The Board does not follow in "our Nation's tradition of central banking" at all. *Ante,* at 9; see *supra,* at 3–6. It is not a "bank," *ante,* at 23, but a novel "federal agency" with "broad powers affecting the entire banking and currency system," Cushman 153; see *supra*, at 4–5. The "'founders of our Government,'" *ante,* at 22, thought that distinction was significant. Although the Court attempts to imply otherwise, *ibid.*, it does not deny that the First and Second Banks of the United States exercised no executive power.

B

The President is also likely to succeed on an independent ground: The injunction against Cook's removal exceeds the limits on federal judicial authority. "Observing the limits on judicial authority . . . is required by a judge's oath to follow the law." *Trump* v. *CASA, Inc.*, 606 U. S. 831, 858

28                          TRUMP *v.* COOK

THOMAS, J., dissenting

(2025).  The Court's holding that Cook was entitled to an injunction based on the Federal Reserve Act contradicts some of its foundational precedents on the authority of the federal courts.  The Court today holds that a plaintiff may sue to enforce federal law without a congressionally-created right of action, contra, *Alexander* v. *Sandoval*, 532 U. S. 275, 286 (2001); against the sovereign without its consent, contra, *Larson* v. *Domestic and Foreign Commerce Corp.*, 337 U. S. 682, 693 (1949); for equitable relief restoring a removed officer, contra, *In re Sawyer*, 124 U. S. 200, 210 (1888); and in a manner that intrudes upon the President's exclusive and preclusive constitutional authority, contra, *Trump* v. *United States*, 603 U. S. 593, 609 (2024).

Cook lacks a right of action to enforce the terms of the Federal Reserve Act against government officials.  No plaintiff, of course, can sue without a right of action.  See *Sandoval*, 532 U. S., at 286.  When seeking to enforce the terms of a federal statute, such as the Federal Reserve Act, that plaintiff's right of action must come from Congress, because "Congress determines who may sue to enforce federal law."  *FS Credit* v. *Saba*, 608 U. S. \_\_\_, \_\_\_ (2026) (slip op., at 3).  When seeking to enforce the terms of a federal statute against the Government, which is otherwise immune from suit, the plaintiff must also demonstrate that the Government clearly consented to the suit.  See *Larson*, 337 U. S., at 693.

The Court does not explain how Cook has overcome these limits to enforce the Federal Reserve Act against the Executive Branch here.  All agree that Cook cannot proceed under the Administrative Procedure Act, the ordinary right of action for lawsuits against the Executive Branch, because she does not challenge any final agency action.  See 5 U. S. C. §704.  The Court does not accept Cook's argument that she has a nonstatutory ultra vires claim—likely because such an argument would implicate threshold requirements that Cook cannot satisfy and merits standards that

THOMAS, J., dissenting

she cannot meet. See *NRC*, 605 U. S., at 681 ("'Hail Mary pass'"). The Court does not suggest that Cook satisfies the extraordinary standards for mandamus relief. See *United States* v. *Duell*, 172 U. S. 576, 582 (1899) ("clear and indisputable"). Instead, the Court proceeds to the merits without identifying a right of action to enforce the Federal Reserve Act at all, let alone one that overcomes sovereign immunity. The Court appears satisfied that Congress did not expressly "exempt the President's removal of Governors for cause from judicial review." *Ante,* at 10. "But federal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with the authority Congress has given them." *CASA*, 606 U. S., at 861.[6]

---

[6] In a footnote, the Court hypothesizes that Cook can enforce the terms of the Federal Reserve Act in "'equity.'" *Ante*, at 16, n. 2. But federal statutory terms do not by their own force create a right to bring freestanding claims in equity. Instead, "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander* v. *Sandoval*, 532 U. S. 275, 286 (2001).

To bring a pre-enforcement equitable claim of the sort that the Court describes, Cook would have to show that her suit seeks to stop an official from committing "tortious conduct" against her, such as an imminent unconstitutional enforcement action. *Trump* v. *CASA, Inc*., 606 U. S. 831, 846, n. 9 (2025). Cook made no such showing here, and the Court does not suggest otherwise.

Likewise, when a plaintiff brings a claim in equity against *federal* officials, this Court requires the plaintiff to make four additional showings that Cook cannot satisfy here: The plaintiff must demonstrate that the defendant "has taken action entirely in excess of its delegated powers," that the defendant's action is "contrary to a specific prohibition in a statute," that no "statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review," and that no "statutory review scheme forecloses all other forms of judicial review." *NRC* v. *Texas*, 605 U. S. 665, 681 (2025) (internal quotation marks omitted; emphasis deleted). The Court has described such an equitable claim as a "Hail Mary pass" that "rarely succeeds." *Id*., at 681–682 (internal quotation marks omitted). The Court also waives these requirements for Cook.

30                    TRUMP *v.* COOK

Even if Cook had a right of action that overcame sovereign immunity, this Court's precedents would foreclose the preliminary injunction that she obtained here. The District Court issued a preliminary injunction, which is an equitable remedy. See *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 318–319 (1999). The equitable jurisdiction of the federal courts is limited to "only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *CASA*, 606 U. S., at 841 (internal quotation marks omitted). Traditionally, courts of equity could not grant injunctions to wrongly removed officers to restore them to office. "No principle of the law of injunctions, and perhaps no doctrine of equity jurisprudence is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment of public officers or their title to office." 2 J. High, Law of Injunctions §1312, p. 863 (2d ed. 1880).

This Court has therefore long held, in categorical terms, that "a court of equity" "has no jurisdiction" over "the removal of public officers." *In re Sawyer*, 124 U. S., at 210. "'[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal.'" *White* v. *Berry*, 171 U. S. 366, 377 (1898); accord, *Harkrader* v. *Wadley*, 172 U. S. 148, 165 (1898) ("The general rule, both in England and in this country, is that courts of equity have no jurisdiction . . . over the appointment and removal of public officers"). Under this Court's precedents, the District Court therefore lacked authority to enter the relief it provided: a "preliminary injunction" allowing Cook to exercise official powers after the President removed her. 804 F. Supp. 3d, at 44.

The Court now reads the categorical statements in our precedents to apply to only "fina[l]" injunctive relief, not "interim" injunctive relief. *Ante,* at 16. The Court's newfound

THOMAS, J., dissenting

distinction does not make sense. "The standard for a preliminary injunction is essentially the same as for a permanent injunction." *Amoco Production Co.* v. *Gambell*, 480 U. S. 531, 546, n. 12 (1987); accord, *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 32 (2008). Interim injunctive relief is still an exercise of "jurisdiction" in "equity," so it does not reach "the removal of public officers." *In re Sawyer*, 124 U. S., at 210. The Court's distinction is also foreclosed by our own precedent, which holds that "the authority to issue *interim* injunctive relief . . . was held lacking in cases such as *White* v. *Berry*." *Sampson* v. *Murray*, 415 U. S. 61, 72 (1974) (emphasis added). *White* and *Sawyer* govern "all equitable relief." 415 U. S., at 83. The Court is therefore incorrect that "[n]either case holds that equity is unavailable in the interim." *Ante,* at 16.

Finally, even if she had a right of action, a waiver of sovereign immunity, and a basis for equitable relief, Cook would not be entitled to prevail because she challenges the removal of an executive officer by the President. Just two Terms ago, this Court said that both Congress and the Judiciary lack the power to impede the President's removal of his own executive officers. The President's "'power to remove—and thus supervise—those who wield executive power'" is within his "'conclusive and preclusive'" constitutional authority, no different from his power to issue pardons or Congress's power to impeach. *Trump*, 603 U. S., at 608–609; see also *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 638, and n. 4 (1952) (Jackson, J., concurring) (describing the President's "exclusive power of removal in executive agencies" as "conclusive and preclusive"). Even "Congress cannot act on" the "President's actions on subjects within his 'conclusive and preclusive' constitutional authority," including his removal decisions. *Trump*, 603 U. S., at 609. Likewise, "courts cannot examine" removal decisions falling within that same authority. *Ibid.* Thus, "once it is determined that the President acted within the

32                    TRUMP *v.* COOK

scope of his exclusive authority," as he did here, "his discretion in exercising such authority cannot be subject to further judicial examination." *Id.*, at 608.

Today's decision is an unprecedented incursion on the Executive Branch. Neither the parties nor the Court can point to a single time in American history that this Court has upheld an injunction against the President's removal of an executive officer. In the 237-year history of our Constitution, this Court has, by all accounts, never done so. See *Bessent* v. *Dellinger*, 604 U. S. ___, ___ (2025) (GORSUCH, J., dissenting from order holding application in abeyance) (slip op., at 4) (recounting the lack of historical precedent for such an order).

III

Finally, the balance of harms and equities also favors the President. "[T]he Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Trump* v. *Wilcox*, 605 U. S. ___, ___ (2025) (slip op., at 1). The equities in this case are relevantly similar to the equities in every removal case in which the Court has granted a stay. See *ibid.*; *Trump* v. *Boyle*, 606 U. S. ___, ___ (2025) (slip op., at 1); *Trump* v. *Slaughter*, 606 U. S. ___ (2025). The Government also suffers irreparable harm from all "injunctions that likely exceed the authority" of the federal courts. *CASA*, 606 U. S., at 860.

The Court offers many policy arguments for an "independent" Federal Reserve Board. *Ante,* at 5; accord, *ante*, at 23; *ante,* at 2 (KAVANAUGH, J., concurring) (explaining that the "Federal Reserve's independence" prevents "political upheaval" and "turmoil in the U. S. and world economies" and promotes the "efficacy of U. S. monetary policy"). As the Court tells it, the Board of Governors of the Federal Reserve System has for the past century served to provide

THOMAS, J., dissenting

the American people with "'stable prices,'" "'maximum employment,'" no "ruinous financial panics," and a banking system free from "'suspicion.'" *Ante,* at 3, 5, 14. The Court credits this century of supposed success to the Board's "independence" from the President, and, in turn, the voters— the "'common people'" who play the antagonist in the Court's account of the 19th century. *Ante,* at 4.

Many do not share the Court's rosy appraisal of the past century. But if the Court prefers an independent Federal Reserve Board, then its issue is not with the President but with the Constitution. Regardless of whether unaccountable executive officers like Cook would better govern the economy, the Framers rejected such a "promised land of technocratic governance." *Slaughter*, 609 U. S., at ___ (slip op., at 24); see A. de Tocqueville, Democracy in America 86– 88, 233–235 (H. Mansfield & D. Winthrop transl. 2000). They instead chose government by the people. As a court, our duty is not to second-guess that decision, but to uphold it.

I respectfully dissent from the denial of the stay application.

Cite as: 609 U. S. \_\_\_\_ (2026)                    1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 25A312

———————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, APPLICANT *v.* LISA D. COOK, MEMBER OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, ET AL.

ON APPLICATION FOR STAY

[June 29, 2026]

JUSTICE ALITO, with whom JUSTICE GORSUCH joins, dissenting.

This case presents many thorny legal questions. What is the substance of the "for cause" removal standard as applied to Federal Reserve Governors? 12 U. S. C. §242. Do Governors have an implied right of action to enforce that removal protection? See *Alexander* v. *Sandoval*, 532 U. S. 275, 286–287 (2001). What degree of judicial review, if any, applies to the President's determination that cause exists? See *Reagan* v. *United States*, 182 U. S. 419, 425 (1901). What showing of "irreparable injury," if any, can entitle a removed executive officer to an interim reinstatement order? See *Sampson* v. *Murray*, 415 U. S. 61, 84, 92, n. 68 (1974). Does the President's social-media post purporting to remove Governor Cook give her standing to seek an injunction against parties who never attempted to effectuate her removal? See *Whole Woman's Health* v. *Jackson*, 595 U. S. 30, 48 (2021). May courts, consistent with Articles II and III of the Constitution, countermand the President's attempted removal of a principal executive officer? See *Trump* v. *United States*, 603 U. S. 593, 608–609 (2024). Can the President appeal an injunction that no enjoined party challenges?

2                                    TRUMP *v.* COOK

ALITO, J., dissenting

Some of these questions present issues of first impression, and many of them lack obvious answers. More important, the lower courts in this case have passed on very few of these issues and have done so in a preliminary and rushed fashion. We often say that "we are a court of review, not of first view," *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005), but the Court has strayed far from that oft-repeated maxim here.

What is before us is simply an application for a stay pending appeal, and the Court should have granted or denied that application in a brief order last fall. The nascency of this lawsuit and the novelty of the issues that it presents militated against holding oral argument and issuing a comprehensive opinion at this juncture. Rather than resolving several challenging and underdeveloped issues at this early stage of the litigation, I would decide this application solely on the two issues that the District Court addressed. And because the District Court resolved those issues incorrectly, I respectfully dissent from the Court's denial of a stay.

I

A summary of this case's history illustrates the imprudence of how the Court has handled this application. The President purported to remove Governor Cook from office on August 25, and on August 28, she filed suit against the President, the Board of Governors of the Federal Reserve, and its chairman, Jerome Powell.

After 12 days, one round of temporary-restraining-order briefing, and a single hearing, the District Court issued a preliminary injunction that barred Powell and the Board of Governors from effectuating the President's attempted removal of Cook. The court rested its order on two grounds: The President's allegations were not "cause" to remove Cook because they pertained to "conduct before she began serving on the Federal Reserve Board," 804 F. Supp. 3d 14, 32–33 (DC 2025), and the President violated the Due

ALITO, J., dissenting

Process Clause by failing to provide Cook sufficient pretermination process, *id.*, at 33–39. The President appealed and moved to stay the injunction in the Court of Appeals for the D. C. Circuit. Four days later, that court denied the motion, relying only on Cook's due process claim. Order in No. 25–5326 (Sept. 15, 2025), App. 1a–7a (Garcia, J., joined by Childs, J., concurring) (Order). The President then applied for a stay from this Court.

When that application arrived here, this litigation was just 21 days old. There had been only two rounds of abbreviated briefing below and no meaningful development of a factual record. Indeed, the record does not even contain copies of Cook's allegedly fraudulent mortgage applications.

Of course, parties may appropriately seek (and courts may appropriately grant) stays early in a litigation. No court, including this Court, should sit on its hands when interim relief is appropriate. But this does not mean that the Court must reach out to opine on each issue that could conceivably arise in a case's future. Here, the incipiency of this case and the complexity of the issues that it presents counseled in favor of a light touch by this Court, regardless of whether we granted or denied the application. To that end, the Court should have resolved the President's application shortly after we received it. And in doing so, we should have focused on the few issues that the courts addressed below. If a majority had desired, we could have issued a statement explaining our decision. That is exactly how we have handled nearly all our stay applications in recent years.

Had we adhered to this well-worn path and decided this application in October, the parties could have continued litigating this case in the lower courts. See, *e.g.*, *Doe* v. *Mills*, No. 21A83 (Oct. 19, 2021) (Breyer, J., in chambers) (denying stay without prejudice to reapply after the lower court issues a final decision). By now, the District Court might well have granted summary judgment for one of the parties,

4                TRUMP *v.* COOK

ALITO, J., dissenting

providing a fuller exposition of the relevant facts and legal issues.  Or perhaps the D. C. Circuit would have resolved an expedited appeal.  Although the panel performed admirably given the four days that it had to decide the President's stay motion, nobody can doubt that the panel would have produced more comprehensive opinions if it had even a fraction of the 280-plus days that this Court has spent with the case.  Either way, this Court could have reentered the fray when we inevitably granted certiorari.

Instead, the Court departed from its normal practice and "deferred" ruling on this application, bringing proceedings in the lower courts to a 9-month standstill.  606 U. S. 1062 (2025).  We then ordered the parties to submit more briefing than they had filed at any other point in this litigation.  In January, we held oral argument, marking just the second in-court proceeding in this entire suit.  The Court now issues a full-length opinion that purports to resolve many complicated and novel legal questions on an underdeveloped record while ignoring lurking jurisdictional issues.  "Either out of humility or out of self-respect (one or the other), the Court should decline to answer" these "incredibly difficult" questions in this case's current posture.  *PGA TOUR, Inc.* v. *Martin*, 532 U. S. 661, 700 (2001) (Scalia, J., dissenting).

II

I would grant the application because, within the narrow confines of this case's posture, the President has satisfied the traditional stay factors.

Consider first the President's likelihood of success on the merits.  If the Court were to grant certiorari at this stage of the litigation, we would normally limit our consideration to the specific issues on which the courts below passed.  See *F. Hoffmann-La Roche Ltd* v. *Empagran S. A.*, 542 U. S. 155, 175 (2004).  Those issues are (1) whether removal "for cause" is limited to removal for in-office conduct, and

ALITO, J., dissenting

(2) whether the President's attempt to remove Cook violated the Due Process Clause.

On those two issues, the courts below were incorrect. As the majority and JUSTICE THOMAS apparently agree, the District Court erred in holding that removal "for cause" means removal only for "events that have occurred while [the officer is] in office." 804 F. Supp. 3d, at 30; see *ante,* at 11–15; *ante,* at 14–16 (dissenting opinion). And as JUSTICE THOMAS and Judge Katsas have explained, Cook lacks a private property interest in her seat on the Board of Governors. See *ante*, at 14; Order 16a–19a (Katsas, J., dissenting). Thus, the President's attempt to remove her could not have violated the Due Process Clause. See *American Mfrs. Mut. Ins. Co.* v. *Sullivan*, 526 U. S. 40, 59 (1999) ("Only after finding the deprivation of a protected interest do we look to see if the [defendant's] procedures comport with due process").

Because the courts below resolved these two issues incorrectly, I would conclude that the President has shown a likelihood that we would reverse at this preliminary stage, leaving all other issues to be developed on remand in the first instance.* As to the remaining stay factors, this Court has held that they are satisfied when a lower court countermands the President's removal of a principal executive

————————

*The Court claims that this disposition would have left "the public in limbo" and "sow[n] doubt as to the status of one of our Nation's (and the world's) most important financial institutions." *Ante*, at 24. See also *ante*, at 2–3 (KAVANAUGH, J., concurring). But granting a stay on the ground set out above would have had no such effect. It would have simply returned the case to the courts below so that the ligation could continue in the normal course. That disposition would not have signaled any view on the question whether the Constitution permits Congress to restrict a President's authority to remove a member of the Federal Reserve's Board of Governors. That question is indeed important and sensitive, but it is not before us in this case because the Government does not challenge the constitutionality of the statutory restriction on the President's power to remove Governor Cook.

6                              TRUMP *v.* COOK

ALITO, J., dissenting

officer.  See *Trump* v. *Wilcox*, 605 U. S. ___, ___ (2025) (slip
op., at 1–2).  A stay is therefore warranted here.

*        *        *

I respectfully dissent.

Cite as: 609 U. S. ____ (2026)    1

BARRETT, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

No. 25A312

————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, APPLICANT *v.* LISA D. COOK, MEMBER OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, ET AL.

ON APPLICATION FOR STAY

[June 29, 2026]

JUSTICE BARRETT, dissenting.

The Court chooses to answer a series of difficult merits questions, most of which were not addressed by the D. C. Circuit below or almost any other court before today. See *ante*, at 1 (ALITO, J., dissenting). What kind of "cause" must the President assert before he can remove Lisa Cook from the Board of Governors of the Federal Reserve? Does the statute require that he afford her process? If so, what kind? Can she challenge her removal by asserting an ultra vires claim? May a court issue a preliminary injunction to keep her in office during the litigation? And then, the biggest issue: Is the removal restriction in the Federal Reserve Act constitutional?

All these questions are complicated and important, but the last is in a league of its own. And unlike the other issues, the constitutional status of the Federal Reserve is entirely outside the scope of this case. The Government expressly waived any constitutional challenge to the removal restriction, so the parties did not brief it. Application 2, n. 1 ("This application does not contest the constitutionality of the Federal Reserve Board's for-cause removal provision"); see also Reply Brief 13; Supp. Brief for Applicant 1. And the lower courts approached this case from the start on the assumption that the removal restriction is consistent with

2                          TRUMP *v.* COOK

Article II.  We ordinarily do not jump ahead of the lower courts to decide waived issues.  See *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005); cf. *Trump* v. *Illinois*, 607 U. S. ___ (2025) (reaching an issue of statutory interpretation decided by the District Court and addressed by the parties in supplemental briefing).  Nonetheless, the Court raises and settles the constitutional issue—and does so based on a conclusory analogy to the First and Second Banks of the United States.  *Ante*, at 22–23.

Even assuming that the Court is right on the merits, the issue warrants much more than a few paragraphs.  As JUSTICE THOMAS points out, the differences between the Federal Reserve and our early national banks are more significant than the majority lets on.  *Ante*, at 3–6, 27 (dissenting opinion); see also A. Bamzai & A. Nielson, Article II and the Federal Reserve, 109 Cornell L. Rev. 843, 905–908 (2024); L. Menand, The Unitary Executive and the Federal Reserve, 94 Ford. L. Rev. 2089, 2119–2121 (2026).  And the Court's holding is in serious tension with *Trump* v. *Slaughter*, which we also decide today.  ___ U. S. ___ (2026).  *Slaughter* announces a categorical rule: Whenever "an agency 'executes' a congressional mandate against private parties, it exercises executive power" and must be subject to plenary executive control—"no ifs, ands, or quasis about it."  *Id.*, at ___ (slip op., at 22).  Yet here, the Court claims a special exception "'sanctioned by history'" and based on the Federal Reserve's role in setting monetary policy.  *Ante*, at 24.  How can history support both a categorical rule and a carveout?  See *Slaughter*, ___ U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 46).  Do all the Federal Reserve's existing regulatory powers have the requisite connection to monetary policy?  If not, are they grandfathered in?  Cf. *ante*, at 23, n. 6 (opinion of the Court) ("In upholding the constitutionality of the Federal Reserve as currently structured and with its existing enforcement authorities, we do not suggest that Congress could assign the Federal Reserve

BARRETT, J., dissenting

*additional* regulatory powers that are attenuated from monetary policy" (emphasis added)). And is the Federal Reserve unique, or might history sanction other exceptions too? The Court does not say.

For present purposes, though, the most significant problem is that the Court decides this issue at all—not to mention the many others covered in its opinion. While a modest approach would have been appropriate, the Court chooses to go big. Its opinion sets precedent on a series of important issues, with implications that extend well beyond this case.

I agree with JUSTICE ALITO that the Court should have limited itself to the issues supporting the District Court's injunction. *Ante*, at 4–5 (dissenting opinion). Addressing these errors would have permitted the litigation to proceed, and the lower courts could have taken first cut at the many other difficult and novel legal issues. Had the Court declined to go further, it may never have needed to reach those other issues anyway. For instance, if the President ultimately satisfied the Federal Reserve Act, 12 U. S. C. §242, the Court may never have needed to address whether Cook could assert an ultra vires claim.

Putting aside my difficulties with the opinion's scope, there is a disconnect between its holding and its disposition line. The Court does not rule out mortgage fraud as sufficient cause for removal under §242; instead, it denies a stay on the "narrow groun[d]" that the President has not yet provided Cook enough process. *Ante*, at 17. The President remains free to "tr[y] again," the Court says, so long as he gives Cook proper notice and an opportunity to respond. *Ante*, at 25–26, and n. 8.

But if the Court wanted to leave the President in that position, it should not have denied the stay. Recall that the District Court held that Cook's alleged mortgage fraud, as pre-office conduct, does not constitute cause for removal under §242. 804 F. Supp. 3d 14, 30 (DC 2025) ("[T]he Court finds that permissible cause for removal of a Federal

4                          TRUMP *v.* COOK

Reserve Governor extends only to concerns about the Board member's ability to effectively and faithfully execute their statutory duties, in light of events that have occurred while they are in office"). So it entered a preliminary injunction barring defendants Jerome Powell and the Board of Governors "from effectuating in any manner Plaintiff's removal from her position as a member of the Board of Governors *on the basis of the grounds stated in the President's letter of August 25, 2025.*" App. to Application 23a (emphasis added). The President's letter clearly stated those "grounds": "[T]here is sufficient reason to believe you may have made false statements on one or more mortgage agreements." See Attachment to Complaint in No. 1:25–cv–02903 (D DC), ECF Doc. 1–3, p. 2. As it stands, then, the President has no way to remove Cook for her alleged mortgage fraud. That is true even if he gives Cook a full-blown judicial trial (process far exceeding what the Court requires, *ante*, at 18–19), and satisfies the Court's "substantial threshold for 'cause'" (by demonstrating that the mortgage fraud truly implies an unfitness for the office, *ante*, at 14).

To get around this problem, the Court adopts an implausibly narrow reading of the injunction: It interprets the injunction "to forbid the implementation of 'the President's letter of August 25' in which he purported to fire Cook—but not to forbid the President from trying again, if he chooses to do so." *Ante*, at 26, n. 8. In other words, the injunction stops the President from "firing her by that letter," not "firing her for mortgage fraud." But that is simply not what the injunction says. It forbids Cook's removal based on "the grounds" stated in the President's August 25th letter—*i.e.*, mortgage fraud. And the D. C. Circuit's order denying the stay left that broad injunction in place—as does the Court's.

We have repeatedly found that the President suffers irreparable harm when he is barred from firing a subordinate. See *Trump* v. *Wilcox*, 605 U. S. ___, ___ (2025) (slip

BARRETT, J., dissenting

op., at 1); *Trump* v. *Boyle*, 606 U. S. ___, ___ (2025) (slip op., at 1). In my view, that harm is somewhat lessened here because the Government has conceded for purposes of this litigation that the President cannot remove Cook or any other member of the Board of Governors for policy reasons. See Application 26. Still, the District Court's order blocks the President from removing Cook for mortgage fraud, and that is so even if he satisfies the requirements that the Court's opinion sets out. Under our precedent, that significant interference with the President's removal authority clears the "irreparable harm" threshold.

For these reasons, I respectfully dissent from the denial of the stay application.